**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF GEORGIA**

----------------------------

Jeffrey Cordtz,                    Case No. 1:21-cv-02003-MHC-LTW

Plaintiff

                 Versus

Johnson Legal Offices, LLC;
FCI Lender Services, Inc.;
And Larry W. Johnson

Defendants

-----------------------------

**<u>Response in Opposition to Johnson Legal Offices, LLC ("JLO") and Larry W.</u>**

**<u>Johnson's ("LWJ") (collectively the "Johnson Defendants") Motion for</u>**

**<u>Summary Judgment</u>**

## Introduction

Cordtz no longer seeks to hold the Johnson Defendants liable for FDCPA violations arising from the 2012 settlement letter. Rather, Cordtz alleges the following FDCPA violations:

1-The Defendants bypassed Cordtz's attorney and sought to collect directly from him when the FDCPA requires communication to be with a consumer's attorney.

2-The Johnson Defendants' April 2021 letter directly to Cordtz claimed that he owed $327,000+ which is $40,000 more than: a) the FCI Defendants claimed was owed in monthly statements sent directly to Cordtz both before and after that date; b) the Johnson Defendants themselves claim was owed in a February 2021 Gwinnett County counterclaim; c) the Johnson Defendants themselves claimed was owed in the January 2021 Fulton County lawsuit; d) James Maffucio claimed was owed in an affidavit.

3-The January 2021 Fulton County lawsuit on behalf of "Aspen Properties Group, LLC, as Trustee of the APG Holdings Revocable Trust" when there is no dispute that it did not own the debt and did not have authority to collect from Plaintiff. (FCI is vicariously liable for this FDCPA violation).

## JLO and LWJ's Motion for Summary Judgment has Been rendered Moot by the filing of the Second Amended Complaint

On September 15, 2021, Plaintiff filed a motion to file the second amended complaint. On November 23, 2021, the Court entered a R&R recommending that the motion to file the second Amended Complaint be granted. The Johnson Defendants filed a motion for summary judgment on November 29, 2021 (the same day as this Court held a discovery hearing and 2 days *before* this Court entered a discovery Order). On December 13, 2021, this Court entered an Order adopting the R&R's recommendation and granted the motion to file the Second Amended Complaint; the Second Amended Complaint was filed that same day. It follows that the Johnson Defendants summary judgment was filed against the Amended Complaint. And before the Second Amended Complaint had been filed. Because the Second Amended Complaint superseded the Amended Complaint, LWJ and JLO's motion for summary judgment should be rendered moot. See *Malowney v. Fed. Collection Deposit Grp*., 193 F.3d 1342, 1345 n.1 (11th Cir. 1999) (noting that "[a]n amended complaint supersedes a previously filed complaint"); *Cordell v. Pacific Indem*., No. 4:05CV167-RLV, 2006 WL 1935644, at *4 (N.D. Ga. July 11, 2006) (finding that, "[b]y granting the plaintiff's third motion for leave to amend his Complaint, the defendants' motion for partial summary judgment ... which was filed prior to the filing of the Second Amended Complaint is rendered moot"); *Meterlogic, Inc. v. Copier Solutions, Inc*., 185 F.Supp.2d 1292, 1297 (S.D. Fla. 2002) (observing that the plaintiff's filing of an amended complaint "rendered moot

the parties' previous pleadings and the defendants' summary judgment and Daubert motions")

## JLO and LWJ's Motion for Summary Judgment Should be Disregarded for failing to follow this Court's "Guidelines for Motion Practice" [Doc. 39, Pg. 4 of 12] concerning "Citations to Facts in Briefs"

This Court's Guidelines for Motion Practice (Doc. 39, Page 4) Ordered the parties to cite directly to evidence supporting their factual positions in the briefs and citations should not be made to a statement of material facts or response thereto citing *Dickson v. Amoco Performance Prods., Inc*., 845 F. Supp. 1565, 1570 (N.D. Ga. 1994) ("[i]t should be the party's responsibility to direct the Court's attention separately to each portion of the record which supports each of the party's distinct arguments"). JLO and LWJ violated these guidelines by failing to cite in their brief directly to any evidence just as it had violated the guidelines for raising a discovery dispute by filing a motion before conferring. This alone is enough to disregard the motion for summary judgment. See *Aldridge v. Travelers Home & Marine Ins. Co.*, No. 1:16-CV-01247-SCJ, 2019 WL 8439150, at *2 (N.D. Ga. Feb. 21, 2019) ("the Court exercises its discretion to decline to incorporate by reference the "Statement of the Facts" and "Argument and Citation and Authority" sections from Defendant's previous motion for partial summary judgment because it violates Local Rule 7.1(D).")

