**In The Matter Of:**

*Cordtz v.*
*Johnson Legal Offices, et al*

---

*Jeffrey D. Cordtz*
*October 21, 2021*

---

*D'Amico & Associates, Inc.*
*Court Reporters & Videoconferencing*
*5855 Sandy Springs Circle #140, Atlanta, GA 30328*
*(770) 645-6111 or toll-free (888) 355-6111*



## Page 1

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
                      ATLANTA DIVISION

JEFFREY D. CORDTZ,               )
                                 )
          Plaintiff,             )   CIVIL ACTION FILE
                                 )
vs.                              )   1:21-CV-02003-MHC-LTW
                                 )
JOHNSON LEGAL OFFICES,           )
L.L.C., FCI LENDER               )
SERVICES, INC., and LARRY        )
W. JOHNSON,                      )
                                 )
          Defendants.            )
_____  )
```

Videoconference deposition of JEFFREY

D. CORDTZ, taken on behalf of the

Defendants, pursuant to the stipulations

contained herein, reading and signing of the

deposition being reserved, in accordance

with the Federal Rules of Civil Procedure,

reported remotely before Charna S. Perloe,

Certified Court Reporter, October 21, 2021,

commencing at 1:02 p.m.


```
              D'AMICO & ASSOCIATES, INC.
             Court Reporters & Videoconferencing
            5855 Sandy Springs Circle, Suite 140
                    Atlanta, Georgia 30328
                       (770) 645-6111
                  www.DamicoAssociates.com
```

## Page 2

### INDEX TO EXAMINATIONS

| EXAMINATION | PAGE |
| --- | --- |
| By Mr. Johnson | 7 |
| By Mr. Baker | 81 |
| By Mr. Johnson | 93 |

### INDEX TO EXHIBITS

DEFENDANT'S
| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| D-1 | Composite of FCI statements | 96 |

JOHNSON
| | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit A | Home Equity Line of Credit, April 3, 2006; Pages 00060-00068 | 23 |
| Exhibit B | Deed to Secure Debt, April 3, 2006 | 30 |
| Exhibit C | Letter addressed to Mr. Cordtz from DIA Solutions, September 14, 2012 | 33 |
| Exhibit D | Verified Complaint for Declaratory Judgment, Specific Performance and Equitable Accounting | 43 |
| Exhibit E | April 8, 2021, letter from Mr. Johnson to Mr. Cordtz | 53 |
| Exhibit F | April 15, 2021, letter from Mr. Alembik to Mr. Johnson | 54 |
| Exhibit G | April 15, 2021, letter from Mr. Johnson to Mr. Alembik | 59 |

(The following transcript contains quoted
material; such material is reproduced as
read or spoken.)

## Page 3

REPORTER DISCLOSURE OF NO CONTRACT

        I, Charna S. Perloe, Certified Court
Reporter, do hereby disclose pursuant to Article
10.B of the Rules and Regulations of the Board of
Court Reporting of the Judicial Council of
Georgia that I am a Georgia Certified Court
Reporter.  D'Amico & Associates/I was contacted
by the party taking the deposition to provide
court reporting services for this deposition;
D'Amico & Associates/I will not be taking this
deposition under any contract that is prohibited
by O.C.G.A. 15-14-37(a) and (b) or Article 7C of
the Board; and I am not disqualified for a
relationship of interest under the provisions of
O.C.G.A. 9-11-28(c).
        There is no contract to provide reporting
services between myself or any person with whom I
have a principal and agency relationship nor any
attorney at law in this action, party to this
action, party having a financial interest in this
action, or agent for an attorney at law in this
action, party to this action, or party having a
financial interest in this action.  Any and all
financial arrangements beyond my/D'Amico &
Associates's usual and customary rates have been
disclosed and offered to all parties.
        This, the 1st day of November, 2021.


        CHARNA PERLOE, CCR-A-457

## Page 4

FIRM DISCLOSURE OF NO CONTRACT

        I, Kelly D'Amico, do hereby disclose
pursuant to Article 10.B of the Rules and
Regulations of the Board of Court Reporting
of the Judicial Council of Georgia that
D'Amico & Associates, Inc., was contacted
by the taking attorney to provide court
reporting services for this deposition and
there is no disclosed contract that is
prohibited by O.C.G.A. 15-14-37(a) and (b)
or Article 7C of the Rules and Regulations
of the Board for the taking of this
deposition.
        There is no contract to provide
reporting services between D'Amico &
Associates, Inc., or any person with whom
D'Amico & Associates, Inc., has a principal
and agency relationship nor any attorney at
law in this action, party to this action,
party having a financial interest in this
action, or agent for an attorney at law in
this action, party to this action, or party
having a financial interest in this action.
Any and all financial arrangements beyond
D'Amico & Associates, Inc.'s usual and
customary rates have been disclosed and
offered to all parties.
        This, the 1st day of November, 2021.


        KELLY D'AMICO, CEO
        D'AMICO & ASSOCIATES, INC.

1   APPEARANCES (via videoconference):

2

3   On behalf of the Plaintiff:

4       SHIMSHON E. WEXLER, Attorney at Law
        S. Wexler, LLC
5       2244 Henderson Mill Road
        Suite 108
6       Decatur, Georgia 30045
        (212) 760-2400
7       swexleresq@gmail.com

8

9   On behalf of Defendants Johnson Legal Offices, LLC, and
    Larry W. Johnson:
10
        LARRY W. JOHNSON, Attorney at Law
11      Johnson Legal Offices, LLC
        138 Hammond Drive
12      Suite B
        Atlanta, Georgia 30328
13      (404) 486-2361
        ljohnson@suretybondsagency.com
14

15  On behalf of Defendant FCI Lender Services, Inc.:

16      MARK A. BAKER, Attorney at Law
17      McMichael Taylor Gray, LLC
        3550 Engineering Drive
18      Suite 260
        Peachtree Corners, Georgia 30092
19      (404) 474-7149
        mbaker@mtglaw.com
20

21

22

23

24

25

1       MR. JOHNSON: If you would, go ahead
2   and swear the witness, please.
3       JEFFREY D. CORDTZ,
4   having been first duly sworn, was examined and testified
5   remotely as follows:
6       MR. JOHNSON: Okay. This is the
7   deposition of Jeffrey Cordtz, Plaintiff, in
8   the federal case. It's taken pursuant to
9   notice of deposition and to all federal law
10  and in accordance with the order that was
11  entered by the judge last week relating to
12  a motion for protective order.
13      I don't know if y'all discussed
14  waiving the reading and signing of the
15  transcript. Do you want to address that
16  now, Mr. Wexler, or do you want to do that
17  at the end of the deposition?
18      MR. WEXLER: We'll do that at the end
19  of the deposition.
20      MR. JOHNSON: Okay. And if we would
21  reserve any objections except as to form of
22  the question and responsiveness of the
23  answer, and I'm happy with making that same
24  reservation for all of our depositions.
25      I know the prior one I had made one

1   objection, I thought, was to the form of
2   the question. If we could do that for this
3   deposition as well as the others, that
4   would be fine with me. Is that okay with
5   you?
6       MR. WEXLER: Yes, sir.
7       MR. BAKER: Okay. Also if we can
8   agree if one lawyer objects to something,
9   the other lawyers don't have to make the
10  same objection; it actually preserves the
11  objection as to all parties, if that's
12  okay.
13      MR. WEXLER: Okay.
14      EXAMINATION
15      BY MR. JOHNSON:
16  Q.  Now, Mr. Cordtz, my name is Larry Johnson.
17  I'm representing myself individually as well as my law
18  firm, Johnson Legal Offices, in this matter, in this
19  lawsuit you brought.
20      You and I have never met in person before,
21  have we?
22  A.  No.
23  Q.  And I believe we actually met online at a
24  hearing on the Gwinnett lawsuit. I don't know if we
25  officially met, but you were on the Zoom hearing on

1   that for that hearing, and I was as well.
2       Other than that one, I don't believe you and I
3   have met, even online. Is that correct?
4   A.  I agree with that.
5   Q.  Have you ever been deposed before?
6   A.  No.
7   Q.  Okay. I'm sure your lawyer has explained, but
8   I'm going to go through just a little bit of ground
9   rules. I'm going to ask you a series of questions
10  about this lawsuit. If at any time you don't
11  understand my question or if you need me to make it
12  more clear, please just let me know. I'm not really
13  here to trick you as far as my wording. So if you
14  don't understand anything, just please let me know, if
15  that's okay. Okay?
16  A.  Okay.
17  Q.  All your answers have to be verbal. A lot of
18  people nod their head yes or no, and that's just
19  something the court reporter cannot take down. So
20  please make sure that all your questions are verbal, if
21  you can help it. Is that okay?
22  A.  Yes.
23  Q.  Also, the court reporter mentioned it earlier,
24  but she's taking this down on a transcript. So if
25  you'll wait until I finish asking my questions.

1 Sometimes the question goes longer, and I'm going in a
2 different direction. I'll try to do the same when you
3 answer so we have a clear transcript. Is that okay?
4 A. Yes.
5 Q. I'm also not here to keep you in that seat.
6 If you need to take a break for any reason during this
7 deposition, you let us know.
8 We don't take breaks in the middle of a
9 question. For instance, if I've asked you a question
10 and you haven't answered it yet, we won't take a break
11 until you've fully answered the question. But if at
12 any time you need to take a break, you just let us
13 know. Okay?
14 A. Yes.
15 Q. And you're aware that the court reporter is
16 taking this down so that at trial or any subsequent
17 motions that we may file where your testimony today is
18 relevant, we'll actually have a transcript available to
19 us. You understand that? Yes?
20 A. Yes.
21 Q. And you understand your testimony is being
22 given under oath, and you're swearing that everything
23 you say is true and correct?
24 A. Yes.
25 Q. You understand that? You do?

1 A. Yes.
2 Q. Okay. All right. Did you review any
3 documents before the deposition, either like yesterday
4 or today?
5 A. Yes. I reviewed the documents that you had
6 sent to Mr. Wexler.
7 Q. Other than those documents, did you review any
8 documents, other documents?
9 A. Not in the last several days, no.
10 Q. Mr. Baker sent over some documents this
11 morning. Did you look over those?
12 A. I'm not sure. I didn't receive any documents
13 from Mr. Baker.
14 Q. I understand. He would have sent them to your
15 attorney, I believe.
16 But did you look over any documents today
17 before the deposition?
18 A. Yeah. There were a couple right when I
19 arrived there. I don't know if it was all.
20 Q. Okay. All right. Other than your attorney --
21 and I'm going to be asking you questions throughout
22 this deposition. I am not looking for you to tell me
23 anything -- any discussions you had with your attorney.
24 Okay. That's not what I'm looking for. I'm not really
25 allowed to go into that, but I will be asking you

1 questions.
2 So just to understand, in any of my questions,
3 I'm not looking for you to tell me anything that your
4 attorney has told you or that you told your attorney.
5 Okay?
6 A. Okay.
7 Q. Now, other than your attorney, did you discuss
8 this deposition with anyone prior to this deposition?
9 A. My wife.
10 Q. What's her name?
11 A. Sheila.
12 Q. And I always have to ask this. Her last name
13 is Cordtz as well?
14 A. Yes.
15 Q. Anybody else other than your attorney and your
16 wife that you discussed this deposition?
17 A. No.
18 Q. Did anyone other than your attorney give you
19 specific instructions regarding this deposition?
20 A. No.
21 Q. What's your date of birth?
22 A. July 21st, 1956.
23 Q. And you mentioned you were currently married.
24 Were you ever married before?
25 A. No.

1 Q. Do you have any children?
2 A. Yes.
3 Q. Could you give me their names and ages,
4 please.
5 A. The ages are going to be difficult:
6 Catherine, who is 37; Carolyn, who is 35; Jeffrey Dan
7 Jr., who is 34; Christopher, who's 30; Robert, who is
8 25; and Mary Grace, who is 22.
9 Q. Are all those children children you've had
10 with Sheila Cordtz?
11 A. Yes.
12 Q. Now, this lawsuit was brought in the Northern
13 District of Georgia, which basically covers Atlanta all
14 the way up to Chattanooga, and if we have a jury trial,
15 we'll be having a jury pool that's pooled from that
16 area.
17 So I need to know, other than the people
18 you've already identified, do you have any other
19 friends or relatives who may be living in the north
20 Georgia area?
21 MR. WEXLER: Objection. Mr. Johnson,
22 that's abusive.
23 MR. BAKER: No, it's not. If they
24 show up on a jury pool, I'm entitled to
25 know their identities. So I'm just asking

1  any relatives or friends in the Northern
2  District of Georgia.
3      MR. WEXLER: We'll take that up at
4  jury selection with the judge.  He doesn't
5  have to tell you all of his friends in the
6  Northern District of Georgia.  And I see
7  what you're doing, and it's abusive, and I
8  will not tolerate it.
9      MR. JOHNSON: So let me understand.
10 Are you instructing your witness not to
11 answer that question, Mr. Wexler?
12     Mr. Wexler?
13     MR. WEXLER: I'm thinking about it.
14     MR. JOHNSON: Okay.  I couldn't tell.
15 You were half off camera.
16     MR. WEXLER: Okay.
17     No.  He could answer.
18 A.  (By the Witness)  I have no family in that
19 area.  I do have several acquaintances that I would
20 probably call friends that live in that area.
21 Q.  I'm not really asking -- acquaintances, I
22 understand.  Someone that's a good friend of yours --
23 and I would like to know their names.
24 A.  How would you define good friend?  I've got
25 lots of people that I might associate with.  I don't

1  know what constitutes, quote, good, unquote, friend.
2  Q.  Neither do I.  So just tell me who your
3  friends are, and we'll go with that.
4  A.  Probably say Michael Banks, Brad Nessler,
5  Steve Womack.
6  Q.  Did you say Steve Womack?
7  A.  Yes.
8      Andy Lyons.  That's probably the people in
9  that area that I spend the most time with socially.
10 Q.  All right.  Have you ever been involved in any
11 other civil actions, other than the ones relating -- we
12 have three lawsuits going on right now and one that was
13 dismissed.
14     Other than the ones that were involved in that
15 group, have you ever been involved in any other civil
16 actions?
17 A.  No.
18 Q.  I think in your response to discovery you
19 mentioned that there was one where you were sued for a
20 debt.
21 A.  I don't know if that constitutes a civil
22 action.  It was a dispute over an amount owed to a
23 phone company that we did settle in court.  So if
24 that's a civil action, then yes.
25 Q.  Okay.  And it sounds like other than the ones,

1  the group that we have that we're involved in, you
2  know, in this situation and that one, you had no other
3  civil actions you were involved in; is that correct?
4  A.  Correct.
5  Q.  Okay.  And you never filed a bankruptcy before
6  either; is that correct?
7  A.  No, I have not.
8  Q.  Have you ever been convicted of a crime?
9  A.  Excuse me.
10     MR. WEXLER: Yes.  You can -- you have
11 to answer.  You can't --
12 A.  (By the Witness)  Yes.
13 Q.  Okay.  Tell me about -- how many times have
14 you been convicted?
15 A.  Once.
16 Q.  What was that for?
17 A.  DUI.
18 Q.  And when was that?
19 A.  It was in May of, I think, 2017, I believe.
20 Q.  Okay.  Was that in Gwinnett County?
21 A.  I'm not sure which county it was in.  It was
22 out of Braselton, which the attorney who represented me
23 on that case said that Braselton actually lies in two
24 or three different counties.
25 Q.  Okay.  In this lawsuit, are you paying your

1  attorney by the hour, or do you have a contingency fee
2  relationship?
3  A.  Which of the lawsuits are you referencing?
4  Q.  Okay.  Let's talk about this one first, the
5  one that's the federal lawsuit that we're deposing you
6  about today.
7  A.  Is that the $4,000,000 lawsuit that you filed?
8  Q.  No.  This is your lawsuit, sir, in federal
9  court under the Fair Debt Collection Practices Act.
10 Your attorney is sitting next to you.
11 A.  Okay.  So, no, I'm not paying hourly.
12 Q.  Are you paying -- do you have a contingency
13 fee relationship, then?
14 A.  I would imagine.  I'm not quite sure what the
15 definition is.  I'm not real schooled on this.
16 Q.  I'll explain it to you.  Many people think
17 about this in car wreck cases, where if you win in the
18 car wreck case and you get money, then your attorney
19 takes a percentage.  So is that --
20 A.  Yes.
21 Q.  Is that your relationship with your attorney
22 in this case?
23 A.  Yes.
24 Q.  Okay.  What about the case that's in Gwinnett
25 County -- that's the one that you brought in Gwinnett

Page 17

1  County -- are you paying an hourly or contingency fee
2  relationship with your attorney in that case?
3  A.  Hourly.
4  Q.  The other case is the one you mentioned as the
5  $4,000,000 case.  I'll call it the slander case.  Do
6  you have an hourly or a contingency fee arrangement in
7  that case?
8  A.  Hourly.
9  Q.  Are those with Mr. Alembik?
10 A.  Alembik, yes.
11 Q.  Do you know what his hourly rate is that he's
12 charging you?
13    MR. WEXLER: Objection.
14    MR. JOHNSON: I'm sorry.  You've
15 actually asked for damages and included a
16 claim for attorneys' fees for the other
17 cases.  So I'm entitled to ask those
18 questions.
19    MR. WEXLER: I withdraw -- I withdraw
20 my objection.
21    MR. JOHNSON: And that's not to the
22 form of the question, anyway.  I thought we
23 were reserving our objections unless it's a
24 form of question or responsiveness of the
25 answer.  So if we could try to limit it to

Page 18

1  that reservation that we've already agreed
2  to, that would be great.
3    BY MR. JOHNSON:
4  Q.  So what's the hourly rate of Mr. Alembik?
5  A.  There is a stated hourly rate in our
6  agreement, but I do not know what it is.
7  Q.  Do you have a written agreement with him?
8  A.  Yes.
9  Q.  Is that something that you've provided to your
10 attorney?  I don't want to know if you talked to your
11 attorney about it.  But have you provided that to your
12 attorney in this case?
13 A.  To attorney Wexler?
14 Q.  Yes.
15 A.  Not to my knowledge.
16 Q.  We're going to need to get a copy of that
17 agreement from you.  Is that something you could
18 provide?
19 A.  I would defer to my attorney as to whether or
20 not he would provide that.
21 Q.  Okay.  My question to you is you still have a
22 copy, and you could give it to him if he asked you for
23 it?
24 A.  Yes.
25 Q.  Okay.  We're going to need to get that from

Page 19

1  you.
2    Now, I meant to ask this to start off with,
3  and this is just to make sure that you're able to
4  testify clearly today.
5    Are you on any medication that you're taking
6  that might affect your ability to testify or the
7  ability to remember here today?
8  A.  No.
9  Q.  Now, I want to talk a little bit about your
10 educational background.  Where did you go to high
11 school?
12 A.  Rye, New York.
13 Q.  Rye, New York?
14 A.  Rye, R-Y-E, New York.
15 Q.  What is the name of that high school?
16 A.  Rye High School.
17 Q.  I'm assuming you graduated.  What year did you
18 graduate?
19 A.  1973.
20 Q.  Did you go to any school after high school?
21 A.  College.
22 Q.  Where did you go to college?
23 A.  Hofstra University, H-O-F-S-T-R-A.
24 Q.  When did you go to that college?
25 A.  From the fall of '73 to the spring of '77.

Page 20

1  Q.  Did you graduate?
2  A.  Yes, I did.
3  Q.  And what kind of degree did you get?
4  A.  Bachelor of science in economics and business.
5  Q.  Other than your high school and Hofstra
6  University, have you gone to any other schools
7  post-high school?
8  A.  No.
9  Q.  Do you have any certifications?
10 A.  Certifications from sales training courses and
11 curricula, et cetera.
12 Q.  That's like going to a continuing education or
13 something, and they give you a certificate at the end?
14 A.  Dale Carnegie sales process.  I don't recall
15 the names of some of the others.
16 Q.  Okay.  That's good.
17    I want to talk a little bit about your work
18 history.  A lot of times, I start from college and come
19 forward, but that's so long ago.  So are you able to
20 start from where you are now and go backwards, say, 10
21 years?
22 A.  Yes.
23 Q.  All right.  So where do you work now?
24 A.  BAMKO, B-A-M-K-O.
25 Q.  I've never heard of that company.  What kind

1 of company is that?
2 A. It's a promotional marketing agency.
3 Q. What are your duties there?
4 A. Business development.
5 Q. And what does that mean? What kind of
6 business are you trying to develop?
7 A. Primarily B2B relationships.
8 Q. B2B. Does that stand for business to
9 business?
10 A. Yes.
11 Q. And is that a communications-type
12 relationship? Is it a software company?
13 A. No. It's branded merchandise.
14 Q. Okay. I still don't understand what that is.
15 Is that like clothing?
16 A. It includes apparel. It's apparel, hard
17 goods, anything that might have a corporate logo on it.
18 Q. Gotcha. So it could be steak knives; it could
19 be a shirt; it could be a cap; it could be a lot of
20 things. But it's really to put a logo and marketing on
21 behalf of the company that you're assisting; is that
22 fair?
23 A. Correct.
24 Q. When did you start working at BAMKO?
25 A. September 27th, 2021.

1 Q. Who is your supervisor there?
2 A. Matt Whiteley.
3 Q. Whiteley?
4 A. W-H-I-T-E-L-E-Y.
5 Q. Before BAMKO, where did you work?
6 A. Staples Promotional Products.
7 Q. When did you work there?
8 A. From February 2010 until September 24th, 2021.
9 Q. What did you do at Staples?
10 A. Business development.
11 Q. Is that something similar to what you're doing
12 now?
13 A. Yes.
14 Q. Does Staples, like, do the logo, same kind of
15 deal where they put logos on things?
