1        IN THE U.S. DISTRICT COURT FOR THE NORTHERN

2        DISTRICT OF GEORGIA

3        Case No.: 1:21 CV-02003-MHC-LTW

4        JEFFREY CORDTZ,

5          Plaintiff,

6        v.

7        JOHNSON LEGAL OFFICES, LLC, et al.,

8          Defendant.

9        -------------------------------------X

10

11

12                    REMOTE DEPOSITION

13                     OF LARRY JOHNSON

14

15

16        PRIORITY ONE COURT REPORTING SERVICES, INC.

17            290 West Mt. Pleasant Ave, Suite 2260

18              Livingston, New Jersey  07039

19                    (718) 983-1234

20

21

22

23

24

25   JOB NO.:  4798910

1
2
3          Transcript of the deposition of the
4     LARRY JOHNSON, called for Oral Examination in
5     the above-captioned matter, said Deposition
6     being taken pursuant to Federal Rules of
7     Civil Procedure by and before RANDI J.
8     GARCIA, Registered Professional Reporter, and
9     Notary Public, via Zoom, on Monday, September
10    13, 2021, commencing at approximately 2:13
11    p.m.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1     A P P E A R A N C E S :
2
3     For the Plaintiff:
4     By: Shimshon Wexler, Esq.
5     Wexler Law Office LLC
6     2244 Henderson Mill Rd., Suite 108
7     Atlanta, GA 30345
8
9     For the Defendant:
10    By: Mark A. Baker, Esq.
11    McMichael Taylor Gray, LLC
12    Peachtree Corners
13    3550 Engineering Drive, Suite 260
14    Peachtree Corners, GA 30092
15
16
17          I N D E X
18
19    WITNESS: LARRY JOHNSON
20
21    EXAMINATION                    PAGE
22
23    By Mr. Wexler: ..............................4
24
25

1     L A R R Y  J O H N S O N, after having been
2     first duly sworn, was examined and testified
3     as follows:
4          MR. WEXLER:  This is Shimshon Wexler
5     taking the individual deposition of Larry
6     Johnson, a defendant in a case in the
7     Northern District of Georgia with the
8     plaintiff Mr. Jeffrey Cordtz.
9          EXAMINATION
10    BY MR. WEXLER:
11    Q.   Mr. Johnson, have you ever had your
12    deposition taken before?
13    A.   Yes.
14    Q.   How many times?
15    A.   I have been involved in so many
16    depositions, I'm not really sure.  Probably two
17    or three times, but maybe more than that.
18    Could have been five or six.
19    Q.   When did you learn about the FTCPA?
20    A.   I don't recall.
21    Q.   Was it 10 years ago?
22    A.   Sure.
23    Q.   When you had the practice of Johnson
24    & Freedman you knew about the FTCPA?
25    A.   Yes.

1     Q.   What was your reason for knowing
2     about the FTCPA when you had the Johnson &
3     Freedman law firm?
4     A.   I would go to conferences and people
5     would speak about it, and certainly were aware
6     of the FTCPA.
7     Q.   And did it impact your practice at
8     all at Johnson & Freedman?
9     A.   Did it impact my practice?  It's a
10    federal law that we were aware of and tried to
11    comply with when we believe that it applies.
12    Q.   When is your understanding that it
13    applied when you were at Johnson & Freedman?
14    A.   If the law firm or an attorney was
15    attempting to collect a consumer debt.
16    Q.   Did Johnson & Freedman do that?
17    A.   Yes.
18    Q.   Did Johnson & Freedman collect
19    deficiency judgments?
20    A.   Typically, no.
21    Q.   But sometimes yes?
22    A.   Are you talking about deficiency of a
23    foreclosure of a real property?
24    Q.   Yes.  What type of deficiency were
25    you thinking?

2 (Pages 2 - 5)

1    A.  Well, there's different types of
2  deficiencies.
3    Q.  Why don't you take me through the
4  different types of deficiencies.
5    A.  I don't know them all, but you would
6  have a deficiency on a note, like, for a car,
7  for instance.
8    Q.  What types of deficiencies did you
9  collect?
10    A.  Me, personally, I didn't collect
11  really any.  Is that what you're asking me,
12  what me, personally?
13    Q.  The law firm of Johnson & Freedman.
14    A.  We typically did not collect
15  deficiency for foreclosures.  Although, it may
16  have happened a couple of times.  There may
17  have been instances where we attempted to
18  collect for auto deficiencies.
19    Q.  Sorry, what was that other word?
20    A.  Auto deficiency.
21    Q.  Auto.  So you collected on auto notes
22  as well?
23    A.  Yes.
24    Q.  And can you tell me a little bit
25  about the Johnson & Freedman law firm?  When

1  did it start?
2    A.  Johnson & Freedman originally started
3  as Morris, Schneider and Prior in approximately
4  1993.  Then it became Morris, Schneider, Prior,
5  Johnson & Freedman, and then Mr. Morris,
6  Mr. Prior and Mr. Schneider withdrew at some
7  point in approximately 2009, and it became
8  Johnson & Freedman.
9    Q.  What was Johnson & Freedman's
10  business?
11    A.  We were a law firm that represented
12  lenders.
13    Q.  What types of lenders?
14    A.  Lenders, like banks.
15    Q.  Credit card company?
16    A.  I think there was a time when we did
17  some credit card debt, yes.
18    Q.  Auto lenders?
19    A.  I think there was a time we did that.
20  We ceased operations in 2013, so it has been
21  over eight years ago.
22    Q.  Okay.
23    A.  We ceased operations, so I'm
24  answering -- it has been almost a decade ago.
25    Q.  Can you walk me through what happened

1  since Johnson & Freedman?
2    A.  I guess I'm confused by the question.
3    Q.  So after Johnson & Freedman closed,
4  ceased operations, what did you do after that?
5    A.  So we stopped operations in the
6  summer of 2013, and I joined another law firm
7  called RCO Legal that is headquartered out of
8  Seattle, Washington.  All our firm -- basically
9  we left the office on Friday, and we were
10  Johnson & Freedman employees, and then on
11  Monday when we came back to the office, we were
12  RCO Legal employees.
13    Q.  And how long did RCO Legal last?
14    A.  We worked with them until
15  September 10, 2015.
16    Q.  And RCO Legal was what type of -- was
17  what type of business?
18    A.  We were a law firm.
19    Q.  And what did they -- who did they
20  represent?
21    A.  They represented lenders similar to
22  what Johnson & Freedman -- who Johnson &
23  Freedman represented.
24    Q.  Did they do credit card collections?
25    A.  I don't believe so.

1    Q.  What was your position at RCO Legal?
2    A.  I think my technical position was
3  vice president of the southeast.
4    Q.  What did you do in that position?
5    A.  I oversaw the operations of the firm
6  in Atlanta and covered the southeast.
7    Q.  The operations entailed collecting
8  credit card debt?
9    A.  I don't believe so.  And to the
10  extent that it did, they wound it down
11  immediately because they had a issue with
12  their -- some state department in the State of
13  Washington.
14    Q.  So what types of practice areas did
15  you oversee?
16    A.  The firm did what -- in general, we
17  did foreclosures, bankruptcies, evictions and
18  litigation.  I was a managing partner when it
19  was Johnson & Freedman, and then a Joel
20  Freedman and myself oversaw the operation that
21  was at our Atlanta office.
22    Q.  What type of litigation?
23    A.  All types.
24    Q.  Could you give me an example?
25  Collections work?

3 (Pages 6 - 9)

1    A.   No.  We didn't do collections.  We
2  did -- at times, individuals would sue their
3  bank or their mortgage companies, and we would
4  defend those lawsuits.  I generally would have
5  a personal injury lawsuit or two, depending --
6  a paralegal would get in a car wreck and we
7  would represent them.  That type of litigation.
8  We -- I -- I have done appellate work, both in
9  state and federal courts.  Whatever our client
10 would need.
11   Q.   Did you do -- you mentioned you did
12 foreclosures in the southeast.
13   A.   Right.
14   Q.   So that would include Florida?
15   A.   For a time, we did foreclosures in
16 Florida, yes.
17   Q.   And did you participate in the
18 foreclosures, or your position was overseeing
19 them?
20   A.   Yeah.  I oversaw them.  Joel actually
21 ran the foreclosure group.
22   Q.   What would -- what would overseeing
23 entail?
24   A.   Keeping the clients happy.  Trying to
25 make sure that everything was done properly.

1  Joel would have to really testify to that,
2  because he is the one that did that.
3    Q.   So you would consider yourself a debt
4  collector at RCO Legal, yes?
5    A.   I believe I would fall in that
6  category or certainly be with a firm that would
7  fall in that category.
8    Q.   You think being with that firm would
9  qualify you as a debt collector as well?
10   A.   I don't know, because I didn't really
11 actively, you know, oversee stuff.  I didn't
12 actively handle files.  And if there was a file
13 I actively handled, it was never a debt
14 collection file.  So I just don't know if that
15 would mean that I was a debt collector versus
16 the law firm.
17   Q.   What happened after September 10,
18 2015?
19   A.   I incorporated Johnson Legal Offices
20 and worked since then as the sole attorney of
21 Johnson Legal Offices, LLC.
22   Q.   Do you have staff?
23   A.   No.
24   Q.   Can you tell me about Johnson Legal
25 Offices, LLC?

