1          UNITED STATES DISTRICT COURT
                        FOR THE
2          NORTHERN DISTRICT OF GEORGIA
        CIVIL ACTION NO. 1:21-cv-02003-MHC-LTW
3                       - - -
4    JEFFREY D. CORDTZ,
5          Plaintiff,
6             v.
7    JOHNSON LEGAL OFFICES, L.L.C., FCI
     LENDER SERVICES, INC., LARRY W. JOHNSON,
8
           Defendants.
9
10                      - - -
11                     VIRTUAL
12      DEPOSITION UNDER ORAL EXAMINATION OF
13                JANUARY N. TAYLOR
14              October 18, 2021
15
                        - - -
16
           REPORTED BY:  LAURA A. GRABOWSKI, CCR
17
                        - - -
18
19
                    PRIORITY-ONE
20        COURT REPORTING SERVICES, INC.
          290 West Mt. Pleasant Avenue
21                 Suite 3200
          Livingston, New Jersey  07039
22              (718) 983-1234
23
24          Job No. P1-4852635
25

1    Transcript of the deposition of
2    JANUARY N. TAYLOR, called for Oral Examination in
3    the above-captioned matter, said deposition taken
4    pursuant to Federal Court Rules of Practice and
5    Procedure by and before LAURA A. GRABOWSKI, a
6    Certified Court Reporter for the State of New
7    Jersey, commencing at 10:00 a.m.
8
9              - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              - - -
2          I N D E X
3              - - -
4
5    Testimony of:  JANUARY N. TAYLOR          PAGE
6
7    DIRECT EXAMINATION BY MR. WEXLER          6
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    APPEARANCES:
2
     S. WEXLER, LLC
3    2244 Henderson Mill Road, Suite 108
     Atlanta, Georgia  30345
4    Swexleresq@gmail.com
     BY:  SHIMSHON WEXLER, ESQ.
5    Attorneys for Plaintiff
6
     McMICHAEL TAYLOR GRAY, LLC
7    3550 Engineering Drive, Suite 260
     Peachtree Corners, Georgia  30092
8    Mbaker@mtglaw.com
     BY:  MARK BAKER, ESQ.
9    Attorney for Defendant FCI Lender Services, Inc.
10
     JOHNSON LEGAL OFFICES, L.L.C.
11   138 Hammond Drive, Suite B
     Atlanta, Georgia  30328-4806
12   Ljohnson@suretybondsagency.com
     BY:  LARRY JOHNSON, ESQ.
13   Attorneys for Johnson Legal Offices, L.L.C., and
     Larry Johnson
14
              - - -
15
16
17
18
19
20
21
22
23
24
25

1              - - -
2        DEPOSITION SUPPORT INDEX
3              - - -
4
5    Direction to Witness Not to Answer
6    Page Line     Page Line     Page Line
7    None
8
9
10   Request for Production of Documents
11   Page Line     Page Line     Page Line
12   None
13
14
15   Stipulations
16   Page Line     Page Line     Page Line
17   None
18
19
20   Question Marked
21   Page Line     Page Line     Page Line
22   None
23
24
25

Page 6

1           - - -
2           JANUARY N. TAYLOR, after having been
3   duly sworn, was examined and testified as follows:
4           - - -
5           DIRECT EXAMINATION BY MR. WEXLER:
6           - - -
7       Q.    Good morning, Ms. Taylor.
8       A.    Good morning.
9       Q.    Have you ever had your deposition
10  taken before?
11      A.    Yes.
12      Q.    How many times?
13      A.    Maybe five times.
14      Q.    Five times, okay.  When did you
15  become a lawyer?
16      A.    2005.
17      Q.    Okay.  And what was your first job as
18  a lawyer?
19      A.    As a foreclosure attorney in North
20  Carolina.
21      Q.    All right.  At which law firm?
22      A.    Brock & Scott.
23      Q.    Okay.  And how long were you at Brock
24  & Scott?
25      A.    A couple years.

Page 7

1       Q.    Okay.  And what was after Brock &
2   Scott?
3       A.    Morris Miner Pryor.
4       Q.    Okay.  And that was also a
5   foreclosure law firm?
6       A.    Correct.
7       Q.    And what was after that Morris law
8   firm?
9       A.    Back to Brock & Scott.
10      Q.    Okay.  Any specific reason why you
11  went and then came back?
12      A.    I mean, that was, my gosh, ten -- ten
13  years ago, and I am sure there were many reasons.
14      Q.    Okay.
15      A.    An opportunity.
16      Q.    Okay.  And I know Brock & Scott, they
17  do credit card collection.  You weren't in that
18  department, were you?
19      A.    I was not in a credit card collection
20  department, no.
21      Q.    What department are you in?
22      A.    Georgia foreclosure department.
23      Q.    Brock & Scott had a Georgia
24  foreclosure department?
25      A.    Correct.

Page 8

1       Q.    Do they still have a Georgia
2   foreclosure department, to the best of your
3   knowledge?
4       A.    I believe so.
5       Q.    Okay.
6       A.    But I don't know for sure.
7       Q.    So what was after your second stint
8   at Brock & Scott?
9       A.    I joined Stern & Eisenberg, another
10  law firm.  They were in South Carolina.  I was there
11  for a couple years, and then I opened up my own
12  firm.
13      Q.    Are you licensed in Georgia, South
14  Carolina and North Carolina?
15      A.    Yes.
16      Q.    Any other states that you are
17  licensed in?
18      A.    No.
19      Q.    What was the name of the law firm
20  that you opened?
21      A.    J. Taylor Law.
22      Q.    Okay.  And do you remember the date
23  that you opened that law firm?
24      A.    I believe it was April 2017.
25      Q.    And who did you open that law firm

Page 9

1   with?
2       A.    Myself.
3       Q.    And how did the opportunity to open
4   that law firm come about?
5       A.    In 2018 I had two -- actually, three
6   additional partners join the firm.  We changed the
7   name and -- I believe we changed the name -- I am
8   not sure exactly what was done in the background.
9   We had attorneys that handled that for us, but
10  Randall McMichael, Edward Gray and Art Morris joined
11  and made it McMichael Taylor Gray, which is what it
12  is known as today.
13      Q.    But how did you come to open J.
14  Taylor by yourself?
15      A.    I am not sure I understand the
16  question.
17      Q.    All right.  So one day you just
18  decided, Hey, I am going to open my law firm by
19  myself or --
20      A.    I think my career path had been
21  preparing me for the ability to do that for about
22  15 years.  I was at the point where I could sustain
23  myself, yes.
24      Q.    Who did you open J. Taylor with?
25      A.    Myself.

3 (Pages 6 - 9)

1  Q.  And did you have any employees?
2  A.  I had some independent contractors
3  that would do work with me occasionally, part-time
4  work.  I believe towards the end I had two or three
5  full-time employees.
6  Q.  Lawyers or legal assistants?
7  A.  Both lawyers and legal assistants.
8  Q.  Okay.  When did you learn about a
9  company called FCI Lender Services, Inc.?
10  A.  I have known FCI Lender Services for
11  ten plus years.
12  Q.  How many?
13  A.  Ten plus.
14  Q.  I am sorry.  You broke up.
15  A.  Ten plus.
16  Q.  Can we move to document number -- so
17  I am going to send the court reporter these 103
18  documents that I sent you.  So we are going to use
19  that, and we are going to work off of that.  This
20  agreement, administrative agreement -- I have never
21  seen an agreement called an administrative
22  agreement.  Do you mind telling me what that is?
23  A.  It's an admin -- I am not sure I
24  understand the question.  It's an administrative
25  agreement between J. Taylor Law and FCI Lender

1  Services, and it has -- it really just recites what
2  the relationship is between FCI and J. Taylor Law.
3  Q.  All right.  So administrative means
4  what?  Like, I am not sure of what that word means.
5  So, like, filing -- you know, I think of
6  administration as someone filing certain things or
7  not doing anything of substance, but I must be
8  getting something wrong here, so I am just not sure
9  what an administrative agreement is.
10  A.  Well, I think rather than focus on
11  what it's called, the terms of it really are
12  attempting to outline the relationship between FCI
13  and Lender Services.
14  Q.  Okay.  That's fair.  So when did you
15  enter into this contract with FCI Lender Services,
16  as far as how long after you had opened J. Taylor
17  Law?
18  A.  This is dated December 19, 2017.
19  Q.  Right.  And the date you opened J.
20  Taylor Law, do you remember that?
21  A.  I believe it was April 2017.
22  Q.  Okay.  What does it mean that FCI
23  Lender Services is viewed as a one-stop shop?
24  A.  Are you referring to the one-stop
25  partner and handling their loan servicing,

1  foreclosure and bankruptcy needs?
2  Q.  Yes.
3  A.  I wouldn't know exactly why that's --
4  why they offer that.  I don't know all the details
5  of what their agreements would be with -- with their
6  investors.
7  Q.  But the term one-stop partner, what
8  does that mean to you?
9  A.  Well, based on the sentence, I think
10  what they are saying is they can offer loan
11  servicing, foreclosure and bankruptcy needs.  That
12  is the services that handled all those types of
13  needs for a particular investor.
14  Q.  Could you think of any other types of
15  needs that are not handled by FCI?
16  A.  I think I would ask you to be more
17  specific.
18  Q.  Okay.  Would they handle a breach of
19  contract issue for one of their investors?
20  A.  I don't know.
21  Q.  Okay.  Looking at the second
22  paragraph of the administrative agreement, it states
23  that FCI increases the efficiency of the referral.
24  Tracking and default process improves communications
25  between counsel and the investor, and therefore adds

1  significant value.
2  Do you see that?
3  A.  Yes.
4  Q.  Why are you agreeing to that?
5  A.  Well, I believe they do.
6  Q.  Okay.
7  A.  At least that's their goal.
8  Q.  Okay.  Now let's go to the sentence,
9  Each party acknowledges that the other party to this
10  agreement is an independent contractor acting on
11  behalf of an investor, and that neither party will
12  be deemed to be an agent or employee of the other
13  party.
14  Do you agree with that?
15  A.  I am sorry.  What -- can you point
16  out again, what paragraph?
17  Q.  It's paragraph two.
18  A.  Okay.
19  Q.  The sentence in the middle.
20  A.  Okay.  Yes, I see that.
21  Q.  Can you tell me about that sentence
22  means?
23  A.  That each party is an independent
24  contractor acting on behalf of an investor, and
25  neither party will be deemed to be an agent or

1 employee of the other party, that we are independent
2 contractors.
3     Q.    Okay. Why did that need to be said?
4     A.    I am not sure.
5     Q.    Okay. Now, how many accounts did FCI
6 have?
7     A.    I wouldn't -- I wouldn't know that.
8     Q.    How many accounts did FCI have that
9 you were handling for them?
10     A.    I wouldn't have that information on
11 hand.
12     Q.    Was it more than a hundred?
13     A.    I really wouldn't have that
14 information offhand. I would have to pull the
15 report, and then you would have to give me a more
16 specific timeframe.
17     Q.    Okay. Was FCI -- scratch that. Did
18 the McMichael law firm work for FCI?
19     A.    Pursuant to this -- are you talking
20 about McMichael Taylor Gray.
21     Q.    Yes.
22     A.    Pursuant to this administrative
23 agreement, yes.
24     Q.    Okay. Now let's go down to the
25 fourth paragraph. It says that counsel agrees to

1 bill for services in accordance with the current
2 FNMA allowable fee schedule.
3     What does that mean?
4     A.    Fannie Mae.
5     Q.    Okay. And counsel refers to the
6 McMichael law firm?
7     A.    I am not sure I understand your
8 question.
9     Q.    It states that counsel agrees to bill
10 for services in accordance with the current Fannie
11 Mae allowable fee schedule.
12     A.    Correct. J. Taylor Law, now known as
13 McMichael Taylor Gray.
14     Q.    And do you know what the current
15 Fannie Mae allowable fee schedule is?
16     A.    Not off the top of my head, no. It's
17 public, online, though.
18     Q.    Okay. I was actually able to find it
19 where it stated that the maximum allowable fee for a
20 Georgia nonjudicial foreclosure is normally $1,600
21 or $1,400. Does that sound right?
22     A.    Actually, 16 sounds a little high. I
23 think it's a little lower than that, but somewhere
24 in that range.
25     Q.    Okay. So did you never agree to bill

1 an investor more than whatever the limit is for
2 Fannie Mae for legal services?
3     A.    Have I -- can you repeat the question
4 one more time?
5     Q.    It states that McMichael agrees to
6 bill for legal services in accordance with the
7 Fannie Mae limits, which you stated 1600 sounds a
8 little bit high. Does McMichael abide by that?
9     A.    Correct.
10     Q.    Okay. Now, my question is, in this
11 case with courts it appears that McMichael paid Mr.
12 Johnson and his law firm more than $15,000. How can
13 you explain that?
14     A.    Likely because he did about $15,000
15 worth of legal work, possibly more at this point.
16     Q.    Is McMichael being reimbursed by the
17 investor for that $15,000?
18     A.    I am not sure. I can check and see
19 if our invoices are in the documents you provided,
20 but otherwise I wouldn't know offhand what we billed
21 to any investor for this case altogether.
22     Q.    Okay. But it would be impossible
23 to -- bill for services for more than that
24 amount, being that you agreed to only bill for the
25 maximum Fannie Mae allowable. Isn't that right?