## FCI and the Johnson Defendants are in default

FCI and the Johnson Defendants did not answer the Second Amended Complaint within the 14 days allotted by FRCP 15(a)(3). Rather they answered the Second Amended Complaint one day late. The Defendants did not obtain consent to file late either from Cordtz or from the Court. The Answer to the Second Amended Complaint is therefore improper and should be stricken.

## Debt Collection in General

In the words of one law dictionary: "To collect a debt or claim is to obtain payment or liquidation of it, either by personal solicitation or legal proceedings." Black's Law Dictionary 263 (6th ed.1990). The Supreme Court relied on this passage when it declared the following in a case concerning the Act's definition of "debt collector": "In ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts." *Heintz v. Jenkins*, 514 U.S. 291, 294, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995).

Plaintiff borrowed from IndyMac Bank by means of a Home Equity Line of Credit ("HELOC"). The resulting debt was backed up by a "mortgage"—a security interest in the property designed to protect the creditor's investment. *Obduskey v. McCarthy & Holthus LLP*, —— U.S. ——, 139 S. Ct. 1029, 1034, 203 L.Ed.2d 390

(2019). The HELOC required Plaintiff to make monthly payments. And if Plaintiff defaulted, the mortgage entitled IndyMac Bank to pursue foreclosure, which is "the process in which property securing a mortgage is sold to pay off the loan balance due." Ibid. Foreclosure is "the process in which property securing a mortgage is sold to pay off the loan balance due." Ibid. at 1036. In other words, foreclosure is a means of collecting a debt. Ibid. "And a business pursuing nonjudicial foreclosures would, under the capacious language of the Act's primary definition, be one that "regularly collects or attempts to collect, directly or indirectly, debts." § 1692a(6)". Ibid.

"[E]very mortgage foreclosure, judicial or otherwise, is undertaken for the very purpose of obtaining payment on the underlying debt, either by persuasion (i.e., forcing a settlement) or compulsion (i.e., obtaining a judgment of foreclosure, selling the home at auction, and applying the proceeds from the sale to pay down the outstanding debt)." *Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 460–65 (6th Cir. 2013). Simply put, an action seeking to collect a debt relating to the enforcement of a security interest remains "an attempt to collect a debt". See *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1216–18 (11th Cir. 2012) (concluding that letters threatening foreclosure are not exempt from the FDCPA because "communication related to debt collection does not become

unrelated to debt collection simply because it also relates to the enforcement of a security interest").

FDCPA liability is defined not in terms of whether the relief sought is money or property, but in terms of whether the debt collector's communication with the consumer is in connection with that consumer's obligation to pay money. *Obduskey* at 1036. Moreover, the provision discussing the definition of regularly collecting debts "sweeps in both "direc[t]" and "indirec[t]" debt collection." Ibid. "So, even if nonjudicial foreclosure were not a direct attempt to collect a debt, because it aims to collect on a consumer's obligation by way of enforcing a security interest, it would be an indirect attempt to collect a debt." *Ibid*. at 1037.

Georgia law permits non-judicial or power of sale foreclosure, under which a creditor recovers on a debt through foreclosing on the security interest without judicial process. See O.C.G.A. § 44–14–162. Georgia law also permits a bank to pursue a deficiency judgment when it seeks personal liability from the mortgagor for the outstanding balance of mortgage debt after the foreclosure fails to compensate for the full debt. *Iwan Renovations, Inc. v. North Atlanta National Bank*, 296 Ga.App. 125, 127, 673 S.E.2d 632 (2009). That said, in this case, LWJ and JLO attempted to collect the money owed on the HELOC loan and not to foreclose.