16 A. Yes.
17 Q. All right. Who was your supervisor there?
18 A. Julie Suttles, S-U-T-T-L-E-S.
19 Q. And I know you live in north Fulton County.
20 Are both of these jobs -- have you worked in north
21 Fulton County?
22 A. Yes.
23 Q. That takes us to about more than 10 years, I
24 think.
25 A. Yes, sir.

1 Q. All right. That's just a little background
2 stuff that I like to go through.
3 Now I want to start asking you questions
4 specific to your lawsuit. So what I would like to
5 do -- and I provided your attorney with some documents
6 that I've listed with Exhibits A through F. So I want
7 to go through those at this point in time with you. Is
8 that okay?
9 A. Yes.
10 (Johnson Exhibit A was marked.)
11 BY MR. JOHNSON:
12 Q. So let's start with what's been marked as
13 Exhibit A. Do you have that in front of you?
14 A. I don't.
15 Q. Can you get a copy? I provided it to your
16 attorney so you would have it in front of you.
17 A. Okay.
18 Q. Okay. I'm looking at something that's
19 identified as Exhibit A. It's titled Home Equity Line
20 of Credit. Do you see that?
21 A. Yes.
22 Q. All right. How many pages is the document you
23 have in front of you?
24 A. Looks like nine.
25 Q. And there's some signatures. So I want to ask

1 you about those on page 8 and on page 9. On page 8, do
2 you see the signature on page 8?
3 A. Yes.
4 Q. Is that your signature?
5 A. Yes.
6 Q. Do you remember signing this document?
7 A. Yes.
8 Q. Okay. On page 9, there's also a signature at
9 the top of that page. It says Fee Schedule. Do you
10 see that?
11 A. Yes.
12 Q. Is that your signature?
13 A. Yes.
14 Q. Do you remember signing this document?
15 A. Yes.
16 Q. What was the purpose of this document?
17 A. It was to secure a home equity line of credit.
18 Q. Okay. And when you signed this document, did
19 you have a closing? Like, did you go up in a law firm
20 and have a closing?
21 A. No. They did it at my residence.
22 Q. At your residence. Okay. All right.
23 And this particular document talks about you
24 getting money, not all at one time. A lot of times,
25 you get loans, and you get all the money at once like

1 when you have a purchase money mortgage on a house, for
2 instance.
3    This particular one, it allows you to get
4 different amounts at different times. Was that your
5 understanding?
6 A. Yes.
7 Q. Okay. So what was the first amount of money
8 that you had that was lent to you under this document?
9 Do you remember?
10 A. To my best recollection, I took the maximum
11 amount initially.
12 Q. What was the maximum amount?
13 A. I believe it was one ninety-seven five,
14 197,500, I believe, somewhere in that estimate.
15 Q. So this isn't a home equity line of credit
16 where you took money at different times. You got all
17 the money up front; is that fair?
18 A. I believe the option was there to take it at
19 different times, but I elected to take the maximum
20 amount when it first was available.
21 Q. Was that on the same day that you signed these
22 documents?
23 A. No.
24 Q. How long after you signed these documents did
25 you actually get that money?

1 A. I don't recall exactly, but I would think it
2 was probably about a week.
3 Q. I'm a little curious, because this document
4 that's marked as Exhibit A shows that you could get up
5 to $200,000. If you took all the money at one time at
6 the beginning, do they limit you to 197,500?
7 A. No. The best recollection I have is that
8 there was a processing fee or a fee associated with it,
9 so that all of the amount of the home equity line of
10 credit was 200,000; the actual cash that you could
11 withdraw was a little bit less.
12 Q. Okay.
13 A. Maybe not. That's my recollection.
14 Q. That's fine. I was curious about that. So
15 that makes sense. I wasn't sure.
16    And the way I read this, this home equity line
17 of credit, initially you only had to make interest
18 payments; is that correct?
19 A. I don't recall.
20 Q. So you don't recall if your payments were
21 interest-only payments or if it included a component
22 for both interest and principal?
23 A. My recollection, there was a component for
24 both principal and interest.
25 Q. Okay. Do you remember how the finance charge

1 was calculated?
2 A. No.
3 Q. Do you know it was a fixed rate, or did it
4 change over time?
5 A. I believe it was a fixed rate.
6 Q. Okay. What was the purpose of the $197,500
7 loan?
8 A. There were several purposes: Medical bills
9 first and foremost, tuitions, and home improvements or
10 home repair. Home repair, I would say.
11 Q. What type of medical bills?
12 A. Bills associated with my wife's cancer
13 treatments and bills associated with my youngest son's
14 health issues.
15 Q. And what was the tuition? Was that for high
16 school or college or what?
17 A. Both.
18 Q. Was that tuition for multiple-year children?
19 A. Yes.
20 Q. And the home repair, what needed to be
21 repaired?
22 A. The deck behind the house had become unsafe.
23 Q. Did you replace the entire deck?
24 A. Yes.
25 Q. I know you said it was for medical bills and

1 tuition as well. You actually paid that money for
2 medical bills and tuition?
3 A. Yes.
4 Q. After paying all those, was there any money
5 left over?
6 A. No.
7 Q. Okay. I know in your lawsuit in Gwinnett you
8 talked about making payments and that you were current
9 in your payments. How long did you make payments and
10 how long -- I guess my question is how long did you
11 make payments until you -- as they came due? Does that
12 make sense?
13 A. Well, for IndyMac Bank, it was for two and a
14 half to three years, until IndyMac Bank became
15 insolvent.
16 Q. And then as relates to you making payments,
17 what happened next?
18 A. Well, we got a notice that IndyMac Bank was no
19 longer operational and the loan was being transferred.
20 Q. And did you make -- did you start making
21 payments to the new entity it was transferred to?
22 A. Yes.
23 Q. Do you remember the name of that entity?
24 A. I believe it was Faslo.
25 Q. How long did you make payments to Faslo?

1 A. I guess probably a year and a half, maybe two
2 years.
3 Q. And then what happened next with respect to
4 payments?
5 A. The payments we were mailing to Faslo started
6 to not be cashed, and when we investigated to see why
7 they weren't being cashed, we were told that Faslo was
8 no longer operational.
9 Q. Okay. You got this loan in -- it's dated
10 April of 2006; is that correct?
11 A. Yes.
12 Q. So now you're two and a half to three years
13 and one to two years -- you're somewhere in the three-
14 to five-year category that you've already explained to
15 me. What happened next with respect to you making
16 payments?
17 A. We then got a communication from another party
18 with an offer to settle.
19 Q. What party was that?
20 A. I believe that was DTI [sic].
21 Q. Is that the first thing you heard from them --
22 is an offer to settle, or did you get, like, a notice
23 saying they had taken over the loan?
24 A. No. The first thing we got was the offer to
25 settle.

1 Q. Okay.
2 (Johnson Exhibit B was marked.)
3 BY MR. JOHNSON:
4 Q. Okay. I think I have that document, but I
5 want to ask you about Exhibit B first. Okay?
6 A. Okay.
7 Q. Exhibit B is titled Deed to Secure Debt. Do
8 you have that in front of you?
9 A. Not yet. Okay. I guess I have it.
10 Q. How many pages is that exhibit? I want to
11 make sure we have the same amount of pages.
12 A. 11.
13 Q. So this is a deed to secure debt, or sometimes
14 we call it a security deed. Does this relate to what
15 we called home equity line of credit as Exhibit A? Do
16 those two documents relate to each other?
17 A. I would believe so.
18 Q. Okay. So this is the document that was
19 purported to put a lien on your house; is that correct?
20 A. I believe so.
21 Q. Now, on page -- on the fourth page in, it has
22 a signature under the typed -- your typed name. Is
23 that your signature?
24 A. Yes.
25 Q. And did you handwrite the date April 3rd,

1 2006, next to it?
2 A. It looks like my writing, yes.
3 Q. Okay. And do you remember signing this
4 document?
5 A. Yes.
6 Q. And I apologize. As I'm going through this
7 document, I notice there's a page missing. The
8 recorded page numbers goes from 331, and the next page
9 is 333. So there's a page missing in there. I
10 apologize for that. That's my fault. I don't -- it's
11 neither here nor there, but I think it's because I
12 missed it, I guess. It pulled two pages together.
13 So the next page, which at the very top
14 right-hand corner it says page 334, it also has a
15 signature on it. Is that your signature?
16 A. Yes.
17 Q. Do you remember signing that document?
18 A. Yes.
19 Q. The page after that -- that's at the top
20 right-hand corner, page 335 -- that also has a
21 signature. Is that your signature?
22 A. Yes.
23 Q. Do you remember signing it?
24 A. Yes.
25 Q. The next page, which is at the top right-hand

1 corner -- it says page 336 -- that has a signature. Is
2 that your signature?
3 A. Yes.
4 Q. And do you remember signing that document?
5 A. Yes.
6 When you ask do I remember signing the
7 document, I signed a lot of documents that day. So I
8 don't remember specifically each one. But, yes, that's
9 my signature.
10 Q. I got you. Thank you for that.
11 At the bottom of the -- I'll just start at
12 page 1. It has some initials at the bottom of page 1.
13 Are those your initials?
14 A. Yes.
15 Q. Okay. Why don't you tell me in your own words
16 what your understanding of what this document was.
17 A. Security relative to the loan.
18 Q. And this was placed or to be placed on your
19 personal residence?
20 A. I believe so, yes.
21 Q. Okay. And that's located at 213 Southern Hill
22 Drive in Duluth, Georgia?
23 A. Yes.
24 Q. Okay. And that's in Fulton County; is that
25 correct?

1  A.  Yes.
2     (Johnson Exhibit C was marked.)
3     BY MR. JOHNSON:
4  Q.  Okay.  Now, the next document that we've
5  marked is Exhibit C.  Do you have that in front of you?
6  A.  Not yet.
7     Okay.  Yes.
8  Q.  Is this what you were referring to a few
9  moments ago when you said you got a communication from
10 DTA about a resolution of your loan?
11 A.  Yes.
12 Q.  At the time they sent this letter to you, were
13 you current?  Had you made all your monthly payments up
14 to that point?
15 A.  Yes.
16 Q.  So in September -- and this is dated September
17 14, 2012 -- you had not missed any payments prior to
18 September 14th, 2012?
19 A.  Yes, relative to the uncashed checks from
20 Faslo.  So there were several payments that they never
21 cashed from that entity.
22 Q.  All right.  I'm going to talk a little bit
23 about that later on because I think in your Gwinnett
24 case you talk about running into some financial trouble
25 in 2009 where you got behind on the payments.  I'll

1  address that, I think, when we get to that complaint
2  just so we can talk about that and we're clear on it.
3     But as it relates to this particular letter,
4  this is the document that you said that you got an
5  offer to resolve your loan for a reduced amount; is
6  that correct?
7  A.  Correct.
8  Q.  All right.  Do you know:  Was this mailed to
9  you?  Did you get it in the mail?
10 A.  Yes.
11 Q.  Okay.  All right.  There's some notes at the
12 top right-hand corner.  Is that your notes or your
13 handwriting?
14 A.  No.  That's my wife's, Sheila's.
15 Q.  Gotcha.
16    MR. WEXLER:  While we got a chance, I
17 would like to refill my coffee.  You can
18 finish questioning on this.  But after I'd
19 like to take a short little break.
20    MR. JOHNSON:  Okay.  After we finish
21 this document, we'll do that.
22    BY MR. JOHNSON:
23 Q.  Right in the middle of the document, it says
24 "William Vaughn."  Do you see that?
25 A.  Yes.

1  Q.  Do you know whose handwriting that is?
2  A.  Sheila's, my wife.
3  Q.  What about "Robert Hall" next to it?
4  A.  Again, my wife, Sheila.
5  Q.  Do you know why she wrote those names?
6  A.  Those are people she was contacting or trying
7  to contact relative to verifying this offer.
8  Q.  Okay.  And at the top right-hand corner, it
9  looks like -- is that an email address?
10 A.  I believe so, yeah.
11 Q.  Okay.  It says "@creditcontrol."  Do you see
12 that?
13 A.  Yes.
14 Q.  Was that an individual with a company called
15 Credit Control?
16 A.  I would think so, yeah.
17 Q.  And do you know how they were related to this
18 loan?
19 A.  My best estimate would be that they were being
20 contacted by my wife in order to determine the validity
21 of the offer.
22 Q.  If you'll look at the second paragraph -- I'm
23 sorry -- the third paragraph below your name, it starts
24 with, "This opportunity is extended to you for only 30
25 days from the date of this letter."  Do you see that?

1  A.  Yes.
2  Q.  What did you understand that to mean?
3  A.  That we had 30 days to accept the offer.
4  Q.  Okay.  So they're authorized -- the next
5  sentence, "Our representatives are authorized to settle
6  your debt, no questions asked, for $9,875, which is 5
7  percent of what you owe."  Do you see that?
8  A.  Yes.
9  Q.  So when they -- when it says you have 30 days
10 from the date of the offer, what was your understanding
11 about when you had to make that payment?
12 A.  My understanding was that we had 30 days to
13 accept.  They had verbally told us that that 30 days
14 was not binding, that we could pay that money as soon
15 as we were ready.
16 Q.  Verbally told you that?
17 A.  Yes.
18 Q.  Who?
19 A.  Someone at DTA told that to Sheila, my wife.
20 Q.  Do you know who the person was, the name of
21 that person?
22 A.  No.
23 Q.  Do you think your wife would remember the name
24 of that person?
25 A.  No.

1 Q. Was it a male or a female?
2 A. I don't know.
3 Q. So the person, who we don't know the name and
4 we don't know if they're male or female, said that you
5 had -- that you could just make that payment anytime?
6 A. Yes.
7 Q. All right. And what was your understanding
8 about how long that meant?
9 A. That there was no time limit to it.
10 Q. After you accepted -- did you accept within
11 that 30-day period?
12 A. Yes.
13 Q. And did you do that verbally or in writing?
14 A. Verbally.
15 Q. And do you know who that verbal acceptance was
16 made to?
17 A. No.
18 Q. Did you make that acceptance, or did your wife
19 make that?
20 A. My wife made it on my behalf.
21 Q. Okay. Did you provide any documents or sign
22 any documents that allowed the lender to talk to your
23 wife instead of talking to you?
24 A. No. But she has power of attorney for me.
25 Q. Did she have power of attorney for you at that

1 time?
2 A. Yes.
3 Q. Can I get a copy of that power of attorney?
4 A. I would imagine.
5 Q. Do you know if you still have a copy?
6 A. I don't know.
7 Q. I'm going to want to get a copy of that from
8 you as well.
9 Most lenders won't talk to someone who is not
10 the borrower unless they have something in writing like
11 that. Your wife was not the borrower on this loan; is
12 that correct?
13 A. Correct.
14 Q. It was just you. Did you own the house just
15 in your name?
16 A. Yes.
17 Q. Do you still own the house just in your name?
18 A. Yes.
19 Q. Okay. After you verbally accepted this offer,
20 did you ever make any monthly payments after that date?
21 A. No.
22 Q. Okay. Did you ever make any payments to the
23 lender? I'm talking about directly to the lender. I'm
24 aware that a payment has been made to the attorney in
25 the Gwinnett case, and he's got money in his escrow

1 account.
2 But my question to you is after the day you
3 accepted, did you make any payments to the lender or
4 anybody you understood or believed to be the lender
5 after that date, directly to the lender?
6 A. Do you mean DTA Solutions?
7 Q. I mean DTA or any other lender related to this
8 loan.
9 A. Not that I'm aware of.
10 Q. Okay. So do you recall when is the last
11 monthly payment you made on this loan?
12 A. I don't recall.
13 Q. Okay. But it would have been before September
14 of 2012?
15 A. Yes.
16 Q. All right. If you'll look -- I know when we
17 finish this document, we're going to take a break. The
18 paragraph or the sentence -- it's about the fifth
19 sentence down. It starts with "to participate in this
20 program." Do you see that?
21 A. Yes.
22 Q. And it says, "Use the coupon below in the
23 enclosed envelope to make your payment." Do you see
24 that?
25 A. Yes.

1 Q. So you never cut this coupon out and sent it
2 in?
3 A. No.
4 Q. This has the DTA Solutions address where the
5 payment was supposed to be made -- do you see that --
6 on the bottom right-hand corner?
7 A. Yes.
8 Q. Unfortunately, the word "Dallas" is partially
9 covered up by my exhibit sticker.
10 Do you know how long DTA held this loan?
11 A. No.
12 Q. Do you know if DTA held this loan through the
13 end of 2012?
14 A. No.
15 Q. Do you know if DTA held this loan for the
16 30-day period referenced in this letter?
17 A. I don't know.
18 Q. Okay. Did you ever mail a check to this
19 address for DTA Solutions in accordance with this
20 particular document that's been listed as Exhibit C?
21 A. Not that I'm aware of.
22 Q. So the paragraph, next one down below that, it
23 says, "We must be in receipt of your payment, $9,875,
24 no later than 30 days from the date of this letter in
25 order to include your account in this program." Do you

1 see that?
2 A. Yes.
3 Q. What did that mean to you?
4 A. Really nothing, after we had gotten the
5 correspondence through verbal correspondence saying
6 that that 30 days was not binding.
7 Q. Okay. The next sentence says,
8 "Preauthorization of this settlement offer will expire
9 after that date." Do you see that?
10 A. Yeah.
11 Q. Then it says, "Please act now." It says,
12 "Your account may not be eligible for similar offers in
13 the future." Do you see that?
14 A. Yes.
15 Q. Okay.
16    MR. JOHNSON: We can take a break now.
17    MR. WEXLER: Excellent.
18    (Recess from 1:47 p.m. to 1:56 p.m.)
19    BY MR. JOHNSON:
20 Q. Mr. Cordtz, you're still under oath. Okay?
21 A. Yes.
22 Q. Just another follow-up question on Exhibit C.
23 Did you have the ability pay this $9,875 back in
24 September of 2012?
25 A. Yes.

1 Q. So you had the money available. So you could
2 have paid it, if you ever wanted to?
3 A. Yes. We could not verify the DTA Solutions
4 really was a company that would be able to clear this
5 matter up. That's what we were trying to determine.
6 Q. Did you ever determine that?
7 A. No. We spoke with the FDIC, with One West
8 Bank, who was the successor for IndyMac. It looks like
9 we spoke to a group called CreditControl.com. We spoke
10 to the Consumer Protection Agency.
11    We spoke to multiple parties, trying to verify
12 it, because this letter just came to us from the mail
13 and not directed from a prior -- you know, from Faslo
14 or anybody else. We weren't prepared to send $9,875 to
15 an entity we had never heard of until we were certain
16 that it was legitimate.
17 Q. By the time you filed your lawsuit in Gwinnett
18 County, you're taking the position that this is a
19 legitimate settlement offer that you accepted relating
20 to this loan; is that correct?
21 A. Yes.
22 Q. So at what time did you come to an
23 understanding or belief that this was actually a valid
24 settlement offer?
25 A. I'm not certain of the exact date.

1 Q. Okay. So would it have been just before you
2 filed the lawsuit in Gwinnett?
3 A. I don't know.
4 Q. Okay. All right.
5    (Johnson Exhibit D was marked.)
6    BY MR. JOHNSON:
7 Q. So the next document is the lawsuit in
8 Gwinnett that I wanted to talk to you a little bit
9 about. It's listed as Exhibit D. I'll give you a
10 second to get that in front of you.
11 A. Okay.
12 Q. Can you tell me how many pages that is?
13 A. 19.
14 Q. Okay. So on page 18, there's a signature. Is
15 that your signature?
16 A. Looks to be, yes.
17 Q. Do you remember signing this complaint?
18 A. Not specifically.
19 Q. The next page is the 19th page, has
20 "Verification" at the top of it. Do you see that?
21 A. Yes.
22 Q. There's a signature above your typed name. Is
23 that your typed signature?
24 A. It looks like, yes.
25 Q. Do you remember signing this document?

1 A. Not specifically.
2 Q. Okay. Do you know Ms. Julie Mason, the
3 notary?
4 A. Not personally, no.
5 Q. Where did you find her?
6 A. I believe she's at a UPS store in Duluth.
7 Q. Okay. Did somebody assist you in drafting
8 this complaint?
9 A. I worked with my attorney on it.
10 Q. Okay. Was that Mr. Alembik?
11 A. Yes.
12 Q. Okay. I know he entered an appearance later
13 in this case. It looks good. Sometimes pro se
14 complaints look different. So this one looked good.
15 So I was wondering.
16    If you'll look to page number 5 of the
17 complaint. We'll start at paragraph 15. Do you see
18 that?
19 A. Yes.
20 Q. It says, "In January of 2009, Cordtz," meaning
21 yourself, "began feeling financial pressure and entered
22 into an agreement with Faslo to modify the loan
23 agreement." Do you see that?
24 A. Yes.
25 Q. Everybody knows that 2009 was during the Great

Page 45

1  Recession.  So that doesn't surprise me.  But what kind
2  of financial pressure were you feeling at the time?
3  A.  I was between jobs.
4  Q.  Okay.  So I know we stopped at your job
5  history back in 2010.  Since that's relevant to this
6  matter, I'm going to go a little further back, then, if
7  you don't mind.
8      You said you started with Staples in February
9  of 2010; is that correct?
10 A.  Yes.
11 Q.  Where did you work before Staples?
12 A.  Meridian Enterprises.
13 Q.  What did you do there?
14 A.  Sales.
15 Q.  And what dates did you work there?
16 A.  I don't recall exactly.  But I believe it was
17 roughly 2007 to 2009.
18 Q.  Do you remember why you left in 2009?
19 A.  I was let go on the downsizing.
20 Q.  I understand that.  I'm sorry to have to ask
21 you questions like that.  I do understand that was
22 during the Great Recession.
23     So do you remember -- was it early 2009, late
24 2009, or do you remember?
25 A.  I don't remember.

Page 46

1  Q.  Okay.  So then you had a gap.  Is this the gap
2  you were just referring to between when you left
3  Meridian and when you started working with Staples?
4  A.  Yes.
5  Q.  Okay.  So this says in January of 2009 you
6  began feeling financial pressure.  Would that have been
7  before you left Meridian?