1    A.   I only do litigation, because that
2  was my background.  I handled matters that, you
3  know, if the client gets sued, I do commercial
4  litigation.  I do some personal injury files.
5  I usually have two or three of those going at
6  any given time.  Things like that.
7    Q.   It's been the same, pretty much, from
8  September 10, 2015?
9    A.   Yes.
10   Q.   Do you ever handle foreclosures?
11   A.   Yes.
12   Q.   What would -- when would that come
13 up?
14   A.   So I have one client that is a local
15 client in Georgia that still refers foreclosure
16 files to me.
17   Q.   What is that client's name?
18   A.   State Home Mortgage.
19   Q.   State Home Mortgage.  How many files
20 did they refer to you per year?
21   A.   Well, you know, as I responded in my
22 discovery, I looked at it for the last year and
23 I have gotten three.
24   Q.   What about the year before that?
25   A.   I'm not really sure, but they

1  probably -- it is not many more than that.
2  They are not a large company.  I would say five
3  to seven.
4    Q.   How would you describe State Home
5  Mortgage's business?
6    A.   They are actually owned by the State
7  of Georgia.  The State of Georgia has its own
8  mortgage company, and that is -- that's who it
9  is.
10   Q.   Who do they lend to?
11   A.   Mostly Georgia residents.
12   Q.   Could I get a loan from State Home
13 Mortgage?
14   A.   I don't know their criteria.
15   Q.   You would describe them as a smallish
16 type of company?
17   A.   Yes.
18   Q.   So I'm sorry for interrupting.  We
19 were getting back -- going through the -- from
20 September 10, 2015.  So we have a Johnson Legal
21 Offices, and you engaged in litigation for
22 them?
23   A.   Yes.
24   Q.   What happens -- what happens next?
25 So you're doing litigation, you're doing

4 (Pages 10 - 13)

1    foreclosures. Who else do you do foreclosures
2    for?
3       A. That is really the only company that
4    refers me foreclosures. I don't have staff,
5    but another law firm in Birmingham has staff
6    that handles the letters and posting
7    advertisements. The client typically arranges
8    for the crying of the sale. I don't do it
9    myself. What I do mostly myself is, I litigate
10   and handle litigation.
11      Q. Who is that firm in Alabama?
12      A. It's called Jauregui. I'm not sure if
13   I'm pronouncing it correctly. It's
14   J-A-U-R-E-G-U-I and Lindsey, L-I-N-D-S-E-Y.
15      Q. They do -- they do the back-office
16   work for your foreclosure work?
17      A. Foreclosure work that they would
18   handle all the back-office work.
19      Q. Who's your clients that they work
20   with?
21      A. State Home Mortgage is the only
22   client I have.
23      Q. They do the work for federal home
24   mortgage?
25      A. No, State Home Mortgage.

1      Q. This Alabama law firm helps you with
2   the paperwork for State Home Mortgage?
3      A. Yes. They send the notices, they do
4   the ads. They or the client arranges for the
5   crying of sale. It means the -- the crying of
6   the sale. That is where someone goes and --
7   actually goes to the courthouse and conducts an
8   auction. We call it crying of the sale. They
9   would -- the client or that firm would arrange
10   for that. They would arrange for title to be
11   searched, and they generally record the deed,
12   if it goes back to the lender. Sometimes if an
13   individual purchases the property, the
14   foreclosure, they want them to handle the
15   reporting themselves. It just depends.
16      Q. That is only for State Home Mortgage?
17      A. That is the only client that I have
18   that do that for us, correct.
19      Q. Because we have the letter that I
20   attached to the opposition to the motion -- to
21   your motion to dismiss, it had a different
22   client. It was not State Home Mortgage.
23      A. That is their client.
24      Q. You help them with their clients as
25   well?

1      A. Correct.
2      Q. How often did you help them with
3   their client?
4      A. Whenever they need any assistance, I
5   give them legal -- legal assistance.
6      Q. How often do they request your help?
7      A. I don't know.
8      Q. They have been requesting your help
9   since September 10, 2015?
10      A. No, I don't think so. When I left
11   RCO Legal, it happened fairly quickly, and I
12   didn't incorporate Johnson Legal -- I mean, I
13   had to do an operating agreement and get all
14   that paperwork filed with the State of Georgia.
15   So I had an LLC in place. It took me about a
16   month to get all that done. And it was some
17   time after that. I don't remember exactly
18   when, but it wasn't immediately.
19      Q. It might have been 2016?
20      A. Yes.
21      Q. And do they pay you a salary or an
22   hourly rate?
23      A. No. We -- we have a fee agreement.
24   I get a portion of the fee.
25      Q. What's the fee agreement?

1      A. I generally get a third and they get
2   two thirds, I believe.
3      Q. Of what fee?
4      A. Whatever fee is generated on a file
5   that we work together on.
6      Q. So you got one third of whatever fee
7   is generated on a file, and that would include
8   foreclosures that you conduct for them, that
9   you helped them with?
10      A. Yes.
11      Q. What is your deal with State Home
12   Mortgage when you do -- when you do work for
13   State Home Mortgage?
14      A. It's the same.
15      Q. You only get a third?
16      A. Right.
17      Q. So whether you bring the client or
18   they bring the client, you're only getting a
19   third?
20      A. That is right.
21      Q. Do you have a formal relationship
22   with the Jauregui and Lindsey law firm?
23      A. I do. I personally do.
24      Q. What is that relationship?
25      A. It's an of-counsel agreement.

1    Q.   That is the two thirds/one third --
2    A.   Yes.
3    Q.   -- that you told me about?  That's
4  why you're on their website?
5    A.   I haven't -- I haven't looked at
6  their website.  I don't know.  But if I'm on
7  there, it's because I'm of counsel.
8    Q.   You permitted -- you permitted
9  your -- your name to appear on that website.
10  You're not doing it without authorization?
11    A.   I didn't know it was on there until
12  you just told me, so I don't -- I don't
13  remember having a discussion with them about
14  that.
15    Q.   Did you prohibit it?
16    A.   No.
17    Q.   Are you okay with it?
18    A.   I don't have a problem with it, no.
19    Q.   So you're not going to call them
20  after this deposition and ask them to take it
21  down, are you?
22    A.   No.
23    Q.   That is because you consider yourself
24  of counsel to that firm?
25    A.   We have an of-counsel agreement.

1    Q.   And where could I find out how much
2  you earned from that of-counsel arrangement
3  with the Jauregui law firm?
4    A.   I don't know.  You probably could --
5  from them, maybe.
6    Q.   What about from you?
7    A.   I don't really designate it in my --
8  I'm a small one, single practice.  The majority
9  of what I do is litigation.  So I don't keep up
10  with it separately.  You know what I mean?
11  It's not something I have a box, where I put in
12  a check I get from them and box I put somewhere
13  else.  It all goes in the coffer.  Make sense?
14    Q.   Yes.  But if you tried to do it, you
15  could do it; correct?  If you wanted to, you
16  have records of how much they -- of how much
17  they paid you?
18    A.   I have records of being paid.  I
19  really don't keep it separate, is what I'm
20  trying to explain to you.  I don't keep that
21  separate.
22    Q.   Have they paid you for the year --
23  what are we in -- 2021?  Have they paid you
24  anything this year?
25    A.   Sure, they have.

1    Q.   Do you know how much?
2    A.   It would not be very much.
3    Q.   Is it a thousand dollars?
4    A.   I would only have to guess, but I've
5  gotten very little.
6    Q.   Is it a thousand dollars?
7    A.   It was probably more than a thousand.
8  It might be 5000.  It might be 7000.  It might
9  be something like that.
10    Q.   But it's not 40,000?
11    A.   No.
12    Q.   Do you have this kind of of-counsel
13  relationship with any other law firm?
14    A.   Not that I recall.  And I answered
15  that way because we've had of-counsel
16  relationships when we were at Johnson &
17  Freedman and RCO Legal.  I don't believe I have
18  any with -- that are -- I'm sorry, RCO Legal
19  and Johnson & Freedman -- I don't believe I
20  have any since I created Johnson Legal Offices,
21  other with than with Jauregui and Lindsey.
22    Q.   The client that I found on Pacer
23  where you were with Jauregui and Lindsey, that
24  was part of the fee agreement?  That was
25  their -- that was Jauregui's client?

1    A.   That is right.
2    Q.   Now we are going back, and you have
3  done litigation foreclosure work -- which
4  states are you licensed in?
5    A.   I'm licensed in Georgia and
6  Tennessee.
7    Q.   Does Tennessee do judicial or
8  nonjudicial foreclosure?
9    A.   Tennessee is a trustee state that
10  handles its foreclosures nonjudicial.
11    Q.   Going back to the history of Johnson
12  Legal Offices.  So you've had this relationship
13  representing State Home Mortgage, and you have
14  been with -- of-counsel with this Jauregui
15  firm.  What else have you done?
16    A.   I have my own surety bond agency.  I
17  do marketing for that surety bond agency.
18    Q.   Did you start that surety bond
19  agency?
20    A.   So this particular agency, I went
21  into partnership with -- he is not a lawyer,
22  but he is my partner on the surety bond agency
23  side, and he left a different agency and then
24  we created our agency together.  When it
25  started, it was me and him and Joel Friedman.

1  The three of us owned a third, a third, a third
2  of the surety bond agency.
3      Q.   And is the surety bond agency
4  separate from Johnson Legal Offices or are
5  those -- do you see those as the same?
6      A.   No.  They are completely separate.
7      Q.   They are completely separate.
8      A.   Yes.
9      Q.   Why is it that you use the surety
10 bond agency e-mail address when we're
11 communicating about this case?
12     A.   Because that is my e-mail address
13 that I use.
14     Q.   That is just for convenience, but it
15 doesn't represent -- those entities are totally
16 separate?
17     A.   That is correct.
18     Q.   And tax returns, Johnson Legal
19 Offices has a -- its tax return is completely
20 separate from the surety bond agency?
21     A.   So the surety bond agency has its own
22 tax return.  Johnson Legal Offices is a single
23 party LLC.  The tax returns goes through my
24 personal tax returns.
25     Q.   Does Johnson Legal Offices provide

1  any services to the surety bond agency?
2      A.   You know, from time to time, very
3  infrequently, but it has before.  Yes.
4      Q.   It has been paid for those services?
5      A.   Yes.
6      Q.   Do you know how much?
7      A.   Probably five grand over the last
8  eight years.
9      Q.   Aside from the surety bond agency,
10 State Home Mortgage, and the relationship with
11 Jauregui, what else -- what else does Johnson
12 Legal Office -- I guess Johnson Legal Offices
13 doesn't even do the surety, but that is you.
14 So what else does Johnson Legal Offices do?
15     A.   That's it.
16     Q.   They have a relationship with the
17 lenders in this case, the Aspen Properties
18 Group, LLC as trustee of the APG Holdings
19 Revocable Trust; is that right?
20     A.   I represent them in the litigation in
21 a matter was in Gwinnett County, as well as in
22 a matter that was in Fulton County as well.
23     Q.   Okay.  But tell me about your
24 relationship with them.
25     A.   That's what I do.  I represent them

1  in litigation.
2      Q.   Do you have any other matters with
3  them or is this your only matter with them?
4      A.   This is my only matter with them.
5      Q.   Wilmington Savings Fund, the owner of
6  Aspen Holdings Trust, is this your only matter
7  with them or do you represent them in more than
8  this matter?
9      A.   It's the only matter with them.
10     Q.   You never represented Aspen
11 Properties Group LLC, APG Revocable Trust,
12 Wilmington Savings Fund or Aspen Holdings Trust
13 before; is that right?
14     A.   I've never represented any of the
15 Aspen matters, but Wilmington Savings is a
16 company that operates as a trustee, and they --
17 I have seen their name before in the last 15
18 years.  So I would not say that I have never
19 represented them in a matter, but I certainly
20 haven't at Johnson Legal Offices.
21     Q.   You don't have any ongoing
22 relationship with Wilmington Savings Fund?
23     A.   No.
24     Q.   So when you brought the Fulton County
25 lawsuit, you had a relationship with Aspen