1     A.    Well, Fannie Mae has a -- an hourly
2 litigated contested rate. So the Fannie Mae
3 doesn't -- isn't just that flat fee that you
4 referenced earlier, that 1600. There's also an
5 hourly allowable rate as well.
6     Q.    I see. Why did the McMichael law
7 firm decide to hire Mr. Johnson and his law firm?
8     A.    My understanding is Mark was busy
9 with some other stuff and needed help with the case,
10 because it was becoming so litigious.
11     Q.    How often does the McMichael law firm
12 hire outside counsel to help?
13     A.    I -- I -- I wouldn't honestly know
14 any percentages, if that's what you are asking, off
15 the top of my head, but very rarely.
16     Q.    Do you know of any other case?
17     A.    Where we have -- is your question any
18 other cases where we have hired local counsel to
19 assist us, or outside counsel to assist us?
20     Q.    Yes.
21     A.    We -- we do use outside counsel to
22 attend some of our non-contested foreclosure and
23 bankruptcy hearings and eviction hearings from time
24 to time. We -- maybe -- I really wouldn't know off
25 the top of my head, but in a situation like this,

Page 18

1 not very often. We try not to.
2    Q.   And sitting here today, you can't
3 name another instance, except for the non-contested
4 foreclosure, kind of like appearance counsel that
5 you hire. Is that right?
6    A.   I believe there is another case in
7 Georgia that we are using outside counsel to assist
8 us with, off the top of my head, and there very well
9 may be more. I just -- I couldn't tell you --
10   Q.   All right.
11   A.   -- more specifics today.
12   Q.   Is Mr. Johnson and his law firm known
13 for being good at debt collection?
14   A.   No, I don't believe Mr. Johnson and
15 his law firm does collection work.
16   Q.   Okay. Well, isn't this lawsuit
17 concerning collection work?
18   A.   I am going to be honest, there is a
19 lot going on with this case. I am not sure of the
20 exact ins and outs of where it stands right now with
21 the current litigation. I am not the assigned
22 attorney with the case.
23   Q.   Okay. We will get to that. Now,
24 this indemnification agreement -- we are looking on
25 page three.

Page 19

1    A.   Yes.
2    Q.   What -- what is your understanding of
3 that indemnification agreement from a very high
4 level?
5    A.   Let's see. That J. Taylor Law will
6 indemnify FCI for any errors made in a foreclosure
7 or bankruptcy or any other legal insurances case.
8    Q.   Is J. Taylor Law indemnifying FCI in
9 this case?
10   A.   Not to my knowledge.
11   Q.   All right. So in other words, FCI is
12 paying legal bills for McMichael representing them?
13   A.   I don't know for sure.
14   Q.   Now, if you don't mind turning to
15 page four of this agreement?
16   A.   Page four of the indemnity agreement?
17   Q.   No. Of the entire 103 pages.
18   A.   Oh, okay.
19   Q.   It's convenient to look on the bottom
20 center, the number.
21   A.   Okay. Okay. Correct.
22   Q.   Okay. Now, is that your signature
23 there?
24   A.   Yes.
25   Q.   Okay. And you see that, it's

Page 20

1 December 2017?
2    A.   Correct.
3    Q.   Okay. Now we are going to scroll
4 down to page eight. I would like you to read the
5 agreement between pages five and eight, and if you
6 can tell me if there's any difference between the
7 first and second agreement?
8    A.   You want me to tell you if there's
9 any difference in the pages between five and eight
10 and one and four?
11   Q.   Yeah. Just general. The question
12 really is, why did you sign different agreements on
13 September 2017 and December 2017, if you have any
14 recollection of the reason why?
15   A.   I -- they appear to be the same from
16 a high level, just brief review. I do not know
17 exactly why, but if I had to guess, it's probably
18 because I added on additional states that I could
19 handle for them, and the same referral firm.
20   Q.   I see. Now, let's go to page nine
21 and ten, and that's your signature again on page
22 ten?
23   A.   Yes.
24   Q.   Now, why is this just an indemnity
25 agreement and not an administrative agreement as

Page 21

1 well?
2    A.   I am not sure. It's likely it might
3 be missing pages.
4    Q.   Okay.
5    A.   I am not sure.
6    Q.   Okay. And this was the first
7 agreement that you signed in April 2017?
8    A.   Yes, yes.
9    Q.   So you pretty much signed one FCI as
10 soon as you opened your law firm?
11   A.   Correct.
12   Q.   And how many accounts did FCI
13 immediately give you?
14   A.   I don't have that information today.
15   Q.   Was it more than ten?
16   A.   I really wouldn't know off the top of
17 my head.
18   Q.   Now let's go to page 11 of the
19 attachment.
20   A.   Okay.
21   Q.   Do you know what this is?
22   A.   No. I mean, I could read what it is.
23   Q.   You have never seen this?
24   A.   Not to my knowledge.
25   Q.   Mr. Baker produced it to me. Do you

1  know why he did that?
2      A.     Possibly because you asked for it. I
3  am not sure.
4      Q.     Okay. But why is this in your
5  possession?
6      A.     I am just seeing this preparing for
7  today's deposition. I don't have any information as
8  to how he obtained it in order to produce it for
9  discovery purposes.
10     Q.     Okay.
11     A.     I was not part of that discovery.
12     Q.     Do you mind reading through that
13  agreement, page 20 -- until page 22, starting from
14  that agreement? Have you seen any agreement similar
15  to this?
16     A.     I see contracts, servicing
17  agreements, engagement agreements frequently
18  throughout my career, yes.
19     Q.     And an FCI loan servicing agreement
20  specifically?
21     A.     I am sure over time I probably have,
22  but would not be able to tell you what one contains
23  or doesn't contain versus another. And you want me
24  to read the entire agreement right now?
25     Q.     No.

1      A.     Okay.
2      Q.     Can we go to page 24 of the
3  attachment?
4      A.     Okay.
5      Q.     Have you ever heard of this company,
6  APG Holdings Revocable Trust?
7      A.     Yes.
8      Q.     How did you come to hear of them?
9      A.     They are -- they are somehow related.
10  I don't know the specifics, but I know they are
11  somehow related to Aspen, I believe, who is one of
12  our clients.
13     Q.     How much business does Aspen give
14  you?
15     A.     I don't know off the top of my head.
16     Q.     How many accounts does Aspen have?
17     A.     I don't -- I wouldn't have that
18  information.
19     Q.     More than ten?
20     A.     I wouldn't have that information.
21     Q.     Can you read this agreement and find
22  out whether the McMichael law firm is allowed to
23  commence a foreclosure with regard to this account?
24     A.     You want me to read the loan
25  servicing agreement and determine from this

1  agreement if McMichael Taylor Gray can proceed on a
2  foreclosure action?
3      Q.     Correct.
4      A.     I am not so sure -- okay. This
5  agreement is nine pages.
6      Q.     I believe there is -- you could
7  find -- you have seen many servicing agreements and
8  you could find where to look. I believe there is --
9  it has to be within the attorney network of FCI
10  Lender Services.
11     A.     I am not quite sure I understand your
12  question, but let me see if I can -- maybe I will
13  understand when I see it, what you are asking.
14     Q.     Sounds great. Thank you.
15     A.     Are you referencing paragraph five?
16  Is that what you are asking me about? On page 26.
17     Q.     Which sentence are you referring to?
18     A.     The highlighted portion, and I don't
19  really know if I understand your question, but you
20  have referenced an attorney network, and this is
21  attorney network language in this bolded part, so I
22  am assuming what you are trying to get me to
23  reference --
24     Q.     Yes.
25     A.     I am not sure I quite understand the

1  question.
2      Q.     You got it. That's excellent.
3      A.     Well, I just found the words attorney
4  network. It really wasn't that --
5      Q.     Are you on their attorney network?
6      A.     I -- attorney network, I would assume
7  I am, being as I have an administrative agreement
8  with them.
9      Q.     Okay.
10     A.     I assume that's what they mean by
11  that reference, yes.
12     Q.     Okay. Why don't you have a contract
13  with the investor?
14     A.     So preparing for this deposition I
15  did learn that we did not produce one, but I do
16  believe we have a contract with Aspen, and that it
17  was not in the location where we keep most of our
18  contracts. So I am working on trying to locate a
19  copy of that.
20     Q.     Okay.
21     A.     I do believe we have a written
22  contract for that.
23     Q.     Have you seen it?
24     A.     It feels familiar, which is why I
25  believe we have one. I am the one that signs all

1  the firm contracts. So when I say all, the majority
2  of them, and especially with Aspen I would have.
3  They have been a client for years, so I just believe
4  because it is an older contract it just got -- it
5  just didn't get moved over to the new software.
6  That's all.
7      Q.    When did you find that contract?
8      A.    I haven't found it yet. I just
9  learned last night that we -- we had responded
10  stating that we didn't have one, and I believe we do
11  have one.
12      Q.    Okay. But at the time of the
13  response you didn't have one, right?
14      A.    Correct. We keep all of our client
15  contracts in one location. The folder that would
16  have held that contract did not have it in there,
17  but I do believe I remember entering into a contract
18  with Aspen. That is our process, to enter into a
19  contract with our clients. So I believe there's one
20  out there. It's just because it's older, one of the
21  older clients from the beginning that it just didn't
22  make its way to the new folder, that's all. It was
23  an oversight. We are looking, I am looking in a
24  couple of other places to make sure.
25      Q.    When Mr. Johnson and his law firm

1  brought a lawsuit in January 2021 in the name of an
2  Aspen entity, he wouldn't have seen a copy of the
3  contract. Is that right?
4      MR. JOHNSON:  I am going to object to
5  the form of the question, because you are asking
6  about --
7      MR. WEXLER:  Mr. Johnson, you can
8  object to the form of the question, but you are not
9  to give a speaking objection.
10      MR. JOHNSON:  I can object any way we
11  want to. We had no stipulations in the beginning OF
12  this deposition, and I am objecting that you are
13  asking here about what I have seen and what I have
14  not seen. That's not something that is necessarily
15  within her knowledge. That's my objection.
16      Q.    I am sorry. Me and Mr. Johnson --
17      MR. JOHNSON:  Please don't scream at
18  me in the future, and allow me to finish my
19  objection before you start screaming.
20      Q.    I am sorry. Mrs. Taylor, I am sorry
21  about that. Can you please continue?
22      A.    I -- can you repeat the question?
23      Q.    Sure. In January 2021 Mr. Johnson
24  sued my client in the name of an Aspen entity. Is
25  that right?

1      A.    I don't know.
2      Q.    If I told you that it was true, do
3  you have any reason not to believe it?
4      A.    I really don't know. I mean, I don't
5  believe Mr. Johnson's firm just sues entities and
6  collection entities or anything like that, but I
7  know he is related to this case, so I guess the
8  answer is it would not shock me, but I don't know
9  the specifics, no.
10      Q.    You -- your firm, the McMichael law
11  firm would not have given a contract to Mr. Johnson
12  or his law firm prior to bringing that lawsuit. Is
13  that correct?
14      A.    I don't know.
15      Q.    Well, if you just found the contract
16  and you didn't know that it existed before a few
17  days ago, there's no way that you would have had a
18  contract between the Aspen entity and the McMichael
19  law firm in January 2021. Is that right?
20      A.    I never said -- specifically said the
21  contract hasn't been located now, but I don't think
22  that -- I believe the contract was signed years ago,
23  so I think it's just been misplaced, is what I said,
24  but I don't have my hand on it, so I don't know.
25      Q.    Okay.

1      A.    And again, I wasn't actively involved
2  in the case or what transpired with Mr. Johnson or
3  Mr. Baker in preparation for any of the cases.
4      Q.    Okay. Now, if we go to the agreement
5  back on page 11 through 22, would you agree with me
6  that this contract does not contain that attorney
7  network language?
8      A.    Without reading the entire agreement,
9  I couldn't answer that question.
10      Q.    Please read the entire agreement.
11      A.    Just to be sure I understand, you
12  want me to read pages 11 through 22 to determine if
13  there's language within the agreement referencing an
14  attorney network?
15      Q.    Yes, please.
16      A.    Okay. In paragraph seven on page 13
17  references -- paragraph numbered seven towards the
18  bottom there are several sentences that relate to
19  the attorney network approved list. You want me to
20  read it for the record?
21      Q.    Sure.
22      A.    Servicer is authorized, and then --
23  sorry. Servicer is authorized, but in accordance
24  with State and Federal regulations may not be
25  obligated, to prepare the full or partial

1  reconveyance or release and coordinate recording of
2  such; and (k) when directed to do so in writing or
3  by e-mail from client or lender or the majority of
4  the lenders, as the case may be, servicer shall
5  support foreclosures with client's selected
6  attorney. Client's selected attorney must be on
7  servicer's approved attorney list or vetted by the
8  servicer for statutory and compliance purposes.
9  Administrative fees and/or deposits are required
10  from client in order for servicer to support the
11  initiation of foreclosures with client-selected
12  attorney. Client must give servicer the exclusive
13  right to coordinate all California nonjudicial
14  foreclosures with respect to such loans, and failure
15  to comply could result in cancellation of loan
16  servicing by servicer on specified loans, or on all
17  loans. California foreclosure fees shall not exceed
18  the State statutory guidelines for foreclosure fees.
19      Q.    Thank you. Can you turn to page 33,
20  please?
21      A.    Okay.
22      Q.    This seems to say that there was a
23  transfer between Value Recovery Group Joint Venture
24  I and the Federal Deposit Insurance Corporation? Is
25  that right?