**The Johnson Defendants are debt collectors because they regularly engage in debt collection and have ongoing relationships with a mortgage company and a debt collection law firm to provide them with debt collection services**

Larry W. Johnson was the managing partner of Johnson & Freedman up until the year 2013. Exhibit B- Johnson Deposition, Page 9, lines 14-21. Johnson & Freedman was a debt collection law firm. Exhibit B- Johnson Deposition, Page 5, lines 12-17. In 2013, Larry W. Johnson joined RCO Legal. Exhibit B Johnson Deposition, Page 8, lines 3-12. RCO Legal was a debt collection law firm. Exhibit B Johnson Deposition, Page 11, lines 3-7. Larry W. Johnson left RCO Legal in 2015. Exhibit B- Johnson Deposition, Page 8, lines 13-15. Shortly after leaving RCO Legal, Larry W. Johnson formed Johnson Legal Offices, LLC. Exhibit B Johnson Deposition, Page 8, lines 8-18. Larry W. Johnson is the owner of Johnson Legal Offices, LLC. Exhibit B- Johnson Deposition, Page 11, lines 17-23. No action of Johnson Legal Offices, LLC was able to be done by anyone but Larry W. Johnson. Exhibit B- Johnson Deposition, Page 11, lines 17-23.

The Johnson Defendants have an ongoing agreement with State Home Mortgage. Exhibit B- Johnson Deposition, Page 12, lines 12-23. Between December 1, 2018, and December 1, 2021, The Johnson Defendants earned $105,455.31 from that ongoing relationship. Exhibit K- See Affidavit of Michael Galloway authorized representative of State Home Mortgage, Para. 6.

The Johnson Defendants' net income for the year 2020 was less than $100,000. Exhibit B Johnson Deposition, Page 43, lines 21-25; Page 44, lines 1-25. After Jauregui & Lindsey (J&L) took its two-third cut, JLO and LWJ were paid for non-judicial foreclosure consumer debt collection $39,459.46 for the 3-year time-period between December 1, 2018, and December 1, 2021. Exhibit K- See affidavit of Jason Tingle.  Affidavit of Jason Tingle, [Doc. 71, Page 2 of 4], Johnson Deposition, Page 16, lines 21-25; Page 17, lines 1-10. The Johnson Defendants receive one third of any fee and Jauregui & Lindsey, LLC receives two thirds of the fee earned when they do work on foreclosure work together. Exhibit B-Johnson Deposition, Page 16, lines 21-25; Page 17, lines 1-10. The Of Counsel Agreement requires Jauregui & Lindsey to maintain malpractice insurance for the benefit of the Johnson Defendants. Exhibit R- See the Of Counsel Agreement between Jauregui and Lindsey and LWJ. Per the Of Counsel Agreement, each week the Johnson Defendants agree to provide Jauregui & Lindsey with availability for providing consumer debt collection services. Exhibit R- See the Of Counsel Agreement between Jauregui and Lindsey and the Johnson Defendants. On dozens of occasions, JLO and J&L have written a specific debt collection letter claiming that they were collecting a consumer debt together with J&L. Exhibit B-Johnson Deposition, Page 36, lines 16-25; Page 37, lines 1-25; Page 38, lines 1-6, See [Doc. 15, Pages 56, 57 of 57] for the collection letter from J&L and JLO. The

Johnson Defendants are unsure whether they have an Of Counsel Agreement with any other law firm. Exhibit B- Johnson Deposition, Page 20, lines 12-21.

The Johnson Defendants also collect delinquent consumer debts based on an hourly rate such as what occurred in this case. Exhibit C- 30(b)(6) Deposition of McMichael Taylor, Page 16, lines 10-21.  The Johnson Defendants were paid hourly for consumer debt collection services in the amount of $412.50 on February 4, 2021, in the amount of $2,933.61 on February 22, 2021, in the amount of $585.70 on April 9, 2021, in the amount of $5,480.85 on June 4, 2021, in the amount of $2,059.40 on July 22, 2021, in the amount of $110 on August 24, 2021, and in the amount of $3,102.60 on September 20, 2021. Exhibit O- See Invoices with Checks. Thus, the Johnson Defendants have regularly been collecting Cordtz's consumer debt and other consumer debts since hired in late 2020 and when this lawsuit was brought.