8  A.  No.
9  Q.  So then it was really early 2009 when you left
10 Meridian, it would appear, based on that testimony?
11 A.  I don't exactly recall.
12 Q.  Okay.  All right.  Do you recall how long you
13 were without employment during that period of time?
14 A.  Not exactly, no.
15 Q.  Was it more than a year?
16 A.  I don't know.
17 Q.  Okay.  Was it more than six months?
18 A.  Yes.
19 Q.  Okay.  In paragraph 16, you indicated -- well,
20 let me go back for a second.  Did you miss any payments
21 while you were out of work on this loan?
22 A.  Not that I'm aware of.
23 Q.  So you continued to make payments throughout
24 the whole time even when you were not employed?
25 A.  Yes.

Page 47

1  Q.  So paragraph 16 said that Faslo agreed to
2  reduce your loan to $100,000; is that correct?
3  A.  Yes.
4  Q.  And by mutual agreement, you said your monthly
5  installment payments were reduced to $500; is that
6  correct?
7  A.  Yes.
8  Q.  What were your monthly payments before that;
9  do you remember?
10 A.  I don't recall.
11 Q.  Was it more than $600?
12 A.  I would think so.
13 Q.  All right.  Did you have a written agreement
14 with respect to this paragraph 16 of reduction of the
15 loan and a reduction of your payment, the installment
16 payments?  Did you have a written agreement?
17 A.  I don't recall.
18 Q.  Okay.  You might have had a written agreement,
19 but you might have just done it based on a verbal
20 conversation?
21 A.  I don't recall.
22 Q.  Okay.  Do you have any documents in your
23 possession that memorialize that agreement?
24 A.  Not that I'm aware of.
25 Q.  Under paragraph 19, it talks about the

Page 48

1  servicing of the loan going into limbo after Faslo
2  dissolved, which you address in paragraph 18.  You said
3  that "Cordtz discovered the loan agreement had been
4  transferred to DTA Solutions."  Do you see that?
5  A.  Yes.
6  Q.  It says you became aware of that in the summer
7  of 2012; is that correct?
8  A.  That's what it says.
9  Q.  So in the summer of 2012, according to the
10 sworn testimony in this document, you discovered that
11 the loan agreement was transferred to DTA Solutions; is
12 that correct?
13 A.  No.  Our first understanding it was now with
14 DTA Solutions was in the letter that we received --
15 Q.  Okay.  So this paragraph 19 -- I'm sorry.  I
16 didn't mean to interrupt you.  I thought you were
17 through.  What did you say?
18 A.  I said Exhibit C.
19 Q.  Yeah.  So this paragraph would be incorrect
20 then; is that fair to say?
21 A.  I don't know whether that's -- you know, we
22 first learned about DTA Solutions when we received the
23 letter, Exhibit C.
24 Q.  Okay.  And I think you earlier testified that
25 you received that in September of 2012.  Is that still

Page 49

1 your testimony?
2 A. That's when it was dated, yes.
3 Q. I mean, you didn't get it, and it was, like,
4 "Oh, it's June, but they dated it in September, three
5 months after the fact"? You got it, and it made sense
6 when you received it. And that was September 2012; is
7 that correct?
8 A. As far as I recall.
9 Q. Okay. In paragraph 20, it says, "In 2012,
10 certain of Cordtz's installment payments under the
11 modified loan agreement became past due." Do you see
12 that?
13 A. Yes.
14 Q. Do you remember when in 2012 that happened?
15 A. No.
16 Q. Did that happen prior to you becoming aware of
17 DTA?
18 A. I don't know.
19 Q. So sitting here today, you agree that your
20 installment payments became past due in 2012; is that
21 correct?
22 A. I don't recall whether they were past due or
23 not.
24 Q. Okay. I just want to -- this is a sworn
25 document. So you swore to this, but you're telling me

Page 50

1 today during the deposition that you're not sure if
2 that's correct; is that right?
3 A. I don't know whether I -- the statement of
4 modified payments becoming past due, when we made
5 payments with checks that were never cashed -- I'm not
6 trying to split hairs, but I don't know that I agree to
7 understand that they were past due.
8 Q. On the next page, page 6, you start talking
9 about the debt reduction program, which is really
10 Exhibit C of what we've been talking about.
11    In paragraph 22, you state that "DTA proposed
12 to Cordtz that Cordtz transmit a $9,875 payment within
13 30 days of the letter's date." Do you see that?
14 A. Yes.
15 Q. Okay. And it was "to resolve the entire
16 balance of the loan at a discount." Do you see that?
17 A. Yes.
18 Q. I think you earlier testified that, after you
19 had conversations, they said that that's not a
20 hard-and-fast date or that's not a hard-and-fast
21 deadline; is that correct?
22 A. Yes.
23 Q. I think you earlier testified that you didn't
24 really know what the deadline was after that point. Is
25 that fair to say?

Page 51

1 A. No; only that they said that the offer was
2 good past 30 days.
3 Q. Okay. And did you have an understanding about
4 how long past 30 days the offer would be good for?
5 A. No.
6 Q. So it could have been months or years, in your
7 understanding?
8 A. Yes.
9 Q. Do you remember when you first submitted the
10 funds, $9,875, to anyone, including your attorney? Do
11 you remember when that happened?
12 A. I don't remember the exact date, no.
13 Q. Did you send a check?
14 A. I believe it was a wire transfer.
15 Q. On page 7 of that complaint, at paragraph 28,
16 I want to talk to you a little bit about paragraph 28.
17 Do you see that?
18 A. Uh-huh (affirmative).
19 Q. It says in October of 2014 that the Cordtz
20 family again contacted DTA to talk about the settlement
21 agreement. Do you see that?
22 A. Yes.
23 Q. And so you were still talking to DTA in
24 October of 2014? You or your wife were still talking
25 to them about the settlement agreement; is that

Page 52

1 correct?
2 A. Apparently.
3 Q. Was it correct or not? Do you know if that's
4 true or not?
5 A. I don't know specifically, no.
6 Q. On page 8, at the very bottom, on paragraph
7 37 -- I'll let you get there. Let me know when you're
8 there.
9 A. There.
10 Q. It says on March 13, 2018, that you were
11 advised the loan agreement had been assigned to Aspen
12 Properties Group, who was the company you sued in this
13 Gwinnett lawsuit; is that correct?
14 A. As far as I recall, yes.
15 Q. Once you became aware that Aspen Properties
16 Group was involved, what did you do with respect to
17 this loan?
18 A. I believe my wife contacted Aspen Properties
19 Group directly to find out what was going on because we
20 had never heard of this, and it came completely out of
21 the blue. I think shortly after that is when we hired
22 an attorney.
23 Q. You make a lot of references to your attorney
24 or Cordtz's attorney, starting at paragraph 41 and
25 thereafter. Are those all referring to Mr. Alembik?

1 A. Not necessarily. We had another attorney
2 prior to Mr. Alembik. His name was Richard Wayne.
3 Q. So starting in paragraph 41, do you know if
4 that's talking about Mr. Wayne or Mr. -- I'm sorry if I
5 mispronounce his name -- Alembik?
6 A. I don't know. I believe that's Mr. Alembik.
7 Q. Okay. You mention this date of August 5th of
8 2019 letter. There's a lot of references to that. Do
9 you have a copy of that letter?
10 A. Not that I know of.
11 Q. Does Mr. Alembik -- do you know if he has a
12 copy of that letter?
13 A. I don't know.
14 Q. Under page 11, at paragraph 48, you talk about
15 failing to provide an accounting to Cordtz for the
16 installment payments. There would be no payments
17 subsequent to September of 2012, would there?
18 A. Not that I'm aware of.
19 Q. Okay. I'm going to go to the next exhibit,
20 Exhibit E.
21 (Johnson Exhibit E was marked.)
22 BY MR. JOHNSON:
23 Q. Do you see that letter?
24 A. I do.
25 Q. Do you recognize that letter?

1 A. I do.
2 Q. Did you receive this letter in the mail?
3 A. As far as I recall, yes.
4 Q. Okay. What about this letter surprised you
5 when you got it?
6 A. Everything.
7 Q. I'm sorry?
8 A. Everything.
9 Q. And what -- so what surprised you?
10 A. A, that I was being contacted directly; B,
11 that there was an amount of $327,000 listed; C, that
12 there was a demand for payment within 30 days. Pretty
13 much covers it.
14 Q. All right. And the next document I've got is
15 listed as Exhibit F.
16 (Johnson Exhibit F was marked.)
17 BY MR. JOHNSON:
18 Q. Do you see that?
19 A. Yes.
20 Q. And it's a letter from Mr. Alembik responding
21 to that letter that we've identified as Exhibit E.
22 It talks about -- if you look on the second
23 page at the first full paragraph where it starts, "In
24 your April 8th letter." Do you see that?
25 A. Yes.

1 Q. It says that you, meaning me -- I'm the one
2 who drafted that letter -- used false, deceptive and
3 misleading representation in collecting this consumer
4 debt. Do you see that?
5 A. Yes.
6 Q. And the first thing that it says -- "first you
7 falsely represented the character, amount, or legal
8 status of the HELOC." Do you see that?
9 A. Yes.
10 Q. Do you know how the character, amount, or
11 legal status was falsely represented?
12 A. No.
13 Q. You don't know how that -- what that meant?
14 A. I don't know legal terminology to this.
15 Q. Okay. That's not legal terminology. That's
16 just, you know, was something falsely represented.
17 It's really a question of fact.
18 A. Each sentence is tied to, you know, a
19 specific -- 15USC1692e(2)(A), I have no idea what those
20 reference. So I wouldn't be able to specifically
21 respond to that.
22 Q. My question wasn't as it related to that
23 statute. My question was in general whether or not the
24 character, amount, or legal status of the HELOC was
25 falsely represented in what way, not in accordance with

1 any statute or not.
2 I'm just asking you -- you're suing in this
3 lawsuit as the plaintiff. That's one of the issues
4 that's been raised in this lawsuit. And I'm just
5 asking you are you aware of any facts that would
6 support that statement?
7 A. I would think the amount of 327,000 might be a
8 good starting point.
9 Q. Okay. What else?
10 A. That's -- that probably does it.
11 Q. Past that, it says the word "second."
12 It says, "You are seeking to collect amounts not
13 expressly authorized by the agreement creating the
14 debt." Do you see that?
15 A. Yes.
16 Q. Do you know any facts in support of that
17 statement?
18 A. Again, I would say the 327,000 isn't tied to
19 anything there.
20 Q. Okay. So you had -- you agreed that you
21 borrowed money and that you agreed that you owe that
22 money back, but you're saying that, really, that
23 relates to the amount in the letter?
24 A. The amount was one of several pieces that were
25 incorrect with the letter.

Page 57

1  Q.  Okay.  What other pieces were incorrect with
2  the letter?  That's the only one that I heard you
3  testify that was incorrect.
4  A.  The fact that it was sent to me directly when
5  I was being represented by an attorney that was fully
6  engaged and aware of it.
7  Q.  Yeah, but that's not an incorrect statement in
8  the letter itself.  You're saying it was delivered to
9  you, and then you felt like that was wrong.
10    But I'm asking you what is factually incorrect
11  in the letter, other than your testimony about the
12  $327,000 amount.
13  A.  Yeah.  I don't know.
14  Q.  Okay.  That's the only thing I've heard you
15  testify was factually incorrect.  You can certainly
16  correct me if I'm wrong.  But that's the only thing I
17  heard you testify.  I want to give you an opportunity
18  if you see anything else.
19  A.  No.  I think the amount was the critical
20  point.
21  Q.  All right.  And the third thing -- where it
22  starts with "third" in this letter that we've marked as
23  Exhibit F, it says, "Third, you also threatened to take
24  an action that cannot legally be taken."  Do you know
25  what that's talking about?

Page 58

1  A.  No.
2  Q.  Okay.  So you don't know any facts to support
3  that?  This is just something your attorney drafted,
4  and you're not aware of any facts that support that?
5  A.  Yes.  Again, it's referenced in a USC code
6  that I'm not aware of.
7  Q.  And I'm not talking about the code.  I'm
8  talking about in general.  I'm not referring to the
9  code.
10    I'm just asking if you're aware of a threat to
11  take an action that cannot be legally taken.
12  A.  No.  I'm not aware of what that is.
13  Q.  Okay.  And are you aware of what that
14  action -- that's my next question -- of what that
15  action might be.  And I think you testified you're not
16  aware; is that correct?
17  A.  Yeah.
18  Q.  Okay.  So this letter -- it says it was copied
19  to you.  Did you get a copy via email of this letter?
20  A.  I did.
21  Q.  Did you see this letter before it was sent?
22  A.  No.
23  Q.  So you only saw it after you got the email of
24  it, when it was being sent?
25  A.  As best as I recall.

Page 59

1  Q.  Okay.  So were you ever aware that after
2  receipt of this letter that I actually spoke to your
3  attorney, Mr. Alembik, on April 15th of 2021?
4  A.  I'm not sure.  I think I recall him
5  referencing somewhere that you had a conversation.
6  Q.  Okay.  And I'm not -- once again, I'm not
7  asking you about what you've been told or any
8  communications between you and your attorney.  I just
9  wanted to know if you were aware in general.
10    (Johnson Exhibit G was marked.)
11    BY MR. JOHNSON:
12  Q.  So the next document is Exhibit G.  That's the
13  response letter after I spoke with Mr. Alembik.
14    Were you aware that Mr. Alembik talked to me
15  and said that, when I asked him what he wanted from me
16  in response to this letter -- was that he wanted me to
17  withdraw the letter that we've marked as Exhibit E?
18  Were you aware of that?
19  A.  Was I aware of what?  I'm sorry.
20  Q.  Were you aware that we had a conversation
21  about Mr. Alembik's letter that's been marked as
22  Exhibit F and that Mr. Alembik told me that what he
23  wanted was for me to withdraw the letter that I had
24  sent on April 8th that we've marked as Exhibit E?  Were
25  you aware of that?

Page 60

1  A.  Only through the sentence in the letter that
2  says "as we discussed."
3  Q.  Okay.  So you have seen what we've marked as
4  Exhibit G?
5  A.  Yes.
6  Q.  Okay.  So that made you aware that we had --
7  at least from the position in the letter was that a
8  discussion had occurred?
9  A.  As far as I know from the letter.  I did
10  not -- that's all I --
11  Q.  Okay.
12  A.  -- knew of the conversation.
13  Q.  And Mr. Alembik indicated that there was --
14  that you were considering filing a lawsuit, and
15  Mr. Alembik indicated that if the letter was withdrawn,
16  such a lawsuit would not be filed.  Were you aware of
17  that?
18  A.  Not that I recall.
19  Q.  You've never been made aware of that
20  conversation?
21  A.  Not that I recall.
22  Q.  Okay.  Do you know if a letter like the one
23  that we marked as Exhibit F is a prerequisite to filing
24  a federal lawsuit under the Fair Debt Collection
25  Practices Act?  Do you know if that's the case?

Page 61

1   A.  I don't know.
2   Q.  So what we marked as Exhibit G is a withdrawal
3   of that letter that we've marked as Exhibit E.  Were
4   you aware that that letter was withdrawn?
5   A.  Based on the contents of the letter, I would
6   think, yes.
7   Q.  Do you remember when you saw this letter?
8   A.  No.  I wasn't copied on it.  So I'm not sure
9   when it was sent to me.
10  Q.  You didn't see this letter for the first time
11  when you got it from me as an exhibit for this
12  deposition, did you?  Had you seen it before?
13  A.  Probably, as best as I recall, yes.
14  Q.  Okay.  I'm going through some of the discovery
15  I sent, some of your responses now.  Some of this stuff
16  I already covered.  I won't ask again.  It will take me
17  a minute to get through some of this stuff, to get to
18  the point, because I don't want to ask questions over
19  and over, if I can help it.
20      I did want to ask about legal bills because in
21  response to my first interrogatories, number 8, you
22  said that in this lawsuit you're seeking the legal
23  bills of Rick Alembik.
24      So my question is this says for the Fulton
25  County lawsuit, and that's the lawsuit that I filed in

Page 62

1   Fulton County that we later dismissed.  Is that the
2   only legal bills that you're seeking for Mr. Alembik,
3   or are you seeking more than that?
4   A.  I'm not sure.  I don't know.
5   Q.  Okay.  So you may be seeking legal bills for
6   the case in Gwinnett as well?
7   A.  I don't recall specifically which motion has
8   seeking legal repayment for.
9   Q.  Okay.  But this is your case.  I know you have
10  an attorney.  I can't really ask your attorney.  So I
11  have to ask you what legal bills, so I'll know.
12  Mr. Wexler has refused to provide copies of the legal
13  bills as it relates to what the claim is for damages.
14  So I need to know where they're coming from, which
15  bills that you're looking to recover in this lawsuit.
16      This says with respect to the Fulton County
17  lawsuit.  That's all it says.  So -- but we have
18  another lawsuit, the slander case that you referred to
19  earlier as the $4,000,000 case.
20      Are you seeking legal bills with respect to
21  that case -- are you seeking legal bills in this case
22  with respect to Mr. Alembik's work in what I'll call
23  the slander case --
24  A.  I'm not certain.
25  Q.  -- which was filed in (audio distortion)

Page 63

1   County?
2       I'm sorry?
3   A.  I'm not certain.
4   Q.  And you're not certain whether or not you're
5   seeking any bills of Mr. Alembik for the Gwinnett case;
6   is that what you said earlier?
7   A.  Again, I'm not certain.  There are multiple
8   cases going on, a lot of which I don't understand, and,
9   you know, which ones we're seeking legal reimbursement
10  for or not, I am not certain of.
11  Q.  All right.  Were you aware that I had offered
12  to dismiss the slander case for $4,000,000 if this
13  particular case was dismissed against me?  When I say
14  "this particular case," I'm talking about the one in
15  federal court that you filed against me.  Were you
16  aware of that?
17  A.  Not that I recall.
18  Q.  So you were not aware that I had made an offer
19  to dismiss that $4,000,000 slander case in return for
20  being dismissed from this case?
21  A.  Not that I recall.
22  Q.  In my first request for production, I had
23  asked for copies of all correspondence you had
24  regarding anything relating to your allegations in the
25  complaint.  That's emails, text messages, things like

Page 64

1   that.
2       The response was that there were none except
3   for communications that are protected by the
4   attorney-client privilege, which is any communication
5   you had between you and your attorney.  I told you from
6   the beginning of this deposition I'm not looking for
7   those.
8       But do you have any other correspondence that
9   you have relating to your lawsuit, whether it be
10  written correspondence or an email or text messages
11  relating to this lawsuit, other than those types of
12  communications between you and your attorney?
13  A.  No.
14  Q.  We've talked about the letter from DTA and
15  some other things, but there's no missing
16  correspondence or anything that you had with somebody,
17  other than your attorney, relating to this case; is
18  that correct?
19  A.  Not that I'm aware of.
20  Q.  Okay.  In response to my third
21  interrogatories, the first interrogatory, I had asked
22  about what kind of presuit investigation with respect
23  to whether or not I am a debt collector under the Fair
24  Debt Collection Practices Act.
25      As you may know -- or you may not know -- one

1  of the defenses that we are at least discussing with
2  your attorney is the fact that I am not a debt
3  collector under the Fair Debt Collection Practices Act.
4  This is not what I do. This is not the normal thing
5  that I do for a living -- is sue consumers.
6      Did you do any presuit investigation or
7  investigation prior to the filing of this federal
8  lawsuit into whether or not either me or my firm was a
9  debt collector?
10 A. Did I?
11     MR. WEXLER: Be sure not to give any
12 communications, as Mr. Johnson had
13 instructed, between you and your attorney.
14     MR. JOHNSON: Yeah.
15     BY MR. JOHNSON:
16 Q. I'm not trying to get there. I'm not trying
17 to trick you into telling me anything about you and
18 your attorney. I don't want to go over that.
19     But I'm asking if you personally did anything
20 pre -- before filing this federal lawsuit about whether
21 or not me or my firm is a debt collector.
22 A. No.
23 Q. Okay. Are you aware of any other
24 investigation that may have occurred? I'm not asking
25 for my communication you had with your attorney. But

1  are you aware of any other investigation that occurred
2  in that regard?
3  A. Not that I recall.
4  Q. Okay. One of the things that attorneys talk
5  about is what they call special damages. In a car
6  wreck case, that's like actual medical bills. In this
7  case, one of the specials that I believe are being
8  covered and requested in this lawsuit is attorneys'
9  fees, for instance.
10     Do you have any other special damages -- and
11 when I "special damages," I mean somebody billed you or
12 gave you a invoice, whether it be a doctor or anybody
13 else, that you're asking for as damages in this
14 lawsuit?
15 A. Not that I'm aware of.
16 Q. Okay. Part of your allegation in the lawsuit
17 was that you were emotionally harmed by some of the
18 actions. Did you ever go and see a doctor about that?
19 A. Did I? No.
20 Q. Yes. Do you know anybody else who did?
21 A. Well, yeah. My youngest son has had multiple
22 issues related to the outcome of all of these actions.
23 Q. Okay. We'll talk about that, because I know
24 you have that in your complaints.
25     But I was asking about you in particular, and

1  I think you testified first, for you, you didn't have
2  any kind of thing like that for yourself; is that
3  correct?
4  A. Yes.
5  Q. And when I say "anything like that," I mean
6  you didn't go see a doctor? You don't have any
7  doctor's bills that you're claiming as damages in this
8  particular lawsuit; is that correct?
9  A. For me, no.
10 Q. Yes. All right. Are you claiming damages for
11 your son's medical bills?
12 A. Possibly. I'm not certain.
13 Q. Okay. How old is that -- you said it's your
14 youngest son. I forget. How old is he?
15 A. 25.
16 Q. Okay. Does he live with you?
17 A. Yes.
18 Q. Are you a legal guardian for him?
19 A. Am I? Sorry.
20 Q. A legal guardian. Have you been appointed by
21 a probate court as a legal guardian of -- I'm sorry.