1  Properties Group LLC, or who was your
2  relationship with when you brought the Fulton
3  County lawsuit in January 2021 against
4  Mr. Cordtz?
5      A.   It was the named plaintiff in that
6  case.  And I don't have that pleading in front
7  of me.  Whoever the named plaintiff was in that
8  case.  That's who that relationship was.
9      Q.   Was there an individual?  How did
10 they find you?
11     A.   They actually -- I was asked to be
12 co-counsel from the other law firm that was
13 involved in that case before.  I forget the
14 name off the top of my head.  It is the same
15 firm that Mark Baker is with.
16     Q.   The McMichael law firm didn't ask
17 you.  It was actually Aspen that called you up
18 and asked you to do the representation?
19     A.   No.  McMichael, that firm, I believe
20 it was Mark called me and asked me if I would
21 co-counsel with him in representing Aspen in
22 that case.
23     Q.   Aspen didn't call you?
24     A.   That is correct.  Except for the fact
25 that Mark Baker -- that firm represented Aspen

1  and then called me on Aspen's behalf. My
2  understanding.
3      Q.  When you filed that Fulton County
4  lawsuit, what was your review of the file
5  before you sued for 200 and something thousand
6  dollars?
7      A.  I had reviewed everything that had
8  been provided to me that was involved in the
9  case in Gwinnett County.
10     Q.  Anything else?
11     A.  I don't recall any documents that I
12 necessarily reviewed separate from those.  I
13 don't recall that.  But it could -- it
14 certainly could have been the case.  I'm sure I
15 had some attorney-client privileged
16 communications that I am not going to get into.
17     Q.  I just want facts.
18     A.  You asked about communications.
19     Q.  Okay.
20     A.  I'm not going to get into those.  I
21 had communications with Aspen.  So I can say
22 that.  But beyond that, I don't recall
23 because -- because it was kind of -- it was the
24 same debt that was involved.
25     Q.  Did you review any monthly statements

1  sent to Mr. Cordtz?
2      A.  I do not recall reviewing any monthly
3  statements, no.
4      Q.  Were you aware that McMichael
5  represented FCI Lender Services with respect to
6  Mr. Cordtz?
7      A.  Not at that time.
8      Q.  Would it be fair to say that
9  McMichael represents FCI Lender Services?
10     A.  You have to ask them.  I know they do
11 in this case, but you have to ask them about
12 what they consider to be who they represent.
13     Q.  Now, if they represented FCI Lender
14 Services, would you consider yourself to be
15 representing FCI Lender Services?
16     A.  No.
17     Q.  Because they were -- if they're
18 representing FCI Lender Services, and you're
19 co-counseling with them, so you, by connection,
20 are representing FCI Lender Services?
21     A.  No.
22     Q.  But you do represent Aspen Properties
23 because of that same connection; is that right?
24     A.  I don't know about the connection
25 with FCI.  I wasn't aware there was any

1  connection when I started representing Aspen in
2  the litigation.  I was not aware of FCI.
3      Q.  By the time you answered the
4  discovery requests you were aware; is that
5  right?
6      A.  Well, you sued them in this case.
7  And I think that is when I really became aware.
8  But I'm not -- I might have become aware
9  earlier, but I never considered myself to
10 represent anybody other than the people I
11 represented in the litigation.  They could
12 represent Bank of America, but just because I'm
13 handling a case for them, doesn't mean I
14 represent Bank of America too.  I was handling
15 a case on behalf of Aspen.
16     Q.  But Aspen works in conjunction with
17 FCI to collect this debt; is that right?
18     A.  They could work in conjunction with
19 FedEx, but it doesn't mean that I represent
20 FedEx.  But I do not represent FCI on this
21 matter.
22     Q.  But you don't either represent Aspen
23 directly; is that right?  You're only
24 connection with Aspen is through the McMichael
25 law firm; is that right?

1      A.  No.  I represent them directly.
2      Q.  Even though you've had no
3  communications with them; is that right?
4      A.  No.  I had communications with them.
5      Q.  What communications have you had with
6  them?  Facts.  I don't want to hear the content
7  of the communications.
8      A.  Phone calls.
9      Q.  And that was directly with Aspen?
10     A.  Yes.
11     Q.  And do you know the name of the
12 individual you had a phone call with?
13     A.  I believe there were two individuals
14 that I spoke with, but one of them was the
15 affidavit -- person who signed the affidavit
16 that I produced last week.  I don't have that
17 in front of me.  It's the affidavit I filed in
18 the Gwinnett case.
19     Q.  That was the person you spoke to
20 before you filed the Fulton lawsuit?
21     A.  I don't remember the timing, but I
22 believe I spoke with them before I filed the
23 Fulton lawsuit.
24     Q.  But it was different parties; right?
25 Because you actually filed the Fulton lawsuit

1  in the name of an entity that actually didn't
2  own the loan; is that right?
3      A.  So I represented the party that I
4  actually filed the lawsuit on behalf of.
5      Q.  What about the new party that
6  actually -- that actually bought the account?
7  Did a party buy the account?
8      A.  It was transferred, ultimately, to
9  Wilmington Savings.  I didn't -- as trustee, I
10  didn't represent them in -- my recollection
11  is -- and I'm pretty sure of this one -- I
12  didn't represent Wilmington Savings in the
13  Fulton case because we dismissed that case.  We
14  filed a motion in the Gwinnett case.  And that
15  was when I was under the impression that Aspen
16  Property Holdings statutory -- Delaware
17  Statutory Trust, I believe they held a note
18  because defense counsel in that case provided
19  me the letter of transfer.  And he is the one
20  that indicated to me that it had been purchased
21  by Aspen Property Holdings.
22      But later -- and we actually moved to
23  have Aspen Property Holdings added to the
24  lawsuit in Gwinnett, and then later we
25  discovered that it was actually Wilmington

1  Savings trustee of Aspen Property Holdings.
2      Q.  You mean Aspen Holdings Trust?
3      A.  Yes.
4      Q.  So if I'm not mistaken, you never
5  represented Aspen Holdings Trust?
6      A.  No.  Actually, I did.
7      Q.  So that is the one -- so that is the
8  one who you had a conversation with prior to
9  filing Fulton County?
10      A.  Yes.  It was -- there was -- you
11  know, there was an Aspen Properties -- and I'm
12  sorry, I don't have the names in front of me.
13  But there was an Aspen Properties that I
14  originally represented, and then at some point,
15  there was a transfer -- I believe there to be a
16  transfer of Aspen Holdings Trust.  So I had --
17  there was a couple of people that I spoke with
18  on the phone.  When I spoke to them -- and I
19  believe I spoke to them on a couple of
20  occasions -- and I can't tell you exactly what
21  their titles were.
22      Q.  Those are the same entities; correct?
23      A.  No.
24      Q.  Similar -- similar, same ownership;
25  correct?

1      A.  I don't believe so.
2      Q.  But you spoke to the same people that
3  knew about both entities?
4      A.  Yeah.  There were two people I spoke
5  with.
6      Q.  I see.  McMichael, have they asked
7  you for help on other occasions?
8      A.  No.
9      Q.  I'm looking at the checks here that
10  you produced.  I see an invoice number
11  MTGO1.005 for $585.  You don't know what that
12  is about?
13      A.  All those invoices relate to this
14  matter.
15      Q.  They relate to this matter.
16      A.  Whether it's a Gwinnett case or the
17  case in Fulton.
18      Q.  What does AP stand for?
19      A.  I don't know what you're referring
20  to.
21      Q.  They sent you $5,480.85, and it is
22  for consolidated check from AP.
23      A.  I would guess that means accounts
24  payable.  But you would have to ask them to be
25  for sure.

1      Q.  They're different invoice numbers.
2  And why do some have the description of Cordtz,
3  and some not?
4      A.  Oh, I don't know.
5      Q.  You're telling me that they are all
6  for Cordtz?
7      A.  Yes.
8      Q.  Have you ever done any other work for
9  them?
10      A.  No.
11      Q.  How did they find you?
12      A.  Mark Baker was a partner of mine
13  previously, and January Taylor worked in the --
14  worked at the law firm Johnson & Freedman, so I
15  know them personally.
16      Q.  But how did they know you were
17  interested in doing this work?
18      A.  They know that I do litigation.  They
19  thought I was pretty good at what I do, and so
20  they had a need for a co-counsel, and they
21  called me.
22      Q.  What is your fee arrangement with
23  them?
24      A.  It's an hourly rate.
25      Q.  Okay.  Do you mind telling me how

1   much the hourly rate is?
2       A.  $300 an hour.  It could be -- I'm
3   sorry, it could be 275.  I don't remember, but
4   it's in that range.
5       Q.  Do you have a written agreement with
6   them?
7       A.  Not that I recall.
8       Q.  So Mark Baker just called you out of
9   the blue five years later after you closed RCO
10  Legal or -- I mean, after you opened Johnson --
11  I didn't establish when RCO Legal closed.  But
12  after you opened Johnson Legal Offices, he just
13  called you out of the blue, or have you kept in
14  touch with him?
15      A.  We've kept in touch.
16      Q.  But not as far as legal matters?  He
17  hasn't referred you any other legal matters; is
18  that right?
19      A.  That is correct.
20      Q.  January Taylor has not referred you
21  any other legal matters; is that correct?
22      A.  That is correct.
23      Q.  Is it fair to say that you do
24  foreclosure work for the Jauregui law firm as
25  well as the home -- the State Home Mortgage?