1      A.    Yes. Based on the first paragraph,
2  correct.
3      Q.    Okay. And this sale took place
4  October 28, 2015?
5      A.    Based on the signatures that are
6  dated on the second page, sure.
7      Q.    Do you know of the company Value
8  Recovery Group?
9      A.    No, not that I know of.
10      Q.    Have you ever had them as a client?
11      A.    Possibly, but not that I am aware of.
12      Q.    Now let's turn to page 35. Have you
13  ever seen FCI Lender Services monthly statements?
14      A.    Yes.
15      Q.    And do you mind explaining to me what
16  this statement means? Credit limit, it states
17  $200,000. Does that mean it's available or it's an
18  open line of credit, or could it be closed as well?
19      A.    I wouldn't know enough information
20  about the loan.
21      Q.    Okay. And what does it mean, Unpaid
22  charges of $1,469.20?
23      A.    Again, I wouldn't -- I am not
24  familiar with the details of this loan.
25      Q.    But do you know what that term means

1  of unpaid charges? Is that interest charges or --
2      A.    Again, I don't know. I mean, I don't
3  know the specifics of this loan, so I couldn't speak
4  to what -- what that means.
5      Q.    Okay. Next to finance charges it
6  states $1,062.99. Do you understand finance charge
7  like -- as it's defined in the Truth and Lending
8  Act, the interest basically -- it's basically the
9  interest on the loan?
10      MR. JOHNSON: I am sorry. What page
11  are we looking at?
12      MR. WEXLER: 35.
13      MR. JOHNSON: Thank you.
14      A.    Yes, I am familiar generally with
15  finance charge and how it relates to truth and
16  lending law, but I am not sure if you are asking
17  me -- I don't know the specifics of what those
18  finance charges are. Again, I don't know the
19  specifics of this loan or -- or what is in the
20  monthly statement. I have no knowledge of that.
21      Q.    Right. I mean not this specific
22  monthly statement. I am just trying to understand
23  in general how -- what information is contained on
24  this monthly statement.
25      A.    Again, I just -- I wouldn't know.

1      Q.    Okay.
2      A.    I would have to have more information
3  about the loan.
4      Q.    Okay. Past due amount, it states
5  $190,058.53?
6      A.    Correct.
7      Q.    Does this mean that the loan was not
8  accelerated or --
9      A.    I don't know, nor do I think you
10  could maybe even answer that question just based on
11  that, but I wouldn't know.
12      Q.    Okay.
13      A.    I can say that the past due amount
14  was 190,058.53.
15      Q.    Okay. And the current payment amount
16  is $2,754.05, do you know what that number
17  represents?
18      A.    I do not. I mean, I assume based on
19  what it says, it's just the current payment amount.
20  So I am sure principal and interest is part of that.
21  I am not sure what else, though.
22      Q.    Okay. And the minimum payment is
23  made up of the past due plus the current payment
24  amount? It looks like that's right, right?
25      A.    Yeah. Just generally doing the math,

Page 34

1  it appears that way, yes.
2      Q.    Okay.
3      A.    Without a calculator, yes.
4      Q.    Right, okay. We are looking now at
5  the account activity, 4/21/21, the balance
6  forwarded. We have a balance of $284,403.87. Is
7  that the total amount due?
8      A.    I am not sure. Are you asking me if
9  the $284,403.87 listed on the balance forward, if
10  that's the total amount due?
11      Q.    Yes.
12      A.    I wouldn't know.
13      Q.    Okay. And that in addition to the
14  190,000 or --
15      A.    I wouldn't know.
16      Q.    Okay. We are both on the same page
17  about this statement. Let's turn to page 38 of 103.
18  Have you seen this complaint before?
19      A.    I believe, yes. I saw it last night.
20      Q.    Okay. And Aspen Properties Group,
21  LLC as trustee of the APG Holdings Revocable Trust,
22  you have seen them before too?
23      A.    I am familiar with that entity, yes.
24      Q.    Okay. Did you know that this entity
25  didn't own the loan at the time this lawsuit was

Page 35

1  brought?
2      A.    I would have no knowledge about the
3  specifics at the time of the case.
4      Q.    Were you in communication with Aspen
5  Properties Group, LLC as trustee of the APG Holdings
6  Revocable Trust at the time this lawsuit was
7  brought?
8      A.    I personally was not in discussions
9  with them about this case at the time it was
10  brought, no.
11      Q.    How does your firm policy state that
12  lawsuits should be brought? Do you have --
13      A.    Can you be more specific?
14      Q.    Sure. So do you have procedures and
15  policies for how complaints for default on note are
16  to be brought?
17      A.    I think you are asking do we have a
18  policy in place to ensure that the current holder of
19  the debt into the entity we bring an action into?
20  Is that your question?
21      Q.    Yes.
22      A.    The answer is yes.
23      Q.    How do you do that?
24      A.    Well, it depends on the type of case
25  and the state that we are in and the particular

Page 36

1  action, but usually it's verified with an assignment
2  and a note and verified with our client.
3      Q.    How much before the lawsuit is
4  brought do you verify it with the client?
5      A.    How much meaning time?
6      Q.    Yes, time. I am sorry.
7      A.    I mean, I think that differs,
8  depending on the case.
9      Q.    Now, you consider your law firm a
10  collection law firm or a foreclosure law firm?
11      A.    I consider our law firm a creditor's
12  rights law firm.
13      Q.    Okay.
14      A.    But we do primarily focus on
15  foreclosures, bankruptcies and evictions. We -- I
16  do not consider us a collections law firm.
17      Q.    Have you ever brought a complaint on
18  a note before?
19      A.    Yes, we have.
20      Q.    How many times?
21      A.    I wouldn't know off the top of my
22  head.
23      Q.    More than five times?
24      A.    I wouldn't know.
25      Q.    Okay.

Page 37

1      A.    I can tell you that the majority of
2  our practice is foreclosures, so....
3      Q.    Now, do you know why this case was
4  brought as a complaint for default on a note when
5  there was -- the house was serving as collateral for
6  this loan?
7      A.    I am not aware of the specifics of
8  why this action was brought in this format.
9      Q.    Okay. And if you look on page 43,
10  the complaint is signed by Mr. Johnson and his law
11  firm?
12      A.    Yes.
13      Q.    Do you know why he is the one who
14  signed it?
15      A.    I do not.
16      Q.    And how do you normally get the
17  balance that you want to say is due? So in this
18  case it states in paragraph 25 that there exists a
19  total outstanding balance of 246,162.04, of which
20  includes 197,500 on principal, 672,040 on unpaid
21  interests. 42,752.58 on deferred unpaid interest,
22  and unpaid late fees due through November 5, whereas
23  interest continues to accrue at a per diem rate of
24  44.75.
25      A.    Are you asking me how this number

10 (Pages 34 - 37)

Page 38

1   specifically was calculated?
2       Q.   Yes.
3       A.   I don't know.
4       Q.   Okay.  Do you gather from this
5   paragraph 25 that the complaint is asking for
6   246,162.04 total, or do you gather that he is asking
7   for 246,162.04 plus 44.75 per day from November 5,
8   2018?
9       A.   I think he is asking for a judgment
10  in the amount of $246,162.04, plus recurring
11  interest and other costs incurred as a result of the
12  action.
13      Q.   What I am asking specifically, is the
14  number 246,162.04 -- is that a number good through
15  November 5, 2018, or and then it's in addition you
16  are asking for 44.75 per day from November 5, 2018?
17  Or is it asking for 246,162.04 total and then
18  another 44.75 interest from today?
19      A.   I am sorry.  I am not sure I
20  understand the question.  It's asking for a judgment
21  totalling 246,162.04 plus occurring interests, other
22  fees and cost of the action.  I am sorry.  Am I not
23  answering the question?
24      Q.   Yes.  I am confused by the language
25  due through November 5, 2018.  Do you know what that

Page 39

1   language means?
2       A.   I don't see that language.
3       Q.   In paragraph 25 it's page 42 of the
4   attachments.
5       A.   Okay.  I was reading the last
6   paragraph.
7       Q.   Sorry.
8       A.   Okay.  Paragraph 25.  Okay.  So --
9   all right.  Now can you re-ask the question one more
10  time?  Paragraph 25.
11      Q.   So the question is that asking -- is
12  he asking for 246,162.04 plus 44.75 from
13  January 2021, or is he asking for 246,162.04 through
14  November 5, 2018, plus 44.75 from November 5, 2018?
15      A.   Just from reading paragraph 25, it
16  appears the interest continues to accrue as per diem
17  rate of 44.75 after November 5, 2018.
18      Q.   Okay.  And do you know why that
19  would -- why it would be, that it would be that
20  interest would accrue at a specific amount from two
21  years and two months prior to the complaint being
22  filed?
23      A.   No.  Again, I don't know the
24  specifics of the case or the loan.
25      Q.   Now, could you look at page 44 of the

Page 40

1   attachment of the 103 pages?
2       A.   Okay.
3       Q.   And it asks for -- it states,
4   Currently your loan has been accelerated and you owe
5   $327,917.83 in principal and interest.  Did you
6   know -- did you see this letter before?
7       A.   Just yesterday in preparing for the
8   deposition.
9       Q.   And do you know how the balance
10  changed so drastically between the time of the
11  filing of that complaint and the time of this
12  letter?
13      A.   I am not that good at math, but maybe
14  interest.
15      Q.   Let's talk about interest.  So
16  246,000 from -- let's even go from November 5, 2018,
17  and then we are talking per diem rate of interest of
18  44.75.  So let's just say $50, and $50 per -- per
19  day is about 18,000 a year in interest?  Is that
20  right?
21      A.   I think I just said I am not good at
22  math.
23      Q.   Okay.  Could you take out a
24  calculator, please?
25      A.   I don't have one with me, sir.

Page 41

1       Q.   Okay.  So the only way would be
2   interest, okay.
3       A.   I said I don't know.  I couldn't
4   speculate.  I don't know.
5       Q.   Okay.
6       A.   You referenced a per diem charge.  I
7   thought you were leading me in that math.  I don't
8   know.
9       Q.   I see.  Okay.  Now can you turn to
10  page 46?
11           Do you remember writing this letter?
12      A.   No, I do not.
13      Q.   You don't.  Okay.  But you did write
14  it, right?
15      A.   I am sure I did, yeah.
16      Q.   Now can you turn to page 58?
17      A.   Okay.
18      Q.   This loan is a home equity line of
19  credit?  Is that right?
20      A.   Yes.  Based on that, yes.
21      Q.   Okay.  What's the difference between
22  a home equity line of credit and a note?
23      A.   I am not sure I understand your
24  question.
25      Q.   Do you know the difference between

11 (Pages 38 - 41)

Page 42

1 the type of loan that's called a note and the type
2 of loan that's called a home equity line of credit?
3     A.    I am not quite sure I know, but if
4 you are asking what is the difference -- I mean, a
5 note is a secured instrument, and if you are talking
6 about a specific type of loan, a home equity line
7 versus a single-family 30-year loan residential -- I
8 mean, home equity has a draw.  Is that what you are
9 referencing?
10     Q.    Yes, yes.  So at the time of this
11 loan nobody knew what the balance was because he
12 could pay it back and it could go -- you know, he
13 could pay 200,000 back and get 200,000 available?
14 Do you agree with that?
15     A.    That is -- well, this is typically
16 how a home equity line works, yes, that I am
17 familiar with, yes.
18     Q.    Okay.  And if we turn to page 67 --
19     A.    Okay.
20     Q.    -- do you know what this is?
21     A.    It's -- based on the top it's a note
22 allonge.
23     Q.    And do you know why it says note date
24 of August 3, 2010?
25     A.    I do not.