## FACTS

Plaintiff opened a revolving line of credit. Exhibit A-Cordtz Dep., Page 24, lines 16-25; Page 25, lines 1-6. Plaintiff used the money to pay personal, family and household expenses. Exhibit A- Cordtz Dep., Page 27, lines 6-25; Page 28, lines 1-6. The money was used for medical procedures and expenses and home repair. Exhibit A- Cordtz Dep., Page 27, lines 6-25; Page 28, lines 1-6. None of the

money was used for business expenses. Exhibit A- Cordtz Dep., Page 28, lines 4-6. Plaintiff defaulted on the loan. Exhibit A- Cordtz Dep., Page 29, lines 3-8; Page 33 lines 22-25; Page 34 lines 1-7.

Plaintiff has a special needs child named Robert. Exhibit A Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert lives with Plaintiff. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has multiple serious medical issues. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has had both of his hips replaced. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has had steel plates put in his shin. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has had surgery on his jaw. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has cracked vertebrae from a degenerative bone condition. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has great difficulty walking up and down steps. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert's condition would be alleviated by moving to a warmer climate. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. The layout and location of Plaintiff's house is not conducive to Robert's existence. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22.

Plaintiff desires to sell his home and move to a warmer climate. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Plaintiff is stressed having

to see his son suffer. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Plaintiff suffers extreme anxiety from not being able to provide a comfortable living arrangement for his son. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22.

FCI has stipulated that it is a debt collector as defined by the FDCPA. Exhibit D- See "Response 2" of FCI's Supplemental Response to Request for Production of Documents.

FCI has written agreements with J Taylor Law, LLC ("J Taylor"). Exhibit E-See attached written agreements between FCI and J Taylor. McMichael Taylor Gray, LLC ("MTG" or "McMichael" or "McMichael Taylor") is subject to J Taylor's written agreement with FCI. Exhibit C- See Taylor Dep. Pg. 14,15, lines 17-25, 1-13. In that agreement FCI refers to itself as managing the foreclosure process for investors. Exhibit E- See attached written agreements between FCI and J Taylor. FCI also states it works with "financial institutions that look to [it] as a "one-stop" partner in handling their [] foreclosure [] needs". Exhibit E- See attached written agreements between FCI and J Taylor. MTG reached an agreement or understanding with LWJ and JLO. Exhibit B- Johnson Deposition, Page 25, lines 9-25. The understanding was not reduced to writing. Exhibit B- Johnson Deposition, Page 25, lines 9-25. The understanding related to the terms by

which LWJ and JLO were to collect Plaintiff's debt on behalf of MTG. Exhibit B-
Johnson Deposition, Page 33, lines 11-24.

LWJ and JLO did not collect pursuant to a written agreement with the
alleged owner of the HELOC. Exhibit L- See Email from Mark Baker dated
October 14, 2021. The owner of the HELOC was MTG's client and not LWJ or
JLO's client. Exhibit B- Johnson Dep. Page 25, 26 lines 9-25, 1-2. LWJ and JLO
were not even aware of the agreement between APG and FCI which allowed FCI
to select the lawyer for APG. Exhibit B- See Johnson Dep., Page 27, lines 4-7.
MTG itself did not believe it had an agreement with the owner of the HELOC.
Exhibit L- See Email from Mark Baker dated October 14, 2021.

Aspen Properties Group, LLC, as Trustee of the APG Holdings Revocable
Trust ("APG") allegedly bought Plaintiff's consumer loan sometime in 2018.
Exhibit F- See APG Welcome letter. FCI began servicing Plaintiff's loan at about
the same or the same time as APG bought Plaintiff's loan. Exhibit G- See
Welcome Letter from FCI. FCI has a written agreement with APG dated March of
2018. Exhibit H- See written Agreement between APG and FCI. That agreement
specifically concerns Plaintiff's loan. Exhibit H- See Addendum to Agreement
between FCI and APG. The agreement provides that FCI has the exclusive right to
coordinate collection of Plaintiff's loan by means of an attorney chosen by FCI.
Exhibit H- See Agreement between FCI and APG Section 5.0. That agreement also

provides that client can never start or coordinate collection of Plaintiff's loan.