22 What's his name?
23 A. Robert.
24 Q. Robert. I mean, he's a 25-year-old man, which
25 makes him an adult. My question is have you been

1  appointed his legal guardian or conservator or anything
2  like that?
3  A. I don't know the exact terminology. He's a
4  special needs child, and, you know, he's our son; so
5  he's with us.
6  Q. But have you gone into probate court and
7  actually had an order by a probate judge that appointed
8  you as his guardian or his conservator?
9  A. I don't know.
10 Q. Do you recall ever going into probate court
11 regarding your son Robert?
12 A. Not that I recall.
13 Q. Do you recall hiring an attorney to represent
14 you in probate court with respect to your son Robert?
15 A. Not that I recall.
16 Q. Okay. In response to the third production,
17 number 4, I had asked about all documents relating to
18 damages you're claiming in the civil action. Your
19 attorney objected and then said that Plaintiff will
20 produce billing records at the damages phase of this
21 litigation.
22     Do you have billing records for your attorneys
23 that have billed you?
24 A. I would think so.
25 Q. Do you know if you have copies of those that

1  you could provide?
2  A.  I would have to ask my attorney if that was
3  agreeable to him.
4  Q.  Okay.  I know he's objected.  Because of that,
5  I'm not able to ask you questions about those
6  documents.
7     So at the end of the deposition, I'm going to
8  actually leave the deposition open for the purpose of
9  seeking Court intervention, and to the extent that I
10  get documents after today, I'm going to leave it open
11  so that I could possibly come back and ask you
12  questions about those documents since I don't have them
13  today.  Okay.  I just wanted you to be aware.
14     So do you understand what I'm saying?
15  A.  Yes.
16  Q.  So in response to the second set of
17  interrogatories, I had also asked about what you had
18  used the money for when you had gotten this particular
19  loan.  One of them said household improvement, which
20  you mentioned was the deck.  Then it says medical
21  procedures and expense, and you mentioned that was
22  about your wife and your son.
23     Then it says insurance payments.  You didn't
24  mention insurance payments.  Did you make some payments
25  for insurance out of the money that you borrowed that's

1  at issue in this case?
2  A.  I don't recall.
3  Q.  So when it says insurance, you don't know if
4  it's, like, car insurance or medical insurance or
5  anything like that?
6  A.  I don't know.
7  Q.  It also says that you had -- it says a master
8  bathroom.  It didn't say renovation, but I assume that
9  means a renovation unless you built on a master
10  bathroom.  Did you use some of the money to either
11  renovate or build a master bathroom at your house?
12  A.  I don't recall.
13  Q.  In response to what -- in federal court, you
14  have to file what's called initial disclosures.  Your
15  attorney (audio distortion) -- and it wasn't even me.
16  It's actually part of the Court rules -- asked about
17  what type of damages you have.  It says you suffered
18  emotional distress and mental anguish.
19     Could you explain to me what type of emotional
20  distress and mental anguish that you suffered as a
21  result of the actions that you're alleging in this
22  lawsuit?
23  A.  Everything about it has caused me personal
24  stress and anxiety, primarily around the issue of our
25  son Robert.  Robert is a special needs child, who's had

1  multiple medical issues, including having both hips
2  replaced, steel plates put into his shin, surgery on
3  his jaw and, most recently, cracked vertebrae from a
4  degenerative bone condition, which the doctors have
5  been telling us could be significantly alleviated by
6  moving to a warmer climate than what's year round in
7  metro Atlanta, which is at the crux of this.
8     Having to see our youngest son in intense
9  critical pain, having to move his entire bedroom down
10  to the living room so he no longer has to climb steps
11  to get to his bedroom, which the doctors say are what's
12  causing the cracked vertebrae, to see him not be able
13  to get to his toys that are up in his room, and just to
14  watch him be in constant pain, particularly coming down
15  to the winter months, is extremely stressful and causes
16  extreme anxiety to both myself and my wife as well as
17  to his siblings.
18  Q.  Okay.  And you're not able to move because of
19  the loan that you took out and the lien on your
20  property that's at issue in this lawsuit; is that
21  correct?
22  A.  Yes.
23  Q.  Okay.  So you understand that neither me nor
24  Johnson Legal Offices, my law firm -- that we're not
25  your lender and we don't own that loan?  You understand

1  that; correct?
2  A.  I don't know.  I don't know who owns the loan.
3  Q.  Okay.  So do you believe that I own the loan?
4  A.  I don't know.
5  Q.  Okay.  So you've filed a lawsuit, and that's
6  one of your allegations against me, and you're now
7  making this part of your damages.  So if you could
8  explain to me how my actions have harmed your son.
9  A.  Our belief is that we have a settled case to
10  close this out for the $9,875 that's being drawn out,
11  not knowing who owns the loan.  I think there's been
12  four or five different representations of who owns the
13  loan with names changing and venues changing that,
14  frankly, I don't understand.  So as far as who owns the
15  loan or who's responsible for continuing to drag this
16  out, I am -- I don't know.
17  Q.  You were at that hearing in Gwinnett.  We
18  filed a motion, and we've actually put into evidence
19  all the assignments showing everybody who it's our
20  position has owned the loan and who currently owns the
21  loan.  You were at that hearing; do you remember?
22  A.  I remember being at it, yes.
23  Q.  And so nobody has ever taken the position that
24  I, Larry Johnson, or my law firm has owned the loan.
25  Are you aware of anybody taking that position?

1 A. I personally don't understand any of who owns
2 the loan or any of the communications or most of what
3 went on at that last Zoom hearing.
4 Q. Okay. So I'm just getting to how you blame me
5 for your son's medical position. I'm having a hard
6 time with that.
7 I'm an attorney who represents a lender in a
8 case against you. I represent my lender to my fullest
9 abilities. It's currently before the judge, and the
10 judge -- the next step is for the judge to rule on
11 those motions to see how these exact issues are
12 resolved and how that turns into you blaming me for
13 your son's medical condition.
14 A. Again, I'm unaware of who the actual owner of
15 the loan is, but when all the correspondences come from
16 you, particularly a letter that came directly to me,
17 that makes you the face of this action, in my
18 viewpoint.
19 And again our viewpoint is that I have a legal
20 right to settle this for the $9,875 that I've already
21 paid into escrow, and it is being held up by continuing
22 legal motions that have dragged on completely outside
23 of this initial matter.
24 Q. The letter from me that you're referencing is
25 Exhibit E that we talked about, and you've already gone

1 over, and the first paragraph says, "Please be advised
2 we represent Aspen Holdings in the above case." And
3 the case is identified as the Gwinnett case. I don't
4 know if you have that in front of you or not. You can
5 just go with my representation.
6 So that letter was sent to you by me as an
7 attorney on behalf of the company that we claim is the
8 holder of the loan, not me personally, but me on behalf
9 of that particular lender.
10 So if the Court rules that I do not own the
11 loan and never did and that somebody else does, is it
12 still your position that I have caused your son's
13 medical conditions or exacerbated them?
14 A. Not being a lawyer and just being in layman's
15 terms, I see a letter coming from Johnson Legal Offices
16 signed by Larry Johnson. I have never spoken to Aspen
17 Holdings Trust, don't know who they are, anything about
18 them, and whether or not they are or some other entity
19 owns the loan. But I see your name and your signature
20 on that. So that's what, in my mind, ties it together.
21 Q. So even only representing my client, which is
22 what the letter said, you're still going with your
23 position that I injured your son or exacerbated his
24 condition?
25 A. In my opinion, yes.

1 Q. In this particular case, you or your attorney
2 on your behalf filed an initial complaint, which
3 included language about your emotional distress and
4 included language about you being unable to sell your
5 house to care for your son and being unable to move to
6 a warmer climate, and that's in your lawsuit against me
7 and my law firm.
8 Then you filed -- your attorney filed an
9 amended complaint -- so it's the second complaint --
10 that included similar language, and your attorney has
11 now filed a motion to amend the complaint further, and
12 in that motion, he includes that same language.
13 So you and your attorney are suing me and
14 continuing to amend your case but including that I have
15 caused you emotional distress because of actions that
16 I've taken that has harmed your son, and the only
17 actions that I'm hearing you're saying that were taken
18 were taken by me as a lawyer on behalf of my client.
19 Is that a fair representation?
20 A. I don't know.
21 Q. Other allegations in your complaint said that
22 I or my law firm filed a complaint at the direction of
23 FCI. FCI is another defendant in this case. That's
24 Mr. Baker who represents them and who will be asking
25 you some follow-up questions.

1 What facts are you aware of that either I or
2 my law firm filed a complaint at the direction of FCI?
3 A. That I personally am aware of, I don't know.
4 Q. What facts are you aware of that I or my law
5 firm are connected to FCI with respect to your loan in
6 any way?
7 A. I don't know.
8 Q. Other allegations in the complaint say that me
9 or my law firm regularly and systematically attempt to
10 collect defaulted debt of consumers. What facts are
11 you aware of that would support that allegation?
12 A. I personally -- I don't know.
13 Q. It says that Johnson and my law firm both
14 regularly and frequently collect defaulted debts for
15 others. Are you aware of any facts that would support
16 that allegation?
17 A. I don't know.
18 Q. All right. It says also Johnson -- my primary
19 and principal business is collecting defaulted debts
20 for others. Are you aware of any facts that support
21 that allegation?
22 A. I don't know.
23 Q. There's another allegation that says FCI,
24 Johnson, being me, and my law firm, JLO, knew at the
25 time that the Fulton County lawsuit was filed that the

1 lawsuit was just served to irritate, annoy, abuse and
2 harass Plaintiff. What facts do you have that would
3 support that allegation?
4 A. I'm not certain. Certainly, the letter of
5 Exhibit E would be inclusive of that.
6 Q. You mentioned that your son was special needs,
7 and you went through -- I appreciate you doing that,
8 you explaining that for me -- and that he currently
9 receives a SSI benefit. Is that a disability-type
10 benefit?
11 A. Yes.
12 Q. Okay. And is all of his special needs
13 relating to his physical shortcomings, or does he
14 have -- you only mentioned, like, his physical aspect.
15 Is there any other aspects that would make him what you
16 called special needs?
17 A. Yes. He's diagnosed on the autism/Asperger's
18 spectrum.
19 Q. Okay. Have you looked into moving to a warmer
20 climate?
21 A. If you mean have we looked at places to live
22 in south Florida, yes, we have.
23 Q. Is it in south Florida? Is that where you are
24 looking at?
25 A. Where we would like to go.

1 MR. JOHNSON: Okay. Y'all, I'm almost
2 done, but maybe we can take a five-minute
3 break for me to look over some of my
4 notes -- is that okay -- or does somebody
5 need 10 minutes?
6 THE WITNESS: Five is fine.
7 MR. JOHNSON: Shimson or Mark, do
8 y'all need more time?
9 MR. WEXLER: Five is fine.
10 MR. BAKER: Let's take 10, please.
11 (Recess from 2:54 p.m. to 3:04 p.m.)
12 BY MR. JOHNSON:
13 Q. You're still under oath, Mr. Cordtz.
14 I just have a couple of follow-up questions.
15 During the break, I went and looked at some of
16 the documents we had filed in the Gwinnett case. One
17 of them was a letter from your attorney that was dated
18 November 20th of 2020 that said that he has the money
19 in the trust funds in the amount of $9,875. He has
20 those funds from you in his account.
21 And he emailed you a copy of that letter -- I
22 don't have it as an exhibit now. I'll just represent
23 to you that's dated November 20th of 2020. Do you
24 remember seeing a letter like that?
25 A. I don't recall but most likely.

1 Q. And he hasn't sent us that letter earlier
2 because he said he was waiting for the funds, and so
3 when he sent this letter, I took that to mean he just
4 recently received the funds from you.
5 Do you know if that's -- that's an assumption.
6 But do you know if you had sent the funds to him in
7 about November of 2020?
8 A. I'm not exactly sure when they were sent over
9 or if they were well prior to that.
10 Q. Okay. So do you remember seeing this letter
11 and going, "Oh, I just sent it to him a couple of days
12 ago. So I'm glad he sent that letter out"?
13 A. I don't recall specifically seeing that
14 letter. It's been a lot of documents that have been
15 forwarded to me through this. That one I don't
16 specifically recall, but I would imagine I did.
17 Q. Okay. Have you made payments to anybody else
18 prior to that time for the $9,875 amount that was
19 addressed in Exhibit C that we've already talked about
20 here today?
21 A. No.
22 Q. Okay. That was an agreement that you said you
23 accepted in September of 2012, and if it was November,
24 even October, we're talking about eight years later.
25 That's the first time you tried to make -- that you

1 actually sent money to anybody. Is that correct?
2 A. Prior to that, I wasn't certain that the money
3 was going to be applied properly to that obligation.
4 Q. Okay. So your answer is yes?
5 A. My answer is what I just said.
6 Q. My question was a yes or no. Sometimes it
7 gets -- when you read a transcript, it's unclear
8 whether or not the question was answered. I certainly
9 don't mind you explaining it.
10 But other than you submitting the funds to
11 your attorney, Mr. Alembik, you had never -- prior to
12 that time, you had never submitted those funds, the
13 $9,875, to anybody else; is that correct?
14 A. Not that I recall.
15 Q. Now, in the third complaint that your attorney
16 is now attempting to amend -- and we're waiting for a
17 Court order in that regard -- he makes an allegation
18 about the firm which Mr. Mark Baker works with,
19 McMichael Taylor & Gray, and that they retained me and
20 my law firm because of my reputation as being an
21 excellent -- excuse me -- as being excellent for this
22 type of consumer debt collection case.
23 So my question to you is were you aware, prior
24 to filing this lawsuit, of either my reputation or my
25 law firm 's reputation?

1  A.  No.
2  Q.  Okay.  After filing the lawsuit, have you
3  become aware of either my reputation or my law firm's
4  reputation in consumer debt collection cases?
5  A.  Reputation, no.
6      MR. JOHNSON: Okay.  I may have some
7  questions after Mark is done.  But I'm
8  through for right now.  So I'll turn the
9  questioning over to Mr. Baker.
10      MR. BAKER: Thank you.
11      EXAMINATION
12      BY MR. BAKER:
13  Q.  Mr. Cordtz, I'm Mark Baker.  I represent FCI
14  Lender Services, Inc.
15      I remind you that you're still under oath.
16      You testified under Mr. Johnson's questioning
17  that, when you got the offer from DTA, you or your wife
18  made efforts to determine the legitimacy of that offer;
19  correct?
20  A.  Yes.
21  Q.  And you testified that at that time you were
22  unable to determine the legitimacy of that offer; is
23  that correct?
24  A.  Yes.
25  Q.  And Mr. Johnson asked you then when did you

1  determine that that offer was legitimate.  So I'm
2  asking you that question as well.  When did you make
3  that determination?
4      MR. WEXLER: I believe -- objection.
5  It's asked and answered.  I believe you --
6  that question was asked, which you
7  admitted.
8      You may answer.
9  A.  (By the Witness)  The answer is I don't
10  recall.
11  Q.  Do you recall if it was a year after your
12  inquiries to the FDIC and others?
13  A.  I don't recall.
14  Q.  Two years?
15  A.  I don't recall.
16  Q.  Was it just prior to filing the lawsuit in
17  Gwinnett?
18  A.  I don't recall.
19  Q.  Mr. Cordtz, I had forwarded documents to your
20  attorney earlier today, and I had also produced them in
21  response to your discovery request, and they are -- the
22  documents I forwarded to your attorney are a subset of
23  all of those payment statements that I had produced
24  pursuant to your discovery requests.
25      Have you had an opportunity to look at those?

1  A.  Not all of them but scanned a few.
2  Q.  What I would like to do is share the screen
3  and run through them with you and ask you to identify
4  certain things about them.  So I'm going to do that
5  now.
6      Are you able to see that, or is it only me
7  looking at it?
8  A.  No.  I see an image, the FCI logo.
9  Q.  I will describe this to you.  You're free to
10  dispute it.  But it appears to be an envelope with the
11  FCI logo in the upper center.  It appears to have been
12  addressed to you, and it appears to have been addressed
13  care of someone at an address, apparently, in Atlanta
14  that's marked through.  Do you see that?
15  A.  Yes.
16      MR. WEXLER: Mr. Baker, can I make a
17  recommendation.  Because you had sent the
18  document over, I could just pull up the
19  document.
20      MR. BAKER: That's perfectly fine.  I
21  had not marked them.  So, unfortunately, I
22  don't have a simple way of describing them.
23  But I can describe them by file name, if
24  that's helpful.
25      MR. WEXLER: Okay.  Yes, it is

1  helpful.
2      BY MR. BAKER:
3  Q.  Okay.  So the document I'm referred to now is
4  named "to ATTY" address, followed by a number, followed
5  by Cordtz name, received, return monthly statement.  Do
6  you see that document?
7  A.  Yes.
8  Q.  Okay.  Are you able to look at it more clearly
9  than what I was showing you on the shared screen?
10  A.  I can see it fine.
11  Q.  Okay.  So do you see the address where that's
12  addressed to you, Jeffrey D. Cordtz, c/o something we
13  don't see.  Do you see "100" as a street number?
14  A.  Yes.
15  Q.  And is that the street number of your
16  residence address?
17  A.  No.
18  Q.  Do you recognize what that number might be?
19  A.  Well, the number is 100.
20  Q.  Do you recognize that as part of any address
21  to which you might have been associated with?
22  A.  It could have -- potentially, it could be the
23  initial attorney we had represent us.
24  Q.  Is that Mr. Wayne?
25  A.  Yes.

Page 85

1 Q. Do you see that this envelope was returned to
2 the sender, unable to -- attempted, not known, unable
3 to be forwarded. It appears to be dated February 25,
4 year 2020; is that correct?
5 A. That's what it would appear to be dated, yes.
6 Q. Do you see this document that I just pulled
7 up?
8 A. Yes.
9 Q. It's dated February 21, year 2020; correct?
10 A. That's what it says.
11 Q. In the upper right corner.
12 This is addressed to Jeffrey D. Cordtz at 100
13 Hammon Drive, Atlanta, Georgia, 30328. Do you
14 recognize that address?
15 A. Hammon Drive, no. I believe my attorney was
16 located at Hammond, with a D, Drive.
17 Q. If it were spelled "Hammond" --
18 A. Yeah. But that's not my address.
19 Q. Okay. I'll ask you to identify this statement
20 dated 12/31/2018. Do you see that?
21 A. Do I recognize -- I recognize it being a
22 statement.
23 Q. Okay. It's addressed to Jeffrey D. Cordtz at
24 100 Hammon Drive Atlanta, Georgia; correct?
25 A. That's what it appears.

Page 86

1 Q. Next statement is dated 2/21/2019, also
2 addressed to Jeffrey D. Cordtz at 100 Hammon Drive. Do
3 you see that?
4 A. Yes.
5 Q. You did not live at Hammon Drive; correct?
6 A. That's correct.
7 Q. The next statement is dated March 21, 2019.
8 That's Jeffrey D. Cordtz at Hammon Drive, Atlanta,
9 Georgia. You don't recall this specifically, do you?
10 A. No, I don't.
11 Q. Do you know -- if we assume that this is the
12 address of Mr. Wayne's law offices on Hammond Drive in
13 Atlanta, did he forward to you correspondence that he
14 had received on behalf of FCI regarding your loan?
15 A. A long time ago, he did through 2019, 2020. I
16 have no idea whether Richard Wayne is still located at
17 100 Hammond Drive or if he's even still practicing law.
18 I've not communicated with him for years.
19 Q. All right. Well, this particular statement
20 we're looking at is dated March 21, 2019, and it was
21 addressed to the Hammon Drive address.
22 Do you know, as a matter of practice, whether
23 Mr. Wayne would have forwarded this letter to you at --
24 A. No.
25 Q. You don't know that it would, or you don't

Page 87

1 know if you received this one?
2 A. I don't know that he would, and I am certain I
3 never received this statement. I haven't seen
4 statements from FCI for years.
5 Q. Did I understand you correctly to say you had
6 not received a statement from FCI for years?
7 A. Not that I recall.
8 Q. Do you recall when the last statement you
9 received from FCI was?
10 A. I don't.
11 Q. Could it have been this year?
12 A. I don't recall but most likely not.
13 Q. Would it have been in the year 2020?
14 A. Not that I recall.
15 Q. I'm showing you the next document dated May
16 21, 2019, addressed to Jeffrey D. Cordtz at 100 Hammon
17 Drive. You don't recall whether you had received this?
18 A. I don't recall seeing it, no.
19 Q. Okay. The next is dated June 21, 2019, same
20 name and address. Do you recall having received this?
21 A. I do not.
22 Q. Next document is dated July 22, 2019, same
23 name and address. Do you recall having received this?
24 A. I do not.
25 Q. The next one is dated -- may be a duplicate --

Page 88

1 7/22/2019, same name and address. Do you recall having
2 received that?
3 A. I do not.
4 Q. This may be a duplicate as well.
5 There's a document dated August 21, 2019, same
6 name and address. Do you recall receiving this?
7 A. I do not.
8 Q. This document is dated 9/23/2019, same name
9 and address. Do you recall receiving that?
10 A. I do not.
11 Q. This document is dated 12/24/2019, same name
12 and address. Do you recall receiving that?
13 A. I do not.
14 Q. This document is dated 05/21/2018, Jeffrey D.
15 Cordtz, 100 Hammon Drive, Atlanta. Do you recall
16 receiving that?
17 A. I do not.
18 Q. I show you now a document dated 6/1/2020,
19 addressed to Jeffrey D. Cordtz but in care of Richard
20 C. Wayne & Associates, at 213 Southern Hill Drive,
21 Duluth, Georgia, 30097. Do you recall receiving that?
22 A. I don't recall seeing it, but there's a much
23 better chance that I might have.
24 Q. Mr. Cordtz, you testified that you hadn't
25 received any correspondence from FCI in you didn't know

1  how long; yet you said you may have received this.