1       A.  No.  I give them legal advice, but
2   they actually handle the foreclosure.
3       Q.  My understanding is that the hearing
4   a couple of weeks ago -- maybe last -- maybe it
5   was last week, you asked for about 30,000 in
6   attorney's fees for the collection case for
7   Mr. Cordtz.
8       A.  Yes.
9       Q.  Who would get those attorney's fees?
10      A.  The judgment would be on behalf of
11  the client in that case.  And so the client
12  that we asked for that was on behalf of
13  Wilmington Savings as trustee.
14      Q.  And would they give you those
15  attorney's fees?
16      A.  I don't know.
17      Q.  Are you expecting them?
18      A.  I'm not expecting them.
19      Q.  Do you think it's fair to ask for
20  more attorney's fees than actually were
21  incurred?
22      A.  I don't know what that means.  That
23  is a statutory attorney's fee allowed under
24  Georgia law.
25      Q.  And you believe the statutory

1   attorney -- I'm sorry.  Scratch that.
2       You believe the statutory attorney's
3   fee is fair, even though it is above the actual
4   reasonable attorney's fees, "yes" or "no"?
5       A.  I consider it to be reasonable
6   because it defines reasonable in the statute.
7   The Georgia legislature has defined it to be
8   reasonable in the statute.  There is lot of
9   case law on that.
10      Q.  My understanding was that that was
11  the cap.  It was not -- it was not -- that's
12  the most that are -- that's allowed to be
13  charged, but not -- not -- not more, but it
14  could be less.
15      A.  I don't know if that is true or not.
16      Q.  When Jauregui uses you for debt
17  collection services, how often do they put your
18  name in a letter similar to the one that I
19  attached in my opposition to your motion to
20  dismiss the amended complaint?
21      A.  I don't believe I do debt collection
22  services for them.  So I don't know if I can
23  answer the question because I provide them
24  legal advice.
25      Q.  How often is your name inserted in a

1   letter similar to the one that was sent to the
2   debtor in that case?
3       A.  I'm not aware of my personal name
4   being included in any letter.
5       Q.  So you didn't allow your name to be
6   used in that letter?
7       A.  I have not seen any letter where they
8   used my personal name.
9       Q.  Johnson Legal Offices?  Did you --
10      A.  So, you know, if you're asking about
11  Johnson Legal Offices, I was confused by your
12  question.
13      Q.  I see.  So Johnson Legal Offices --
14      A.  So what is your question?
15      Q.  Did you allow Jauregui to use your
16  name within the letter?
17      A.  If you're talking about when you say
18  "your name, Johnson Legal Offices"?  Yes.
19      Q.  I'm sorry?
20      A.  Yes.
21      Q.  How many letters did you allow your
22  name to be inserted on?
23      A.  I don't know the number, but it has
24  not been a lot.  When you say "your name", just
25  to be clear, it's Johnson Legal Offices.

1    Q.   Johnson Legal Offices.  And that one
2  is, would you say more than 20?
3    A.   Probably more than 20, yes.
4    Q.   More than 100?
5    A.   I don't think it's anywhere close to
6  100.
7    Q.   Do you plan on doing more debt
8  collection work for McMichael Taylor?
9    A.   So I don't know how to answer that
10 question.  I don't do debt collection work for
11 them.
12   Q.   Do you plan on engaging, in similar
13 circumstances to Mr. Cordtz, to represent
14 lenders against Mr. Cordtz with McMichael --
15   A.   I do not plan on that.
16   Q.   Do you have systems in place to
17 prevent FTCPA violations?
18   A.   It is just me.  I'm the only person
19 here.  So I rely on my own knowledge and
20 training.
21   Q.   Prior to the January Fulton lawsuit,
22 how did you calculate the balance owed?
23   A.   I took the amount that was provided
24 to me by the client and I -- I guess they gave
25 me per diem, like they did in the affidavit

1    Q.   What was the date of default?
2    A.   Based on his complaint, he was in
3  default before September of 2012.  I don't know
4  how familiar you are with the Gwinnett case,
5  but the lawsuit alleges there was a settlement
6  offer made to them in September of 2012 for a
7  reduced amount for them to pay off the loan and
8  gave them 30 days.  And prior to that time
9  he -- Mr. Cordtz was already in default.  So
10 certainly, in September 2012 he was in default
11 and never made a payment after that.
12   Q.   How did you know the amount that he
13 owed in September 2012?
14   A.   That was provided to me by the
15 client.
16   Q.   Did you see any statements?
17   A.   No.
18   Q.   Did you rely exclusively on the
19 client?
20   A.   No.  I had documentation indicating
21 what the -- what the principal amount was owed.
22   Q.   What is that documentation showing
23 the principal amount owed?
24   A.   How much, you mean?
25   Q.   Yeah.

1  that I provided to you, and so I would have to
2  count the days and multiply that by the per
3  diem.
4    Q.   How did you calculate the April
5  letter that was sent to Mr. Cordtz?
6    A.   So that one I actually calculated
7  from his initial default, which was -- my
8  understanding is was in 2012.  But the client
9  calculated it, as you can see from the
10 affidavit I provided to you, from 2015.  So
11 while they could have asserted more interest
12 than they did they, they had a three-year
13 additional amount of interest they decided not
14 to seek.
15   Q.   That's why the three years makes up
16 the $80,000?
17   A.   I don't know how much it makes up.
18 It makes up a lot.
19   Q.   So would you say that letter is the
20 wrong amount?
21   A.   That is not the amount that they
22 wanted me to pursue in the ultimate summary
23 judgment motion I filed in Gwinnett County.
24   Q.   Was that the amount owed?
25   A.   I believe that it was.

1    A.   It was the amount that was included
2  in the affidavit that I provided to you.
3    Q.   What was that documentation you
4  reviewed?
5    A.   It was a documentation from, I
6  believe, it was FDIC, on a document of
7  transfer.  It wasn't the actual assignment.
8  But it was a transfer document where they
9  transferred a bunch of loans, like a bunch.  So
10 the Cordtz loan was one of those, and it
11 included the principal amount owed.
12   Q.   Did it strike you that the number was
13 kind of like a round number, the 197.5 or
14 198.5, did that strike you that it was a round
15 number?
16   A.   No, it didn't.
17   Q.   That it ends in zeros like that?
18   A.   If you read the actual loan document,
19 they -- it appears to read like an interest
20 only.  So when you take a loan, and then you
21 pay money back, it is only for the interest
22 that was owed.  So typically, loans are in
23 round numbers like that.  And if your
24 payments -- the principal amount is going to be
25 a round number like that.

1     Q.  I see.  Do you agree that the FTCPA
2 prohibits sending a letter to a consumer while
3 he is represented by counsel?
4     A.  Not in every case.
5     Q.  What would those cases be that it
6 doesn't apply?
7     A.  Well, the FTCPA doesn't apply to
8 every letter that goes to a borrower.
9     Q.  What about the letter specifically
10 that you sent Mr. Cordtz in April 2021?  Does
11 the FTCPA apply to that letter?
12     A.  I don't believe that I'm a debt
13 collector under the FTCPA.  So I don't believe
14 it would apply to that letter.
15     Q.  If you were a debt collector, and I'm
16 not saying that you are, would you be allowed
17 to contact a consumer who is represented by
18 counsel?
19     A.  I'm not 100 percent sure on that.  I
20 mean, because counsel was copied on that letter
21 and aware of it.
22     Q.  Was there any special reason that it
23 had to go to him, the communication had to go
24 to him?
25     A.  Just that it's required under the

1 statutes.
2     Q.  Had you provided the attorney's fees
3 notice prior to that April letter?
4     A.  I believe so.
5     Q.  Was it required under the statute?
6     A.  I don't know -- I don't know a thing
7 in the statute that says you can't provide
8 multiple notices.
9     Q.  But you know that it was required?
10     A.  I don't know how to answer that
11 question.  As far as legal goes, it wasn't
12 prohibited.  There is notice that it is
13 required, so I don't know how else to answer
14 that question.
15     Q.  Do you know the professional rules of
16 responsibility say you should not contact a
17 represented party?
18     A.  I'm not sure which rule you're
19 referring to.  I felt like my letter was in
20 compliance with the laws.
21     Q.  In discovery responses, I saw that it
22 said that you earned less than $100,000 for the
23 year 2020; is that right?
24     A.  Can you refer me to the question?
25     Q.  Sure.

1     A.  Because I don't remember answering...
2     Q.  37.
3     A.  Do you want to read that to me?  I'm
4 sorry.
5     Q.  Sure.  "Defendant JLO" -- I'm sorry.
6 "Admit that your income is greater than 100,000
7 for the year 2020. "
8     "Response:  Defendant JLO and
9 defendant LWJ respond to this request as
10 follows:  Defendant JLO and defendant LWJ deny
11 that defendant LWJ had a net income greater
12 than 100,000 for the year 2020. "
13     "Defendant JLO and defendant LWJ deny
14 the remaining allegations contained in request
15 number 37."
16     A.  So there's different kinds of income.
17 So I was referred a net income, and so my net
18 income was that amount.
19     Q.  I'm sorry.
20     A.  I believe you asked if my net income
21 was greater than 100.  And my response was, I
22 denied that it was greater than 100.
23     Q.  Okay.  You're denying that it is
24 greater than 100; is that right?
25     A.  That is right.

1     Q.  And if we added up these Cordtz
2 amounts, the amounts that you were paid for
3 Cordtz, it's about $10,000; is that right?
4     A.  Your -- that's why I was very
5 specific in my response.  There is gross income
6 and there is net income.
7     Q.  Okay.
8     A.  Net income is you take the gross
9 income and you deduct all your expenses and
10 everything out of it.  So that's why I refer to
11 it as net income.
12     Q.  What is your total net income, if you
13 don't mind?
14     A.  I don't -- what -- I don't know
15 recall for the specific year, but I know it was
16 less than 100 grand for that year, because I
17 looked at it back then.
18     Q.  Do you expect 2021 to be greater than
19 100 or less than 100?
20     A.  You know, I'm not sure because it
21 depends on expenses.
22     Q.  How did you create the April 2021
23 letter to Mr. Johnson?
24     A.  Mr. Cordtz?
25     Q.  Sorry.  Yes.

1     A.   On my computer.
2     Q.   Okay.  And how was the content
3   created?
4     A.   I typed it.
5     Q.   Where did you get the content from?
6     A.   From the statute.
7     Q.   Was it an original letter or you had
8   the basic format of the letter and you just
9   incorporated the basic format of the letter to
10   the letter to Mr. Johnson?
11     A.   To Mr. Cordtz?
12     Q.   I'm sorry, I need a break.
13     A.   Do you want to take a break?
14     Q.   We could go for -- just answer this
15   question, and then take five minutes.
16     A.   I don't recall.
17     Q.   You don't recall where the content of
18   that letter came from?
19     A.   No, I don't recall if I used another
20   letter.
21     Q.   I see.
22     A.   Or if I drafted it from scratch.  I
23   don't remember.
24        MR. WEXLER:  Can we take five
25     minutes?