Page 43

1     Q.    Okay.  And that's because it's not a
2 note, right?
3     A.    Well, it's a note allonge.
4     Q.    Okay.  But I am referring to the
5 loan.  The loan is not a note.  Is that correct?
6     A.    I am not sure I understand what you
7 are asking.  If you are asking what it's called,
8 this document is called a home equity line of
9 credit.  If you are asking -- I am not sure.
10     Q.    Yeah.  So it's basically -- it's not
11 a note.  So note date doesn't -- it's not referring
12 to this home equity line of credit.  Is that right?
13     A.    I am not sure.  I know that this
14 document is called a note allonge, and the previous
15 document you showed me is called a home equity line
16 of credit.
17     Q.    Could the two go together, a note
18 allonge and a home equity line of credit?
19     A.    I don't know if I understand what you
20 mean by go together.
21     Q.    So a note allonge would go along with
22 the note.  Isn't that right?
23     A.    Typically, yes.  A note allonge is
24 referencing an underlying note.
25     Q.    Could a note allonge reference an

Page 44

1 underlying line of credit?
2     A.    Maybe.
3     Q.    What does it depend on?
4     A.    I am not really sure.
5     Q.    Have you ever heard of a note allonge
6 referencing a home equity line of credit?
7     A.    Off the top of my head, no.
8     Q.    Do you know why it has a date of
9 August 3, 2010, when that's the wrong date?
10     A.    No, I do not.
11     Q.    It should have the date of April 3,
12 2006.  Isn't that right?
13     A.    I wouldn't know.  I am not familiar
14 with the specifics of this loan.
15     Q.    Okay.  Why don't you take a look at
16 the date of the loan?
17     A.    The date of the home equity line of
18 credit?
19     Q.    Yes.
20     A.    The top of the home equity line of
21 credit is dated April 3, 2006, but the signature
22 block does not have a date.
23     Q.    Okay.  But it states that it's --
24 that it's on the date stated on page one, on page 52
25 which contains the signature -- it actually does say

Page 45

1 4/3/06, if you look closely next to where the word
2 seal is in abbreviation.
3     A.    I don't see a date on signature block
4 or a reference, but --
5     Q.    Are you looking at page 50?
6     A.    I am looking on page 65.
7     Q.    Oh, I see.  Okay.  But it has the
8 date on the first page of April 3.
9     A.    That's correct, on the first page it
10 is dated April 3.
11     Q.    So you wouldn't know why this note
12 allonge is dated August 3, 2010?
13     A.    I would not know.
14     Q.    Okay.  And if you look at the next
15 one it has note allonge also dated August 3, 2010,
16 and again you wouldn't know why it has that date?
17     A.    No.
18         MR. WEXLER:  All right.  Can we take
19 a ten-minute break?
20         MR. BAKER:  Okay.
21         (A recess is taken.)
22     Q.    Ms. Taylor, how did you prepare for
23 this deposition?
24     A.    I reviewed the documents that you had
25 sent to Mr. Baker and the subpoena.

12 (Pages 42 - 45)

Page 46

1    Q.    Now, can we turn back to page 38,
2 which is the complaint for default on note?
3    A.    Okay.
4    Q.    And do you see that date of
5 January 21st, 2021?
6    A.    The E-file stamped copy?
7    Q.    Yeah.  And also if you look on the
8 signature page it's there too?
9    A.    Correct.
10    Q.    Now, if you don't mind turning back
11 to page 11, the loan servicing agreement --
12    A.    Okay.
13    Q.    -- and that's dated January 20, 2021.
14 Do you see that?
15    A.    Correct, I see that.
16    Q.    Why -- it seems very odd that the
17 loan servicing agreement was signed just one day
18 before the lawsuit was brought.  Do you have any
19 explanation?
20    A.    I have no information or knowledge as
21 to the date the loan servicing agreement was
22 executed compared to the date the complaint was
23 filed.
24    Q.    In your experience is it common to
25 have a loan servicing agreement executed the day

Page 47

1 before a lawsuit is brought?
2    A.    I really would have no knowledge of
3 that type of issue or experience, really.
4    Q.    And if we turn to page 24, that loan
5 servicing agreement was in place from March 1, 2018,
6 until January 20, 2021, when the other loan
7 servicing agreement took its place, and the very
8 next day that lawsuit was filed by Mr. Johnson and
9 his law firm.  Do you know why that was?
10    A.    I have no knowledge.  No, I do not
11 know.
12    Q.    In your experience why would a change
13 of servicer be required to bring a lawsuit?
14    A.    I am not sure I understand the
15 question.  Can you repeat that?
16    Q.    Sure.  What -- in your experience do
17 different loan servicing agreements allow lawsuits
18 to be brought as opposed to other ones?  Like, why
19 would a servicer change a loan servicing agreement
20 in order to bring the lawsuit?
21    A.    I -- I am not sure, nor do I think
22 that we are made aware of it from the attorney side,
23 so -- and I don't know that I had experience with
24 that particular issue occurring.
25    Q.    Okay.  Do you have any -- as far as

Page 48

1 communications between FCI and the investor, how did
2 you learn about those communications?
3    A.    In general?
4    Q.    Yes.
5    A.    In general we are made aware if we
6 are included in those communications; otherwise, we
7 would have to ask.
8    Q.    And are you always made aware of the
9 servicing agreements?
10    A.    No.  Usually we are not.
11    Q.    Is that because the servicing
12 agreements are not important?
13    A.    I don't know that I can answer that
14 question. It's just not something that is typically
15 provided to the attorneys for purposes of what we
16 typically represent our clients in.
17    Q.    Now, can we turn to page 69 of the
18 attachment, and it has -- this is a demand loan
19 payoff.
20    A.    Okay.
21    Q.    And it looks like they are saying
22 that the -- to pay off your loan is 236,377.81.  Is
23 that right?
24    A.    Correct.
25    Q.    And this daily interest amount of

Page 49

1 41.93, what does that mean?  It could change from
2 41.93.  Is that right?
3    A.    If you are asking account per diem
4 change on a loan, the answer is yes, in my opinion
5 it can change.
6    Q.    Okay.  Does interest ever become part
7 of the unpaid principal?
8    A.    In general, yes, it can.
9    Q.    As far as this loan?
10    A.    I would have to review the loan
11 history and the loan documents to provide a specific
12 interest to this loan.
13    Q.    Who would have the loan history of
14 this loan?
15    A.    I believe likely the current owner of
16 the loan, current holder of the loan.
17    Q.    So does FCI pay the McMichael law
18 firm or does the McMichael law firm pay FCI for the
19 administrative agreement?  What's the purpose of the
20 administrative agreement?
21    A.    The administrative agreement lays out
22 the expectations of the relationship between J.
23 Taylor Law, now McMichael Taylor Gray, and FCI, what
24 the expectations are.  FCI does not pay McMichael
25 Taylor Gray, nor does McMichael Taylor Gray pay FCI

13 (Pages 46 - 49)

1　for those services provided.

2　　Q.　So why does the McMichael law firm

3　have any relationship at all with FCI?  I don't

4　understand the purpose of the administrative

5　agreement.  Perhaps you could enlighten me.

6　　A.　Well, if you read it, it sets out

7　certain expectations of how well have a J. Taylor

8　Law and FCI will communicate, what their

9　expectations are as far as return times, what they

10　will bill, what their fee arrangement is; that we

11　have to follow the Fannie Mae fee schedule that

12　we -- whatever previously, things like that.  Also

13　provides an indemnification that -- if the law firm

14　makes an error, whatever, that they would indemnify

15　FCI.

16　　Q.　Okay.  Now, looking back at this

17　demand loan payoff on page 69, have you seen this

18　demand loan payoff?

19　　A.　Yes, I have.

20　　Q.　When?

21　　A.　Most recently yesterday preparing for

22　this deposition.

23　　Q.　Okay.  Now, this interest paid to

24　date, it has October 20, 2015.  Do you see that?

25　　A.　Correct.

1　　Q.　What does that date represent?

2　　A.　The date in which the interest has

3　been paid to.

4　　Q.　Okay.  So would you say as of that

5　date it's -- the unpaid principal is 197,500?

6　　A.　Based on the demand loan payoff on

7　page 69 of the attachment, the unpaid principal

8　balance is $197,500, and it's -- the payoff

9　good-through date is of May 1, 2018.

10　　Q.　Okay.  And what's that unpaid

11　interest?

12　　A.　Unpaid interest is listed as

13　$34,721.06.

14　　Q.　What does that represent?

15　　A.　According to this, unpaid interest.

16　　Q.　From what date until what date?

17　　A.　I don't know what date, but the

18　payoff date is good through May 1, 2018.

19　　Q.　Okay.

20　　A.　On this document.

21　　Q.　Okay.  And if we go to page 71, do

22　you know what this is?

23　　A.　According to the document title, it's

24　a loan reinstatement calculation.

25　　Q.　And what's that?

1　　A.　I mean, it's a reinstatement for a

2　loan.

3　　Q.　Okay.  Can we look on page 74?  I am

4　sorry.  73.

5　　A.　Okay.

6　　Q.　Does this look like a document that

7　APG Holdings Revocable Trust would send on the date

8　that they purchased the loan?

9　　A.　I wouldn't have any knowledge of

10　that.

11　　Q.　Have you ever seen a document like

12　this?

13　　A.　Well, I see, Welcome to APG Holdings.

14　I think you are referencing a welcome letter and

15　yes, I have seen welcome letters, if that is in fact

16　what this is.

17　　Q.　And does this mean that this is the

18　date that they bought the debt?

19　　A.　I wouldn't know.

20　　Q.　And are you aware of any borrowers

21　who have had a successful workout program with APG

22　Holdings Revocable Trust?

23　　A.　I -- yes, I am familiar with loans in

24　the past that Aspen or one of its entities would

25　have completed successful loss mitigation.

1　　Q.　Can we turn to page 76?

2　　A.　Okay.

3　　Q.　Is that a letter from you?

4　　A.　It appears, yes.

5　　Q.　Okay.  And then to turn to page 79,

6　and that letter is dated February 22nd, 2018?

7　　A.　Yes.  Based on the date at the top,

8　correct.

9　　Q.　Okay.  And that's a borrower welcome

10　letter as well?

11　　A.　That is what it's titled, correct.

12　　Q.　Okay.  Is this when FCI Lender

13　Services began servicing the loan, or they might

14　have began servicing it prior?

15　　A.　I wouldn't have any knowledge of when

16　they began servicing it.

17　　Q.　Have you ever seen a borrower welcome

18　letter after they began servicing it?

19　　A.　Yes.  It's usually a delay.

20　　Q.　Okay.  Now, let's turn to page 80.

21　This is a notice of servicing transfer, so it states

22　that the loan is being transferred from value

23　recovery to FCI Lender Services?  Is that right?

24　　A.　Correct.

25　　Q.　And the date -- the servicing of your

Page 54

1  mortgage loan is being transferred effective
2  2/20/18, and that letter was addressed to Mr.
3  Cordtz, right?
4      A.    This letter is dated at the top
5  January 30, 2018.  It refers to the notice of
6  servicing transfer, and the first sentence of the
7  first paragraph says, Effective 2/20/2018.
8      Q.    Okay.  Let's turn to page 82, and do
9  you agree that a home equity line of credit is not a
10 promissory note?
11     A.    Agreed.
12     Q.    Okay.
13     A.    To the best of my knowledge today,
14 agreed.
15     Q.    Okay.  Now, if we go to page 83 is a
16 borrower welcome letter from FCI with a date of -- I
17 don't even see a date.  Okay.  Let's go to page 86.
18     A.    Okay.
19     Q.    Were you representing Wilmington
20 Savings Fund as trustee of the Aspen Holdings Trust?
21     A.    Yes.  According to this letter the
22 firm was.
23     Q.    Now, can we turn to page 88?
24     A.    Okay.
25     Q.    What date was this assignment of

Page 55

1  security deed dated?
2      A.    April 11, 2018.
3      Q.    Okay.  Is this when the transfer took
4  place, or could the transfer have taken place before
5  this date?
6      A.    The transfer of the loan could have
7  taken place before this, and this was later
8  memorialized by this writing.  In my experience,
9  yes, that happens.
10     Q.    Okay.  And if we look on page 91,
11 that assignment, it looks like it took place on
12 5/11/18.  Is that right?
13     A.    Yes.  This assignment is dated
14 May 11, 2018.
15     Q.    Again, that one could have taken
16 place earlier?
17     A.    Yeah.  The loan could have
18 transferred prior to this date.
19     Q.    How did McMichael Taylor normally
20 notify FCI that a borrower is represented by an
21 attorney?
22     A.    Via e-mail.
23     Q.    Okay.  Does McMichael have a
24 contractual agreement to provide that information to
25 FCI Lender Services?