Exhibit H- See Agreement between FCI and APG Section 5.0. The agreement

provides that APG "must notify [FCI] promptly, in writing, of…[the] sale of the

loan by [APG]…… [and] shall immediately supply supporting documentation

and/or information regarding such change in status to [FCI]." Exhibit H See

Agreement between FCI and APG Section 10.1. Per the contract (and common

sense) APG should have known, and should have told FCI, that APG had sold

Cordtz's loan on 1/14/21.

      The Johnson Defendants filed a lawsuit in January 2021 seeking to collect

on Plaintiff's allegedly owed to APG. Exhibit P- See January 2021 lawsuit- Doc.

53-5, Page 1-6 of 6. They sued on behalf of APG. Ibid. They claimed money was

owed to APG. Ibid. They claimed that APG was the owner of Plaintiff's debt. Ibid.

They claimed that APG was "the proper entity to enforce the instrument." Ibid.

Para 7. They claimed that APG could seek a judgment against Cordtz. Ibid.

Wherefore Clause. At the time of the lawsuit APG did not own the debt and they

were not the proper entity to enforce the debt. Exhibit I- See Motion to Substitute

with Real Party in Interest dated 2/11/21. APG had sold or transferred the debt

prior to the January 2021 lawsuit being brought. Exhibit I- See Motion to

Substitute with Real Party in Interest dated 2/11/21. JLO and LWJ believe that the

debt was sold or transferred to an entity unrelated to APG prior to bringing the

lawsuit on behalf of APG. Exhibit B- Johnson Deposition, Page 31, lines 10-25; Page 32, line 1.

The Johnson Defendants mailed a letter to Cordtz on April 8, 2021, seeking to collect $327,000+. (Doc. 55, Page 24 of 33). At the time they sent the letter they knew he was represented by counsel. The Johnson Defendants began trying to collect the debt in September 2021. See Declaration of Larry W. Johnson, Doc. 53, Pages 3, 4 of 18, Paras. 12-13.  The Johnson Defendants knew Alembik represented Cordtz on or before February 12, 2021, as they had been communicating with Alembik as counsel for Cordtz. See Declaration of Larry W. Johnson, Doc 53, Page 5 of 18, Para. 17.

JLO and LWJ's own Fulton County lawsuit filed on behalf of the owner of the HELOC on January 21, 2021, asks for $246,162.04 plus $44.75 daily (Para. 25) since November 5, 2018. Exhibit P- See Fulton County Lawsuit Doc 53-5, Page 5 of 6. A simple calculation shows that this number is far less than he was seeking in the letter written April 2021. The same applies to his counterclaim filed on February 26, 2021, in Gwinnett County where JLO and LWJ sought on behalf of the owner of the HELOC the same $246,162.04 plus $44.75 daily since November 5, 2018. Exhibit Q- See Gwinnett County Counterclaim (Para. 14). A simple calculation also show that number would be less than $327,917.83.

An April 30, 2021, affidavit by a James Maffucio also claiming authorization to speak for the owner of Plaintiff's HELOC claimed that there was $282,190.58 owed as of March 31, 2021, due and owing on the note with interest of $44.75 daily. Exhibit M- See affidavit of James Maffucio. Again, an amount far less than $327,917.83 as of April 8, 2021. Another company claiming authorization to speak for the owner of Plaintiff's HELOC, co-defendant FCI, claimed in monthly statements on May 21, April 21 and March 22, 2021, respectively, that the balance Plaintiff owed was respectively $285,466.86, $284,403.87, and $283,305.45. Exhibit N- See attached FCI Statements. These amounts also are less than the Johnson Defendants were seeking in their April 8, 2021, letter.