2  A.  Because it was delivered doesn't necessarily
3  mean that I personally have seen it.
4  Q.  This document is dated June 29, 2020, to
5  Jeffrey D. Cordtz, care of Richard C. Wayne Associates,
6  P.C., 213 Southern Hill Drive in Duluth.  Do you recall
7  receiving this?
8  A.  I do not.
9  Q.  This document is dated July 24, 2020, to
10  Jeffrey D. Cordtz, care of Richard Wayne, Southern Hill
11  address.  Do you recall receiving that?
12  A.  I do not.
13  Q.  This document is dated August 28, 2020, to you
14  in care of Richard C. Wayne at the 213 Southern Hill
15  Drive address.  Do you recall receiving this?
16  A.  I don't recall receiving it, no.  Had we been
17  receiving them, we would have instructed whoever was
18  sending them to us to be sending them to our attorney,
19  which is why the original started going to Richard
20  Wayne at 100 Hammon Drive.
21      So I have no idea, A, whether my wife would
22  have seen it or, B, whether the care of Richard Wayne &
23  Associates, who is the one located at 100 Hammond
24  Drive, would have caused the mail to be undeliverable.
25  I don't recall.

1  Q.  Is 213 Southern Hill Drive, Duluth, Georgia,
2  30097, your personal residence address?
3  A.  It is.  Richard Wayne doesn't live there and
4  has never visited there.
5  Q.  Here's a document dated September 25, 2020, to
6  you, care of Richard Wayne at the Southern Hill Drive
7  address.  Do you recall receiving it?
8  A.  I do not.
9  Q.  Here's a document dated October 23, 2020, to
10  you, care of Richard Wayne at the Southern Hill Drive
11  address.  Do you recall receiving that?
12  A.  I do not.
13  Q.  Here's a document dated November 25, 2020, to
14  you, care of Richard Wayne at the Southern Hill Drive
15  address.  Do you recall receiving that?
16  A.  I do not.
17  Q.  Okay.  Here's a document dated December 23,
18  2020, to Mr. Cordtz, care of Richard Wayne, Southern
19  Hill Drive address.  Do you recall receiving that?
20  A.  I do not.
21  Q.  A document dated 1/22/21 to Mr. Cordtz, care
22  of Mr. Wayne at the Southern Hill Drive address.  Do
23  you recall receiving it?
24  A.  I do not.
25  Q.  A document dated 2/19/2021 to Mr. Cordtz, care

1  of Richard Wayne at the Southern Hill Drive address.
2  Do you recall receiving that?
3  A.  I do not.
4  Q.  A document dated March 26, 2021, to
5  Mr. Cordtz, care of Richard Wayne, Southern Hill Drive
6  address.  Do you recall receiving that?
7  A.  I do not.
8  Q.  A document dated 4/23/2021 to Mr. Cordtz, care
9  of Richard Wayne, Southern Hill Drive address.  Do you
10  recall receiving that?
11  A.  I do not.
12  Q.  A document dated 5/28/2021 to Mr. Cordtz, care
13  of Richard Wayne, Southern Hill Drive address.  Do you
14  recall receiving that?
15  A.  I do not.
16  Q.  A document dated 6/25/2021 to Jeffrey D.
17  Cordtz, care of Richard C. Wayne Associates, 213
18  Southern Hill Drive, Duluth.  Do you recall receiving
19  that?
20  A.  I do not.
21  Q.  Mr. Cordtz, I'm pulling up the amended
22  complaint in this case.  This is the document that the
23  parties are proceeding under in this lawsuit.  I want
24  to call your attention to some of the provisions in the
25  complaint.

1      Paragraph 59 here states that on April 8,
2  2021, JLO and Johnson -- that's Johnson Law Offices and
3  Larry Johnson -- at the direction of FCI sent a letter
4  directly to Plaintiff seeking to collect a debt of
5  $327,917.83.
6      What are the facts that you rely upon to
7  allege that FCI directed Mr. Johnson to send this
8  letter?
9  A.  I don't know.
10  Q.  Paragraph 65:  As noted above, FCI
11  communicated directly with Plaintiff after this lawsuit
12  had begun even though it knew he was represented by
13  counsel.
14      What are your allegations of these
15  communications?  What communications has FCI made
16  directly to you after the lawsuit commenced?
17  A.  I don't know, but if all those previous
18  documents we went through were taken by my wife and
19  forwarded to Mr. Alembik, that could be a reference
20  there, but I don't know.
21      MR. BAKER:  Let me take five minutes,
22  please.
23      MR. WEXLER:  Sure.
24      (Recess from 3:29 p.m. to 3:35 p.m.)
25      MR. BAKER:  I have no further

1 questions for you, Mr. Cordtz.
2     MR. JOHNSON: I just have a couple of
3 questions; and then your attorney, if he
4 wants to ask you questions, can.
5     FURTHER EXAMINATION
6     BY MR. JOHNSON:
7 Q. First, Mr. Cordtz, until I got served with
8 this lawsuit, I was not aware of any issues with your
9 son and any physical issues that he may have had. Do
10 you have any facts that would indicate that you thought
11 I was aware of that prior to your federal lawsuit being
12 filed against me?
13 A. I don't know whether or not my attorney would
14 have informed you of that or not.
15 Q. So you don't know, but you're not aware,
16 sitting here today, of any facts that I was aware of
17 your son's situation prior to being served with the
18 initial lawsuit that actually mentioned it, are you?
19 A. Again, I am not aware of whether my attorney
20 would have related that. Since we agreed at the onset
21 that you and I have never met or spoken, other than the
22 session with -- the court session, and it was not
23 brought up then, I have no other way of knowing.
24 Q. So you're not -- so the question is you're not
25 aware of any facts that I was aware. I think your

1 answer is yes, that you're not aware of me knowing
2 about it unless your attorney had told me about it.
3 But you're not aware if your attorney told me about it
4 or not. Is that a fair recitation of what you just
5 said?
6 A. Yes.
7 Q. And I'm representing to you that I didn't know
8 anything about that.
9     Another thing is, if you would, I had early on
10 in this lawsuit, you know, made a settlement overture
11 to your attorney about resolving both this case and the
12 slander case. If you would get together with him and
13 let me know -- you know, talk to him about it and let
14 me know what your position is or if you have a response
15 on that.
16 A. So are you asking me to have Mr. Alembik
17 contact you after I speak with him?
18 Q. No. That was the conversation I had with
19 Mr. Wexler --
20 A. Okay.
21 Q. -- in this case, because it was about this
22 case and it was also about -- and Mr. Alembik is not
23 involved in this case. So the discussion was
24 dismissing this case --
25 A. Okay.

1 Q. -- with me, which would have been with
2 Mr. Wexler and, in response, dismissing the other cases
3 as well.
4     So I'll let him talk to you about the
5 specifics of that since you weren't aware of it up
6 until today, and I would just ask, if you would, get
7 back to me on that, if you would.
8 A. Okay. I'll have Mr. Wexler get back to you.
9 Q. Yeah. That's what I meant. I'm sorry. I
10 didn't mean for you personally. But, yeah, talk to him
11 and have him get back to me on that.
12     MR. BAKER: I don't have any other
13 questions.
14     MR. WEXLER: Me either. We'll read
15 and sign.
16     MR. JOHNSON: And just to reiterate --
17 I'm sorry -- that I'm leaving this open in
18 the event that we get any more documents or
19 any other information after today that we
20 may want to revisit. If we don't, we
21 don't; so I wouldn't have anything else to
22 revisit.
23     But if we do get any other documents
24 or information through discovery that we
25 didn't have before today, I'm leaving this

1 open for the limited purpose of us possibly
2 getting back together and asking questions
3 limited to those new documents or the new
4 information. Does that make sense?
5     THE WITNESS: Yes.
6     THE COURT REPORTER: First, if the
7 attorneys could let me know their orders.
8     MR. WEXLER: I'm not -- we just would
9 like to read and sign, so no.
10     THE COURT REPORTER: Mr. Baker and
11 Mr. Johnson, are you sharing in the
12 original or how is that handled?
13     MR. JOHNSON: Yeah. I think we're
14 sharing in the original.
15     We're sharing in the original, Mark?
16     MR. BAKER: Yes. We are sharing in
17 the original.
18     THE COURT REPORTER: And you're each
19 getting a copy.
20     MR. JOHNSON: Okay.
21     (Defendant's Exhibit D-1 was marked.)
22     (Deposition concluded at 3:40 p.m.)
23
24
25

1       C E R T I F I C A T E

2

3       I hereby certify that the foregoing
transcript was reported remotely, as stated
4   in the caption; that the witness was duly
sworn and elected to reserve signature in
5   this matter; that the colloquies, questions
and answers were reduced to typewriting
6   under my direction; and that the foregoing
pages 1 through page 97 represent a true,
7   correct, and complete record of the
evidence given.

8       I further certify that I am not
disqualified for a relationship of interest
9   under O.C.G.A. 9-11-28(c); that I am a
Georgia Certified Court Reporter here as a
10  representative of D'Amico & Associates,
Inc.; that D'Amico & Associates was
11  contacted by the party taking the
deposition to provide court reporting
12  services for this deposition; that I will
not be taking this deposition under any
13  contract that is prohibited by O.C.G.A.
15-14-37(a) and (b) or Article 7C of the
14  Rules and Regulations of the Board; and by
the attached disclosure forms I confirm
15  that I/D'Amico & Associates is not a party
to a contract prohibited by O.C.G.A.
16  15-14-37 or Article 7C of the Rules and
Regulations of the Board.

17      The above certification is expressly
withdrawn and denied upon the disassembly
18  or photocopying of the foregoing
transcript, unless said disassembly or
19  photocopying is done under the auspices of
D'Amico & Associates, Inc., and the
20  signature and original seal is attached
thereto.

21      This, the 1st day of November, 2021.

22

23

24  _____
CHARNA S. PERLOE
25  Certified Court Reporter A-457.

1           ERRATA SHEET

2       Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or OCGA 9-11(30)(e), any changes in
3   form or substance which you desire to make to your
deposition testimony shall be entered upon the
4   deposition with a statement of the reasons given for
making them.

5       To assist you in making any such corrections,
please use the form below.  If supplemental or
6   additional pages are necessary, please furnish same and
attach them to this errata sheet.

7           -   -   -

8       I, the undersigned, JEFFREY D. CORDTZ, do
hereby certify that I have read the foregoing deposition
9   and that said transcript is true and accurate, with the
exception of the following changes noted below, if any:

10

11  Page_____Line_____should read:_____

12  _____

13  Reason:_____

14

15  Page_____Line_____should read:_____

16  _____

17  Reason:_____

18

19  Page_____Line_____should read:_____

20  _____

21  Reason:_____

22

23  Page_____Line_____should read:_____

24  _____

25  Reason:_____

1   Page_____Line_____should read:_____

2   _____

3   Reason:_____

4

5   Page_____Line_____should read:_____

6   _____

7   Reason:_____

8

9   Page_____Line_____should read:_____

10  _____

11  Reason:_____

12

13  Page_____Line_____should read:_____

14  _____

15  Reason:_____

16

17  Page_____Line_____should read:_____

18  _____

19  Reason:_____

20

21  _____

22          JEFFREY D. CORDTZ,

23  Sworn to and subscribed before me,
24  _____, Notary Public.

24  This _____ day of _____ 2021.

25  My commission expires:

**$**

**$100,000 (1)**
47:2
**$197,500 (1)**
27:6
**$200,000 (1)**
26:5
**$327,000 (2)**
54:11;57:12
**$327,917.83 (1)**
92:5
**$4,000,000 (5)**
16:7;17:5;62:19;
63:12,19
**$500 (1)**
47:5
**$600 (1)**
47:11
**$9,875 (11)**
36:6;40:23;41:23;
42:14;50:12;51:10;
72:10;73:20;78:19;
79:18;80:13

**@**

**@creditcontrol (1)**
35:11

**[**

**[sic] (1)**
29:20

**A**

**abilities (1)**
73:9
**ability (3)**
19:6,7;41:23
**able (9)**
19:3;20:19;42:4;
55:20;69:5;71:12,18;
83:6;84:8
**above (3)**
43:22;74:2;92:10
**abuse (1)**
77:1
**abusive (2)**
12:22;13:7
**accept (3)**
36:3,13;37:10
**acceptance (2)**
37:15,18
**accepted (5)**
37:10;38:19;39:3;
42:19;79:23
**accordance (3)**
6:10;40:19;55:25
**according (1)**
48:9

**account (4)**
39:1;40:25;41:12;
78:20
**accounting (1)**
53:15
**acquaintances (2)**
13:19,21
**Act (5)**
16:9;41:11;60:25;
64:24;65:3
**action (8)**
14:22,24;57:24;
58:11,14,15;68:18;
73:17
**actions (9)**
14:11,16;15:3;
66:18,22;70:21;72:8;
75:15,17
**actual (3)**
26:10;66:6;73:14
**actually (15)**
7:10,23;9:18;15:23;
17:15;25:25;28:1;
42:23;59:2;68:7;69:8;
70:16;72:18;80:1;
93:18
**address (33)**
6:15;34:1;35:9;
40:4,19;48:2;83:13;
84:4,11,16,20;85:14,
18;86:12,21;87:20,
23;88:1,6,9,12;89:11,
15;90:2,7,11,15,19,
22;91:1,6,9,13
**addressed (10)**
79:19;83:12,12;
84:12;85:12,23;86:2,
21;87:16;88:19
**admitted (1)**
82:7
**adult (1)**
67:25
**advised (2)**
52:11;74:1
**affect (1)**
19:6
**affirmative (1)**
51:18
**Again (10)**
35:4;51:20;56:18;
58:5;59:6;61:16;63:7;
73:14,19;93:19
**against (6)**
63:13,15;72:6;73:8;
75:6;93:12
**agency (2)**
21:2;42:10
**ages (2)**
12:3,5
**ago (4)**
20:19;33:9;79:12;
86:15
**agree (4)**

7:8;8:4;49:19;50:6
**agreeable (1)**
69:3
**agreed (5)**
18:1;47:1;56:20,21;
93:20
**agreement (18)**
18:6,7,17;44:22,23;
47:4,13,16,18,23;
48:3,11;49:11;51:21,
25;52:11;56:13;79:22
**ahead (1)**
6:1
**Alembik (23)**
17:9,10;18:4;44:10;
52:25;53:2,5,6,11;
54:20;59:3,13,14,22;
60:13,15;61:23;62:2;
63:5;80:11;92:19;
94:16,22
**Alembik's (2)**
59:21;62:22
**allegation (7)**
66:16;76:11,16,21,
23;77:3;80:17
**allegations (5)**
63:24;72:6;75:21;
76:8;92:14
**allege (1)**
92:7
**alleging (1)**
70:21
**alleviated (1)**
71:5
**allowed (2)**
10:25;37:22
**allows (1)**
25:3
**almost (1)**
78:1
**always (1)**
11:12
**amend (3)**
75:11,14;80:16
**amended (2)**
75:9;91:21
**amount (19)**
14:22;25:7,11,12,
20;26:9;30:11;34:5;
54:11;55:7,10,24;
56:7,23,24;57:12,19;
78:19;79:18
**amounts (2)**
25:4;56:12
**Andy (1)**
14:8
**anguish (2)**
70:18,20
**annoy (1)**
77:1
**answered (4)**
9:10,11;80:8;82:5
**anxiety (2)**

7:8;8:4;49:19;50:6
**apologize (2)**
31:6,10
**apparel (2)**
21:16,16
**Apparently (2)**
52:2;83:13
**appear (2)**
46:10;85:5
**appearance (1)**
44:12
**appears (5)**
83:10,11,12;85:3,
25
**applied (1)**
80:3
**appointed (3)**
67:20;68:1,7
**appreciate (1)**
77:7
**April (6)**
29:10;30:25;54:24;
59:3,24;92:1
**area (5)**
12:16,20;13:19,20;
14:9
**around (1)**
70:24
**arrangement (1)**
17:6
**arrived (1)**
10:19
**aspect (1)**
77:14
**aspects (1)**
77:15
**Aspen (5)**
52:11,15,18;74:2,
16
**assigned (1)**
52:11
**assignments (1)**
72:19
**assist (1)**
44:7
**assisting (1)**
21:21
**associate (1)**
13:25
**associated (4)**
26:8;27:12,13;
84:21
**Associates (4)**
88:20;89:5,23;
91:17
**assume (2)**
70:8;86:11
**assuming (1)**
19:17
**assumption (1)**
79:5
**Atlanta (8)**
12:13;71:7;83:13;

70:24;71:16
**apologize (2)**
(see above)

85:13,24;86:8,13;
88:15
**attempt (1)**
76:9
**attempted (1)**
85:2
**attempting (1)**
80:16
**attention (1)**
91:24
**attorney (68)**
10:15,20,23;11:4,4,
7,15,18;15:22;16:1,
10,18,21;17:2;18:10,