1        (Thereupon, a brief recess was taken.)
2   BY MR. WEXLER:
3     Q.   How did you meet the Jauregui law
4   firm?  How were you introduced to them?
5     A.   So they actually assisted us, Johnson
6   & Freedman and RCO Legal, with matters in
7   Alabama.
8     Q.   Is that why you're the registered
9   agent of that company?
10     A.   I don't know.
11     Q.   Why are you the registered agent of
12   that company?
13     A.   I didn't remember that I was, but if
14   I am a registered agent, they would have asked
15   me and I would have said okay.
16     Q.   Do you have any ownership interest in
17   that company?
18     A.   No.
19     Q.   What does the bond company do?
20     A.   It only handles surety bonds.
21     Q.   Does it ever do collections work?
22     A.   No.
23     Q.   Don't you have to sometimes collect
24   the bond that is paid?
25     A.   No.  I represented them when they

1   were -- when the bond company had a lawsuit
2   filed against it, and I defended them in that
3   lawsuit.
4     Q.   What do you do for the bond company
5   now?
6     A.   I do marketing, so I try to convince
7   other people to use the bond company for their
8   surety bonds.
9     Q.   But nothing else besides marketing?
10     A.   That's right.  Other than that one
11   case.  I defended them in a case.
12     Q.   And when you do work for Jauregui or
13   McMichael Taylor, or the home properties, what
14   do you tell the bond company, that you're just
15   not able to work today, or how do you excuse
16   yourself from working for that company with
17   other work?
18     A.   That is our arrangement.
19     Q.   So the arrangement is, you're allowed
20   to do other work whenever you please or...
21     A.   Yes.  Can I clarify one other thing?
22     Q.   Sure.
23     A.   There was another matter that I gave
24   some legal advice to McMichael, the firm -- is
25   that the name of the firm?

1     Q.   Okay.
2     A.   And it was a matter where they were
3   in litigation, but I never entered an
4   appearance on that, and I gave them some
5   advice.  And so there was the second matter and
6   I wanted to clarify that.
7     Q.   Was that litigation -- what type of
8   litigation was that, just very generally?
9     A.   I believe they're defending their
10   client in a matter where they have been sued by
11   a company that was -- that had a commercial
12   loan.  But I never entered an appearance in the
13   case, but I did review some things and give
14   them my thoughts on some legal matters.
15        MR. WEXLER:  I think this is it.  I
16     don't have any anything else.
17        THE WITNESS:  I don't know if Mark
18     has any questions.
19        MR. BAKER:  I do not have any
20     questions.
21        (Time Noted:  3:13 p.m.)
22
23
24
25

CERTIFICATE

1

2

3      I, the undersigned authority, hereby

4  certify that the foregoing transcript, page 1

5  through 49 is a true and correct transcription

6  of the deposition of Larry Johnson taken before

7  me at the time and place set forth on the title

8  page hereof.

9      I further certify that said witness

10  was duly sworn by me according to law.

11      I further certify that I am not of

12  counsel to any of the parties to said cause or

13  otherwise interested in the event thereof.

14      IN WITNESS WHEREOF I hereunto set my

15  hand and affix official seal this 15th day of

16  September, 2021.

17  _____

18      RANDI GARCIA, COURT REPORTER, RPR

19          NOTARY PUBLIC

20

21

22

23

24

25

---

1      I have read the foregoing transcript of my

2      deposition and find it to be true and

3      accurate to the best of my knowledge and

4      belief.

5

6

7

8      _____

9      LARRY JOHNSON

10      Sworn and subscribed to before me on

11

12      this _____ day

13      of _____ 2021.

14

15

16

17      Notary_____

18      My Commission Expires_____

19

20      PRIORITY-ONE COURT REPORTING SERVICES, INC.

21          (718) 983-1234

22

23

24

25

---

1          E R R A T A   S H E E T
2              Priority-One/Veritext
3  JOB #  4798910
4  ATTACH TO DEPO OF:  LARRY JOHNSON
   Case:  CORDTZ v. JOHNSON LEGAL OFFICES, LLC, et al.
5  Date of Depo:  9/13/2021
6  Instructions:  Please read this copy of your
   deposition and make note of any errors in the
7  transcription on this page.  DO NOT mark on the
   transcript itself.  Sign and date errata sheet
8  Thank you.
9
   PAGE   LINE    ERROR OR AMENDMENT
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
    Date _____  _____
25

---

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

| & |
|---|
| **&** 4:24 5:2,8,13,16 |
| 5:18 6:13,25 7:2,5 |
| 7:8,9 8:1,3,10,22 |
| 8:22 9:19 20:16 |
| 20:19 33:14 47:6 |

| 0 |
|---|
| **02003** 1:3 |
| **07039** 1:18 |

| 1 |
|---|
| **1** 50:4 |
| **10** 4:21 8:15 11:17 |
| 12:8 13:20 16:9 |
| **10,000** 45:3 |
| **100** 38:4,6 42:19 |
| 44:21,22,24 45:16 |
| 45:19,19 |
| **100,000** 43:22 44:6 |
| 44:12 |
| **108** 3:6 |
| **13** 2:10 |
| **15** 24:17 |
| **1571** 50:16 |
| **15th** 50:15 |
| **197.5** 41:13 |
| **198.5** 41:14 |
| **1993** 7:4 |
| **1:21** 1:3 |

| 2 |
|---|
| **20** 38:2,3 |
| **200** 26:5 |
| **2009** 7:7 |
| **2012** 39:8 40:3,6 |
| 40:10,13 |
| **2013** 7:20 8:6 |
| **2015** 8:15 11:18 |
| 12:8 13:20 16:9 |
| 39:10 |
| **2016** 16:19 |

| 2020 | 43:23 44:7,12 |
|---|---|
| **2021** 2:10 19:23 |
| 25:3 42:10 45:18 |
| 45:22 50:16 51:13 |
| **2244** 3:6 |
| **2260** 1:17 |
| **260** 3:13 |
| **275** 34:3 |
| **290** 1:17 |

| 3 |
|---|
| **30** 40:8 |
| **30,000** 35:5 |
| **300** 34:2 |
| **30092** 3:14 |
| **30345** 3:7 |
| **3550** 3:13 |
| **37** 44:2,15 |
| **3:13** 49:21 |

| 4 |
|---|
| **4** 3:23 |
| **40,000** 20:10 |
| **4798910** 1:25 52:3 |
| **49** 50:5 |

| 5 |
|---|
| **5,480.85** 32:21 |
| **5000** 20:8 |
| **585** 32:11 |

| 7 |
|---|
| **7000** 20:8 |
| **718** 1:19 51:21 |

| 8 |
|---|
| **80,000** 39:16 |

| 9 |
|---|
| **9/13/2021** 52:5 |
| **983-1234** 1:19 |
| 51:21 |

| a |
|---|
| **able** 48:15 |
| **account** 30:6,7 |
| **accounts** 32:23 |
| **accurate** 51:3 |
| **actively** 11:11,12 |
| 11:13 |
| **actual** 36:3 41:7 |
| 41:18 |
| **added** 30:23 45:1 |
| **additional** 39:13 |
| **address** 22:10,12 |
| **admit** 44:6 |
| **ads** 15:4 |
| **advertisements** |
| 14:7 |
| **advice** 35:1 36:24 |
| 48:24 49:5 |
| **affidavit** 29:15,15 |
| 29:17 38:25 39:10 |
| 41:2 |
| **affix** 50:15 |
| **agency** 21:16,17 |
| 21:19,20,22,23,24 |
| 22:2,3,10,20,21 |
| 23:1,9 |
| **agent** 47:9,11,14 |
| **ago** 4:21 7:21,24 |
| 35:4 |
| **agree** 42:1 |
| **agreement** 16:13 |
| 16:23,25 17:25 |
| 18:25 20:24 34:5 |
| **al** 1:7 52:4 |
| **alabama** 14:11 |
| 15:1 47:7 |
| **allegations** 44:14 |
| **alleges** 40:5 |
| **allow** 37:5,15,21 |
| **allowed** 35:23 |
| 36:12 42:16 48:19 |

| amended | 36:20 |
|---|---|
| **amendment** 52:9 |
| **america** 28:12,14 |
| **amount** 38:23 |
| 39:13,20,21,24 |
| 40:7,12,21,23 41:1 |
| 41:11,24 44:18 |
| **amounts** 45:2,2 |
| **answer** 36:23 38:9 |
| 43:10,13 46:14 |
| **answered** 20:14 |
| 28:3 |
| **answering** 7:24 |
| 44:1 |
| **anybody** 28:10 |
| **ap** 32:18,22 |
| **apg** 23:18 24:11 |
| **appear** 18:9 |
| **appearance** 49:4 |
| 49:12 |
| **appears** 41:19 |
| **appellate** 10:8 |
| **applied** 5:13 |
| **applies** 5:11 |
| **apply** 42:6,7,11,14 |
| **approximately** |
| 2:10 7:3,7 |
| **april** 39:4 42:10 |
| 43:3 45:22 |
| **areas** 9:14 |
| **arrange** 15:9,10 |
| **arrangement** 19:2 |
| 33:22 48:18,19 |
| **arranges** 14:7 |
| 15:4 |
| **aside** 23:9 |
| **asked** 25:11,18,20 |
| 26:18 32:6 35:5 |
| 35:12 44:20 47:14 |
| **asking** 6:11 37:10 |

**aspen** 23:17 24:6
24:10,12,15,25
25:17,21,23,25
26:21 27:22 28:1
28:15,16,22,24
29:9 30:15,21,23
31:1,2,5,11,13,16
**aspen's** 26:1
**asserted** 39:11
**assignment** 41:7
**assistance** 16:4,5
**assisted** 47:5
**atlanta** 3:7 9:6,21
**attach** 52:4
**attached** 15:20
36:19
**attempted** 6:17
**attempting** 5:15
**attorney** 5:14
11:20 26:15 36:1
**attorney's** 35:6,9
35:15,20,23 36:2,4
43:2
**auction** 15:8
**authority** 50:3
**authorization**
18:10
**auto** 6:18,20,21,21
7:18
**ave** 1:17
**aware** 5:5,10 27:4
27:25 28:2,4,7,8
37:3 42:21

**b**

**back** 8:11 13:19
14:15,18 15:12
21:2,11 41:21
45:17
**background** 12:2
**baker** 3:10 25:15
25:25 33:12 34:8

49:19
**balance** 38:22
**bank** 10:3 28:12
28:14
**bankruptcies** 9:17
**banks** 7:14
**based** 40:2
**basic** 46:8,9
**basically** 8:8
**behalf** 26:1 28:15
30:4 35:10,12
**belief** 51:4
**believe** 5:11 8:25
9:9 11:5 17:2
20:17,19 25:19
29:13,22 30:17
31:15,19 32:1
35:25 36:2,21
39:25 41:6 42:12
42:13 43:4 44:20
49:9
**best** 51:3
**beyond** 26:22
**birmingham** 14:5
**bit** 6:24
**blue** 34:9,13
**bond** 21:16,17,18
21:22 22:2,3,10,20
22:21 23:1,9
47:19,24 48:1,4,7
48:14
**bonds** 47:20 48:8
**borrower** 42:8
**bought** 30:6
**box** 19:11,12
**break** 46:12,13
**brief** 47:1
**bring** 17:17,18
**brought** 24:24
25:2