Page 56

1      A.    I am not sure.  I am not sure, but we
2  have a policy to advise.
3      Q.    But FCI Lender Services does not have
4  an agreement with the McMichael law firm that it
5  would provide that information that the borrower is
6  represented by an attorney?
7      A.    I didn't say we didn't.  I said I am
8  not sure off the top of my head if it's included in
9  any of our agreements or not, but it might not be
10 relevant, because we have an internal policy to
11 advise our clients if we identify that a borrower is
12 represented by counsel.
13     Q.    I see.  You know why interests would
14 have accumulated before Aspen came in to ownership
15 of the loan?
16     A.    I wouldn't know any of the specifics
17 of this particular loan.
18     Q.    Can I have a ten-minute break and I
19 am almost finished?
20         MR. BAKER:  Okay.
21         (A recess is taken.)
22     Q.    Ms. Taylor, do you know when APG
23 Holdings Revocable Trust obtained this loan?
24     A.    No, I do not.
25     Q.    Can you look through the documents to

Page 57

1  see if you are able to determine the date?
2      A.    If you are -- maybe assignment is --
3  that would be what we were just discussing, and was
4  dated May 11, 2018.  So I would say on or before
5  that date.
6      Q.    How much before that date?
7      A.    I don't know.
8      Q.    Again, if you are able to look
9  through the documents, could you see if you are able
10 to determine that?
11     A.    There are 103 documents here.  I have
12 just done a cursory review of them, and I don't know
13 that I can determine based on what's in front of me.
14     Q.    Okay.  What I am getting at is, prior
15 to APG Holdings Revocable Trust owning this loan, on
16 what basis was interest charged on this loan?
17     A.    I don't know that information.
18     Q.    On what basis could interest be
19 charged?
20     A.    I am not sure I can answer that
21 question.
22     Q.    If a previous lender decided not to
23 charge interest, can APG Holdings Revocable Trust
24 decide to charge interest during the period of time
25 that the previous lender decided not to charge

Page 58

1  interest for?
2      A.    I -- I am not sure about this
3  particular loan or really any loan.  I think it
4  would just depend on the agreement between the
5  previous lender and the borrower.
6      Q.    Okay.  To the best of your knowledge,
7  what business is FCI in?
8      A.    Loan servicing.
9      Q.    Of what types of loans?
10     A.    All types of loans.
11     Q.    Performing loans?
12     A.    I believe yes, they service both
13  performing and nonperforming.
14     Q.    Do you know what percent is
15  performing and what percentage is nonperforming?
16     A.    No, I do not.
17     Q.    Does FCI have any relationship with
18  the -- with any borrowers that you are aware of that
19  have performing loans?
20     A.    I am not sure if I understand the
21  question.  Do they have relationships with borrowers
22  on performing loans?
23     Q.    That you are aware of; because FCI
24  has an agreement with the McMichael law firm,
25  correct?

Page 59

1      A.    Yes.  We have an administrative
2  agreement with FCI.
3      Q.    Okay.
4      A.    Are you asking me if I am aware of
5  any performing loans that FCI services?
6      Q.    Yes.
7      A.    Yes, I am aware that they service
8  performing loans.
9      Q.    Do you -- that your firm deals with.
10     A.    Not off the top of my head, but we
11  are a -- creditor's rights, and we focus on default
12  work, and the majority of the work we deal with is
13  on nonperforming loans by virtue of foreclosures and
14  bankruptcies sees.
15     Q.    Okay.  And do you consider FCI
16  services a large account, a small account or a
17  medium account?
18     A.    I am not sure what the percentage of
19  volume referral is based on, if that's what you are
20  asking, off the top of my head.
21     Q.    Okay.  Is it, like, a hundred --
22     A.    It's certainly an important account,
23  just like all of our clients are important.
24     Q.    Okay.  Do they refer to you, like, a
25  hundred accounts or a thousand accounts or --

Page 60

1      A.    I wouldn't know off the top of my
2  head.  I would have to pull -- I would have to pull
3  a report.
4      Q.    And that information is available,
5  though?
6      A.    Yes.  I have the ability to generate
7  reports to identify what referrals are sent by what
8  service and/or client, correct.
9      Q.    Okay.  Is FCI Lender Services in your
10  top ten accounts?
11     A.    I would not know off the top of my
12  head.  I would have to pull, and I also think it
13  would depend on when you massed.
14     Q.    Okay.  I am done with questioning.
15         MR. BAKER:  Larry, do you have any
16  questions?
17         MR. JOHNSON:  I don't have any
18  questions.
19         MR. BAKER:  I don't have any
20  questions.
21         (Witness excused.)
22         (Deposition concluded at
23         approximately 12:24 p.m.)
24
25

Page 61

1              CERTIFICATE
2
3      I, LAURA A. GRABOWSKI, a Certified
4  Court Reporter of the State of New Jersey, do hereby
5  certify that prior to the commencement of the
6  examination, JANUARY N. TAYLOR was duly sworn by me
7  to testify to the truth, the whole truth and nothing
8  but the truth.
9      I DO FURTHER CERTIFY that the
10  foregoing is a verbatim transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth,
13  to the best of my ability.
14     I DO FURTHER CERTIFY that I am
15  neither a relative nor employee nor attorney nor
16  counsel of any of the parties to this action, and
17  that I am neither a relative nor employee of such
18  attorney or counsel, and that I am not financially
19  interested in the action.
20  *Laura A. Grabowski*
21     LAURA A. GRABOWSKI, CCR
        CCR Number:  XI01350
22     Dated:  October 25, 2021
23
24
25

```
1        WITNESS CERTIFICATION
2
3
4    I have read the foregoing transcript of
5    my testimony and find it to be true and
6    accurate to the best of my knowledge and
7    belief.
8
9
     _____
10     [January N Taylor]
11
12
       Subscribed and sworn to
13
       before me on this _____
14
       day of _____, 2021.
15
16
17   _____
       Notary Public
18
19
20         *    *    *
21
22
23
24
25
```

```
1      ERRATA SHEET
       Priority-One Court Reporting/Veritext
2         718-983-1234
       ASSIGNMENT NO. P1-4852635
3    CASE NAME: Cordtz v. Jonson Legal Offices
       DATE OF DEPOSITION: 10/18/2021
4    WITNESS' NAME: January N Taylor
5
       PAGE/LINE(S)/  CHANGE      REASON
6    ____/_____/_____/_____
       ____/_____/_____/_____
7    ____/_____/_____/_____
       ____/_____/_____/_____
8    ____/_____/_____/_____
       ____/_____/_____/_____
9    ____/_____/_____/_____
       ____/_____/_____/_____
10   ____/_____/_____/_____
       ____/_____/_____/_____
11   ____/_____/_____/_____
       ____/_____/_____/_____
12   ____/_____/_____/_____
       ____/_____/_____/_____
13   ____/_____/_____/_____
       ____/_____/_____/_____
14   ____/_____/_____/_____
       ____/_____/_____/_____
15   ____/_____/_____/_____
       ____/_____/_____/_____
16   ____/_____/_____/_____
       ____/_____/_____/_____
17   ____/_____/_____/_____
       ____/_____/_____/_____
18   ____/_____/_____/_____
       ____/_____/_____/_____
19   ____/_____/_____/_____
       ____/_____/_____/_____
20   _____
       January N Taylor
21   (Notary not required in California)
       SUBSCRIBED AND SWORN TO
22   BEFORE ME THIS_____ DAY
       OF_____, 2021.
23
     _____
24     NOTARY PUBLIC
25   MY COMMISSION EXPIRES_____
```

| | | | |
|---|---|---|---|
| **&** | **2/20/2018** 54:7 | **3** | **672,040** 37:20 |

**&**  6:22,24 7:1,9,16
  7:23 8:8,9

**0**

**02003**  1:2
**07039**  1:21

**1**

**1**  47:5 51:9,18
**1,062.99.**  32:6
**1,400**  15:21
**1,469.20**  31:22
**1,600**  15:20
**10/18/2021**  63:3
**103**  10:17 19:17
  34:17 40:1 57:11
**108**  3:3
**10:00**  2:7
**11**  21:18 29:5,12
  46:11 55:2,14
  57:4
**12:24**  60:23
**13**  29:16
**138**  3:11
**15**  9:22
**15,000**  16:12,14,17
**16**  15:22
**1600**  16:7 17:4
**18**  1:14
**18,000**  40:19
**19**  11:18
**190,000**  34:14
**190,058.53**  33:5
**190,058.53.**  33:14
**197,500**  37:20 51:5
  51:8
**1:21**  1:2

**2**

**2,754.05**  33:16
**2/20/18**  54:2

**20**  22:13 46:13
  47:6 50:24
**200,000**  31:17
  42:13,13
**2005**  6:16
**2006**  44:12,21
**2010**  42:24 44:9
  45:12,15
**2015**  31:4 50:24
**2017**  8:24 11:18,21
  20:1,13,13 21:7
**2018**  9:5 38:8,15
  38:16,25 39:14,14
  39:17 40:16 47:5
  51:9,18 53:6 54:5
  55:2,14 57:4
**2021**  1:14 27:1,23
  28:19 39:13 46:5
  46:13 47:6 61:22
  62:14 63:22
**21st**  46:5
**22**  22:13 29:5,12
**2244**  3:3
**22nd**  53:6
**236,377.81.**  48:22
**24**  23:2 47:4
**246,000**  40:16
**246,162.04**  37:19
  38:6,7,10,14,17,21
  39:12,13
**25**  37:18 38:5 39:3
  39:8,10,15 61:22
**26**  24:16
**260**  3:7
**28**  31:4
**284,403.87**  34:9
**284,403.87.**  34:6
**290**  1:20

**3**  42:24 44:9,11,21
  45:8,10,12,15
**30**  42:7 54:5
**30092**  3:7
**30328-4806**  3:11
**30345**  3:3
**3200**  1:21
**327,917.83**  40:5
**33**  30:19
**34,721.06.**  51:13
**35**  31:12 32:12
**3550**  3:7
**38**  34:17 46:1

**4**

**4/21/21**  34:5
**4/3/06**  45:1
**41.93**  49:1
**41.93.**  49:2
**42**  39:3
**42,752.58**  37:21
**43**  37:9
**44**  39:25
**44.75**  38:7,16,18
  39:12,14,17
**44.75.**  37:24 40:18
**46**  41:10

**5**

**5**  37:22 38:7,15,16
  38:25 39:14,14,17
  40:16
**5/11/18**  55:12
**50**  40:18,18 45:5
**52**  44:24
**58**  41:16

**6**

**6**  4:7
**65**  45:6
**67**  42:18

**672,040**  37:20
**69**  48:17 50:17
  51:7

**7**

**71**  51:21
**718**  1:22
**718-983-1234**  63:2
**73**  52:4
**74**  52:3
**76**  53:1
**79**  53:5

**8**

**80**  53:20
**82**  54:8
**83**  54:15
**86**  54:17
**88**  54:23

**9**

**91**  55:10
**9629**  61:19
**983-1234**  1:22

**a**

**a.m.**  2:7
**abbreviation**  45:2
**abide**  16:8
**ability**  9:21 60:6
  61:13
**able**  15:18 22:22
  57:1,8,9
**accelerated**  33:8
  40:4
**account**  23:23
  34:5 49:3 59:16
  59:16,17,22
**accounts**  14:5,8
  21:12 23:16 59:25
  59:25 60:10
**accrue**  37:23
  39:16,20

**accumulated**
56:14
**accurate** 62:6
**acknowledges**
13:9
**act** 32:8
**acting** 13:10,24
**action** 1:2 24:2
35:19 36:1 37:8
38:12,22 61:16,19
**actively** 29:1
**activity** 34:5
**added** 20:18
**addition** 34:13
38:15
**additional** 9:6
20:18
**addressed** 54:2
**adds** 12:25
**admin** 10:23
**administration**
11:6
**administrative**
10:20,21,24 11:3,9
12:22 14:22 20:25
25:7 30:9 49:19
49:20,21 50:4
59:1
**advise** 56:2,11
**agent** 13:12,25
**ago** 7:13 28:17,22
**agree** 13:14 15:25
29:5 42:14 54:9
**agreed** 16:24
54:11,14
**agreeing** 13:4
**agreement** 10:20
10:20,21,22,25
11:9 12:22 13:10
14:23 18:24 19:3
19:15,16 20:5,7,25

20:25 21:7 22:13
22:14,14,19,24
23:21,25 24:1,5
25:7 29:4,8,10,13
46:11,17,21,25
47:5,7,19 49:19,20
49:21 50:5 55:24
56:4 58:4,24 59:2
**agreements** 12:5
20:12 22:17,17
24:7 47:17 48:9
48:12 56:9
**agrees** 14:25 15:9
16:5
**allonge** 42:22 43:3
43:14,18,21,23,25
44:5 45:12,15
**allow** 27:18 47:17
**allowable** 15:2,11
15:15,19 16:25
17:5
**allowed** 23:22
**altogether** 16:21
**amount** 16:24
33:4,13,15,19,24
34:7,10 38:10
39:20 48:25
**answer** 5:5 28:8
29:9 33:10 35:22
48:13 49:4 57:20
**answering** 38:23
**apg** 23:6 34:21
35:5 52:7,13,21
56:22 57:15,23
**appear** 20:15
**appearance** 18:4
**appearances** 3:1
**appears** 16:11
34:1 39:16 53:4
**approved** 29:19
30:7

**approximately**
60:23
**april** 8:24 11:21
21:7 44:11,21
45:8,10 55:2
**arrangement**
50:10
**art** 9:10
**asked** 22:2
**asking** 17:14
24:13,16 27:5,13
32:16 34:8 35:17
37:25 38:5,6,9,13
38:16,17,20 39:11
39:12,13 42:4
43:7,7,9 49:3 59:4
59:20
**asks** 40:3
**aspen** 23:11,13,16
25:16 26:2,18
27:2,24 28:18
34:20 35:4 52:24
54:20 56:14
**assigned** 18:21
**assignment** 36:1
54:25 55:11,13
57:2 63:2
**assist** 17:19,19
18:7
**assistants** 10:6,7
**assume** 25:6,10
33:18
**assuming** 24:22
**atlanta** 3:3,11
**attachment** 21:19
23:3 40:1 48:18
51:7
**attachments** 39:4
**attempting** 11:12
**attend** 17:22