## The FDCPA

In enacting the FDCPA, Congress recognized that abusive debt-collection practices may lead to marital instability and intrude on another's privacy interests. See 15 U.S.C. § 1692(a) ("Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."). "Congress thus sought to protect consumers' concrete economic interests in enacting these provisions." *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 81 (2d Cir. 2018). "Congress enacted the

FDCPA to protect against the abusive debt collection practices likely to disrupt a

debtor's life." *Id*. (internal quotation marks and citation omitted)).

**<u>LWJ and JLO violated the FDCPA by bypassing communicating with his</u>**

**<u>attorney Alembik and Threatening Cordtz with a letter saying that if he</u>**

**<u>didn't pay $327,917.83 within 10 days then statutory attorney's fees in excess</u>**

**<u>of $32,000 would be added to his debt</u>**

Georgia Rule of Professional Conduct 4.2(a) titled communication with
person represented by Counsel provides:

> A lawyer who is representing a client in a matter shall not communicate
> about the subject of the representation with a person the lawyer knows to
> be represented by another lawyer in the matter, unless the lawyer has the
> consent of the other lawyer or is authorized to do so by law or court
> order.

This Rule is intended to "provide protection of the represented person

against overreaching by adverse counsel, safeguard the client-lawyer relationship

from interference by adverse counsel, and reduce the likelihood that clients will

disclose privileged or other information that might harm their interests." ABA

Comm. on Ethics and Prof'l Responsibility, Formal Op. 95-396 (1995). Here, LWJ

and JLO communicated with Plaintiff after it knew that he was represented by

counsel. Indeed, it appears as though the communication was designed to

specifically interfere with the attorney client relationship between Plaintiff and

Alembik. (A mere 2 months later LWJ filed a 4-million-dollar lawsuit against

Plaintiff and both his state court and federal court lawyers which would at the very least indicate an intention to interfere with Plaintiff's relationships with his attorneys; that lawsuit was stricken for violating Georgia law against filing Strategic Lawsuits Against Public Participation or under the Georgia anti-SLAPP law- OCGA 9-11-11.) LWJ and JLO's April communication to Cordtz served no purpose. The OCGA 13-1-11 statutory attorney's fee notice had previously been provided on numerous occasions and there was no requirement that the OCGA 13-1-11 statutory attorney's fee notice needed to be provided again and at the time.

1692c(a) provides

Communication with the consumer generally

*Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may **not** communicate with a consumer in connection with the collection of any debt—*

*….*

*(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond*

within a reasonable period of time to a communication from the debt

collector or unless the attorney consents to direct communication with the

consumer;

JLO and LWJ thus violated 1692c(a)(2) because they contacted Cordtz after

knowing that he was represented by an attorney. *Young v. NPAS, Inc*., 361 F. Supp.

3d 1171 (D. Utah 2019) ("Medicredit violated 15 U.S.C. § 1692c(a)(2) because

they contacted Ms. Young after knowing she was represented by an attorney.")

Plaintiff was injured by the communication because it caused him to have to

deal with the situation that he had hired a lawyer to deal with thus causing him to

think of the harm this lawsuit was causing to his son.

At common law, courts readily recognized a concrete injury arising from the

tort of intrusion upon seclusion—a tort protecting against defendants who intrude

into the private solitude of another. See Restatement (Second) of Torts §

652A(2)(a) (1977); see also id. § 652B. And the Supreme Court recently cited

"intrusion upon seclusion" as a harm "traditionally recognized as providing a basis

for [a] lawsuit[ ] in American courts." *TransUnion LLC v. Ramirez*, —— U.S. ——,

141 S. Ct. 2190, 2204, 210 L.Ed.2d 568 (2021) (citing *Gadelhak v. AT&T Servs.,

Inc*., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.), cert denied, —— U.S. ——, ——

– S.Ct. ——, 209 L.Ed.2d 568 (2021)).

Cordtz did not want to have this lawsuit in his life except when on his terms. He wanted to be able to call his lawyer when he wanted an update on the case. He did not want to receive any unwanted debt collection communications from LWJ or JLO because it interferes with his privacy. See *Gadelhak*, 950 F.3d at 462–63 (determining that a consumer's receipt of a few unwanted text messages under the Telephone Consumer Protection Act is "a modern relative" of the tort of intrusion upon seclusion—a tort with "long common law roots").