11,12,13,19;23:5,16;
37:24,25;38:3,24;
44:9;51:10;52:22,23,
24;53:1;57:5;58:3;
59:3,8;62:10,10;64:5,
12,17;65:2,13,18,25;
68:13,19;69:2;70:15;
73:7;74:7;75:1,8,10,
13;78:17;80:11,15;
82:20,22;84:23;
85:15;89:18;93:3,13,
19;94:2,3,11
**attorney-client (1)**
64:4
**attorneys (3)**
66:4;68:22;96:7
**attorneys' (2)**
17:16;66:8
**ATTY (1)**
84:4
**audio (2)**
62:25;70:15
**August (3)**
53:7;88:5;89:13
**authorized (3)**
36:4;5;56:13
**autism/Asperger's (1)**
77:17
**available (3)**
9:18;25:20;42:1
**aware (56)**
9:15;38:24;39:9;
40:21;46:22;47:24;
48:6;49:16;52:15;
53:18;56:5;57:6;58:4,
6,10,12,13,16;59:1,9,
14,18,19,20,25;60:6,
16,19;61:4;63:11,16,
18;64:19;65:23;66:1,
15;69:13;72:25;76:1,
3,4,11,15,20;80:23;
81:3;93:8,11,15,16,
19,25,25;94:1,3;95:5

**B**

**B2B (2)**
21:7,8
**Bachelor (1)**

20:4
**back (10)**
41:23;45:5,6;46:20;
56:22;69:11;95:7,8,
11;96:2
**background (2)**
19:10;23:1
**backwards (1)**
20:20
**BAKER (19)**
7:7;10:10,13;12:23;
75:24;78:10;80:18;
81:9,10,12,13;83:16,
20;84:2;92:21,25;
95:12;96:10,16
**balance (1)**
50:16
**BAMKO (3)**
20:24;21:24;22:5
**B-A-M-K-O (1)**
20:24
**Bank (4)**
28:13,14,18;42:8
**bankruptcy (1)**
15:5
**Banks (1)**
14:4
**based (3)**
46:10;47:19;61:5
**basically (1)**
12:13
**bathroom (3)**
70:8,10,11
**became (5)**
28:14;48:6;49:11,
20;52:15
**become (2)**
27:22;81:3
**becoming (2)**
49:16;50:4
**bedroom (2)**
71:9,11
**began (2)**
44:21;46:6
**beginning (2)**
26:6;64:6
**begun (1)**
92:12
**behalf (7)**
21:21;37:20;74:7,8;
75:2,18;86:14
**behind (2)**
27:22;33:25
**belief (2)**
42:23;72:9
**below (3)**
35:23;39:22;40:22
**benefit (2)**
77:9,10
**best (5)**
25:10;26:7;35:19;
58:25;61:13
**better (1)**

88:23
**billed (2)**
66:11;68:23
**billing (2)**
68:20,22
**bills (19)**
27:8,11,12,13,25;
28:2;61:20,23;62:2,5,
11,13,15,20,21;62:5;
66:6;67:7,11
**binding (2)**
36:14;41:6
**birth (1)**
11:21
**bit (7)**
8:8;19:9;20:17;
26:11;33:22;43:8;
51:16
**blame (1)**
73:4
**blaming (1)**
73:12
**blue (1)**
52:21
**bone (1)**
71:4
**borrowed (2)**
56:21;69:25
**borrower (2)**
38:10,11
**both (8)**
22:20;26:22,24;
27:17;71:1,16;76:13;
94:11
**bottom (4)**
32:11,12;40:6;52:6
**Brad (1)**
14:4
**branded (1)**
21:13
**Braselton (2)**
15:22,23
**break (8)**
9:6,10,12;34:19;
39:17;41:16;78:3,15
**breaks (1)**
9:8
**brought (4)**
7:19;12:12;16:25;
93:23
**build (1)**
70:11
**built (1)**
70:9
**business (7)**
20:4;21:4,6,8,9;
22:10;76:19

**C**

**c/o (1)**
84:12
**calculated (1)**

27:1
**call (6)**
13:20;17:5;30:14;
62:22;66:5;91:24
**called (5)**
30:15;35:14;42:9;
70:14;77:16
**came (4)**
28:11;42:12;52:20;
73:16
**camera (1)**
13:15
**can (17)**
7:7;8:21;15:10;
23:15;34:2,17;38:3;
41:16;43:12;57:15;
61:19;74:4;78:2;
83:16,23;84:10;93:4
**cancer (1)**
27:12
**cap (1)**
21:19
**car (4)**
16:17,18;66:5;70:4
**care (17)**
75:5;83:13;88:19;
89:5,10,14,22;90:6,
10,14,18,21,25;91:5,
8,12,17
**Carnegie (1)**
20:14
**Carolyn (1)**
12:6
**case (49)**
6:8;15:23;16:18,22,
24;17:2,4,5,5,7;18:12;
33:24;38:25;44:13;
60:25;62:6,9,18,19,
21,21,23;63:5,12,13,
14,19,20;64:17;66:6,
7;70:1;72:9;73:8;
74:2,3,3;75:1,14,23;
78:16;80:22;91:22;
94:11,12,21,22,23,24
**cases (5)**
16:17;17:17;63:8;
81:4;95:2
**cash (1)**
26:10
**cashed (4)**
29:6,7;33:21;50:5
**category (1)**
29:14
**Catherine (1)**
12:6
**caused (4)**
70:23;74:12;75:15;
89:24
**causes (1)**
71:15
**causing (1)**
71:12
**center (1)**

83:11
**certain (13)**
42:15,25;49:10;
62:24;63:3,4,7,10;
67:12;77:4;80:2;83:4;
87:2
**certainly (3)**
57:15;77:4;80:8
**certificate (1)**
20:13
**certifications (2)**
20:9,10
**cetera (1)**
20:11
**chance (2)**
34:16;88:23
**change (1)**
27:4
**changing (2)**
72:13,13
**character (3)**
55:7,10,24
**charge (1)**
26:25
**charging (1)**
17:12
**Chattanooga (1)**
12:14
**check (2)**
40:18;51:13
**checks (2)**
33:19;50:5
**child (2)**
68:4;70:25
**children (4)**
12:1,9,9;27:18
**Christopher (1)**
12:7
**civil (6)**
14:11,15,21,24;
15:3;68:18
**claim (3)**
17:16;62:13;74:7
**claiming (3)**
67:7,10;68:18
**clear (4)**
8:12;9:3;34:2;42:4
**clearly (2)**
19:4;84:8
**client (2)**
74:21;75:18
**climate (3)**
71:6;75:6;77:20
**climb (1)**
71:10
**close (1)**
72:10
**closing (2)**
24:19,20
**clothing (1)**
21:15
**code (3)**
58:5,7,9

**coffee (1)**
34:17
**collect (5)**
56:12;76:10,14;
92:4
**collecting (2)**
55:3;76:19
**Collection (6)**
16:9;60:24;64:24;
65:3;80:22;81:4
**collector (2)**
64:23;65:3,9,21
**College (5)**
19:21,22,24;20:18;
27:16
**coming (3)**
62:14;71:14;74:15
**commenced (1)**
92:16
**communicated (2)**
86:18;92:11
**communication (4)**
29:17;33:9;64:4;
65:25
**communications (7)**
59:8;64:3,12;65:12;
73:2;92:15,15
**communications-type (1)**
21:11
**company (9)**
14:23;20:25;21:1,
12,21;35:14;42:4;
52:12;74:7
**complaint (17)**
34:1;43:17;44:8,17;
51:15;63:25;75:2,9,9,
11,21,22;76:2,8;
80:15;91:22,25
**complaints (2)**
44:14;66:24
**completely (1)**
52:20;73:22
**component (2)**
26:21,23
**concluded (1)**
96:22
**condition (3)**
71:4;73:13;74:24
**conditions (1)**
74:13
**connected (1)**
76:5
**conservator (2)**
68:1,8
**considering (1)**
60:14
**constant (1)**
71:14
**constitutes (2)**
14:1,21
**Consumer (4)**
42:10;55:3;80:22;
81:4

**consumers (2)**
65:5;76:10
**contact (2)**
35:7;94:17
**contacted (4)**
35:20;51:20;52:18;
54:10
**contacting (1)**
35:6
**contents (1)**
61:5
**contingency (4)**
16:1,12;17:1,6
**continued (1)**
46:23
**continuing (4)**
20:12;72:15;73:21;
75:14
**Control (1)**
35:15
**conversation (6)**
47:20;59:5,20;
60:12,20;94:18
**conversations (1)**
50:19
**convicted (2)**
15:8,14
**copied (2)**
58:18;61:8
**copies (3)**
62:12;63:23;68:25
**copy (11)**
18:16,22;23:15;
38:3,5,7;53:9,12;
58:19;78:21;96:19
**CORDTZ (37)**
6:3;7:7;16:11;13;
12:10;41:20;44:20;
48:3;50:12,12;51:19;
53:15;78:13;81:13;
82:19;84:5,12;85:12,
23;86:2,8;87:16;
88:15,19,24;89:5,10;
90:18,21,25;91:5,8,
12,17,21;93:1,7
**Cordtz's (2)**
49:10;52:24
**corner (7)**
31:14,20;32:1;
34:12;35:8;40:6;
85:11
**corporate (1)**
21:17
**correctly (1)**
87:5
**correspondence (8)**
41:5,5;63:23;64:8,
10,16;86:13;88:25
**correspondences (1)**
73:15
**counsel (1)**
92:13
**counties (1)**

15:24
**County (13)**
15:20,21;16:25;
17:1;22:19,21;32:24;
42:18;61:25;62:1,16;
63:1;76:25
**couple (4)**
10:18;78:14;79:11;
93:2
**coupon (2)**
39:22;40:1
**courses (1)**
20:10
**court (19)**
8:19,23;9:15;14:23;
16:9;63:15;67:21;
68:6,10,14;69:9;
70:13,16;74:10;
80:17;93:22;96:6,10,
18
**covered (3)**
40:9;61:16;66:8
**covers (2)**
12:13;54:13
**cracked (2)**
71:3,12
**creating (1)**
56:13
**Credit (7)**
23:20;24:17;25:15;
26:10,17;30:15;35:15
**CreditControlcom (1)**
42:9
**crime (1)**
15:8
**critical (2)**
57:19;71:9
**crux (1)**
71:7
**curious (2)**
26:3,14
**current (2)**
28:8;33:13
**currently (4)**
11:23;72:20;73:9;
77:8
**curricula (1)**
20:11
**cut (1)**
40:1

**D**

**D-1 (1)**
96:21
**Dale (1)**
20:14
**Dallas (1)**
40:8
**damages (12)**
17:15;62:13;66:5,
10,11,13;67:7,10;
68:18,20;70:17;72:7

**Dan (1)**
12:6
**date (13)**
11:21;30:25;35:25;
36:10;38:20;39:5;
40:24;41:9;42:25;
50:13,20;51:12;53:7
**dated (35)**
29:9;33:16;49:2,4;
78:17,23;85:3,5,9,20;
86:1,7,20;87:15,19,
22,25;88:5,8,11,14,
18;89:4,9,13;90:5,9,
13,17,21,25;91:4,8,
12,16
**dates (1)**
45:15
**day (3)**
25:21;32:7;39:2
**days (13)**
10:9;35:25;36:3,9,
12,13;40:24;41:6;
50:13;51:2,4;54:12;
79:11
**deadline (2)**
50:21,24
**deal (1)**
22:15
**debt (19)**
14:20;16:9;30:7,13;
36:6;50:9;55:4;56:14;
60:24;64:23,24;65:2,
3,9,21;76:10;80:22;
81:4;92:4
**debts (2)**
76:14,19
**December (1)**
90:17
**deceptive (1)**
55:2
**deck (3)**
27:22,23;69:20
**Deed (3)**
30:7,13,14
**defaulted (3)**
76:10,14,19
**defendant (1)**
75:23
**Defendant's (1)**
96:21
**defenses (1)**
65:1
**defer (1)**
18:19
**define (1)**
13:24
**definition (1)**
16:15
**degenerative (1)**
71:4
**degree (1)**
20:3
**delivered (2)**

57:8;89:2
**demand (1)**
54:12
**deposed (1)**
8:5
**deposing (1)**
16:5
**deposition (19)**
6:7,9,17,19;7:3;9:7;
10:3,17,22;11:8,8,16,
19;50:1;61:12;64:6;
69:7,8;96:22
**depositions (1)**
6:24
**describe (2)**
83:9,23
**describing (1)**
83:22
**determination (1)**
82:3
**determine (6)**
35:20;42:5,6;81:18,
22;82:1
**develop (1)**
21:6
**development (2)**
21:4;22:10
**diagnosed (1)**
77:17
**different (8)**
9:2;15:24;25:4,4,
16,19;44:14;72:12
**difficult (1)**
12:5
**directed (2)**
42:13;92:7
**direction (4)**
9:2;75:22;76:2;
92:3
**directly (9)**
38:23;39:5;52:19;
54:10;57:4;73:16;
92:4,11,16
**disability-type (1)**
77:9
**disclosures (1)**
70:14
**discount (1)**
50:16
**discovered (2)**
48:3,10
**discovery (5)**
14:18;61:14;82:21,
24;95:24
**discuss (1)**
11:7
**discussed (3)**
6:13;11:16;60:2
**discussing (1)**
65:1
**discussion (2)**
60:8;94:23
**discussions (1)**

10:23
**dismiss (2)**
63:12,19
**dismissed (4)**
14:13;62:1;63:13,
20
**dismissing (2)**
94:24;95:2
**dispute (2)**
14:22;83:10
**dissolved (1)**
48:2
**distortion (2)**
62:25;70:15
**distress (4)**
70:18,20;75:3,15
**District (3)**
12:13;13:2,6
**doctor (3)**
66:12,18;67:6
**doctors (2)**
71:4,11
**doctor's (1)**
67:7
**document (54)**
23:22;24:6,14,16,
18,23;25:8;26:3;30:4,
18;31:4,7,17;32:4,7,
16;33:4;34:4,21,23;
39:17;40:20;43:7,25;
48:10;49:25;54:14;
59:12;83:18,19;84:3,
6;85:6;87:15,22;88:5,
8,11,14,18;89:4,9,13;
90:5,9,13,17,21,25;
91:4,8,12,16,22
**documents (28)**
10:3,5,7,8,8,10,12,
16;23:5;25:22,24;
30:16;32:7;37:21,22;
47:22;68:17;69:6,10,
12;78:16;79:14;
82:19,22;92:18;
95:18,23;96:3
**done (3)**
47:19;78:2;81:7
**down (3)**
8:19,24;9:16;39:19;
40:22;71:9,14
**downsizing (1)**
45:19
**drafted (2)**
55:2;58:3
**drafting (1)**
44:7
**drag (1)**
72:15
**dragged (1)**
73:22
**drawn (1)**
72:10
**Drive (29)**
32:22;85:13,15,16,

24;86:2,5,8,12,17,21;
87:17;88:15,20;89:6,
15,20,24;90:1,6,10,
14,19,22;91:1,5,9,13,
18

**DTA (20)**
33:10;36:19;39:6,7;
40:4,10,12,15,19;
42:3;48:4,11,14,22;
49:17;50:11;51:20,
23;64:14;81:17

**DTI (1)**
29:20

**due (6)**
28:11;49:11,20,22;
50:4,7

**DUI (1)**
15:17

**Duluth (6)**
32:22;44:6;88:21;
89:6;90:1;91:18

**duly (1)**
6:4

**duplicate (2)**
87:25;88:4

**during (6)**
9:6;44:25;45:22;
46:13;50:1;78:15

**duties (1)**
21:3

## E

**earlier (8)**
8:23;48:24;50:18,
23;62:19;63:6;79:1;
82:20

**early (3)**
45:23;46:9;94:9

**economics (1)**
20:4

**education (1)**
20:12

**educational (1)**
19:10

**efforts (1)**
81:18

**eight (1)**
79:24

**either (8)**
10:3;15:6;65:8;
70:10;76:1;80:24;
81:3;95:14

**elected (1)**
25:19

**eligible (1)**
41:12

**else (10)**
11:15;42:14;56:9;
57:18;66:13,20;
74:11;79:17;80:13;
95:21

**email (4)**

35:9;58:19,23;
64:10

**emailed (1)**
78:21

**emails (1)**
63:25

**emotional (4)**
70:18,19;75:3,15

**emotionally (1)**
66:17

**employed (1)**
46:24

**employment (1)**
46:13

**enclosed (1)**
39:23

**end (5)**
6:17,18;20:13;
40:13;69:7

**engaged (1)**
57:6

**entered (3)**
6:11;44:12,21

**Enterprises (1)**
45:12

**entire (3)**
27:23;50:15;71:9

**entitled (2)**
12:24;17:17

**entity (5)**
28:21,23;33:21;
42:15;74:18

**envelope (3)**
39:23;83:10;85:1

**Equity (6)**
23:19;24:17;25:15;
26:9,16;30:15

**escrow (2)**
38:25;73:21

**estimate (2)**
25:14;35:19

**et (1)**
20:11

**even (7)**
8:3;46:24;70:15;
74:21;79:24;86:17;
92:12

**event (1)**
95:18

**Everybody (2)**
44:25;72:19

**evidence (1)**
72:18

**exacerbated (2)**
74:13,23

**exact (4)**
42:25;51:12;68:3;
73:11

**exactly (5)**
26:1;45:16;46:11,
14;79:8

**EXAMINATION (3)**
7:14;81:11;93:5

**examined (1)**
6:4

**Excellent (3)**
41:17;80:21,21

**except (2)**
6:21;64:2

**Excuse (2)**
15:9;80:21

**Exhibit (41)**
23:10,13,19;26:4;
30:2,5,7,10,15;33:2,5;
40:9,20;41:22;43:5,9;
48:18,23;50:10;
53:19,20,21;54:15,16,
21;57:23;59:10,12,17,
22,24;60:4,23;61:2,3,
11;73:25;77:5;78:22;
79:19;96:21

**Exhibits (1)**
23:6

**expense (1)**
69:21

**expire (1)**
41:8

**explain (3)**
16:16;70:19;72:8

**explained (1)**
8:7;29:14

**explaining (2)**
77:8;80:9

**expressly (1)**
56:13

**extended (1)**
35:24

**extent (1)**
69:9

**extreme (1)**
71:16

**extremely (1)**
71:15

## F

**face (1)**
73:17

**fact (4)**
49:5;55:17;57:4;
65:2

**facts (14)**
56:5,16;58:2,4;
76:1,4,10,15,20;77:2;
92:6;93:10,16,25

**factually (2)**
57:10,15

**failing (1)**
53:15

**Fair (10)**
16:9;21:22;25:17;
48:20;50:25;60:24;
64:23;65:3;75:19;
94:4

**fall (1)**
19:25

**false (1)**
55:2

**falsely (4)**
55:7,11,16,25

**family (2)**
13:18;51:20

**far (6)**
8:13;49:8;52:14;
54:3;60:9;72:14

**Faslo (9)**
28:24,25;29:5,7;
33:20;42:13;44:22;
47:1;48:1

**fault (1)**
31:10

**FCI (17)**
75:23,23;76:2,5,23;
81:13;83:8,11;86:14;
87:4,6,9;88:25;92:3,7,
10,15

**FDIC (2)**
42:7;82:12

**February (3)**
22:8;45:8;85:3,9

**federal (10)**
6:8,9;16:5,8;60:24;
63:15;65:7,20;70:13;
93:11

**fee (7)**
16:1,13;17:1,6;
24:9;26:8,8

**feeling (3)**
44:21;45:2;46:6

**fees (2)**
17:16;66:9

**felt (1)**
57:9

**female (2)**
37:1,4

**few (2)**
33:8;83:1

**fifth (1)**
39:18

**file (3)**
9:17;70:14;83:23

**filed (19)**
15:5;16:7;42:17;
43:2;60:16;61:25;
62:25;63:15;72:5,18;
75:2,8,8,11,22;76:2,
25;78:16;93:12

**filing (7)**
60:14,23;65:7,20;
80:24;81:2;82:16

**finance (1)**
26:25

**financial (4)**
33:24;44:21;45:2;
46:6

**find (2)**
44:5;52:19

**fine (6)**
7:4;26:14;78:6,9;

83:20;84:10

**finish (4)**
8:25;34:18,20;
39:17

**firm (16)**
7:18;24:19;65:8,21;
71:24;72:24;75:7,22;
76:2,5,9,13,24;80:18,
20,25

**firm's (1)**
81:3

**first (23)**
6:4;16:4;25:7,20;
27:9;29:21,24;30:5;
48:13,22;51:9;54:23;
55:6,6;61:10,21;
63:22;64:21;67:1;
74:1;79:25;93:7;96:6

**five (5)**
25:13;72:12;78:6,9;
92:21

**five-minute (1)**
78:2

**five-year (1)**
29:14

**fixed (2)**
27:3,5

**Florida (1)**
77:22,23

**followed (2)**
84:4,4

**follows (1)**
6:5

**follow-up (3)**
41:22;75:25;78:14

**foremost (1)**
27:9

**forget (1)**
67:14

**form (4)**
6:21;7:1;17:22,24

**forward (2)**
20:19;86:13

**forwarded (6)**
79:15;82:19,22;
85:3;86:23;92:19

**four (1)**
72:12

**fourth (1)**
30:21

**frankly (1)**
72:14

**free (1)**
83:9

**frequently (1)**
76:14

**friend (3)**
13:22,24;14:1

**friends (3)**
12:19;13:1,5,20;
14:3

**front (8)**
23:13,16,23;25:17;

30:8;33:5;43:10;74:4
**full (1)**
54:23
**fullest (1)**
73:8
**fully (2)**
9:11;57:5
**Fulton (7)**
22:19,21;32:24;
61:24;62:1,16;76:25
**funds (8)**
51:10;78:19,20;
79:2,4,6;80:10,12
**further (4)**
45:6;75:11;92:25;
93:5
**future (1)**
41:13

**G**

**gap (2)**
46:1,1
**gave (1)**
66:12
**general (3)**
55:23;58:8;59:9
**Georgia (10)**
12:13,20;13:2,6;
32:22;85:13,24;86:9;
88:21;90:1
**gets (1)**
80:7
**given (1)**
9:22
**glad (1)**
79:12
**goes (2)**
9:1;31:8
**good (9)**
13:22,24;14:1;
20:16;44:13,14;51:2,
4;56:8
**goods (1)**
21:17
**Gotcha (2)**
21:18;34:15
**Grace (1)**
12:8
**graduate (2)**
19:18;20:1
**graduated (1)**
19:17
**Gray (1)**
80:19
**great (3)**
18:2;44:25;45:22
**ground (1)**
8:8
**group (6)**
14:15;15:1;42:9;
52:12,16,19
**guardian (5)**

67:18,20,21;68:1,8
**guess (4)**
28:10;29:1;30:9;
31:12
**Gwinnett (17)**
7:24;15:20;16:24,
25;28:7;33:23;38:25;
42:17;43:2,8;52:13;
62:6;63:5;72:17;74:3;
78:16;82:17

**H**

**hairs (1)**
50:6
**half (4)**
13:15;28:14;29:1,
12
**Hall (1)**
35:3
**Hammon (10)**
85:13,15,24;86:2,5,
8,21;87:16;88:15;
89:20
**Hammond (5)**
85:16,17;86:12,17;