**bunch** 41:9,9
**business** 7:10 8:17
13:5
**buy** 30:7

**c**

**c** 3:1
**calculate** 38:22
39:4
**calculated** 39:6,9
**call** 15:8 18:19
25:23 29:12
**called** 2:4 8:7
14:12 25:17,20
26:1 33:21 34:8
34:13
**calls** 29:8
**cap** 36:11
**captioned** 2:5
**car** 6:6 10:6
**card** 7:15,17 8:24
9:8
**case** 1:3 4:6 22:11
23:17 25:6,8,13,22
26:9,14 27:11
28:6,13,15 29:18
30:13,13,14,18
32:16,17 35:6,11
36:9 37:2 40:4
42:4 48:11,11
49:13 52:4
**cases** 42:5
**category** 11:6,7
**cause** 50:12
**ceased** 7:20,23 8:4
**certainly** 5:5 11:6
24:19 26:14 40:10
**certificate** 50:1
**certify** 50:4,9,11
**charged** 36:13
**check** 19:12 32:22

**checks** 32:9
**circumstances**
38:13
**civil** 2:7
**clarify** 48:21 49:6
**clear** 37:25
**client** 10:9 12:3,14
12:15 14:7,22
15:4,9,17,22,23
16:3 17:17,18
20:22,25 26:15
35:11,11 38:24
39:8 40:15,19
49:10
**client's** 12:17
**clients** 10:24 14:19
15:24
**close** 38:5
**closed** 8:3 34:9,11
**coffer** 19:13
**collect** 5:15,18 6:9
6:10,14,18 28:17
47:23
**collected** 6:21
**collecting** 9:7
**collection** 11:14
35:6 36:17,21
38:8,10
**collections** 8:24
9:25 10:1 47:21
**collector** 11:4,9,15
42:13,15
**come** 12:12
**commencing** 2:10
**commercial** 12:3
49:11
**commission** 51:18
**communicating**
22:11
**communication**
42:23

communications
26:16,18,21 29:3,4
29:5,7
**companies** 10:3
**company** 7:15
13:2,8,16 14:3
24:16 47:9,12,17
47:19 48:1,4,7,14
48:16 49:11
**complaint** 36:20
40:2
**completely** 22:6,7
22:19
**compliance** 43:20
**comply** 5:11
**computer** 46:1
**conduct** 17:8
**conducts** 15:7
**conferences** 5:4
**confused** 8:2
37:11
**conjunction** 28:16
28:18
**connection** 27:19
27:23,24 28:1,24
**consider** 11:3
18:23 27:12,14
36:5
**considered** 28:9
**consolidated**
32:22
**consumer** 5:15
42:2,17
**contact** 42:17
43:16
**contained** 44:14
**content** 29:6 46:2
46:5,17
**convenience** 22:14
**conversation** 31:8

**convince** 48:6
**copied** 42:20
**copy** 52:6
**cordtz** 1:4 4:8 25:4
27:1,6 33:2,6 35:7
38:13,14 39:5
40:9 41:10 42:10
45:1,3,24 46:11
52:4
**corners** 3:12,14
**correct** 15:18 16:1
19:15 22:17 25:24
31:22,25 34:19,21
34:22 50:5
**correctly** 14:13
**counsel** 17:25 18:7
18:24,25 19:2
20:12,15 21:14
25:12,21 30:18
33:20 42:3,18,20
50:12
**counseling** 27:19
**count** 39:2
**county** 23:21,22
24:24 25:3 26:3,9
31:9 39:23
**couple** 6:16 31:17
31:19 35:4
**court** 1:1,16 50:18
51:20
**courthouse** 15:7
**courts** 10:9
**covered** 9:6
**create** 45:22
**created** 20:20
21:24 46:3
**credit** 7:15,17 8:24
9:8
**criteria** 13:14
**crying** 14:8 15:5,5
15:8

**cv** 1:3

**d**

**d** 3:17 14:14
**date** 40:1 52:5,7
52:24
**day** 50:15 51:12
**days** 39:2 40:8
**deal** 17:11
**debt** 5:15 7:17 9:8
11:3,9,13,15 26:24
28:17 36:16,21
38:7,10 42:12,15
**debtor** 37:2
**decade** 7:24
**decided** 39:13
**deduct** 45:9
**deed** 15:11
**default** 39:7 40:1,3
40:9,10
**defend** 10:4
**defendant** 1:8 3:9
4:6 44:5,8,9,10,10
44:11,13,13
**defended** 48:2,11
**defending** 49:9
**defense** 30:18
**deficiencies** 6:2,4
6:8,18
**deficiency** 5:19,22
5:24 6:6,15,20
**defined** 36:7
**defines** 36:6
**delaware** 30:16
**denied** 44:22
**deny** 44:10,13
**denying** 44:23
**department** 9:12
**depending** 10:5
**depends** 15:15
45:21

**depo** 52:4,5
**deposition** 1:12
2:3,5 4:5,12 18:20
50:6 51:2 52:6
**depositions** 4:16
**describe** 13:4,15
**description** 33:2
**designate** 19:7
**diem** 38:25 39:3
**different** 6:1,4
15:21 21:23 29:24
33:1 44:16
**directly** 28:23
29:1,9
**discovered** 30:25
**discovery** 12:22
28:4 43:21
**discussion** 18:13
**dismiss** 15:21
36:20
**dismissed** 30:13
**district** 1:1,2 4:7
**document** 41:6,8
41:18
**documentation**
40:20,22 41:3,5
**documents** 26:11
**doing** 13:25,25
18:10 33:17 38:7
**dollars** 20:3,6 26:6
**drafted** 46:22
**drive** 3:13
**duly** 4:2 50:10

**e**

**e** 3:1,1,17 14:14,14
22:10,12 52:1,1,1
**earlier** 28:9
**earned** 19:2 43:22
**eight** 7:21 23:8
**either** 28:22

| | | | |
|---|---|---|---|
| **employees** 8:10,12 | **fall** 11:5,7 | **follows** 4:3 44:10 | **generally** 10:4 |
| **ends** 41:17 | **familiar** 40:4 | **foreclosure** 5:23 | 15:11 17:1 49:8 |
| **engaged** 13:21 | **far** 34:16 43:11 | 10:21 12:15 14:16 | **generated** 17:4,7 |
| **engaging** 38:12 | **fci** 27:5,9,13,15,18 | 14:17 15:14 21:3 | **georgia** 1:2 4:7 |
| **engineering** 3:13 | 27:20,25 28:2,17 | 21:8 34:24 35:2 | 12:15 13:7,7,11 |
| **entail** 10:23 | 28:20 | **foreclosures** 6:15 | 16:14 21:5 35:24 |
| **entailed** 9:7 | **fdic** 41:6 | 9:17 10:12,15,18 | 36:7 |
| **entered** 49:3,12 | **federal** 2:6 5:10 | 12:10 14:1,1,4 | **getting** 13:19 |
| **entities** 22:15 | 10:9 14:23 | 17:8 21:10 | 17:18 |
| 31:22 32:3 | **fedex** 28:19,20 | **foregoing** 50:4 | **give** 9:24 16:5 35:1 |
| **entity** 30:1 | **fee** 16:23,24,25 | 51:1 | 35:14 49:13 |
| **errata** 52:7 | 17:3,4,6 20:24 | **forget** 25:13 | **given** 12:6 |
| **error** 52:9 | 33:22 35:23 36:3 | **formal** 17:21 | **go** 5:4 42:23,23 |
| **errors** 52:6 | **fees** 35:6,9,15,20 | **format** 46:8,9 | 46:14 |
| **esq** 3:4,10 | 36:4 43:2 | **forth** 50:7 | **goes** 15:6,7,12 |
| **establish** 34:11 | **felt** 43:19 | **found** 20:22 | 19:13 22:23 42:8 |
| **et** 1:7 52:4 | **file** 11:12,14 17:4 | **freedman** 4:24 5:3 | 43:11 |
| **event** 50:13 | 17:7 26:4 | 5:8,13,16,18 6:13 | **going** 12:5 13:19 |
| **evictions** 9:17 | **filed** 16:14 26:3 | 6:25 7:2,5,8 8:1,3 | 18:19 21:2,11 |
| **exactly** 16:17 | 29:17,20,22,25 | 8:10,22,23 9:19,20 | 26:16,20 41:24 |
| 31:20 | 30:4,14 39:23 | 20:17,19 33:14 | **good** 33:19 |
| **examination** 2:4 | 48:2 | 47:6 | **gotten** 12:23 20:5 |
| 3:21 4:9 | **files** 11:12 12:4,16 | **freedman's** 7:9 | **grand** 23:7 45:16 |
| **examined** 4:2 | 12:19 | **friday** 8:9 | **gray** 3:11 |
| **example** 9:24 | **filing** 31:9 | **friedman** 21:25 | **greater** 44:6,11,21 |
| **exclusively** 40:18 | **find** 19:1 25:10 | **front** 25:6 29:17 | 44:22,24 45:18 |
| **excuse** 48:15 | 33:11 51:2 | 31:12 | **gross** 45:5,8 |
| **expect** 45:18 | **firm** 5:3,14 6:13 | **ftcpa** 4:19,24 5:2,6 | **group** 10:21 23:18 |
| **expecting** 35:17 | 6:25 7:11 8:6,8,18 | 38:17 42:1,7,11,13 | 24:11 25:1 |
| 35:18 | 9:5,16 11:6,8,16 | **fulton** 23:22 24:24 | **guess** 8:2 20:4 |
| **expenses** 45:9,21 | 14:5,11 15:1,9 | 25:2 26:3 29:20 | 23:12 32:23 38:24 |
| **expires** 51:18 | 17:22 18:24 19:3 | 29:23,25 30:13 | **gwinnett** 23:21 |
| **explain** 19:20 | 20:13 21:15 25:12 | 31:9 32:17 38:21 | 26:9 29:18 30:14 |
| **extent** 9:10 | 25:15,16,19,25 | **fund** 24:5,12,22 | 30:24 32:16 39:23 |
| | 28:25 33:14 34:24 | **further** 50:9,11 | 40:4 |
| **f** | 47:4 48:24,25 | **g** | **h** |
| **fact** 25:24 | **first** 4:2 | **g** 14:14 | **h** 4:1 52:1 |
| **facts** 26:17 29:6 | **five** 4:18 13:2 23:7 | **ga** 3:7,14 | **hand** 50:15 |
| **fair** 27:8 34:23 | 34:9 46:15,24 | **garcia** 2:8 50:18 | **handle** 11:12 |
| 35:19 36:3 | **florida** 10:14,16 | **general** 9:16 | 12:10 14:10,18 |
| **fairly** 16:11 | | | 15:14 35:2 |