**attorney** 3:9 6:19
18:22 24:9,20,21
25:3,5,6 29:6,14
29:19 30:6,6,7,12
47:22 55:21 56:6
61:15,18
**attorneys** 3:5,13
9:9 48:15
**august** 42:24 44:9
45:12,15
**authorized** 29:22
29:23
**available** 31:17
42:13 60:4
**avenue** 1:20
**aware** 31:11 37:7
47:22 48:5,8
52:20 58:18,23
59:4,7

**b**

**b** 3:11
**back** 7:9,11 29:5
42:12,13 46:1,10
50:16
**background** 9:8
**baker** 3:8 21:25
29:3 45:20,25
56:20 60:15,19
**balance** 34:5,6,9
37:17,19 40:9
42:11 51:8
**bankruptcies**
36:15 59:14
**bankruptcy** 12:1
12:11 17:23 19:7
**based** 12:9 31:1,5
33:10,18 41:20
42:21 51:6 53:7
57:13 59:19
**basically** 32:8,8
43:10

basis 57:16,18
becoming 17:10
began 53:13,14,16
  53:18
beginning 26:21
  27:11
behalf 13:11,24
belief 62:7
believe 8:4,24 9:7
  10:4 11:21 13:5
  18:6,14 23:11
  24:6,8 25:16,21,25
  26:3,10,17,19 28:3
  28:5,22 34:19
  49:15 58:12
best 8:2 54:13 58:6
  61:13 62:6
bill 15:1,9,25 16:6
  16:23,24 50:10
billed 16:20
bills 19:12
bit 16:8
block 44:22 45:3
bolded 24:21
borrower 53:9,17
  54:16 55:20 56:5
  56:11 58:5
borrowers 52:20
  58:18,21
bottom 19:19
  29:18
bought 52:18
breach 12:18
break 45:19 56:18
brief 20:16
bring 35:19 47:13
  47:20
bringing 28:12
brock 6:22,23 7:1
  7:9,16,23 8:8

broke 10:14
brought 27:1 35:1
  35:7,10,12,16 36:4
  36:17 37:4,8
  46:18 47:1,18
business 23:13
  58:7
busy 17:8

**c**

calculated 38:1
calculation 51:24
calculator 34:3
  40:24
california 30:13
  30:17 63:21
called 2:2 10:9,21
  11:11 42:1,2 43:7
  43:8,14,15
cancellation 30:15
captioned 2:3
card 7:17,19
career 9:20 22:18
carolina 6:20 8:10
  8:14,14
case 16:11,21 17:9
  17:16 18:6,19,22
  19:7,9 28:7 29:2
  30:4 35:3,9,24
  36:8 37:3,18
  39:24 63:3
cases 17:18 29:3
ccr 1:16 61:21,21
center 19:20
certain 11:6 50:7
certainly 59:22
certificate 61:1
certification 62:1
certified 2:6 61:3
certify 61:5,9,14
change 47:12,19
  49:1,4,5 63:5

changed 9:6,7
  40:10
charge 32:6,15
  41:6 57:23,24,25
charged 57:16,19
charges 31:22
  32:1,1,5,18
check 16:18
civil 1:2
client 26:3,14
  27:24 30:3,10,11
  30:12 31:10 36:2
  36:4 60:8
client's 30:5,6
clients 23:12 26:19
  26:21 48:16 56:11
  59:23
closed 31:18
closely 45:1
collateral 37:5
collection 7:17,19
  18:13,15,17 28:6
  36:10
collections 36:16
come 9:4,13 23:8
commence 23:23
commencement
  61:5
commencing 2:7
commission 63:25
common 46:24
communicate 50:8
communication
  35:4
communications
  12:24 48:1,2,6
company 10:9
  23:5 31:7
compared 46:22
complaint 34:18
  36:17 37:4,10

38:5 39:21 40:11
  46:2,22
complaints 35:15
completed 52:25
compliance 30:8
comply 30:15
concerning 18:17
concluded 60:22
confused 38:24
consider 36:9,11
  36:16 59:15
contain 22:23 29:6
contained 32:23
contains 22:22
  44:25
contested 17:2,22
  18:3
continue 27:21
continues 37:23
  39:16
contract 11:15
  12:19 25:12,16,22
  26:4,7,16,17,19
  27:3 28:11,15,18
  28:21,22 29:6
contractor 13:10
  13:24
contractors 10:2
  14:2
contracts 22:16
  25:18 26:1,15
contractual 55:24
convenient 19:19
coordinate 30:1
  30:13
copy 25:19 27:2
  46:6
cordtz 1:4 54:3
  63:3
corners 3:7

| | | | |
|---|---|---|---|
| corporation 30:24 | 51:1,2,5,9,16,16 | depending 36:8 | duly 6:3 61:6 |
| correct 7:6,25 | 51:17,18 52:7,18 | depends 35:24 | **e** |
| 15:12 16:9 19:21 | 53:7,25 54:16,17 | deposit 30:24 | e 4:2 30:3 46:6 |
| 20:2 21:11 24:3 | 54:25 55:5,18 | deposition 1:12 | 55:22 |
| 26:14 28:13 31:2 | 57:1,5,6 61:12 | 2:1,3 5:2 6:9 22:7 | earlier 17:4 55:16 |
| 33:6 43:5 45:9 | 63:3 | 25:14 27:12 40:8 | edward 9:10 |
| 46:9,15 48:24 | dated 11:18 31:6 | 45:23 50:22 60:22 | effective 54:1,7 |
| 50:25 53:8,11,24 | 44:21 45:10,12,15 | 63:3 | efficiency 12:23 |
| 58:25 60:8 | 46:13 53:6 54:4 | deposits 30:9 | eight 20:4,5,9 |
| cost 38:22 | 55:1,13 57:4 | details 12:4 31:24 | eisenberg 8:9 |
| costs 38:11 | 61:22 | determine 23:25 | employee 13:12 |
| counsel 12:25 | day 9:17 38:7,16 | 29:12 57:1,10,13 | 14:1 61:15,17 |
| 14:25 15:5,9 | 40:19 46:17,25 | diem 37:23 39:16 | employees 10:1,5 |
| 17:12,18,19,21 | 47:8 62:14 63:22 | 40:17 41:6 49:3 | engagement 22:17 |
| 18:4,7 56:12 | days 28:17 | difference 20:6,9 | engineering 3:7 |
| 61:16,18 | deal 59:12 | 41:21,25 42:4 | enlighten 50:5 |
| couple 6:25 8:11 | deals 59:9 | different 20:12 | ensure 35:18 |
| 26:24 | debt 18:13 35:19 | 47:17 | enter 11:15 26:18 |
| court 1:1,20 2:4,6 | 52:18 | differs 36:7 | entering 26:17 |
| 10:17 61:4 63:1 | december 11:18 | direct 4:7 6:5 | entire 19:17 22:24 |
| courts 16:11 | 20:1,13 | directed 30:2 | 29:8,10 |
| credit 7:17,19 | decide 17:7 57:24 | direction 5:5 | entities 28:5,6 |
| 31:16,18 41:19,22 | decided 9:18 | discovery 22:9,11 | 52:24 |
| 42:2 43:9,12,16,18 | 57:22,25 | discussing 57:3 | entity 27:2,24 |
| 44:1,6,18,21 54:9 | deed 55:1 | discussions 35:8 | 28:18 34:23,24 |
| creditor's 36:11 | deemed 13:12,25 | district 1:1,2 | 35:19 |
| 59:11 | default 12:24 | document 10:16 | equity 41:18,22 |
| current 15:1,10,14 | 35:15 37:4 46:2 | 43:8,14,15 51:20 | 42:2,6,8,16 43:8 |
| 18:21 33:15,19,23 | 59:11 | 51:23 52:6,11 | 43:12,15,18 44:6 |
| 35:18 49:15,16 | defendant 3:9 | documents 5:10 | 44:17,20 54:9 |
| currently 40:4 | defendants 1:8 | 10:18 16:19 45:24 | errata 63:1 |
| cursory 57:12 | deferred 37:21 | 49:11 56:25 57:9 | error 50:14 |
| cv 1:2 | defined 32:7 | 57:11 | errors 19:6 |
| **d** | delay 53:19 | doing 11:7 33:25 | especially 26:2 |
| d 1:4 4:2 | demand 48:18 | drastically 40:10 | esq 3:4,8,12 |
| daily 48:25 | 50:17,18 51:6 | draw 42:8 | eviction 17:23 |
| date 8:22 11:19 | department 7:18 | drive 3:7,11 | evictions 36:15 |
| 42:23 43:11 44:8 | 7:20,21,22,24 8:2 | due 33:4,13,23 | exact 18:20 |
| 44:9,11,16,17,22 | depend 44:3 58:4 | 34:7,10 37:17,22 | exactly 9:8 12:3 |
| 44:24 45:3,8,16 | 60:13 | 38:25 | 20:17 |
| 46:4,21,22 50:24 | | | |

**examination** 1:12
2:2 4:7 6:5 61:6
**examined** 6:3
**exceed** 30:17
**excellent** 25:2
**exclusive** 30:12
**excused** 60:21
**executed** 46:22,25
**existed** 28:16
**exists** 37:18
**expectations**
49:22,24 50:7,9
**experience** 46:24
47:3,12,16,23 55:8
**expires** 63:25
**explain** 16:13
**explaining** 31:15
**explanation** 46:19

**f**

**fact** 52:15
**failure** 30:14
**fair** 11:14
**familiar** 25:24
31:24 32:14 34:23
42:17 44:13 52:23
**family** 42:7
**fannie** 15:4,10,15
16:2,7,25 17:1,2
50:11
**far** 11:16 47:25
49:9 50:9
**fci** 1:7 3:9 10:9,10
10:25 11:2,12,15
11:22 12:15,23
14:5,8,17,18 19:6
19:8,11 21:9,12
22:19 24:9 31:13
48:1 49:17,18,23
49:24,25 50:3,8,15
53:12,23 54:16
55:20,25 56:3

58:7,17,23 59:2,5
59:15 60:9
**february** 53:6
**federal** 2:4 29:24
30:24
**fee** 15:2,11,15,19
17:3 50:10,11
**feels** 25:24
**fees** 30:9,17,18
37:22 38:22
**file** 46:6
**filed** 39:22 46:23
47:8
**filing** 11:5,6 40:11
**finance** 32:5,6,15
32:18
**financially** 61:18
**find** 15:18 23:21
24:7,8 26:7 62:5
**finish** 27:18
**finished** 56:19
**firm** 6:21 7:5,8
8:10,12,19,23,25
9:4,6,18 14:18
15:6 16:12 17:7,7
17:11 18:12,15
20:19 21:10 23:22
26:1,25 28:5,10,11
28:12,19 35:11
36:9,10,10,11,12
36:16 37:11 47:9
49:18,18 50:2,13
54:22 56:4 58:24
59:9
**first** 6:17 20:7
21:6 31:1 45:8,9
54:6,7
**five** 6:13,14 20:5,9
24:15 36:23
**flat** 17:3

**fnma** 15:2
**focus** 11:10 36:14
59:11
**folder** 26:15,22
**follow** 50:11
**follows** 6:3
**foreclosure** 6:19
7:5,22,24 8:2 12:1
12:11 15:20 17:22
18:4 19:6 23:23
24:2 30:17,18
36:10
**foreclosures** 30:5
30:11,14 36:15
37:2 59:13
**foregoing** 61:10
62:4
**form** 27:5,8
**format** 37:8
**forth** 61:12
**forward** 34:9
**forwarded** 34:6
**found** 25:3 26:8
28:15
**four** 19:15,16
20:10
**fourth** 14:25
**frequently** 22:17
**front** 57:13
**full** 10:5 29:25
**fund** 54:20
**further** 61:9,14
**future** 27:18

**g**

**gather** 38:4,6
**general** 20:11
32:23 48:3,5 49:8
**generally** 32:14
33:25
**generate** 60:6

**georgia** 1:2 3:3,7
3:11 7:22,23 8:1
8:13 15:20 18:7
**getting** 11:8 57:14
**give** 14:15 21:13
23:13 27:9 30:12
**given** 28:11
**gmail.com** 3:4
**go** 13:8 14:24
20:20 21:18 23:2
29:4 40:16 42:12
43:17,20,21 51:21
54:15,17
**goal** 13:7
**going** 9:18 10:17
10:18,19 18:18,19
20:3 27:4
**good** 6:7,8 18:13
38:14 40:13,21
51:9,18
**gosh** 7:12
**grabowski** 1:16
2:5 61:3,21
**gray** 3:6 9:10,11
14:20 15:13 24:1
49:23,25,25
**great** 24:14
**group** 30:23 31:8
34:20 35:5
**guess** 20:17 28:7
**guidelines** 30:18