Spokeo, Inc. v. Robins, 578 U.S. 330, 341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) instructs Courts to analogize to harms recognized by the common law for a "close relationship" in kind, not degree. In other words, while the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy. Congress's power is greater than that: it may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law. An unwanted letter may be too minor an annoyance to be actionable at common law. But such a letter nevertheless poses the same kind of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable.

So too here. Though a letter may not intrude to the degree required at common law, that letter poses the same kind of harm recognized at common law— an unwanted intrusion into a plaintiff's peace and quiet. See *TransUnion LLC*, 141

S. Ct. at 2204 ("*Spokeo* does not require an exact duplicate in American history
and tradition.").

**LWJ and JLO violated the FDCPA by Bringing the January Fulton County
lawsuit on behalf of Aspen Properties Group, LLC, as Trustee of the APG
Holdings Revocable Trust when there is no dispute that it was not able to**

The filing of a legally defective debt collection suit violates § 1692e where
the filing falsely implies that the debt collector has legal recourse to collect the
debt. In *Gearing v. Check Brokerage Corp*., 233 F.3d 469 (7th Cir.2000), a
company called Check Brokerage purchased from Ayerco, a convenience store, a
bad check that Gearing had written to Ayerco; Check Brokerage then brought a
debt collection action against Gearing. *Id*. at 471. Illinois law provided at the time
that the subrogee of a bad check's payee could sue for the face value of the check,
treble damages up to $1,500, and attorney fees and costs. Ibid. Unfortunately for
Check Brokerage, its purchase agreement with Ayerco did not make it Ayerco's
subrogee, meaning that it was prohibited from suing Gearing on the check. *Id*. at
472. The Seventh Circuit held that Check Brokerage had violated § 1692e because
its state court complaint incorrectly alleged that it was Ayerco's subrogee, thus
giving "a false impression as to the legal status it enjoyed." Ibid.; see also
*Manlapaz v. Unifund CCR Partners*, 2009 WL 3015166, *2–3, *5 (N.D.Ill. Sept.
15, 2009) (holding that the plaintiff stated an FDCPA claim where the defendant

allegedly filed a debt collection suit for an account it did not own); *Matmanivong v. Unifund CCR Partners*, 2009 WL 1181529, *5 (N.D.Ill. Apr. 28, 2009) (same); *Foster v. Velocity Investments, LLC*, 2007 WL 2461665, at *2 (N.D.Ill. Aug. 24, 2007) (same). *Gearing* applies with equal force here, where LWJ and JLO allegedly brought a debt collection action against Plaintiff thus giving the "false impression" that it had the "legal status" necessary to file the suit.

"For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.' " *Czyzewski v. Jevic Holding Corp.*, —— U.S. ——, 137 S.Ct. 973, 983, 197 L.Ed.2d 398 (2017). Here JLO and LWJ's actions caused Cordtz to obtain an attorney to respond to the Fulton County lawsuit brought in the name of an entity that was alleged to own the debt but certainly did not. See *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 576 (D.C. Cir. 2003) ("the funds necessarily expended to defend against the wrongful legal proceedings" can be "damages for 'loss of property' "). Cordtz also spent time defending against the meritless suit, itself an injury. See *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 692 (7th Cir. 2015) (individuals alleging fraudulent credit-card charges suffered Article III injury—"the aggravation and loss of value of the time needed to set things straight"). See also *Wells v. Willow Lake Estates, Inc*., 390 Fed.Appx. 956, 959 (11th Cir. 2010) (being "forced to spend time and money complying with [selectively-enforced] regulations ... is an injury in fact."). in fact.").

Aside from the tangible harm, which is enough for standing purposes, suing on behalf of an entity with no right to collect the money is like the common law abuse of process because the Fulton complaint was brought on behalf of an entity that didn't own the debt and caused Cordtz stress, loss of time and lawyer expense. The common law elements of abuse of process are (1) that the defendant made an illegal, improper, or perverted use of process; (2) that the defendant had ulterior motives or purposes in exercising such illegal, improper, or perverted use of process; and (3) that, as a result of such action on the part of the defendant, the plaintiff suffered damage. See *White v. Lemma*, 947 F.3d 1373, 1376 (11th Cir. 2020). Each of those elements are satisfied here, thus giving this FDCPA violation a common law analogue.