89:23
**handled (1)**
96:12
**handwrite (1)**
30:25
**handwriting (2)**
34:13;35:1
**happen (1)**
49:16
**happened (5)**
28:17;29:3,15;
49:14;51:11
**happy (1)**
6:23
**harass (1)**
77:2
**hard (2)**
21:16;73:5
**hard-and-fast (2)**
50:20,20
**harmed (3)**
66:17;72:8;75:16
**head (1)**
8:18
**health (1)**
27:14
**heard (7)**
20:25;29:21;42:15;
52:20;57:2,14,17
**hearing (7)**
7:24,25;8:1;72:17,
21;73:3;75:17
**held (4)**
40:10,12,15;73:21
**HELOC (2)**
55:8,24
**help (2)**

8:21;61:19
**helpful (2)**
83:24;84:1
**Here's (4)**
90:5,9,13,17
**high (6)**
19:10,15,16,20;
20:5;27:15
**Hill (16)**
32:21;88:20;89:6,
10,14;90:1,6,10,14,
19,22;91:1,5,9,13,18
**hips (1)**
71:1
**hired (1)**
52:21
**hiring (1)**
68:13
**history (2)**
20:18;45:5
**Hofstra (2)**
19:23;20:5
**H-O-F-S-T-R-A (1)**
19:23
**holder (1)**
74:8
**Holdings (2)**
74:2,17
**Home (10)**
23:19;24:17;25:15;
26:9,16;27:9,10,10,
20;30:15
**hour (1)**
16:1
**hourly (8)**
16:11;17:1,3,6,8,
11;18:4,5
**house (7)**
25:1;27:22;30:19;
38:14,17;70:11;75:5
**household (1)**
69:19

**I**

**idea (3)**
55:19;86:16;89:21
**identified (4)**
12:18;23:19;54:21;
74:3
**identify (2)**
83:3;85:19
**identities (1)**
12:25
**image (1)**
83:8
**imagine (3)**
16:14;38:4;79:16
**improvement (1)**
69:19
**improvements (1)**
27:9
**Inc (1)**

81:14
**include (1)**
40:25
**included (5)**
17:15;26:21;75:3,4,
10
**includes (2)**
21:16;75:12
**including (3)**
51:10;71:1;75:14
**inclusive (1)**
77:5
**incorrect (7)**
48:19;56:25;57:1,3,
7,10,15
**indicate (1)**
93:10
**indicated (3)**
46:19;60:13,15
**individual (1)**
35:14
**individually (1)**
7:17
**IndyMac (4)**
28:13,14,18;42:8
**information (3)**
95:19,24;96:4
**informed (1)**
93:14
**initial (5)**
70:14;73:23;75:2;
84:23;93:18
**initially (1)**
25:11;26:17
**initials (2)**
32:12,13
**injured (1)**
74:23
**inquiries (1)**
82:12
**insolvent (1)**
28:15
**installment (5)**
47:5,15;49:10,20;
53:16
**instance (3)**
9:9;25:2;66:9
**instead (1)**
37:23
**instructed (2)**
65:13;89:17
**instructing (1)**
13:10
**instructions (1)**
11:19
**insurance (6)**
69:23,24,25;70:3,4,
4
**intense (1)**
71:8
**interest (3)**
26:17,22,24
**interest-only (1)**

26:21
**interrogatories (3)**
61:21;64:21;69:17
**interrogatory (1)**
64:21
**interrupt (1)**
48:16
**intervention (1)**
69:9
**into (13)**
10:25;33:24;44:22;
48:1;65:8,17;68:6,10;
71:2;72:18;73:12,21;
77:19
**investigated (1)**
29:6
**investigation (5)**
64:22;65:6,7,24;
66:1
**invoice (1)**
66:12
**involved (7)**
14:10,14,15;15:1,3;
52:16;94:23
**irritate (1)**
77:1
**issue (3)**
70:1,24;71:20
**issues (7)**
27:14;56:3;66:22;
71:1;73:11;93:8,9

**J**

**January (2)**
44:20;46:5
**jaw (1)**
71:3
**JEFFREY (14)**
6:3;7:12;6;84:12;
85:12,23;86:2,8;
87:16;88:14,19;89:5,
10;91:16
**JLO (2)**
76:24;92:2
**job (1)**
45:4
**jobs (2)**
22:20;45:3
**JOHNSON (55)**
6:1,6,20;7:15,16,
18;12:21;13:9,14;
17:14,21;18:3;23:10,
11;30:2,3;33:2,3;
34:20,22;41:16,19;
43:5,6;53:21,22;
54:16,17;59:10,11;
65:12,14,15;71:24;
72:24;74:15,16;
76:13,18,24;78:1,7,
12;81:6,25;92:2,2,3,7;
93:2,6;95:16;96:11,
13,20

**Johnson's (1)**
81:16
**Jr (1)**
12:7
**judge (6)**
6:11;13:4;68:7;
73:9,10,10
**Julie (2)**
22:18;44:2
**July (3)**
11:22;87:22;89:9
**June (3)**
49:4;87:19;89:4
**jury (2)**
12:14,15,24;13:4

**K**

**keep (1)**
9:5
**kind (7)**
20:3,25;21:5;22:14;
45:1;64:22;67:2
**knew (3)**
60:12;76:24;92:12
**knives (1)**
21:18
**knowing (3)**
72:11;93:23;94:1
**knowledge (1)**
18:15
**known (1)**
85:2
**knows (1)**
44:25

**L**

**language (4)**
75:3,4,10,12
**Larry (4)**
7:16;72:24;74:16;
92:3
**last (6)**
6:11;10:9;11:12;
39:10;73:3;87:8
**late (1)**
45:23
**later (5)**
33:23;40:24;44:12;
62:1;79:24
**law (18)**
6:9;7:17;24:19;
71:24;72:24;75:7,22;
76:2,4,9,13,24;80:20,
25;81:3;86:12,17;
92:2
**lawsuit (49)**
7:19,24;8:10;12:12;
15:25;16:5,7,8;23:4;
28:7;42:17;43:2,7;
52:13;56:3,4;60:14,
16,24;61:22,25,25;

62:15,17,18;64:9,11;
65:8,20;66:8,14,16;
67:8;70:22;71:20;
72:5;75:6;76:25;77:1;
80:24;81:2;82:16;
91:23;92:11,16;93:8,
11,18;94:10
**lawsuits (2)**
14:12;16:3
**lawyer (4)**
7:8;8:7;74:14;
75:18
**lawyers (1)**
7:9
**layman's (1)**
74:14
**learned (1)**
48:22
**least (2)**
60:7;65:1
**leave (2)**
69:8,10
**leaving (2)**
95:17,25
**left (5)**
28:5;45:18;46:2,7,9
**Legal (24)**
7:18;55:7,11,14,15,
24;61:20,22;62:2,5,8,
11,12,20,21;63:9;
67:18,20,21;68:1;
71:24;73:19,22;74:15
**legally (2)**
57:24;58:11
**legitimacy (2)**
81:18,22
**legitimate (3)**
42:16,19;82:1
**lender (7)**
37:22;38:23,23;
39:3,4,5,7;71:25;73:7,
8;74:9;81:14
**lenders (1)**
38:9
**lent (1)**
25:8
**less (1)**
26:11
**letter (62)**
33:12;34:3;35:25;
40:16,24;42:12;
48:14,23;53:8,9,12,
23,25;54:2,4,20,21,
24;55:2;56:23,25;
57:2,8,11,22;58:18,
19,21;59:2,13,16,17,
21,23;60:1,7,9,15,22;
61:3,4,5,7,10;64:14;
73:16,24;74:6,15,22;
77:4;78:17,21,24;
79:1,3,10,12,14;
86:23;92:3,8
**letter's (1)**

50:13
**lien (2)**
30:19;71:19
**lies (1)**
15:23
**likely (2)**
78:25;87:12
**limbo (1)**
48:1
**limit (3)**
17:25;26:6;37:9
**limited (2)**
96:1,3
**Line (6)**
23:19;24:17;25:15;
26:9,16;30:15
**listed (5)**
23:6;40:20;43:9;
54:11,15
**litigation (1)**
68:21
**little (11)**
8:8;19:9;20:17;
23:1;26:3,11;33:22;
34:19;43:8;45:6;
51:16
**live (6)**
13:20;22:19;67:16;
77:21;86:5;90:3
**living (3)**
12:19;65:5;71:10
**loan (44)**
27:7;28:19;29:9,23;
32:17;33:10;34:5;
35:18;38:11;39:8,11;
40:10,12,15;42:20;
44:22;46:21;47:2,15;
48:1,3,11;49:11;
50:16;52:11,17;
69:19;71:19,25;72:2,
3,11,13,15,20,21,24;
73:2,15;74:8,11,19;
76:5;86:14
**loans (1)**
24:25
**located (4)**
32:21;85:16;86:16;
89:23
**logo (5)**
21:17,20;22:14;
83:8,11
**logos (1)**
22:15
**long (12)**
20:19;25:24;28:9,
10,10,25;37:8;40:10;
46:12;51:4;86:15;
89:1
**longer (4)**
9:1;28:19;29:8;
71:10
**look (10)**
10:11,16;35:22;

39:16;44:14,16;
54:22;78:3;82:25;
84:8
**looked (4)**
44:14;77:19,21;
78:15
**looking (9)**
10:22,24;11:3;
23:18;62:15;64:6;
77:24;83:7;86:20
**Looks (5)**
23:24;31:2;35:9;
42:8;43:16,24;44:13
**lot (9)**
8:17;20:18;21:19;
24:24;32:7;52:23;
53:8;63:8;79:14
**lots (1)**
13:25
**Lyons (1)**
14:8

**M**

**mail (5)**
34:9;40:18;42:12;
54:2;89:24
**mailed (1)**
34:8
**mailing (1)**
29:5
**makes (4)**
26:15;67:25;73:17;
80:17
**making (6)**
6:23;28:8,16,20;
29:15;72:7
**male (2)**
37:1,4
**man (1)**
67:24
**many (5)**
15:13;16:16;23:22;
30:10;43:12
**March (4)**
52:10;86:7,20;91:4
**Mark (5)**
78:7;80:18;81:7,13;
96:15
**marked (21)**
23:10,12;26:4;30:2;
33:2,5;43:5;53:21;
54:16;57:22;59:10,
17,21,24;60:3,23;
61:2,3;83:14,21;
96:21
**marketing (2)**
21:2,20
**married (2)**
11:23,24
**Mary (1)**
12:8
**Mason (1)**

44:2
**master (3)**
70:7,9,11
**Matt (1)**
22:2
**matter (5)**
7:18;42:5;45:6;
73:23;86:22
**maximum (1)**
25:10,12,19
**may (16)**
9:17;12:19;15:19;
41:12;62:5;64:25,25;
65:24;81:6;82:8;
87:15,25;88:4;89:1;
93:9;95:20
**Maybe (3)**
26:13;29:1;78:2
**McMichael (1)**
80:19
**mean (14)**
21:5;36:2;39:6,7;
41:3;48:16;49:3;
66:11;67:5,24;77:21;
79:3;89:3;95:10
**meaning (2)**
44:20;55:1
**means (1)**
70:9
**meant (4)**
19:2;37:8;55:13;
95:9
**Medical (12)**
27:8,11,25;28:2;
66:6;67:11;69:20;
70:4;71:1;73:5,13;
74:13
**medication (1)**
19:5
**memorialize (1)**
47:23
**mental (2)**
70:18,20
**mention (2)**
53:7;69:24
**mentioned (9)**
8:23;11:23;14:19;
17:4;69:20,21;77:6,
14;93:18
**merchandise (1)**
21:13
**Meridian (4)**
45:12;46:3,7,10
**messages (2)**
63:25;64:10
**met (5)**
7:20,23,25;8:3;
93:21
**metro (1)**
71:7
**Michael (1)**
14:4
**middle (2)**

9:8;34:23

**might (10)**
13:25;19:6;21:17;
47:18,19;56:7;58:15;
84:18,21;88:23

**mind (3)**
45:7;74:20;80:9

**minute (1)**
61:17

**minutes (2)**
78:5;92:21

**misleading (1)**
55:3

**mispronounce (1)**
53:5

**miss (1)**
46:20

**missed (2)**
31:12;33:17

**missing (3)**
31:7;9;64:15

**modified (2)**
49:11;50:4

**modify (1)**
44:22

**moments (1)**
33:9

**money (22)**
16:18;24:24,25;
25:1,7,16,17,25;26:5;
28:1,4;36:14;38:25;
42:1;56:21,22;69:18,
25;70:10;78:18;80:1,
2

**monthly (6)**
33:13;38:20;39:11;
47:4,8;84:5

**months (4)**
46:17;49:5;51:6;
71:15

**more (9)**
8:12;22:23;46:15,
17;47:11;62:3;78:8;
84:8;95:18

**morning (1)**
10:11

**mortgage (1)**
25:1

**most (6)**
14:9;38:9;71:3;
73:2;78:25;87:12

**motion (5)**
6:12;62:7;72:18;
75:11,12

**motions (3)**
9:17;73:11,22

**move (3)**
71:9,18;75:5

**moving (2)**
71:6;77:19

**much (2)**
54:13;88:22

**multiple (4)**

42:11;63:7;66:21;
71:1

**multiple-year (1)**
27:18

**must (1)**
40:23

**mutual (1)**
47:4

**myself (2)**
7:17;71:16

## N

**name (25)**
7:16;11:10,12;
19:15;28:23;30:22;
35:23;36:20,23;37:3;
38:15,17;43:22;53:2,
5;67:22;74:19;83:23;
84:5;87:20,23;88:1,6,
8,11

**named (1)**
84:4

**names (5)**
12:3;13:23;20:15;
35:5;72:13

**necessarily (2)**
53:1;89:2

**need (9)**
8:11;9:6,12;12:17;
18:16,25;62:14;78:5,
8

**needed (1)**
27:20

**needs (5)**
68:4;70:25;77:6,12,
16

**Neither (3)**
14:2;31:11;71:23

**Nessler (1)**
14:4

**New (6)**
19:12,13,14;28:21;
96:3,3

**next (27)**
16:10;28:17;29:3,
15;31:1,8,13,25;33:4;
35:3;36:4;40:22;41:7;
43:7,19;50:8;53:19;
54:14;58:14;59:12;
73:10;86:1,7;87:15,
19,22,25

**nine (1)**
23:24

**ninety-seven (1)**
25:13

**nobody (1)**
72:23

**nod (1)**
8:18

**none (1)**
64:2

**nor (2)**

31:11;71:23

**normal (1)**
65:4

**north (3)**
12:19;22:19,20

**Northern (3)**
12:12;13:1,6

**notary (1)**
44:3

**noted (1)**
92:10

**notes (3)**
34:11,12;78:4

**notice (4)**
6:9;28:18;29:22;
31:7

**November (5)**
78:18,23;79:7,23;
90:13

**number (8)**
44:16;61:21;68:17;
84:4,13,15,18,19

**numbers (1)**
31:8

## O

**oath (4)**
9:22;41:20;78:13;
81:15

**objected (2)**
68:19;69:4

**objection (7)**
7:1,10,11;12:21;
17:13,20;82:4

**objections (2)**
6:21;17:23

**objects (1)**
7:8

**obligation (1)**
80:3

**occurred (3)**
60:8;65:24;66:1

**October (4)**
51:19,24;79:24;
90:9

**off (2)**
13:15;19:2

**offer (19)**
29:18,22,24;34:5;
35:7,21;36:3,10;
38:19;41:8;42:19,24;
51:1,4;63:18;81:17,
18,22;82:1

**offered (1)**
63:11

**offers (1)**
41:12

**Offices (5)**
7:18;71:24;74:15;
86:12;92:2

**officially (1)**
7:25

**old (2)**
67:13,14

**Once (4)**
15:15;24:25;52:15;
59:6

**one (36)**
6:25,25;7:8;8:2;
14:12,19;15:2;16:4,5,
25;17:4;24:24;25:3,
13;26:5;29:13;32:8;
40:22;42:7;44:14;
55:1;56:3,24;57:2;
60:22;63:14;64:25;
66:4,7;69:19;72:6;
78:16;79:15;87:1,25;
89:23

**ones (4)**
14:11,14,25;63:9

**online (2)**
7:23;8:3

**only (13)**
26:17;35:24;51:1;
57:2,14,16;58:23;
60:1;62:2;74:21;
75:16;77:14;83:6

**onset (1)**
93:20

**open (4)**
69:8,10;95:17;96:1

**operational (2)**
28:19;29:8

**opinion (1)**
74:25

**opportunity (3)**
35:24;57:17;82:25

**option (1)**
25:18

**order (6)**
6:10,12;35:20;
40:25;68:7;80:17

**orders (1)**
96:7

**original (5)**
89:19;96:12,14,15,
17

**others (5)**
7:3;20:15;76:15,20;
82:12

**out (11)**
15:22;40:1;46:21;
52:19,20;69:25;
71:19;72:10,10,16;
79:12

**outcome (1)**
66:22

**outside (1)**
73:22

**over (15)**
10:10,11,16;14:22;
27:4;28:5;29:23;
61:18,19;65:18;74:1;
78:3;79:8;81:9;83:18

**overture (1)**

94:10

**owe (2)**
36:7;56:21

**owed (1)**
14:22

**own (6)**
32:15;38:14,17;
71:25;72:3;74:10

**owned (2)**
72:20,24

**owner (1)**
73:14

**owns (5)**
72:2,11,12,14,20;
73:1;74:19

## P

**page (30)**
24:1,1,1,2,8,9;
30:21,21;31:7,8,8,9,
13,14,19,20,25;32:1,
12,12;43:14,19,19;
44:16;50:8,8,8;51:15;
52:6;53:14;54:23

**pages (5)**
23:22;30:10,11;
31:12;43:12

**paid (3)**
28:1;42:2;73:21

**pain (2)**
71:9,14

**paragraph (24)**
35:22,23;39:18;
40:22;44:17;46:19;
47:1,14,25;48:2,15,
19;49:9;50:11;51:15,
16;52:6,24;53:3,14;
54:23;74:1;92:1,10

**Part (4)**
66:16;70:16;72:7;
84:20

**partially (1)**
40:8

**participate (1)**
39:19

**particular (12)**
24:23;25:3;34:3;
40:20;63:13,14;
66:25;67:8;69:18;
74:9;75:1;86:19

**particularly (2)**
71:14;73:16

**parties (3)**
7:11;42:11;91:23

**party (2)**
29:17,19

**past (8)**
49:11,20,22;50:4,7;
51:2,4;56:11

**pay (2)**
36:14;41:23

**paying (5)**

15:25;16:11,12;
17:1;28:4
**payment (11)**
36:11;37:5;38:24;
39:11,23;40:5,23;
47:15;50:12;54:12;
82:23
**payments (35)**
26:18,20,21;28:8,9,
9,11,16,21,25;29:4,5,
16;33:13,17,20,25;
38:20,22;39:3;46:20,
23;47:5,8,16;49:10,
20;50:4,5;53:16,16;
69:23,24,24;79:17
**PC (1)**
89:6
**people (6)**
8:18;12:17;13:25;
14:8;16:16;35:6
**percent (1)**
36:7
**percentage (1)**
16:19
**perfectly (1)**
83:20
**period (3)**
37:11;40:16;46:13
**person (5)**
7:20;36:20,21,24;
37:3
**personal (3)**
32:19;70:23;90:2
**personally (8)**
44:4;65:19;73:1;
74:8;76:3,12;89:3;
95:10
**phase (1)**
68:20
**phone (1)**
14:23
**physical (3)**
77:13,14;93:9
**pieces (2)**
56:24;57:1
**placed (2)**
32:18,18
**places (1)**
77:21
**Plaintiff (6)**
6:7;56:3;68:19;
77:2;92:4,11
**plates (1)**
71:2
**please (9)**
6:2;8:12,14,20;
12:4;41:11;74:1;
78:10;92:22
**pm (7)**
41:18,18;78:11,11;
92:24,24;96:22
**point (6)**
23:7;33:14;50:24;

56:8;57:20;61:18
**pool (2)**
12:15,24
**pooled (1)**
12:15
**position (9)**
42:18;60:7;72:20,
23,25;73:5;74:12,23;
94:14
**possession (1)**
47:23
**Possibly (3)**
67:12;69:11;96:1
**post-high (1)**
20:7
**potentially (1)**
84:22
**power (3)**
37:24,25;38:3
**practice (1)**
86:22
**Practices (4)**
16:9;60:25;64:24;
65:3
**practicing (1)**
86:17
**pre (1)**
65:20
**Preauthorization (1)**
41:8
**prepared (1)**
42:14
**prerequisite (1)**
60:23
**preserves (1)**
7:10
**pressure (3)**
44:21;45:2;46:6
**presuit (2)**
64:22;65:6
**Pretty (1)**
54:12
**previous (1)**
92:17
**Primarily (2)**
21:7;70:24
**primary (1)**
76:18
**principal (3)**
26:22,24;76:19
**prior (15)**
6:25;11:8;33:17;
42:13;49:16;53:2;
65:7;79:9,18;80:2,11,
23;82:16;93:11,17
**privilege (1)**
64:4
**pro (1)**
44:13
**probably (7)**
13:20;14:4,8;26:2;
29:1;56:10;61:13
**probate (5)**

67:21;68:6,7,10,14
**procedures (1)**
69:21
**proceeding (1)**
91:23
**process (1)**
20:14
**processing (1)**
26:8
**produce (1)**
68:20
**produced (2)**
82:20,23
**production (2)**
63:22;68:16
**Products (1)**
22:6
**program (3)**
39:20;40:25;50:9
**promotional (2)**
21:2;22:6
**properly (1)**
80:3
**Properties (3)**
52:12,15,18
**property (1)**
71:20
**proposed (1)**
50:11
**protected (1)**
64:3
**Protection (1)**
42:10
**protective (1)**
6:12
**provide (6)**
18:18,20;37:21;
53:15;62:12;69:1
**provided (4)**
18:9,11;23:5,15
**provisions (1)**
91:24
**pull (1)**
83:18
**pulled (2)**
31:12;85:6
**pulling (1)**
91:21
**purchase (1)**
25:1
**purported (1)**
30:19
**purpose (4)**
24:16;27:6;69:8;
96:1
**purposes (1)**
27:8
**pursuant (2)**
6:8;82:24
**put (5)**
21:20;22:15;30:19;
71:2;72:18

**Q**

**quite (1)**
16:14
**quote (1)**
14:1

**R**

**raised (1)**
56:4
**rate (5)**
17:11;18:4,5;27:3,5
**read (4)**
26:16;80:7;95:14;
96:9
**reading (1)**
6:14
**ready (1)**
36:15
**real (1)**
16:15
**really (12)**
8:12;10:24;13:21;
21:20;41:4;42:4;46:9;
50:9,24;55:17;56:22;
62:10
**reason (1)**
9:6
**recall (71)**
20:14;26:1,19,20;
39:10,12;45:16;
46:11,12;47:10,17,21;
49:8,22;52:14;54:3;
58:25;59:4;60:18,21;
61:13;62:7;63:17,21;
66:3;68:10,12,13,15;
70:2,12;78:25;79:13,
16;80:14;82:10,11,13,
15,18;86:9;87:7,8,12,
14,17,18,20,23;88:1,
6,9,12,15,21,22;89:6,
11,15,16,25;90:7,11,
15,19,23;91:2,6,10,
14,18
**receipt (2)**
40:23;59:2
**receive (2)**
10:12;54:2