| | | | |
|---|---|---|---|
| **handled** 11:13 12:2 | **include** 10:14 17:7 | 20:23 21:14 23:11 34:24 36:16 37:15 47:3 48:12 | 20:1 23:2,6 27:10 27:24 29:11 31:11 32:11,19 33:4,15 |
| **handles** 14:6 21:10 47:20 | **included** 37:4 41:1 41:11 | **jauregui's** 20:25 | 33:16,18 35:16,22 |
| **handling** 28:13,14 | **income** 44:6,11,16 44:17,18,20 45:5,6 45:8,9,11,12 | **jeffrey** 1:4 4:8 | 36:15,22 37:10,23 38:9 39:17 40:3 |
| **happened** 6:16 7:25 11:17 16:11 | **jersey** 1:18 | 40:12 43:6,6,9,10 |
| **happens** 13:24,24 | **incorporate** 16:12 | **jlo** 44:5,8,10,13 | 43:13,15 45:14,15 |
| **happy** 10:24 | **incorporated** 11:19 46:9 | **job** 1:25 52:3 | 45:20 47:10 49:17 |
| **head** 25:14 | **joel** 9:19 10:20 11:1 21:25 | **knowing** 5:1 |
| **headquartered** 8:7 | **incurred** 35:21 | **knowledge** 38:19 51:3 |
| **hear** 29:6 | **indicated** 30:20 | **johnson** 1:7,13 2:4 3:19 4:6,11,23 5:2 | |
| **hearing** 35:3 | **indicating** 40:20 | 5:8,13,16,18 6:13 | **l** |
| **held** 30:17 | **individual** 4:5 15:13 25:9 29:12 | 6:25 7:2,5,8,9 8:1 8:3,10,22,22 9:19 | **l** 4:1 14:14 |
| **help** 15:24 16:2,6 16:8 32:7 | **individuals** 10:2 29:13 | 11:19,21,24 13:20 | **large** 13:2 |
| **helped** 17:9 | **infrequently** 23:3 | 16:12 20:16,19,20 | **larry** 1:13 2:4 3:19 4:5 50:6 51:9 52:4 |
| **helps** 15:1 | **initial** 39:7 | 21:11 22:4,18,22 | **law** 3:5 5:3,10,14 |
| **henderson** 3:6 | **injury** 10:5 12:4 | 22:25 23:11,12,14 | 6:13,25 7:11 8:6 |
| **hereof** 50:8 | **inserted** 36:25 37:22 | 24:20 33:14 34:10 | 8:18 11:16 14:5 |
| **hereunto** 50:14 | **instance** 6:7 | 34:12 37:9,11,13 | 15:1 17:22 19:3 |
| **history** 21:11 | **instances** 6:17 | 37:18,25 38:1 | 20:13 25:12,16 |
| **holdings** 23:18 24:6,12 30:16,21 | **instructions** 52:6 | 45:23 46:10 47:5 | 28:25 33:14 34:24 |
| 30:23 31:1,2,5,16 | **interest** 39:11,13 41:19,21 47:16 | 50:6 51:9 52:4,4 | 35:24 36:9 47:3 |
| **home** 12:18,19 | **interested** 33:17 | **joined** 8:6 | 50:10 |
| 13:4,12 14:21,23 | 50:13 | **judgment** 35:10 | **laws** 43:20 |
| 14:25 15:2,16,22 | **interrupting** 13:18 | 39:23 | **lawsuit** 10:5 24:25 |
| 17:11,13 21:13 | **introduced** 47:4 | **judgments** 5:19 | 25:3 26:4 29:20 |
| 23:10 34:25,25 | **invoice** 32:10 33:1 | **judicial** 21:7 | 29:23,25 30:4,24 |
| 48:13 | **invoices** 32:13 | | 38:21 40:5 48:1,3 |
| **hour** 34:2 | **involved** 4:15 | **k** | **lawsuits** 10:4 |
| **hourly** 16:22 | 25:13 26:8,24 | **keep** 19:9,19,20 | **lawyer** 21:21 |
| 33:24 34:1 | **issue** 9:11 | **keeping** 10:24 | **learn** 4:19 |
| | | **kept** 34:13,15 | **left** 8:9 16:10 |
| **i** | **j** | **kind** 20:12 26:23 41:13 | 21:23 |
| **immediately** 9:11 16:18 | **j** 2:7 4:1 14:14 | **kinds** 44:16 | **legal** 1:7 8:7,12,13 8:16 9:1 11:4,19 |
| **impact** 5:7,9 | **january** 25:3 33:13 34:20 38:21 | **knew** 4:24 32:3 | 11:21,24 13:20 |
| **impression** 30:15 | **jauregui** 14:12 | **know** 6:5 11:10,11 11:14 12:3,21 | 16:5,5,11,12 20:17 |
| | 17:22 19:3 20:21 | 13:14 16:7 18:6 | 20:18,20 21:12 |
| | | 18:11 19:4,10 | 22:4,18,22,25 |

23:12,12,14 24:20
34:10,11,12,16,17
34:21 35:1 36:24
37:9,11,13,18,25
38:1 43:11 47:6
48:24 49:14 52:4
**legislature** 36:7
**lend** 13:10
**lender** 15:12 27:5
27:9,13,15,18,20
**lenders** 7:12,13,14
7:18 8:21 23:17
38:14
**letter** 15:19 30:19
36:18 37:1,4,6,7
37:16 39:5,19
42:2,8,9,11,14,20
43:3,19 45:23
46:7,8,9,10,18,20
**letters** 14:6 37:21
**licensed** 21:4,5
**lindsey** 14:14
17:22 20:21,23
**line** 52:9
**litigate** 14:9
**litigation** 9:18,22
10:7 12:1,4 13:21
13:25 14:10 19:9
21:3 23:20 24:1
28:2,11 33:18
49:3,7,8
**little** 6:24 20:5
**livingston** 1:18
**llc** 1:7 3:5,11
11:21,25 16:15
22:23 23:18 24:11
25:1 52:4
**loan** 13:12 30:2
40:7 41:10,18,20
49:12

**loans** 41:9,22
**local** 12:14
**long** 8:13
**looked** 12:22 18:5
45:17
**looking** 32:9
**lot** 36:8 37:24
39:18
**ltw** 1:3
**lwj** 44:9,10,11,13

## m

**mail** 22:10,12
**majority** 19:8
**managing** 9:18
**mark** 3:10 25:15
25:20,25 33:12
34:8 49:17 52:7
**marketing** 21:17
48:6,9
**matter** 2:5 23:21
23:22 24:3,4,6,8,9
24:19 28:21 32:14
32:15 48:23 49:2
49:5,10
**matters** 12:2 24:2
24:15 34:16,17,21
47:6 49:14
**mcmichael** 3:11
25:16,19 27:4,9
28:24 32:6 38:8
38:14 48:13,24
**mean** 11:15 16:12
19:10 28:13,19
31:2 34:10 40:24
42:20
**means** 15:5 32:23
35:22
**meet** 47:3
**mentioned** 10:11
**mhc** 1:3

**mill** 3:6
**mind** 33:25 45:13
**mine** 33:12
**minutes** 46:15,25
**mistaken** 31:4
**monday** 2:9 8:11
**money** 41:21
**month** 16:16
**monthly** 26:25
27:2
**morris** 7:3,4,5
**mortgage** 10:3
12:18,19 13:8,13
14:21,24,25 15:2
15:16,22 17:12,13
21:13 23:10 34:25
**mortgage's** 13:5
**motion** 15:20,21
30:14 36:19 39:23
**moved** 30:22
**mt** 1:17
**mtgo1.005** 32:11
**multiple** 43:8
**multiply** 39:2

## n

**n** 3:1,17 4:1,1
14:14
**name** 12:17 18:9
24:17 25:14 29:11
30:1 36:18,25
37:3,5,8,16,18,22
37:24 48:25
**named** 25:5,7
**names** 31:12
**necessarily** 26:12
**need** 10:10 16:4
33:20 46:12
**net** 44:11,17,17,20
45:6,8,11,12
**never** 11:13 24:10
24:14,18 28:9

31:4 40:11 49:3
49:12
**new** 1:18 30:5
**nonjudicial** 21:8
21:10
**northern** 1:1 4:7
**notary** 2:9 50:19
51:17
**note** 6:6 30:17
52:6
**noted** 49:21
**notes** 6:21
**notice** 43:3,12
**notices** 15:3 43:8
**number** 32:10
37:23 41:12,13,15
41:25 44:15
**numbers** 33:1
41:23

## o

**o** 4:1,1
**occasions** 31:20
32:7
**offer** 40:6
**office** 3:5 8:9,11
9:21 14:15,18
23:12
**offices** 1:7 11:19
11:21,25 13:21
20:20 21:12 22:4
22:19,22,25 23:12
23:14 24:20 34:12
37:9,11,13,18,25
38:1 52:4
**official** 50:15
**oh** 33:4
**okay** 7:22 18:17
23:23 26:19 33:25
44:23 45:7 46:2
47:15 49:1

ongoing  24:21
opened  34:10,12
operates  24:16
operating  16:13
operation  9:20
operations  7:20,23
  8:4,5 9:5,7
opposition  15:20
  36:19
oral  2:4
original  46:7
originally  7:2
  31:14
oversaw  9:5,20
  10:20
oversee  9:15 11:11
overseeing  10:18
  10:22
owed  38:22 39:24
  40:13,21,23 41:11
  41:22
owned  13:6 22:1
owner  24:5
ownership  31:24
  47:16