**h**

**hammond** 3:11
**hand** 14:11 28:24
**handle** 12:18
20:19
**handled** 9:9 12:12
12:15
**handling** 11:25
14:9

| | | | k |
|---|---|---|---|

**happens** 55:9
**head** 15:16 17:15
  17:25 18:8 21:17
  23:15 36:22 44:7
  56:8 59:10,20
  60:2,12
**hear** 23:8
**heard** 23:5 44:5
**hearings** 17:23,23
**held** 26:16
**help** 17:9,12
**henderson** 3:3
**hereinbefore**
  61:12
**hey** 9:18
**high** 15:22 16:8
  19:3 20:16
**highlighted** 24:18
**hire** 17:7,12 18:5
**hired** 17:18
**history** 49:11,13
**holder** 35:18
  49:16
**holdings** 23:6
  34:21 35:5 52:7
  52:13,22 54:20
  56:23 57:15,23
**home** 41:18,22
  42:2,6,8,16 43:8
  43:12,15,18 44:6
  44:17,20 54:9
**honest** 18:18
**honestly** 17:13
**hourly** 17:1,5
**house** 37:5
**hundred** 14:12
  59:21,25

| i |
|---|

**identify** 56:11
  60:7

**immediately** 21:13
**important** 48:12
  59:22,23
**impossible** 16:22
**improves** 12:24
**included** 48:6 56:8
**includes** 37:20
**increases** 12:23
**incurred** 38:11
**indemnification**
  18:24 19:3 50:13
**indemnify** 19:6
  50:14
**indemnifying** 19:8
**indemnity** 19:16
  20:24
**independent** 10:2
  13:10,23 14:1
**index** 5:2
**information** 14:10
  14:14 21:14 22:7
  23:18,20 31:19
  32:23 33:2 46:20
  55:24 56:5 57:17
  60:4
**initiation** 30:11
**ins** 18:20
**instance** 18:3
**instrument** 42:5
**insurance** 30:24
**insurances** 19:7
**interest** 32:1,8,9
  33:20 37:21,23
  38:11,18 39:16,20
  40:5,14,15,17,19
  41:2 48:25 49:6
  49:12 50:23 51:2
  51:11,12,15 57:16
  57:18,23,24 58:1
**interested** 61:19

**interests** 37:21
  38:21 56:13
**internal** 56:10
**investor** 12:13,25
  13:11,24 16:1,17
  16:21 25:13 48:1
**investors** 12:6,19
**invoices** 16:19
**involved** 29:1
**issue** 12:19 47:3
  47:24

| j |
|---|

**j** 8:21 9:13,24
  10:25 11:2,16,19
  15:12 19:5,8
  49:22 50:7
**january** 1:13 2:2
  4:5 6:2 27:1,23
  28:19 39:13 46:5
  46:13 47:6 54:5
  61:6 62:10 63:4
  63:20
**jeffrey** 1:4
**jersey** 1:21 2:7
  61:4
**job** 1:24 6:17
**johnson** 1:7,7 3:10
  3:12,13,13 16:12
  17:7 18:12,14
  26:25 27:4,7,10,16
  27:17,23 28:11
  29:2 32:10,13
  37:10 47:8 60:17
**johnson's** 28:5
**join** 9:6
**joined** 8:9 9:10
**joint** 30:23
**jonson** 63:3
**judgment** 38:9,20

**k** 30:2
**keep** 25:17 26:14
**kind** 18:4
**knew** 42:11
**know** 7:16 8:6
  11:5 12:3,4,20
  14:7 15:14 16:20
  17:13,16,24 19:13
  20:16 21:16,21
  22:1 23:10,10,15
  24:19 28:1,4,7,8
  28:14,16,24 31:7,9
  31:19,25 32:2,3,17
  32:18,25 33:9,11
  33:16 34:12,15,24
  36:21,24 37:3,13
  38:3,25 39:18,23
  40:6,9 41:3,4,8,25
  42:3,12,20,23
  43:13,19 44:8,13
  45:11,13,16 47:9
  47:11,23 48:13
  51:17,22 52:19
  56:13,16,22 57:7
  57:12,17 58:14
  60:1,11
**knowledge** 8:3
  19:10 21:24 27:15
  32:20 35:2 46:20
  47:2,10 52:9
  53:15 54:13 58:6
  62:6
**known** 9:12 10:10
  15:12 18:12

| l |
|---|

**l.l.c.** 1:7 3:10,13
**language** 24:21
  29:7,13 38:24
  39:1,2

**large** 59:16
**larry** 1:7 3:12,13
  60:15
**late** 37:22
**laura** 1:16 2:5
  61:3,21
**law** 6:21 7:5,7
  8:10,19,21,23,25
  9:4,18 10:25 11:2
  11:17,20 14:18
  15:6,12 16:12
  17:6,7,11 18:12,15
  19:5,8 21:10
  23:22 26:25 28:10
  28:12,19 32:16
  36:9,10,10,11,12
  36:16 37:10 47:9
  49:17,18,23 50:2,8
  50:13 56:4 58:24
**lawsuit** 18:16 27:1
  28:12 34:25 35:6
  36:3 46:18 47:1,8
  47:13,20
**lawsuits** 35:12
  47:17
**lawyer** 6:15,18
**lawyers** 10:6,7
**lays** 49:21
**leading** 41:7
**learn** 10:8 25:15
  48:2
**learned** 26:9
**legal** 1:7 3:10,13
  10:6,7 16:2,6,15
  19:7,12 63:3
**lender** 1:7 3:9 10:9
  10:10,25 11:13,15
  11:23 24:10 30:3
  31:13 53:12,23
  55:25 56:3 57:22
  57:25 58:5 60:9

**lenders** 30:4
**lending** 32:7,16
**letter** 40:6,12
  41:11 52:14 53:3
  53:6,10,18 54:2,4
  54:16,21
**letters** 52:15
**level** 19:4 20:16
**licensed** 8:13,17
**limit** 16:1 31:16
**limits** 16:7
**line** 5:6,6,6,11,11
  5:11,16,16,16,21
  5:21,21 31:18
  41:18,22 42:2,6,16
  43:8,12,15,18 44:1
  44:6,17,20 54:9
  63:5
**list** 29:19 30:7
**listed** 34:9 51:12
**litigated** 17:2
**litigation** 18:21
**litigious** 17:10
**little** 15:22,23 16:8
**livingston** 1:21
**ljohnson** 3:12
**llc** 3:2,6 34:21
  35:5
**loan** 11:25 12:10
  22:19 23:24 30:15
  31:20,24 32:3,9,19
  33:3,7 34:25 37:6
  39:24 40:4 41:18
  42:1,2,6,7,11 43:5
  43:5 44:14,16
  46:11,17,21,25
  47:4,6,17,19 48:18
  48:22 49:4,9,10,11
  49:12,13,14,16,16
  50:17,18 51:6,24
  52:2,8 53:13,22

  54:1 55:6,17
  56:15,17,23 57:15
  57:16 58:3,3,8
**loans** 30:14,16,17
  52:23 58:9,10,11
  58:19,22 59:5,8,13
**local** 17:18
**locate** 25:18
**located** 28:21
**location** 25:17
  26:15
**long** 6:23 11:16
**look** 19:19 24:8
  37:9 39:25 44:15
  45:1,14 46:7 52:3
  52:6 55:10 56:25
  57:8
**looking** 12:21
  18:24 26:23,23
  32:11 34:4 45:5,6
  50:16
**looks** 33:24 48:21
  55:11
**loss** 52:25
**lot** 18:19
**lower** 15:23
**ltw** 1:2

**m**

**mae** 15:4,11,15
  16:2,7,25 17:1,2
  50:11
**mail** 30:3 55:22
**majority** 26:1 30:3
  37:1 59:12
**march** 47:5
**mark** 3:8 17:8
**marked** 5:20
**massed** 60:13
**math** 33:25 40:13
  40:22 41:7

**matter** 2:3
**maximum** 15:19
  16:25
**mbaker** 3:8
**mcmichael** 3:6
  9:10,11 14:18,20
  15:6,13 16:5,8,11
  16:16 17:6,11
  19:12 23:22 24:1
  28:10,18 49:17,18
  49:23,24,25 50:2
  55:19,23 56:4
  58:24
**mean** 7:12 11:22
  12:8 15:3 21:22
  25:10 28:4 31:17
  31:21 32:2,21
  33:7,18 36:7 42:4
  42:8 43:20 49:1
  52:1,17
**meaning** 36:5
**means** 11:3,4
  13:22 31:16,25
  32:4 39:1
**medium** 59:17
**memorialized**
  55:8
**mhc** 1:2
**middle** 13:19
**mill** 3:3
**mind** 10:22 19:14
  22:12 31:15 46:10
**miner** 7:3
**minimum** 33:22
**minute** 45:19
  56:18
**misplaced** 28:23
**missing** 21:3
**mitigation** 52:25
**monthly** 31:13
  32:20,22,24

**months** 39:21
**morning** 6:7,8
**morris** 7:3,7 9:10
**mortgage** 54:1
**move** 10:16
**moved** 26:5
**mt** 1:20
**mtglaw.com** 3:8

**n**

**n** 1:13 2:2 4:2,5
6:2 61:6 62:10
63:4,20
**name** 8:19 9:7,7
18:3 27:1,24 63:3
63:4
**necessarily** 27:14
**need** 14:3
**needed** 17:9
**needs** 12:1,11,13
12:15
**neither** 13:11,25
61:15,17
**network** 24:9,20
24:21 25:4,5,6
29:7,14,19
**never** 10:20 15:25
21:23 28:20
**new** 1:21 2:6 26:5
26:22 61:4
**night** 26:9 34:19
**nine** 20:20 24:5
**non** 17:22 18:3
**nonjudicial** 15:20
30:13
**nonperforming**
58:13,15 59:13
**normally** 15:20
37:16 55:19
**north** 6:19 8:14
**northern** 1:2

**notary** 62:17
63:21,24
**note** 35:15 36:2,18
37:4 41:22 42:1,5
42:21,23 43:2,3,5
43:11,11,14,17,21
43:22,23,24,25
44:5 45:11,15
46:2 54:10
**notice** 53:21 54:5
**notify** 55:20
**november** 37:22
38:7,15,16,25
39:14,14,17 40:16
**number** 10:16
19:20 33:16 37:25
38:14,14 61:21
**numbered** 29:17

**o**

**object** 27:4,8,10
**objecting** 27:12
**objection** 27:9,15
27:19
**obligated** 29:25
**obtained** 22:8
56:23
**occasionally** 10:3
**occurring** 38:21
47:24
**october** 1:14 31:4
50:24 61:22
**odd** 46:16
**offer** 12:4,10
**offhand** 14:14
16:20
**offices** 1:7 3:10,13
63:3
**oh** 19:18 45:7
**okay** 6:14,17,23
7:1,4,10,14,16 8:5
8:22 10:8 11:14

11:22 12:18,21
13:6,8,18,20 14:3
14:5,17,24 15:5,18
15:25 16:10,22
18:16,23 19:18,21
19:21,22,25 20:3
21:4,6,20 22:4,10
23:1,4 24:4 25:9
25:12,20 26:12
28:25 29:4,16
30:21 31:3,21
32:5 33:1,4,12,15
33:22 34:2,4,13,16
34:20,24 36:13,25
37:9 38:4 39:5,8,8
39:18 40:2,23
41:1,2,5,9,13,17
41:21 42:18,19
43:1,4 44:15,23
45:7,14,20 46:3,12
47:25 48:20 49:6
50:16,23 51:4,10
51:19,21 52:3,5
53:2,5,9,12,20
54:8,12,15,17,18
54:24 55:3,10,23
56:20 57:14 58:6
59:3,15,21,24 60:9
60:14
**older** 26:4,20,21
**ones** 47:18
**online** 15:17
**open** 8:25 9:3,13
9:18,24 31:18
**opened** 8:11,20,23
11:16,19 21:10
**opinion** 49:4
**opportunity** 7:15
9:3
**opposed** 47:18

**oral** 1:12 2:2
**order** 22:8 30:10
47:20
**outline** 11:12
**outs** 18:20
**outside** 17:12,19
17:21 18:7
**outstanding** 37:19
**oversight** 26:23
**owe** 40:4
**owner** 49:15
**ownership** 56:14
**owning** 57:15

**p**

**p.m.** 60:23
**p1-4852635** 1:24
63:2
**page** 4:5 5:6,6,6,11
5:11,11,16,16,16
5:21,21,21 18:25
19:15,16 20:4,20
20:21 21:18 22:13
22:13 23:2 24:16
29:5,16 30:19
31:6,12 32:10
34:16,17 37:9
39:3,25 41:10,16
42:18 44:24,24
45:5,6,8,9 46:1,8
46:11 47:4 48:17
50:17 51:7,21
52:3 53:1,5,20
54:8,15,17,23
55:10 63:5
**pages** 19:17 20:5,9
21:3 24:5 29:12
40:1
**paid** 16:11 50:23
51:3
**paragraph** 12:22
13:16,17 14:25