## **LWJ and JLO violated the FDCPA by claiming a balance owed of $327,917.83 in principal and interest when that amount was not due**

LWJ and JLO did not own the debt and were not authorized to seek amounts unauthorized by the client. In the April 8, 2021, letter, LWJ and JLO sought $327,917.83 an amount never authorized by the alleged owner of the HELOC. Subsection 1692f(1) of the FDCPA addresses the abusive practice of collecting an amount greater than that which is owing. S.Rep. 382 95th Cong., 1st Sess. 4 reprinted in 1977 U.S.Code Cong. & Admin.News 1695, 1698. Subsection 1692e(2)(A) addresses the false representation of the amount of the debt.

LWJ and JLO claim authorization to speak for the owner of the HELOC but the owner of the HELOC never authorized JLO and LWJ to seek $327,917.83. JLO and LWJ's own Fulton County lawsuit filed on behalf of the owner of the HELOC on January 21, 2021, asks for $246,162.04 plus $44.75 daily (Para. 25) since November 5, 2018. Exhibit P. A back of the envelope calculation shows that this is less than the $327,000+ that he was seeking in the letter written April 2021.

The same applies to his counterclaim filed on February 26 in Gwinnett County where JLO and LWJ sought the same $246,162.04 plus $44.75 daily since November 5, 2018, Exhibit Q- (Para. 14 of the Counterclaim). Finally, an April 30, 2021, affidavit by a James Maffucio also claiming authorization to speak for the owner of Plaintiff's HELOC claimed that there was $282,190.58 owed as of March 31, 2021, due and owing on the note with interest of $44.75 daily. Exhibit M. Again, an amount less than $327,917.83.

Another company claiming authorization to speak for the owner of Plaintiff's HELOC, co-defendant FCI, claimed in monthly statements on May 21, April 21 and March 22, 2021, respectively, that the balance Plaintiff owed was $285,466.86 on May 21, 2021, $284,403.87 on April 21, 2021, and $283,305.45 on March 22, 2021. Exhibit N- See attached Statements. These amounts are less than JLO and LWJ were seeking in their April 8, 2021, letter.

## FCI is vicariously liable for the Johnson Defendants' FDCPA violations in bringing the Fulton County Lawsuit

FCI, a debt collector, employed MTG which worked with the Johnson Defendants to carry out the bringing of the Fulton County lawsuit in the name of an entity that did not own Cordtz's debt. FCI is vicariously liable for its agent's conduct. "Debt collectors employing attorneys or other agents to carry out debt collection practices that violate the FDCPA are vicariously liable for their agent's conduct." *Martinez v. Albuquerque Collection Servs., Inc*., 867 F. Supp. 1495, 1502 (D.N.M. 1994). Otherwise, a debt collector "could evade the FDCPA by hiring [an] attorney to do what it could not do." *Id*. (citing 17 Am. Jur. Consumer Protection § 200 (2d ed. 1990)). It would be contrary to the reasoning expressed in *Martinez* and the remedial purpose of the FDCPA to permit principals to avoid liability by hiring agents to do their bidding while keeping the agents in the dark about violations they may be committing. See, e.g*., Schutz v. Arrow Financial Servs., LLC*, 465 F. Supp. 2d 872, 876 (N.D. Ill. 2006); *Beach v. LVLN Funding, LLC*, No. 12-CV-778, 2013 WL 1878938, *2 (E.D. Wis. May 3, 2013).

## Conclusion

LWJ and JLO's Motion for Summary should be denied.

Dated this 28th day of December 2021.

Respectfully submitted,
By: /s/ Shimshon Wexler
GA Bar No. 436163
S Wexler LLC
2244 Henderson Mill Rd, Ste 108
Atlanta, GA 30345
(212) 760-2400
(917) 512-6132 (FAX)
swexleresq@gmail.com