**received (17)**
48:14,22,25;49:6;
79:4;84:5;86:14;87:1,
3,6,9,17,20,23;88:2,
25;89:1
**receives (1)**
77:9
**receiving (20)**
88:6,9,12,16,21;
89:7,11,15,16,17;
90:7,11,15,19,23;
91:2,6,10,14,18
**recently (2)**

71:3;79:4
**Recess (3)**
41:18;78:11;92:24
**Recession (2)**
45:1,22
**recitation (1)**
94:4
**recognize (6)**
53:25;84:18,20;
85:14,21,21
**recollection (4)**
25:10;26:7,13,23
**recommendation (1)**
83:17
**recorded (1)**
31:8
**records (2)**
68:20,22
**recover (1)**
62:15
**reduce (1)**
47:2
**reduced (2)**
34:5;47:5
**reduction (3)**
47:14,15;50:9
**reference (2)**
55:20;92:19
**referenced (2)**
40:16;58:5
**references (2)**
52:23;53:8
**referencing (3)**
16:3;59:5;73:24
**referred (2)**
62:18;84:3
**referring (2)**
33:8;46:2;52:25;
58:8
**refill (1)**
34:17
**refused (1)**
62:12
**regard (2)**
66:2;80:17
**regarding (4)**
11:19;63:24;68:11;
86:14
**regularly (2)**
76:9,14
**reimbursement (1)**
63:9
**reiterate (1)**
95:16
**relate (2)**
30:14,16
**related (5)**
35:17;39:7;55:22;
66:22;93:20
**relates (4)**
28:16;34:3;56:23;
62:13
**relating (9)**

6:11;14:11;42:19;
63:24;64:9,11,17;
68:17;77:13
**relationship (5)**
16:2,13,21;17:2;
21:12
**relationships (1)**
21:7
**relative (3)**
32:17;33:19;35:7
**relatives (2)**
12:19;13:1
**relevant (2)**
9:18;45:5
**rely (1)**
92:6
**remember (29)**
19:7;24:6,14;25:9;
26:25;28:23;31:3,17,
23;32:4,6,8;36:23;
43:17,25;45:18,23,24,
25;47:9;49:14;51:9,
11,12;61:17;72:21,22;
78:24;79:10
**remind (1)**
81:15
**remotely (1)**
6:5
**renovate (1)**
70:11
**renovation (2)**
70:8,9
**repair (3)**
27:10,10,20
**repaired (1)**
27:21
**repayment (1)**
62:8
**replace (1)**
27:23
**replaced (1)**
71:2
**reporter (6)**
8:19,23;9:15;96:6,
10,18
**represent (6)**
68:13;73:8;74:2;
78:22;81:13;84:23
**representation (3)**
55:3;74:5;75:19
**representations (1)**
72:12
**representatives (1)**
36:5
**represented (7)**
15:22;55:7,11,16,
25;57:5;92:12
**representing (3)**
7:17;74:21;94:7
**represents (2)**
73:7;75:24
**reputation (6)**
80:20,24,25;81:3,4,

5
**request (2)**
63:22;82:21
**requested (1)**
66:8
**requests (1)**
82:24
**reservation (2)**
6:24;18:1
**reserve (1)**
6:21
**reserving (1)**
17:23
**residence (5)**
24:21,22;32:19;
84:16;90:2
**resolution (1)**
33:10
**resolve (2)**
34:5;50:15
**resolved (1)**
73:12
**resolving (1)**
94:11
**respect (10)**
29:3,15;47:14;
52:16;62:16,20,22;
64:22;68:14;76:5
**respond (1)**
55:21
**responding (1)**
54:20
**response (12)**
14:18;59:13,16;
61:21;64:2,20;68:16;
69:16;70:13;82:21;
94:14;95:2
**responses (1)**
61:15
**responsible (1)**
72:15
**responsiveness (2)**
6:22;17:24
**result (1)**
70:21
**retained (1)**
80:19
**return (2)**
63:19;84:5
**returned (1)**
85:1
**review (2)**
10:2,7
**reviewed (1)**
10:5
**revisit (2)**
95:20,22
**Richard (18)**
53:2;86:16;88:19;
89:5,10,14,19,22;
90:3,6,10,14,18;91:1,
5,9,13,17
**Rick (1)**

61:23
**right (29)**
10:2,18,20;14:10,
12;20:23;22:17;23:1,
22;24:22;33:22;34:8,
11,23;37:7;39:16;
43:4;46:12;47:13;
50:2;54:14;57:21;
63:11;67:10;73:20;
76:18;81:8;85:11;
86:19
**right-hand (6)**
31:14,20,25;34:12;
35:8;40:6
**Robert (8)**
12:7;35:3;67:23,24;
68:11,14;70:25,25
**room (2)**
71:10,13
**roughly (1)**
45:17
**round (1)**
71:6
**rule (1)**
73:10
**rules (3)**
8:9;70:16;74:10
**run (1)**
83:3
**running (1)**
33:24
**Rye (4)**
19:12,13,14,16
**R-Y-E (1)**
19:14

# S

**sales (3)**
20:10,14;45:14
**same (13)**
6:23;7:10;9:2;
22:14;25:21;30:11;
75:12;87:19,22;88:1,
5,8,11
**saw (2)**
58:23;61:7
**saying (6)**
29:23;41:5;56:22;
57:8;69:14;75:17
**scanned (1)**
83:1
**Schedule (1)**
24:9
**school (8)**
19:11,15,16,20,20;
20:5,7;27:16
**schooled (1)**
16:15
**schools (1)**
20:6
**science (1)**
20:4

**screen (2)**
83:2;84:9
**se (1)**
44:13
**seat (1)**
9:5
**second (7)**
35:22;43:10;46:20;
54:22;56:11;69:16;
75:9
**secure (3)**
24:17;30:7,13
**security (2)**
30:14;32:17
**seeing (5)**
78:24;79:10,13;
87:18;88:22
**seeking (12)**
56:12;61:22;62:2,3,
5,8,20,21;63:5,9;69:9;
92:4
**selection (1)**
13:4
**sell (1)**
75:4
**send (3)**
42:14;51:13;92:7
**sender (1)**
85:2
**sending (2)**
89:18,18
**sense (4)**
26:15;28:12;49:5;
96:4
**sent (21)**
10:6,10,14;33:12;
40:1;57:4;58:21,24;
59:24;61:9,15;74:6;
79:1,3,6,8,11,12;80:1;
83:17;92:3
**sentence (6)**
36:5;39:18,19;41:7;
55:18;60:1
**September (13)**
21:25;22:8;33:16,
16,18;39:13;41:24;
48:25;49:4,6;53:17;
79:23;90:5
**series (1)**
8:9
**served (3)**
77:1;93:7,17
**Services (1)**
81:14
**servicing (1)**
48:1
**session (2)**
93:22,22
**set (1)**
69:16
**settle (6)**
14:23;29:18,22,25;
36:5;73:20

**settled (1)**
72:9
**settlement (6)**
41:8;42:19,24;
51:20,25;94:10
**several (5)**
10:9;13:19;27:8;
33:20;56:24
**share (1)**
83:2
**shared (1)**
84:9
**sharing (4)**
96:11,14,15,16
**Sheila (4)**
11:11;12:10;35:4;
36:19
**Sheila's (2)**
34:14;35:2
**Shimson (1)**
78:7
**shin (1)**
71:2
**shirt (1)**
21:19
**short (1)**
34:19
**shortcomings (1)**
77:13
**shortly (1)**
52:21
**show (2)**
12:24;88:18
**showing (3)**
72:19;84:9;87:15
**shows (1)**
26:4
**siblings (1)**
11:17
**sign (5)**
37:21;95:15;96:9
**signature (18)**
24:2,4,8,12;30:22,
23;31:15,15,21,21;
32:1,2,9;43:14,15,22,
23;74:19
**signatures (1)**
23:25
**signed (5)**
24:18;25:21,24;
32:7;74:16
**significantly (1)**
71:5
**signing (10)**
6:14;24:6,14;31:3,
17,23;32:4,6;43:17,25
**similar (3)**
22:11;41:12;75:10
**simple (1)**
83:22
**sitting (3)**
16:10;49:19;93:16
**situation (2)**

15:2;93:17
**six (1)**
46:17
**slander (6)**
17:5;62:18,23;
63:12,19;94:12
**socially (1)**
14:9
**software (1)**
21:12
**Solutions (8)**
39:6;40:4,19;42:3;
48:4,11,14,22
**somebody (5)**
44:7;64:16;66:11;
74:11;78:4
**Someone (4)**
13:22;36:19;38:9;
83:13
**Sometimes (4)**
9:1;30:13;44:13;
80:6
**somewhere (3)**
25:14;29:13;59:5
**son (14)**
66:21;67:14;68:4,
11,14;69:22;70:25;
71:8;72:8;74:23;75:5,
16;77:6;93:9
**son's (6)**
27:13;67:11;73:5,
13;74:12;93:17
**soon (1)**
36:14
**sorry (12)**
17:14;35:23;45:20;
48:15;53:4;54:7;
59:19;63:2;67:19,21;
95:9,17
**sounds (1)**
14:25
**south (2)**
77:22,23
**Southern (16)**
32:21;88:20;89:6,
10,14;90:1,6,10,14,
18,22;91:1,5,9,13,18
**speak (1)**
94:17
**special (8)**
66:5,10,11;68:4;
70:25;77:6,12,16
**specials (1)**
66:7
**specific (3)**
11:19;23:4;55:19
**specifically (9)**
32:8;43:18;44:1;
52:5;55:20;62:7;
79:13,16;86:9
**specifics (1)**
95:5
**spectrum (1)**

77:18
**spelled (1)**
85:17
**spend (1)**
14:9
**split (1)**
50:6
**spoke (6)**
42:7,9,9,11;59:2,13
**spoken (2)**
74:16;93:21
**spring (1)**
19:25
**SSI (1)**
77:9
**stand (1)**
21:8
**Staples (6)**
22:6,9,14;45:8,11;
46:3
**start (10)**
19:2;20:18,20;
21:24;23:3,12;28:20;
32:11;44:17;50:8
**started (4)**
29:5;45:8;46:3;
89:19
**starting (3)**
52:24;53:3;56:8
**starts (4)**
35:23;39:19;54:23;
57:22
**state (1)**
50:11
**stated (1)**
18:5
**statement (13)**
50:3;56:6,17;57:7;
84:5;85:19,22;86:1,7,
19;87:3,6,8
**statements (2)**
82:23;87:4
**states (1)**
92:1
**status (3)**
55:8,11,24
**statute (2)**
55:23;56:1
**steak (1)**
21:18
**steel (1)**
71:2
**step (1)**
73:10
**steps (1)**
71:10
**Steve (2)**
14:5,6
**sticker (1)**
40:9
**still (14)**
18:21;21:14;38:5,
17;41:20;48:25;

51:23,24;74:12,22;
78:13;81:15;86:16,17
**stopped (1)**
45:4
**store (1)**
44:6
**street (2)**
84:13,15
**stress (1)**
70:24
**stressful (1)**
71:15
**stuff (3)**
23:2;61:15,17
**submitted (2)**
51:9;80:12
**submitting (1)**
80:10
**subsequent (2)**
9:16;53:17
**subset (1)**
82:22
**successor (1)**
42:8
**sue (1)**
65:5
**sued (2)**
14:19;52:12
**suffered (2)**
70:17,20
**suing (2)**
56:2;75:13
**summer (2)**
48:6,9
**supervisor (2)**
22:1,17
**support (8)**
56:6,16;58:2,4;
76:11,15,20;77:3
**supposed (1)**
40:5
**sure (15)**
8:7,20;10:12;15:21;
16:14;19:3;26:15;
30:11;50:1;59:4;61:8;
62:4;65:11;79:8;
92:23
**surgery (1)**
71:2
**surprise (1)**
45:1
**surprised (2)**
54:4,9
**Suttles (1)**
22:18
**S-U-T-T-L-E-S (1)**
22:18
**swear (1)**
6:2
**swearing (1)**
9:22
**swore (1)**
49:25

**sworn (3)**
6:4;48:10;49:24
**systematically (1)**
76:9

## T

**talk (17)**
16:4;19:9;20:17;
33:22,24;34:2;37:22;
38:9;43:8;51:16,20;
53:14;66:4,23;94:13;
95:4,10
**talked (6)**
18:10;28:8;59:14;
64:14;73:25;79:19
**talking (12)**
37:23;38:23;50:8,
10;51:23,24;53:4;
57:25;58:7,8;63:14;
79:24
**talks (3)**
24:23;47:25;54:22
**Taylor (1)**
80:19
**telling (3)**
49:25;65:17;71:5
**terminology (3)**
55:14,15;68:3
**terms (1)**
74:15
**testified (9)**
6:4;48:24;50:18,23;
58:15;67:1;81:16,21;
88:24
**testify (5)**
19:4,6;57:3,15,17
**testimony (6)**
9:17,21;46:10;
48:10;49:1;57:11
**thereafter (1)**
52:25
**thinking (1)**
13:13
**third (7)**
35:23;57:21,22,23;
64:20;68:16;80:15
**though (1)**
92:12
**thought (4)**
7:1;17:22;48:16;
93:10
**threat (1)**
58:10
**threatened (1)**
57:23
**three (5)**
14:12;15:24;28:14;
29:12;49:4
**three- (1)**
29:13
**throughout (2)**
10:21;46:23

**tied (2)**
55:18;56:18
**ties (1)**
74:20
**times (6)**
15:13;20:18;24:24;
25:4,16,19
**titled (2)**
23:19;30:7
**today (16)**
9:17;10:4,16;16:6;
19:4,7;49:19;50:1;
69:10,13;79:20;
82:20;93:16;95:6,19,
25
**together (4)**
31:12;74:20;94:12;
96:2
**told (11)**
11:4,4;29:7;36:13,
16,19;59:7,22;64:5;
94:2,3
**tolerate (1)**
13:8
**took (5)**
25:10,16;26:5;
71:19;79:3
**top (7)**
24:9;31:13,19,25;
34:12;35:8;43:20
**toys (1)**
71:13
**training (1)**
20:10
**transcript (5)**
6:15;8:24;9:3,18;
80:7
**transfer (1)**
51:14
**transferred (4)**
28:19,21;48:4,11
**transmit (1)**
50:12
**treatments (1)**
27:13
**trial (2)**
9:16;12:14
**trick (2)**
8:13;65:17
**tried (1)**
79:25
**trouble (1)**
33:24
**true (2)**
9:23;52:4
**Trust (2)**
74:17;78:19
**try (2)**
9:2;17:25
**trying (7)**
21:6;35:6;42:5,11;
50:6;65:16,16
**tuition (4)**

27:15,18;28:1,2
**tuitions (1)**
27:9
**turn (1)**
81:8
**turns (1)**
73:12
**two (8)**
15:23;28:13;29:1,
12,13;30:16;31:12;
82:14
**type (4)**
27:11;70:17,19;
80:22
**typed (4)**
30:22,22;43:22,23
**types (1)**
64:11

**U**

**unable (5)**
75:4,5;81:22;85:2,2
**unaware (1)**
73:14
**uncashed (1)**
33:19
**unclear (1)**
80:7
**undeliverable (1)**
89:24
**under (15)**
9:22;16:9;25:8;
30:22;41:20;47:25;
49:10;53:14;60:24;
64:23;65:3;78:13;
81:15,16;91:23
**understood (1)**
39:4
**Unfortunately (2)**
40:8;83:21
**University (2)**
19:23;20:6
**unless (4)**
17:23;38:10;70:9;
94:2
**unquote (1)**
14:1
**unsafe (1)**
27:22
**up (16)**
12:14,24;13:3;
24:19;25:17;26:4;
33:13;40:9;42:5;
71:13;73:21;83:18;
85:7;91:21;93:23;
95:5
**upon (1)**
92:6
**upper (2)**
83:11;85:11
**UPS (1)**
44:6

**USC (1)**
58:5
**Use (2)**
39:22;70:10
**used (2)**
55:2;69:18

**V**

**valid (1)**
42:23
**validity (1)**
35:20
**Vaughn (1)**
34:24
**venues (1)**
72:13
**verbal (5)**
8:17,20;37:15;41:5;
47:19
**verbally (5)**
36:13,16;37:13,14;
38:19
**Verification (1)**
43:20
**verify (2)**
42:3,11
**verifying (1)**
35:7
**vertebrae (2)**
71:3,12
**via (1)**
58:19
**viewpoint (2)**
73:18,19
**visited (1)**
90:4

**W**

**wait (1)**
8:25
**waiting (2)**
79:2;80:16
**waiving (1)**
6:14
**wants (1)**
93:4
**warmer (3)**
71:6;75:6;77:19
**watch (1)**
71:14
**way (6)**
12:14;26:16;55:25;
76:6;83:22;93:23
**Wayne (22)**
53:2,4;84:24;86:16,
23;88:20;89:5,10,14,
20,22;90:3,6,10,14,
18,22;91:1,5,9,13,17
**Wayne's (1)**
86:12
**week (2)**

6:11;26:2
**weren't (3)**
29:7;42:14;95:5
**West (1)**
42:7
**Wexler (29)**
6:16,18;7:6,13;
10:6;12:21;13:3,11,
12,13,16;15:10;17:13,
19;18:13;34:16;
41:17;62:12;65:11;
78:9;82:4;83:16,25;
92:23;94:19;95:2,8,
14;96:8
**What's (8)**
11:10,21;18:4;
23:12;67:22;70:14;
71:6,11
**Whiteley (2)**
22:2,3
**W-H-I-T-E-L-E-Y (1)**
22:4
**whole (1)**
46:24
**who's (3)**
12:7;70:25;72:15
**whose (1)**
35:1
**wife (18)**
11:9,16;35:2,4,20;
36:19,23;37:18,20,23;
38:11;51:24;52:18;
69:22;71:16;81:17;
89:21;92:18
**wife's (2)**
27:12;34:14
**William (1)**
34:24
**win (1)**
16:17
**winter (1)**
71:15
**wire (1)**
51:14
**withdraw (5)**
17:19,19;26:11;
59:17,23
**withdrawal (1)**
61:2
**withdrawn (2)**
60:15;61:4
**within (3)**
37:10;50:12;54:12
**without (1)**
46:13
**witness (7)**
6:2;13:10,18;15:12;
78:6;82:9;96:5
**Womack (1)**
14:5,6
**wondering (1)**
44:15
**word (2)**

40:8;56:11
**wording (1)**
8:13
**words (1)**
32:15
**work (8)**
20:17,23;22:5,7;
45:11,15;46:21;62:22
**worked (2)**
22:20;44:9
**working (2)**
21:24;46:3
**works (1)**
80:18
**wreck (3)**
16:17,18;66:6
**writing (3)**
31:2;37:13;38:10
**written (5)**
18:7;47:13,16,18;
64:10
**wrong (2)**
57:9,16
**wrote (1)**
35:5

**Y**

**y'all (3)**
6:13;78:1,8
**year (9)**
19:17;29:1;46:15;
71:6;82:11;85:4,9;
87:11,13
**years (12)**
20:21;22:23;28:14;
29:2,12,13;51:6;
79:24;82:14;86:18;
87:4,6
**yesterday (1)**
10:3
**York (3)**
19:12,13,14
**youngest (4)**
27:13;66:21;67:14;
71:8

**Z**

**Zoom (2)**
7:25;73:3

**0**

**05/21/2018 (1)**
88:14

**1**

**1 (2)**
32:12,12
**1/22/21 (1)**
90:21

**1:47 (1)**
41:18
**1:56 (1)**
41:18
**10 (4)**
20:20;22:23;78:5,
10
**100 (10)**
84:13,19;85:12,24;
86:2,17;87:16;88:15;
89:20,23
**11 (2)**
30:12;53:14
**12/24/2019 (1)**
88:11
**12/31/2018 (1)**
85:20
**13 (1)**
52:10
**14 (1)**
33:17
**14th (1)**
33:18
**15 (1)**
44:17
**15th (1)**
59:3
**15USC1692e2A (1)**
55:19
**16 (3)**
46:19;47:1,14
**18 (2)**
43:14;48:2
**19 (3)**
43:13;47:25;48:15
**1956 (1)**
11:22
**197,500 (2)**
25:14;26:6
**1973 (1)**
19:19
**19th (1)**
43:19

**2**

**2/19/2021 (1)**
90:25
**2/21/2019 (1)**
86:1
**2:54 (1)**
78:11
**20 (1)**
49:9
**200,000 (1)**
26:10
**2006 (2)**
29:10;31:1
**2007 (1)**
45:17
**2009 (9)**
33:25;44:20,25;
45:17,18,23,24;46:5,9

**2010 (3)**
  22:8;45:5,9
**2012 (14)**
  33:17,18;39:14;
  40:13;41:24;48:7,9,
  25;49:6,9,14,20;
  53:17;79:23
**2014 (2)**
  51:19,24
**2017 (1)**
  15:19
**2018 (1)**
  52:10
**2019 (8)**
  53:8;86:7,15,20;
  87:16,19,22;88:5
**2020 (14)**
  78:18,23;79:7;85:4,
  9;86:15;87:13;89:4,9,
  13;90:5,9,13,18
**2021 (5)**
  21:25;22:8;59:3;
  91:4;92:2
**20th (2)**
  78:18,23
**21 (6)**
  85:9;86:7,20;87:16,
  19;88:5
**213 (6)**
  32:21;88:20;89:6,
  14;90:1;91:17
**21st (1)**
  11:22
**22 (3)**
  12:8;50:11;87:22
**23 (2)**
  90:9,17
**24 (1)**
  89:9
**24th (1)**
  22:8
**25 (5)**
  12:8;67:15;85:3;
  90:5,13
**25-year-old (1)**
  67:24
**26 (1)**
  91:4
**27th (1)**
  21:25
**28 (3)**
  51:15,16;89:13
**29 (1)**
  89:4

---

## 3

**3:04 (1)**
  78:11
**3:29 (1)**
  92:24
**3:35 (1)**
  92:24

**3:40 (1)**
  96:22
**30 (12)**
  12:7;35:24;36:3,9,
  12,13;40:24;41:6;
  50:13;51:2,4;54:12
**30097 (2)**
  88:21;90:2
**30328 (1)**
  85:13
**30-day (2)**
  37:11;40:16
**327,000 (2)**
  56:7,18
**331 (1)**
  31:8
**333 (1)**
  31:9
**334 (1)**
  31:14
**335 (1)**
  31:20
**336 (1)**
  32:1
**34 (1)**
  12:7
**35 (1)**
  12:6
**37 (2)**
  12:6;52:7
**3rd (1)**
  30:25

---

## 4

**4 (1)**
  68:17
**4/23/2021 (1)**
  91:8
**41 (2)**
  52:24;53:3
**48 (1)**
  53:14

---

## 5

**5 (2)**
  36:6;44:16
**5/28/2021 (1)**
  91:12
**59 (1)**
  92:1
**5th (1)**
  53:7

---

## 6

**6 (1)**
  50:8
**6/1/2020 (1)**
  88:18
**6/25/2021 (1)**
  91:16

**65 (1)**
  92:10

---

## 7

**7 (1)**
  51:15
**7/22/2019 (1)**
  88:1
**73 (1)**
  19:25
**77 (1)**
  19:25

---

## 8

**8 (6)**
  24:1,1,2;52:6;
  61:21;92:1
**8th (2)**
  54:24;59:24

---

## 9

**9 (2)**
  24:1,8
**9/23/2019 (1)**
  88:8