**p**

p  3:1,1
p.m.  2:11 49:21
pacer  20:22
page  3:21 50:4,8
  52:7,9
paid  19:17,18,22
  19:23 23:4 45:2
  47:24
paperwork  15:2
  16:14
paralegal  10:6
part  20:24
participate  10:17
particular  21:20

parties  29:24
  50:12
partner  9:18
  21:22 33:12
partnership  21:21
party  22:23 30:3,5
  30:7 43:17
pay  16:21 40:7
  41:21
payable  32:24
payment  40:11
payments  41:24
peachtree  3:12,14
people  5:4 28:10
  31:17 32:2,4 48:7
percent  42:19
permitted  18:8,8
person  29:15,19
  38:18
personal  10:5 12:4
  22:24 37:3,8
personally  6:10,12
  17:23 33:15
phone  29:8,12
  31:18
place  16:15 38:16
  50:7
plaintiff  1:5 3:3
  4:8 25:5,7
plan  38:7,12,15
pleading  25:6
pleasant  1:17
please  48:20 52:6
point  7:7 31:14
portion  16:24
position  9:1,2,4
  10:18
posting  14:6
practice  4:23 5:7,9
  9:14 19:8

president  9:3
pretty  12:7 30:11
  33:19
prevent  38:17
previously  33:13
principal  40:21,23
  41:11,24
prior  7:3,4,6 31:8
  38:21 40:8 43:3
priority  1:16
  51:20 52:2
privileged  26:15
probably  4:16
  13:1 19:4 20:7
  23:7 38:3
problem  18:18
procedure  2:7
produced  29:16
  32:10
professional  2:8
  43:15
prohibit  18:15
prohibited  43:12
prohibits  42:2
pronouncing
  14:13
properly  10:25
properties  23:17
  24:11 25:1 27:22
  31:11,13 48:13
property  5:23
  15:13 30:16,21,23
  31:1
provide  22:25
  36:23 43:7
provided  26:8
  30:18 38:23 39:1
  39:10 40:14 41:2
  43:2
public  2:9 50:19

purchased  30:20
purchases  15:13
pursuant  2:6
pursue  39:22
put  19:11,12 36:17

**q**

qualify  11:9
question  8:2 36:23
  37:12,14 38:10
  43:11,14,24 46:15
questions  49:18,20
quickly  16:11

**r**

r  3:1 4:1,1 14:14
  52:1,1
ran  10:21
randi  2:7 50:18
range  34:4
rate  16:22 33:24
  34:1
rco  8:7,12,13,16
  9:1 11:4 16:11
  20:17,18 34:9,11
  47:6
rd  3:6
read  41:18,19 44:3
  51:1 52:6
real  5:23
really  4:16 6:11
  11:1,10 12:25
  14:3 19:7,19 28:7
reason  5:1 42:22
reasonable  36:4,5
  36:6,8
recall  4:20 20:14
  26:11,13,22 27:2
  34:7 45:15 46:16
  46:17,19
recess  47:1

recollection 30:10
record 15:11
records 19:16,18
reduced 40:7
refer 12:20 43:24
  45:10
referred 34:17,20
  44:17
referring 32:19
  43:19
refers 12:15 14:4
registered 2:8
  47:8,11,14
relate 32:13,15
relationship 17:21
  17:24 20:13 21:12
  23:10,16,24 24:22
  24:25 25:2,8
relationships
  20:16
rely 38:19 40:18
remaining 44:14
remember 16:17
  18:13 29:21 34:3
  44:1 46:23 47:13
remote 1:12
reporter 2:8 50:18
reporting 1:16
  15:15 51:20
represent 8:20
  10:7 22:15 23:20
  23:25 24:7 27:12
  27:22 28:10,12,14
  28:19,20,22 29:1
  30:10,12 38:13
representation
  25:18
represented 7:11
  8:21,23 24:10,14
  24:19 25:25 27:5
  27:13 28:11 30:3

31:5,14 42:3,17
  43:17 47:25
representing
  21:13 25:21 27:15
  27:18,20 28:1
represents 27:9
request 16:6 44:9
  44:14
requesting 16:8
requests 28:4
required 42:25
  43:5,9,13
residents 13:11
respect 27:5
respond 44:9
responded 12:21
response 44:8,21
  45:5
responses 43:21
responsibility
  43:16
return 22:19,22
returns 22:18,23
  22:24
review 26:4,25
  49:13
reviewed 26:7,12
  41:4
reviewing 27:2
revocable 23:19
  24:11
right 10:13 17:16
  17:20 21:1 23:19
  24:13 27:23 28:5
  28:17,23,25 29:3
  29:24 30:2 34:18
  43:23 44:24,25
  45:3 48:10
round 41:13,14,23
  41:25

rpr 50:18
rule 43:18
rules 2:6 43:15

**s**

s 3:1 4:1 14:14
  52:1
salary 16:21
sale 14:8 15:5,6,8
savings 24:5,12,15
  24:22 30:9,12
  31:1 35:13
saw 43:21
saying 42:16
says 43:7
schneider 7:3,4,6
scratch 36:1 46:22
seal 50:15
searched 15:11
seattle 8:8
second 49:5
see 22:5 32:6,10
  37:13 39:9 40:16
  42:1 46:21
seek 39:14
seen 24:17 37:7
send 15:3
sending 42:2
sense 19:13
sent 27:1 32:21
  37:1 39:5 42:10
separate 19:19,21
  22:4,6,7,16,20
  26:12
separately 19:10
september 2:9
  8:15 11:17 12:8
  13:20 16:9 40:3,6
  40:10,13 50:16
services 1:16 23:1
  23:4 27:5,9,14,15
  27:18,20 36:17,22

51:20
set 50:7,14
settlement 40:5
seven 13:3
sheet 52:7
shimshon 3:4 4:4
showing 40:22
side 21:23
sign 52:7
signature 50:16
signed 29:15
similar 8:21 31:24
  31:24 36:18 37:1
  38:12
single 19:8 22:22
six 4:18
small 19:8
smallish 13:15
sole 11:20
sorry 6:19 13:18
  20:18 31:12 34:3
  36:1 37:19 44:4,5
  44:19 45:25 46:12
southeast 9:3,6
  10:12
speak 5:5
special 42:22
specific 45:5,15
specifically 42:9
spoke 29:14,19,22
  31:17,18,19 32:2,4
staff 11:22 14:4,5
stand 32:18
start 7:1 21:18
started 7:2 21:25
  28:1
state 9:12,12 10:9
  12:18,19 13:4,6,7
  13:12 14:21,25
  15:2,16,22 16:14
  17:11,13 21:9,13

23:10 34:25
**statements** 26:25
  27:3 40:16
**states** 21:4
**statute** 36:6,8 43:5
  43:7 46:6
**statutes** 43:1
**statutory** 30:16,17
  35:23,25 36:2
**stopped** 8:5
**strike** 41:12,14
**stuff** 11:11
**subscribed** 51:10
**sue** 10:2
**sued** 12:3 26:5
  28:6 49:10
**suite** 1:17 3:6,13
**summary** 39:22
**summer** 8:6
**sure** 4:16,22 10:25
  12:25 14:12 19:25
  26:14 30:11 32:25
  42:19 43:18,25
  44:5 45:20 48:22
**surety** 21:16,17,18
  21:22 22:2,3,9,20
  22:21 23:1,9,13
  47:20 48:8
**sworn** 4:2 50:10
  51:10
**systems** 38:16

**t**

**t** 52:1,1
**take** 6:3 18:20
  41:20 45:8 46:13
  46:15,24
**taken** 2:6 4:12
  47:1 50:6
**talking** 5:22 37:17
**tax** 22:18,19,22,23
  22:24

**taylor** 3:11 33:13
  34:20 38:8 48:13
**technical** 9:2
**tell** 6:24 11:24
  23:23 31:20 48:14
**telling** 33:5,25
**tennessee** 21:6,7,9
**testified** 4:2
**testify** 11:1
**thank** 52:8
**thereof** 50:13
**thing** 43:6 48:21
**things** 12:6 49:13
**think** 7:16,19 9:2
  11:8 16:10 28:7
  35:19 38:5 49:15
**thinking** 5:25
**third** 17:1,6,15,19
  18:1 22:1,1,1
**thirds** 17:2 18:1
**thought** 33:19
**thoughts** 49:14
**thousand** 20:3,6,7
  26:5
**three** 4:17 12:5,23
  22:1 39:12,15
**time** 7:16,19 10:15
  12:6 16:17 23:2,2
  27:7 28:3 40:8
  49:21 50:7
**times** 4:14,17 6:16
  10:2
**timing** 29:21
**title** 15:10 50:7
**titles** 31:21
**today** 48:15
**told** 18:3,12
**top** 25:14
**total** 45:12
**totally** 22:15

**touch** 34:14,15
**training** 38:20
**transcript** 2:3
  50:4 51:1 52:7
**transcription** 50:5
  52:7
**transfer** 30:19
  31:15,16 41:7,8
**transferred** 30:8
  41:9
**tried** 5:10 19:14
**true** 36:15 50:5
  51:2
**trust** 23:19 24:6
  24:11,12 30:17
  31:2,5,16
**trustee** 21:9 23:18
  24:16 30:9 31:1
  35:13
**try** 48:6
**trying** 10:24 19:20
**two** 4:16 10:5 12:5
  17:2 18:1 29:13
  32:4
**type** 5:24 8:16,17
  9:22 10:7 13:16
  49:7
**typed** 46:4
**types** 6:1,4,8 7:13
  9:14,23
**typically** 5:20 6:14
  14:7 41:22

**u**

**u** 14:14,14
**u.s.** 1:1
**ultimate** 39:22
**ultimately** 30:8
**undersigned** 50:3
**understanding**
  5:12 26:2 35:3
  36:10 39:8

**use** 22:9,13 37:15
  48:7
**uses** 36:16
**usually** 12:5

**v**

**v** 1:6 52:4
**veritext** 52:2
**versus** 11:15
**vice** 9:3
**violations** 38:17

**w**

**walk** 7:25
**want** 15:14 26:17
  29:6 44:3 46:13
**wanted** 19:15
  39:22 49:6
**washington** 8:8
  9:13
**way** 20:15
**we've** 20:15 34:15
**website** 18:4,6,9
**week** 29:16 35:5
**weeks** 35:4
**went** 21:20
**west** 1:17
**wexler** 3:4,5,23
  4:4,4,10 46:24
  47:2 49:15
**whereof** 50:14
**wilmington** 24:5
  24:12,15,22 30:9
  30:12,25 35:13
**withdrew** 7:6
**witness** 3:19 49:17
  50:9,14
**word** 6:19
**work** 9:25 10:8
  14:16,16,17,18,19
  14:23 17:5,12
  21:3 28:18 33:8

33:17 34:24 38:8
38:10 47:21 48:12
48:15,17,20
**worked**   8:14 11:20
33:13,14
**working**   48:16
**works**   28:16
**wound**   9:10
**wreck**   10:6
**written**   34:5
**wrong**   39:20

| x |
| --- |

**x**   1:9 3:17

| y |
| --- |

**y**   4:1 14:14
**yeah**   10:20 32:4
40:25
**year**   12:20,22,24
19:22,24 39:12
43:23 44:7,12
45:15,16
**years**   4:21 7:21
23:8 24:18 34:9
39:15

| z |
| --- |

**zeros**   41:17
**zoom**   2:9

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.