24:15 29:16,17
31:1 37:18 38:5
39:3,6,8,10,15
54:7
**part** 10:3 22:11
24:21 33:20 49:6
**partial** 29:25
**particular** 12:13
35:25 47:24 56:17
58:3
**parties** 61:16
**partner** 11:25
12:7
**partners** 9:6
**party** 13:9,9,11,13
13:23,25 14:1
**path** 9:20
**pay** 42:12,13
48:22 49:17,18,24
49:25
**paying** 19:12
**payment** 33:15,19
33:22,23
**payoff** 48:19 50:17
50:18 51:6,8,18
**peachtree** 3:7
**percent** 58:14
**percentage** 58:15
59:18
**percentages** 17:14
**performing** 58:11
58:13,15,19,22
59:5,8
**period** 57:24
**personally** 35:8
**place** 31:3 35:18
47:5,7 55:4,4,7,11
55:16 61:12
**places** 26:24
**plaintiff** 1:5 3:5

**pleasant** 1:20
**please** 27:17,21
29:10,15 30:20
40:24
**plus** 10:11,13,15
33:23 38:7,10,21
39:12,14
**point** 9:22 13:15
16:15
**policies** 35:15
**policy** 35:11,18
56:2,10
**portion** 24:18
**possession** 22:5
**possibly** 16:15
22:2 31:11
**practice** 2:4 37:2
**preparation** 29:3
**prepare** 29:25
45:22
**preparing** 9:21
22:6 25:14 40:7
50:21
**pretty** 21:9
**previous** 43:14
57:22,25 58:5
**previously** 50:12
**primarily** 36:14
**principal** 33:20
37:20 40:5 49:7
51:5,7
**prior** 28:12 39:21
53:14 55:18 57:14
61:5
**priority** 1:19 63:1
**probably** 20:17
22:21
**procedure** 2:5
**procedures** 35:14
**proceed** 24:1

**process** 12:24
26:18
**produce** 22:8
25:15
**produced** 21:25
**production** 5:10
**program** 52:21
**promissory** 54:10
**properties** 34:20
35:5
**provide** 49:11
55:24 56:5
**provided** 16:19
48:15 50:1
**provides** 50:13
**pryor** 7:3
**public** 15:17 62:17
63:24
**pull** 14:14 60:2,2
60:12
**purchased** 52:8
**purpose** 49:19
50:4
**purposes** 22:9
30:8 48:15
**pursuant** 2:4
14:19,22

**q**

**question** 5:20 9:16
10:24 15:8 16:3
16:10 17:17 20:11
24:12,19 25:1
27:5,8,22 29:9
33:10 35:20 38:20
38:23 39:9,11
41:24 47:15 48:14
57:21 58:21
**questioning** 60:14
**questions** 60:16,18
60:20

**quite** 24:11,25
42:3

**r**

**randall** 9:10
**range** 15:24
**rarely** 17:15
**rate** 17:2,5 37:23
39:17 40:17
**read** 20:4 21:22
22:24 23:21,24
29:10,12,20 50:6
62:4
**reading** 22:12
29:8 39:5,15
**really** 11:1,11
14:13 17:24 20:12
21:16 24:19 25:4
28:4 44:4 47:2,3
58:3
**reason** 7:10 20:14
28:3 63:5
**reasons** 7:13
**recess** 45:21 56:21
**recites** 11:1
**recollection** 20:14
**reconveyance**
30:1
**record** 29:20
**recording** 30:1
**recovery** 30:23
31:8 53:23
**recurring** 38:10
**refer** 59:24
**reference** 24:23
25:11 43:25 45:4
**referenced** 17:4
24:20 41:6
**references** 29:17
**referencing** 24:15
29:13 42:9 43:24
44:6 52:14

referral 12:23
20:19 59:19
referrals 60:7
referring 11:24
24:17 43:4,11
refers 15:5 54:5
regard 23:23
regulations 29:24
reimbursed 16:16
reinstatement
51:24 52:1
relate 29:18
related 23:9,11
28:7
relates 32:15
relationship 11:2
11:12 49:22 50:3
58:17
relationships
58:21
relative 61:15,17
release 30:1
relevant 56:10
remember 8:22
11:20 26:17 41:11
repeat 16:3 27:22
47:15
report 14:15 60:3
reported 1:16
reporter 2:6 10:17
61:4
reporting 1:20
63:1
reports 60:7
represent 48:16
51:1,14
represented 55:20
56:6,12
representing
19:12 54:19

represents 33:17
request 5:10
required 30:9
47:13 63:21
residential 42:7
respect 30:14
responded 26:9
response 26:13
result 30:15 38:11
return 50:9
review 20:16
49:10 57:12
reviewed 45:24
revocable 23:6
34:21 35:6 52:7
52:22 56:23 57:15
57:23
right 6:21 9:17
11:3,19 15:21
16:25 18:5,10,20
19:11 22:24 26:13
27:3,25 28:19
30:13,25 32:21
33:24,24 34:4
39:9 40:20 41:14
41:19 43:2,12,22
44:12 45:18 48:23
49:2 53:23 54:3
55:12
rights 36:12 59:11
road 3:3
rules 2:4

**s**

s 3:2 63:5
sale 31:3
savings 54:20
saw 34:19
saying 12:10 48:21
says 14:25 33:19
42:23 54:7

schedule 15:2,11
15:15 50:11
scott 6:22,24 7:2,9
7:16,23 8:8
scratch 14:17
scream 27:17
screaming 27:19
scroll 20:3
seal 45:2
second 8:7 12:21
20:7 31:6
secured 42:5
security 55:1
see 13:2,20 16:18
17:6 19:5,25
20:20 22:16 24:12
24:13 39:2 40:6
41:9 45:3,7 46:4
46:14,15 50:24
52:13 54:17 56:13
57:1,9
seeing 22:6
seen 10:21 21:23
22:14 24:7 25:23
27:2,13,14 31:13
34:18,22 50:17
52:11,15 53:17
sees 59:14
selected 30:5,6,11
send 10:17 52:7
sent 10:18 45:25
60:7
sentence 12:9 13:8
13:19,21 24:17
54:6
sentences 29:18
september 20:13
service 58:12 59:7
60:8
servicer 29:22,23
30:4,8,10,12,16

47:13,19
servicer's 30:7
services 1:7,20 3:9
10:9,10 11:1,13,15
11:23 12:12 15:1
15:10 16:2,6,23
24:10 31:13 50:1
53:13,23 55:25
56:3 59:5,16 60:9
servicing 11:25
12:11 22:16,19
23:25 24:7 30:16
46:11,17,21,25
47:5,7,17,19 48:9
48:11 53:13,14,16
53:18,21,25 54:6
58:8
serving 37:5
set 61:12
sets 50:6
seven 29:16,17
sheet 63:1
shimshon 3:4
shock 28:8
shop 11:23
showed 43:15
side 47:22
sign 20:12
signature 19:22
20:21 44:21,25
45:3 46:8 61:19
signatures 31:5
signed 21:7,9
28:22 37:10,14
46:17
significant 13:1
signs 25:25
similar 22:14
single 42:7
sir 40:25

sitting 18:2
situation 17:25
small 59:16
software 26:5
soon 21:10
sorry 10:14 13:15
  27:16,20,20 29:23
  32:10 36:6 38:19
  38:22 39:7 52:4
sound 15:21
sounds 15:22 16:7
  24:14
south 8:10,13
speak 32:3
speaking 27:9
specific 7:10 12:17
  14:16 32:21 35:13
  39:20 42:6 49:11
specifically 22:20
  28:20 38:1,13
specifics 18:11
  23:10 28:9 32:3
  32:17,19 35:3
  37:7 39:24 44:14
  56:16
specified 30:16
speculate 41:4
stamped 46:6
stands 18:20
start 27:19
starting 22:13
state 2:6 29:24
  30:18 35:11,25
  61:4
stated 15:19 16:7
  44:24
statement 31:16
  32:20,22,24 34:17
statements 31:13
states 1:1 8:16
  12:22 15:9 16:5

20:18 31:16 32:6
  33:4 37:18 40:3
  44:23 53:21
stating 26:10
statutory 30:8,18
stenographically
  61:11
stern 8:9
stint 8:7
stipulations 5:15
  27:11
stop 11:23,24 12:7
stuff 17:9
subpoena 45:25
subscribed 62:12
  63:21
substance 11:7
successful 52:21
  52:25
sued 27:24
sues 28:5
suite 1:21 3:3,7,11
support 5:2 30:5
  30:10
sure 7:13 8:6 9:8
  9:15 10:23 11:4,8
  14:4 15:7 16:18
  18:19 19:13 21:2
  21:5 22:3,21 24:4
  24:11,25 26:24
  27:23 29:11,21
  31:6 32:16 33:20
  33:21 34:8 35:14
  38:19 41:15,23
  42:3 43:6,9,13
  44:4 47:14,16,21
  56:1,1,8 57:20
  58:2,20 59:18
suretybondsagen...
  3:12

sustain 9:22
swexleresq 3:4
sworn 6:3 61:6
  62:12 63:21

**t**

take 40:23 44:15
  45:18
taken 2:3 6:10
  45:21 55:4,7,15
  56:21 61:11
talk 40:15
talking 14:19
  40:17 42:5
taylor 1:13 2:2 3:6
  4:5 6:2,7 8:21
  9:11,14,24 10:25
  11:2,16,20 14:20
  15:12,13 19:5,8
  24:1 27:20 45:22
  49:23,23,25,25
  50:7 55:19 56:22
  61:6 62:10 63:4
  63:20
tell 13:21 18:9
  20:6,8 22:22 37:1
telling 10:22
ten 7:12,12 10:11
  10:13,15 20:21,22
  21:15 23:19 45:19
  56:18 60:10
term 12:7 31:25
terms 11:11
testified 6:3
testify 61:7
testimony 4:5
  61:10 62:5
thank 24:14 30:19
  32:13
things 11:6 50:12
think 9:20 11:5,10
  12:9,14,16 15:23

28:21,23 33:9
  35:17 36:7 38:9
  40:21 47:21 52:14
  58:3 60:12
thought 41:7
thousand 59:25
three 9:5 10:4
  18:25
time 10:3,5 16:4
  17:23,24 22:21
  26:12 34:25 35:3
  35:6,9 36:5,6
  39:10 40:10,11
  42:10 57:24 61:12
timeframe 14:16
times 6:12,13,14
  36:20,23 50:9
title 51:23
titled 53:11
today 9:12 18:2,11
  21:14 38:18 54:13
today's 22:7
told 28:2
top 15:16 17:15,25
  18:8 21:16 23:15
  36:21 42:21 44:7
  44:20 53:7 54:4
  56:8 59:10,20
  60:1,10,11
total 34:7,10 37:19
  38:6,17
totalling 38:21
tracking 12:24
transcript 2:1
  61:10 62:4
transfer 30:23
  53:21 54:6 55:3,4
  55:6
transferred 53:22
  54:1 55:18

**transpired** 29:2
**true** 28:2 62:5
**trust** 23:6 34:21
  35:6 52:7,22
  54:20 56:23 57:15
  57:23
**trustee** 34:21 35:5
  54:20
**truth** 32:7,15 61:7
  61:7,8
**try** 18:1
**trying** 24:22 25:18
  32:22
**turn** 30:19 31:12
  34:17 41:9,16
  42:18 46:1 47:4
  48:17 53:1,5,20
  54:8,23
**turning** 19:14
  46:10
**two** 9:5 10:4 13:17
  39:20,21 43:17
**type** 35:24 42:1,1
  42:6 47:3
**types** 12:12,14
  58:9,10
**typically** 42:15
  43:23 48:14,16

### u

**underlying** 43:24
  44:1
**understand** 9:15
  10:24 15:7 24:11
  24:13,19,25 29:11
  32:6,22 38:20
  41:23 43:6,19
  47:14 50:4 58:20
**understanding**
  17:8 19:2
**united** 1:1

**unpaid** 31:21 32:1
  37:20,21,22 49:7
  51:5,7,10,12,15
**use** 10:18 17:21
**usually** 36:1 48:10
  53:19

### v

**v** 1:6 63:3
**value** 13:1 30:23
  31:7 53:22
**venture** 30:23
**verbatim** 61:10
**verified** 36:1,2
**verify** 36:4
**veritext** 63:1
**versus** 22:23 42:7
**vetted** 30:7
**viewed** 11:23
**virtual** 1:11
**virtue** 59:13
**volume** 59:19

### w

**w** 1:7
**want** 20:8 22:23
  23:24 27:11 29:12
  29:19 37:17
**way** 26:22 27:10
  28:17 34:1 41:1
**welcome** 52:13,14
  52:15 53:9,17
  54:16
**went** 7:11
**west** 1:20
**wexler** 3:2,4 4:7
  6:5 27:7 32:12
  45:18
**wilmington** 54:19
**witness** 5:5 60:21
  62:1 63:4

**word** 11:4 45:1
**words** 19:11 25:3
**work** 10:3,4,19
  14:18 16:15 18:15
  18:17 59:12,12
**working** 25:18
**workout** 52:21
**works** 42:16
**worth** 16:15
**write** 41:13
**writing** 30:2 41:11
  55:8
**written** 25:21
**wrong** 11:8 44:9

### x

**x** 4:2
**xi01350** 61:21

### y

**yeah** 20:11 33:25
  41:15 43:10 46:7
  55:17
**year** 40:19 42:7
**years** 6:25 7:13
  8:11 9:22 10:11
  26:3 28:22 39:21
**yesterday** 40:7
  50:21

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.