E-FILED IN OFFICE - LW
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
**19-A-10263-7**
6/28/2021 3:09 PM
TIANA P. GARNER, CLERK

IN THE SUPERIOR COURT OF GWINNETT COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| JEFFREY D. CORDTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| vs. | ) | |
| | ) | 19-A-10263-7 |
| ASPEN PROPERTIES GROUP, L.L.C., | ) | |
| As Trustee of the APG Holdings | ) | |
| Revocable Trust, and | ) | |
| WILMINGTON SAVINGS FUND | ) | |
| SOCIETY, F.S.B., not in its | ) | |
| individual capacity but solely | ) | |
| as Owner Trustee of the Aspen | ) | |
| Holdings Trust, a Delaware | ) | |
| Statutory Trust, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF JAMES MAFFUCCIO

STATE OF KANSAS

COUNTY OF JOHNSON

Personally appeared before the undersigned duly authorized to administer oaths, JAMES MAFFUCCIO, who, after being duly sworn, deposes and states on oath as follows:

1.

That I am the authorized signer on behalf of Aspen Holdings Trust ("Trust"), that I based this Affidavit on my own personal knowledge and my knowledge of the accounts of the Trust upon my review of the business records of the Trust, as further described herein, that I am competent to testify regarding those things

and those accounts about which I have personal knowledge, and that I am over 18 years of age.

2.

That I am qualified to make this affidavit as I am familiar with the business records of the Trust, which include the account statements, billings, letters and various documents of the Trust.

3.

That the Trust's business records are maintained by the Trust at its office.

4.

That the business records are made as part of the regular practice of the Trust and were kept in the course of a regularly conducted business activity of the Trust.

5.

That the business records are made at or near the time of the date of such documents and the entries are subsequently reviewed for accuracy and it is the regular practice of the Trust to do this.

6.

That on or about April 3, 2006 (in accordance with the Note described below), Plaintiff executed a Home Equity Line of Credit (the "Note") in the original principal credit limit amount of $200,000 in favor of IndyMac Bank, F.S.B. ("IndyMac").

7.

That a true and correct copy of the Note is attached hereto as Exhibit "A" and is incorporated herein by reference.

8.

That on or about April 3, 2006 (in accordance with the Security Deed described below), Plaintiff executed a Deed to Secure Debt (With Future Advances Clause) (the "Security Deed") in the original principal credit limit amount of $200,000 in favor of Indymac.

9.

That a true and correct copy of the Security Deed is attached hereto as Exhibit "B" and is incorporated herein by reference.

10.

That on or about August 3, 2010 (in accordance with Assignment #1 described below), IndyMac assigned the Note and the Security Deed to The Federal Deposit Insurance Corporation, as Receiver for Indymac (Hereinafter collectively referred to as the "FDIC") pursuant to that certain Assignment and Transfer of Note and Security Agreement ("Assignment #1").

11.

That a true and correct copy of Assignment #1 is attached hereto as Exhibit "C" and is incorporated herein by reference.

12.

That on or about April 11, 2018 (in accordance with Assignment #2 described below), the FDIC assigned the Note and the Security Deed to Value Recovery Group, L.P. ("VRG") pursuant to that certain Assignment of Security Deed ("Assignment #2").

13.

That a true and correct copy of Assignment #2 is attached hereto as Exhibit "D" and is incorporated herein by reference.

14.

That on or about May 11, 2018 (in accordance with Assignment #3 described below), VRG assigned the Note and the Security Deed to Aspen Properties Group, L.L.C., as Trustee ("Aspen Properties") pursuant to that certain Assignment of Security Deed ("Assignment #3").

15.

That a true and correct copy of Assignment #3 is attached hereto as Exhibit "E" and is incorporated herein by reference.

16.

That on or about January 14, 2021 (in accordance with Assignment #4 described below), Aspen Properties assigned the Note and the Security Deed to Defendant Trust pursuant to that certain Assignment of Security Deed ("Assignment #4") and Defendant Trust is the current owner and holder of the Note and the Security Deed and Defendant Trust is also currently in possession of the original Note.

17.

That a true and correct copy of Assignment #4 is attached hereto as Exhibit "F" and is incorporated herein by reference.

18.

That Plaintiff has defaulted and remains in default pursuant to the terms of the Note and the Security Deed and the maturity of the Note has been accelerated.

19.

That as of March 31, 2021, the following amounts are due and owing on the Note:

| | |
|---|---|
| Principal | $ 197,500.00 |
| Interest from 10/20/15 – 3/31/21 | $ 80,237.29 |
| Unpaid Late Charges | $ 4,453.29 |
| TOTAL | $ 282,190.58 |

20.

That interest continues to accrue daily in the amount of $44.75.

21.

That no payment has been made on the Note by Plaintiff since 2012 (in accordance with the applicable loan records) and no payments have been made on the Note since the Trust or its trustee has become the owner and holder of the Note and the Security Deed.

22.

That this Affidavit is made in support of a motion for summary judgment.

FURTHER AFFIANT SAITH NOT.

_____
JAMES MAFFUCCIO

Sworn to and subscribed before me
this 30ᵗʰ day of April , 2021.

_____
Notary Public

(Notarial Seal)

KIMBERLY YOUNG
Notary Public, State of Kansas
My Appointment Expires
3/11/2025

My commission expires on:
_____3/11/2025_____
CordtzAspenSJAff01am02

| JEFFREY D. CORDEZ | INDYMAC BANK, F. S. B., A FEDERALLY CHARTERED SAVINGS BANK 190 TECHNOLOGY PWY SUITE 100, NORCROSS, GA 30092 |
|---|---|
| | **Lender's Name and Address** "We," "us" or "our" means the lender named above. |
| **Address** 213 SOUTHERN HILL DRIVE DULUTH, GA 30097 | No. ▮▮▮▮▮ Date: April 3, 2006 Credit Limit $ 200,000.00 Draw Period 120 MONTHS Repayment Period 120 MONTHS Maturity Date: April 15, 2026 |
| **Borrower's Name and Address** "You" or "your" means each borrower above, jointly and severally. | |

# HOME EQUITY LINE OF CREDIT

1. **GENERALLY:** This agreement (the "Agreement") sets out the terms and conditions of your home equity line of credit (the "Line of Credit" or the "Line of Credit Account"). Many of the terms we use in this Agreement have special meanings:

   - The "Line of Credit Account Balance" is the sum of the unpaid principal of loans made under your Line of Credit, plus unpaid but earned finance charges, plus any costs, expenses, and fees that are due.
   - The "Credit Limit" is the maximum amount of principal we ordinarily will allow you to owe us under your Line of Credit at any time.
   - The "Billing Cycle" means the period of time normally covered by monthly periodic statements and includes such period of time even when a statement is not sent because there is no balance on your Line of Credit Account for that period.
   - An "Equity Card" is any credit card we issue to allow you to obtain advances on your Line of Credit.
   - The "Draw Period" is the period during which you may request advances on your Line of Credit.
   - The "Repayment Period" is the period during which you must repay your Line of Credit Account Balance and may not request further advances.

   If any term of this Agreement violates any law or for some other reason is not enforceable, the term will not be part of this Agreement.

2. **PROMISE TO PAY:** You promise to pay to us, or our order, the total principal of all loans made under your Line of Credit, together with all finance charges, costs, expenses, and fees for which you are responsible under this Agreement. If there is more than one of you, each is jointly and severally liable on this Agreement. This means that we can require any one of you to pay all amounts due under this Agreement, including loans made to any of you, even if in excess of the authorized Credit Limit. Each of you authorizes any other Borrower, on his or her request alone, to cancel the Line of Credit, request and receive advances of principal under your Line of Credit, and to do all actions in connection with the terms of this Agreement. We can release any of you from responsibility under this Agreement, and the others will remain fully responsible hereunder.

3. **TAX DEDUCTIBILITY:** You understand that we (including our employees and representatives) do not make any representations or warranties to you about the tax consequences -- including the deductibility of interest or fees -- of you establishing or using this Line of Credit, and we will not be liable if interest or fees are not deductible. You should consult a tax advisor regarding the deductibility of interest and charges under your Line of Credit.

4. **REQUESTING A LOAN:** During the Draw Period, you may request a loan under your Line of Credit by the following methods:

   - You write a special check that we have given you for this purpose (the "Equity Check").
   - You use an Equity Card for purchase transactions or cash advances.
   - You authorize us to pay a designated third person or account.

   You may not obtain advances under the Line of Credit until any rescission period provided by federal law has expired and we are reasonably satisfied that none of the persons entitled to rescind had rescinded this Agreement and the Line of Credit.

IndyMac Bank
Multistate HELOC Agreement - I/O Min Pay

8480282 (0509)

Page 1 of 9

VMP Mortgage Solutions, Inc. (800)821-7291

I064
09/05

EXHIBIT
A

When you request a loan, we will advance exactly the amount you request. The smallest amount we will advance to you when you use an Equity Check is $ _250.00_ (the "Minimum Advance"). We will make the advance by depositing the amount in your transaction account, by advancing the money directly to you, or by paying a designated third person or account, depending on how we agree to make the advance. We will record the amount as a loan in your Line of Credit Account.

If you request a loan by writing an Equity Check for less than the Minimum Advance, we may, at our option, grant the request. However, granting the request does not mean we will be required to grant requests for less than the Minimum Advance in the future. We always have the option to deny any such request.

By signing below, each of you requests that we issue each of you an Equity Card. Your use of this Equity Card at automated teller machines is subject to our rules relating to automated teller machine transactions.

We will not ordinarily grant any request for a loan that would cause the unpaid principal balance of your Line of Credit Account to be greater than the Credit Limit listed in this Agreement. We may, at our option, grant such a request without obligating ourselves to do so in the future.

Loans under your Line of Credit may be for any lawful purpose, except that you may not use such loans to pay amounts due on your Line of Credit Account. You will notify us immediately in the event any of your Equity Checks or any of your Equity Cards are lost or stolen.

5.    **HOW PERIODIC FINANCE CHARGES ARE COMPUTED:** Finance charges begin to accrue immediately when we make a loan to you. To figure the finance charge for a Billing Cycle, we apply a daily periodic rate of finance charge to the "average daily balance" of your Line of Credit Account for the Billing Cycle. We then multiply that figure by the number of days in the Billing Cycle. The average daily balance is computed as follows. First we take your Line of Credit Account Balance at the beginning of each day and subtract any unpaid finance charges that are due. Next, we subtract the portion of any payments or credits received that day that apply to the repayment of your loans. (A portion of each payment you make is applied to finance charges.) Then we add any new loans made that day. This gives us the daily balance. Then we add up all the daily balances for the Billing Cycle and divide the total by the number of days in the Billing Cycle. This gives us the "average daily balance."

The paragraph checked below applies to this Agreement.

[X]  Until the end of the _1st_ Billing Cycle after the date of this Agreement (the "Initial Rate Period"), the daily periodic rate of **FINANCE CHARGE** is _0.013671_ % which corresponds to an **ANNUAL PERCENTAGE RATE** of _4.990_ %. The annual percentage rate corresponding to the periodic rate includes interest and not other costs.

[ ]  Until the end of the _____ Billing Cycle after the date of this Agreement (the "Initial Rate Period"), the daily periodic rate of finance charge will be determined by discounting the "base rate" described below under the heading **Variable Rate** by _____ percentage points. On the date of this Agreement, this calculation results in a daily periodic rate of **FINANCE CHARGE** of _____ %, which corresponds to an **ANNUAL PERCENTAGE RATE** of _____ %. The annual percentage rate corresponding to the periodic rate includes interest and not other costs.

The periodic rate and corresponding annual percentage rate described above are the initial rates assessed under this Line of Credit, and are not based on the formula used for later rate adjustments. Had these rates been based on that formula, the daily periodic rate of **FINANCE CHARGE** would have been _0.030137_ %, which corresponds to an **ANNUAL PERCENTAGE RATE** of _11.000_ %. At the end of the Initial Rate Period specified above, the rates will be subject to further adjustments and limitations, as described below under the heading **Variable Rate**.

6.    **VARIABLE RATE:** The "annual percentage rate" referred to in this section is the annual rate that corresponds to the periodic rate applied to the balance as described above. The annual percentage rate may change, and will be _three and 250/1000ths_ percentage points ( _3.250_ ) above the following "base rate:" the highest base rate on corporate loans posted at large U.S. money center commercial banks as published in the Money Rates table of The Wall Street Journal as the Prime Rate. The annual percentage rate may increase if this "base rate" increases. An increase will take effect on the first day of the Billing Cycle. An increase will result in an increase in the finance charge and it may have the effect of increasing your periodic minimum payment. The annual percentage rate will not increase more often than once a month. A decrease will have the opposite effect of an increase described above.

IndyMac Bank
Multistate HELOC Agreement • I/O Min Pay
8480282 (0509)

Page 2 of 9

1064
09/05

If the base rate changes more frequently than the annual percentage rate, we will always use the base rate in effect on the day we adjust the annual percentage rate to determine the new annual percentage rate. In such a case, we will ignore any changes in the base rate that occur between annual percentage rate adjustments.

This corresponding **ANNUAL PERCENTAGE RATE** will never exceed 18% and will never exceed the highest allowable rate for this type of Agreement as determined by applicable state or federal law.

See the Fee Schedule attached hereto and made a part hereof for additional finance charges and other charges on your Line of Credit.

7. **MONTHLY PAYMENTS:** We will send you a periodic statement for each Billing Cycle in which there is a balance owing under your Line of Credit, or a credit balance, or a finance charge is imposed. The periodic statement will show, among other things, the amount of the minimum monthly payment (the "Minimum Payment") and the date by which it is due. You must pay us at least the Minimum Payment indicated on the periodic statement by the date indicated on the statement.

During the Draw Period, the Minimum Payment is the amount, if any, by which your outstanding principal loan balance exceeds your Credit Limit, plus the greater of: (a) $100.00; or (b) the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument, as described below under the heading Security. During the Draw Period the minimum payment may not fully repay the principal that is outstanding on your Line of Credit.

During the Repayment Period, the Minimum Payment is the amount, if any, by which your outstanding principal loan balance exceeds your Credit Limit, plus: (a) the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument; and (b) _____ .8333 _____ % of the principal balance outstanding on the last day of the Draw Period.

If your Minimum Payment includes any other items authorized by this Agreement, we will so advise you, and the periodic statement will include an itemization of such amounts.

You must send all payments to our attention at the address indicated on the periodic statement.

**FINAL PAYMENT:** On the maturity date listed in this Agreement, you must pay the amount of any remaining Line of Credit Account Balance outstanding. The minimum payments may not be sufficient to fully repay the principal that is outstanding on your Line of Credit. If they are not, you will be required to pay the entire outstanding balance in a single balloon payment.

We are not obligated to refinance your loan at that time, but will consider your request to do so. If you refinance this account at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain financing from us.

8. **ADDITIONAL REPAYMENT TERMS:** If your Line of Credit Account Balance on a payment date is less than the amount of the Minimum Payment, your minimum monthly payment will equal the Line of Credit Account Balance.

You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic Minimum Payment.

The amounts you pay will be applied first to any fees and charges you owe other than principal and finance charges, then to any finance charges that are due, and finally to principal.

9. **SECURITY:** We have secured your obligations under this plan by taking a security interest (by way of a separate security agreement, mortgage, deed of trust, or other instrument (the "Security Instrument") dated _____ April 3, 2006 _____, in the following property, described by item or type (the "Property"): _____ 213 SOUTHERN HILL DRIVE, DULUTH, GA 30097 _____

_____

_____

Property securing any other loans that you have with us may also secure this Agreement. You may buy property insurance from anyone you want who is acceptable to us.

**Florida:** The state documentary tax due on this Agreement has been paid on the mortgage securing this indebtedness. You agree to pay additional taxes or other charges to the extent such amounts may be imposed by third parties or government authorities in connection with any event of borrowing under this Line of Credit.

You consent to a continuing writ of garnishment effective with respect to any money, salary, or wages as may be owed to us to the fullest extent permitted by law. This consent is given pursuant to Florida Statutes Section 222.11(2).

IndyMac Bank
Multistate HELOC Agreement - I/O Min Pay
8480282 (0509)

Page 3 of 9

I064
09/05

**Maryland Recordation Tax:** If the entire principal amount of the Line of Credit is not disbursed by us to you upon the execution of this Agreement, you may, at your option, pay Maryland recordation tax on the entire principal amount of the Line of Credit at the time of closing, or you may pay Maryland recordation tax at the time of making of the initial and each future advance from us to you. If you pay the Maryland recordation tax on the entire principal amount of the Line of Credit at the time of closing, your total tax liability will be satisfied, regardless of the amount of any future advances that may subsequently be made by us to you. If, however, you elect to pay the required Maryland recordation tax as advances are made, you have seven (7) days to file with the clerk of the court where the security instrument is recorded a verified statement of the amount of the additional debt incurred as each advance is made, and you must pay the applicable Maryland recordation tax on that additional debt, or you may be penalized by a fine of up to $500.00 or imprisonment of up 6 months for failing to do so as provided in §14-1012 of the Tax Property Article of the Annotated Code of Maryland.

**North Carolina:** This is an equity line of credit Agreement as defined in Section 45-81 of the North Carolina General Statutes. In accordance with the NCGS Section 75-30, you agree to accept all telephone calls made by us through the use of automatic dialing machines.

**Washington:** If this Agreement is signed by husband or wife, or by two or more unmarried individuals, each irrevocably authorizes us to charge the amount of any Equity Check signed by any one of you against the Line of Credit Account and consents to the use of Property identified in the Security Instrument as security for repayment of all such charges.

10. **CHANGING TERMS OF THIS AGREEMENT:** Generally, we may not change the terms of this Agreement. However, we may change the terms in the following circumstances:

   - If this is a variable rate plan, we may change the index and margin if the original index described in this agreement becomes unavailable. Any new index will have a historical movement similar to the original, and, together with a new margin, will produce a similar interest rate.
   - We may make changes that you have agreed to in writing.
   - We may make changes that unequivocally benefit you.
   - We may make changes to insignificant terms of this Agreement.
   - If we are required to send notice of a change in terms, we will send the notice to your address listed in this Agreement. (You should inform us of any change in address.)

11. **YOUR RIGHT TO TERMINATE YOUR RIGHT TO OBTAIN LOANS:**

   A. <u>Termination.</u>  You may terminate your right to obtain loans by sending us a written notice that will become effective upon receipt by us. If more than one person signs this Agreement as Borrower, your right to obtain loans may be terminated by written notice pursuant to this paragraph signed by any one or more of such persons. We may also suspend your right to obtain loans pursuant to paragraph fourteen (14) below. You must notify the servicer at the following address or at a different address as required by servicer of your intent to terminate.

   P.O. Box 3038, Evansville, IN 47730

   B. <u>Effect of Termination.</u>  Upon termination of your Line of Credit Account, you must continue to pay the minimum payment due on or before each payment due date until all amounts owed under this Agreement are paid in full. However, you may be required to repay all obligations immediately if we exercise our rights under paragraph thirteen (13) below. You must return unused Equity Checks upon termination. You may be required to pay an account termination fee pursuant to the Fee Schedule attached hereto and made a part hereof.

12. **COSTS OF COLLECTION:** You agree to pay all our costs, including reasonable attorneys' fees, that we incur in legal proceedings to collect or enforce this debt should you be in default.

   **Alabama:** You agree to pay our reasonable and actual attorneys' fees, incurred as a result of your default if the unpaid balance at the time of default exceeds $300.

   **Arkansas:** You agree to pay our reasonable and actual attorneys' fees, not to exceed 10% of the amount of principal and accrued interest, if you are in default.

   **California:** You agree to pay costs actually incurred for recording, mailing, publishing, and posting legally required notices, costs of postponement, not to exceed $50, litigation or trustee sale fees, and attorneys' fees allowed by law.

IndyMac Bank
Multistate HELOC Agreement - I/O Min Pay
8480282 (05091)

Page 4 of 9

1064
09/05

**Colorado, Missouri, New York, North Carolina, Oklahoma, South Carolina:** You agree to pay our reasonable attorneys' fees not in excess of 15% of the unpaid debt after default and referral to an attorney who is not our salaried employee, together with any assessed court costs and legal expenses, to the extent permitted by applicable law.

**Louisiana:** You agree to pay our costs of collection and reasonable attorneys' fees not in excess of twenty-five (25) percent of the unpaid debt after default and referral to an attorney for collection.

**Maine:** You will pay all costs, including reasonable attorneys' fees and legal costs, incurred by us in attempting to collect, or collecting, what is owed from any real estate that secures this Agreement. You will pay all costs except attorneys' fees incurred by us in attempting to collect, or collecting, any amounts owed from personal property securing this Agreement.

**New Hampshire:** You agree to pay all our costs, including reasonable attorneys' fees that we incur in legal proceedings to collect or enforce this debt should you be in default. If you successfully assert a partial defense or set off, or recoupment or counterclaim, the court may reduce the amount of attorneys' fees we may recover from you. If you prevail in any action or defense against us, you may recover the amount of reasonable attorneys' fees from us.

**Wisconsin:** If you default, you agree to pay our statutory fees and charges and statutory attorneys' fees when and to the extent authorized by the Wisconsin Consumer Act. Fees and charges include, but are not limited to, the disposition of any Property under Wis. Stat. Ann. § 422.413, as amended.

13. **TERMINATION OF LINE FOR CERTAIN DEFAULTS:** We may terminate your Line of Credit Account, require you to pay the entire outstanding balance in one payment, and charge you a termination fee (if provided for in this Agreement) and fees related to the collection of the amount owing, if:
    (1) You engage in fraud or material misrepresentation in connection with your Line of Credit;
    (2) You fail to make a payment as required by this Agreement; or
    (3) Your action or inaction adversely affects the collateral or our rights in the collateral.

    In that instance, we may take other action short of termination, such as charging you a fee if you fail to maintain required property insurance and we purchase insurance. In the District of Columbia, the remedy of acceleration is subject to the provisions of D.C. Code Ann. § 28-3312(5).

    Even if we choose not to use one of our remedies when you default, we do not forfeit our right to do so if you default again. If we do not use a remedy when you default, we can still consider your actions as a default in the future.

    In North Dakota, if permitted by applicable law, this obligation may be the basis for a personal action against the promisor or promisors in addition to other remedies allowed by law.

14. **SUSPENSION OF CREDIT AND REDUCTION OF CREDIT LIMIT:** We may prohibit you from obtaining additional extensions of credit, or reduce your Credit Limit if:
    (1) The value of the dwelling securing this home equity Line of Credit declines significantly below its appraised value for purposes of this Line of Credit;
    (2) We reasonably believe you will not be able to meet the repayment requirements due to a change in your financial circumstances;
    (3) Your payment history on this home equity Line of Credit is not satisfactory;
    (4) You are in default of an obligation of this Agreement or any agreement securing this Agreement, which shall include, but is not limited to, your ongoing obligation to supply us with information we feel we need to assess your financial condition;
    (5) A governmental action prevents us from imposing the annual percentage rate provided for in this Agreement;
    (6) The action of a governmental body adversely affects our security interest to the extent that the value of the security interest is less than 120% of the home equity Line of Credit;
    (7) The annual percentage rate corresponding to the periodic rate reaches the maximum rate allowed under this Line of Credit (if provided for in this Agreement); or
    (8) A regulatory agency has notified us that continued advances would constitute an unsafe and unsound practice.

    In the event that we suspend your right to additional advances or reduce your Credit Limit, we will send you notice of our decision at the address listed in this Agreement. (You should inform us of any change in your address.) If we have based our decision to suspend or reduce your credit privileges on an assessment of your financial condition or performance under your Line of Credit, and you believe that your situation has changed, you must request that we re-evaluate your situation, and reinstate your credit privileges.

IndyMac Bank
Multistate HELOC Agreement - I/O Min Pay
8480282 (0509)

Page 8 of 9

1064
09/05

to cure a default for failure to make a required payment, you waive, protest, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor.

**Wisconsin:** In addition, subject to Wis. Stat. Ann. § 422.407, as amended, you will not assert any claims or defenses arising out of your Line of Credit against any person to whom we assign our rights under the Line of Credit (the assignee) if the assignee is unrelated to us, acquires the Line of Credit in good faith and for value, gives you a notice of the assignment, and has not received notice from you of your claims or defense within 12 months after the assignee mailed you the notice of assignment.

To the extent permitted by applicable law, you waive your right to the benefit of exemption as to your Property securing, or to secure, this Agreement. If required by law, we will provide you with separate written statement regarding the waiver of your right of exemption. In Indiana, you hereby waive any rights to relief from valuation and appraisement laws.

16. **REPRESENTATIONS AND WARRANTIES:** You represent and warrant to us that the information contained in the loan application, in each material respect, was true at the time the loan application was completed.

You represent and warrant to us that the terms of any existing Security Instrument on the Property permit us to enter into this Agreement and that the loans secured by such existing deed of trust or mortgage are current in all material respects and are not in default.

17. **LOAN CHARGES:** If your Line of Credit Account is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected, or to be collected, in connection with your Line of Credit Account exceeds the permitted limits, then: (a) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you that exceeded permitted limits will be refunded to you. We will refund such excess either by reducing the principal owed under your Line of Credit Account or by making a direct payment to you. If we apply the excess toward reducing the principal balance, such reduction shall be treated as a partial prepayment hereunder.

18. **APPLICABLE LAW:** Federal law applies to certain aspects of this Agreement, including, but not limited to, the interest rate and related charges. The law of the state where you and the Property are located will apply to the extent legally required. If any term of this Agreement violates any law or for some reason is not enforceable, or becomes unenforceable, that term will not be part of this Agreement.

If the Lender listed on page one of this Agreement is not IndyMac Bank, F.S.B., the following provisions apply to this Agreement: This is to inform you that your loan is an alternative mortgage loan within the definition of the Federal Alternative Mortgage Transactions Parity Act of 1982 (the "Parity Act") (12 U.S.C. §§ 3801 et seq.) and the implementing regulations adopted by the Office of Thrift Supervision ("OTS") (12 C.F.R. §§ 560.220, referencing, 560.33, 560.34, 560.35 and 560.210). Your loan will be made by us in accordance with the Parity Act requirements of the OTS rather than the provisions of state law. In this regard, pursuant to the authority granted by the Parity Act and the OTS Parity Act regulations, certain state laws will not apply to this loan.

19. **CREDIT INFORMATION:** You agree to supply us with whatever information we reasonably feel we need to decide whether to continue this Line of Credit. We agree to make requests for this information without undue frequency; and to give you reasonable time in which to supply the information.

You authorize us to make or have made any credit inquiries we feel are necessary. You also authorize the person or agencies to whom we make these inquiries to supply us with the information we request.

As required by California law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

IndyMac Bank
Multistate HELOC Agreement - I/O Min Pay
8480282 (0509)

Page 6 of 9

1064
09/05

## ADDITIONAL TERMS

### YOUR BILLING RIGHTS -- KEEP THIS NOTICE FOR FUTURE USE
This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings, checking, share draft or other account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities*
*After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases*

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or the services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
(b) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

IndyMac Bank
Multistate HELOC Agreement - I/O Min Pay
8480282 (0509)

Page 7 of 9

1064
09/05

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE NOTICE SPECIFYING THE CIRCUMSTANCES AND TIME UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

Utah: THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS.

Missouri: ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER) AND US (LENDER) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

Iowa: IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT. YOU ARE ENTITLED TO A COPY OF THIS AGREEMENT. YOU MAY REPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY, AND IF THIS IS A CONSUMER CREDIT TRANSACTION YOU MAY BE ENTITLED TO RECEIVE A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.

Washington: PLEASE BE ADVISED THAT ORAL AGREEMENTS OR ORAL COMMUNICATIONS TO LOAN MONEY, EXTEND CREDIT, OR FOREBEAR FROM ENFORCING REPAYMENT OF THE DEBT ARE UNENFORCEABLE UNDER WASHINGTON LAW.

NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

YOU SHOULD CHECK WITH YOUR LEGAL ADVISOR AND WITH OTHER MORTGAGE LIEN HOLDERS AS TO WHETHER ANY PRIOR LIENS CONTAIN ACCELERATION CLAUSES WHICH WOULD BE ACTIVATED BY A JUNIOR ENCUMBRANCE.

20.     SIGNATURES: By signing below, you agree to the terms of this Agreement and you promise to pay any amounts you owe under this Agreement. You also state that you received a completed copy of this Agreement on today's date.

CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

_____ (Seal)          _____ (Seal)
JEFFREY D CORDTZ            -Borrower                                 -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                 -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                 -Borrower

# FEE SCHEDULE

You agree to pay the following additional charges in connection with your Line of Credit:

## 1. ADDITIONAL FINANCE CHARGES: You agree to pay the following additional FINANCE CHARGES:

| | | |
|---|---|---|
| Application Fee | $ | 0.00 |
| Broker Fee | $ | 0.00 |
| Closing Agent Fee | $ | 200.00 |
| Flood Certification Fee | $ | 12.00 |
| Lender Fees | $ | 125.00 |
| Origination Fee | $ | 2,000.00 |
| Points | $ | 0.00 |
| Processing Fee | $ | 250.00 |
| Tax Service Fee | $ | 0.00 |
| (Other) _____ | $ | 0.00 |

## 2. OTHER CHARGES: You agree to pay the following additional charges:

| | | |
|---|---|---|
| • Appraisal Fee | $ | 0.00 |
| • Check Re-order Fee | $ | 5.00 |
| • Credit Report Fee | $ | 0.00 |
| • Documentation Fee | $ | 0.00 |
| • Recording/Filing Fee | $ | 75.00 |
| • Title Insurance Fee | $ | 500.00 |
| • Title Search Fee | $ | 140.00 |
| • (Misc.) _____ Misc. Fees | $ | 606.50 |

- • An annual charge of $75.00.
- • A termination fee of $500.00 if terminated within the first three years (not applicable in NC, NJ, NY or SC, lesser of 2% of the line amount or $500 for NM).
- • A late charge on any payment not paid within 15 days of the payment date of 5% of the payment.
- • A charge of $10.00 for any advance made by special check in an amount less than the Minimum Advance (not applicable in New York).
- • A charge of $10.00 per credit transaction that is in excess of your Credit Limit.
- • A fee of $25.00 for each check, negotiable order of withdrawal or draft you issue in connection with this loan that is returned because it has been dishonored.
- • A fee of $10.00 to stop payment.

Other charges will be assessed in accordance with the terms of the Line of Credit Agreement.

This Fee Schedule supplements the Line of Credit Agreement and is incorporated therein. Nothing contained in this Fee Schedule shall be deemed to impair in any way your obligations under the Line of Credit Agreement, the related security agreement, mortgage, or deed of trust, or any other document executed by you concerning the indebtedness evidenced by the Line of Credit Agreement.

| | | |
|---|---|---|
| _JEFFREY D CORDTZ_ (Seal) -Borrower | Pay To The Order Of: | _____ (Seal) -Borrower |
| _____ (Seal) -Borrower | Without Recourse IndyMac Bank, F.S | _____ (Seal) -Borrower |
| _____ (Seal) -Borrower | By: _Melody Spotts_ Assistant Vice Pr | _____ (Seal) -Borrower |

IndyMac Bank
Multistate HELOC Agreement - I/O Min Pay
8480282 (0509)

Page 9 of 9

1064
09/05

Deed Book 42616 Pg 328
Filed and Recorded May-19-2006 01:35pm
2006-0152211
Georgia Intangible Tax Paid $600.00
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia

JONAGHUE & CHANDLER, LLC
2525 Hwy 34 East
Suite C
Newnan, GA 30265

3093F

IM IMOC 6-21-06
ms
38

GEORGIA INTANGIBLE TAX PAID

$ _____

~~TAX LAWLER~~
~~SUPERIOR COURT GWINNETT~~
~~COUNTY GEORGIA~~

Loan No: ██████

When recorded return to:
INDYMAC BANK, F.S.B., C/O DOCUMENT
MANAGEMENT
BLDG B, 901 E 104TH ST, SUITE 400/500
KANSAS CITY, MO 64131

State of Georgia _____

Space Above This Line For Recording Data

# DEED TO SECURE DEBT
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Deed to Secure Debt (Security Instrument) is April 3, 2006
and the parties, their addresses and tax identification numbers, if required, are as follows:
GRANTOR: JEFFREY D CORDTZ

☐ If checked, refer to the attached Addendum incorporated herein, for additional Grantors, their signatures and
acknowledgments.
GRANTEE: INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK
("Lender") 155 NORTH LAKE AVENUE
PASADENA, CA 91101

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to
secure the Secured Debt (defined below) and Grantor's performance under this Security Instrument, Grantor irrevocably
grants, bargains, transfers, conveys and sells to Lender, with power of sale, the following described property:
SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

EXHIBIT
B
_____

The property is located in ....................GWINNETT.................... at 213 SOUTHERN HILL
(County)
.DRIVE.....................................................................DULUTH....................., Georgia 30097
(Address)                                          (City)                          (ZIP Code)
Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian
rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may
now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall
not exceed $ 200,000.00 . This limitation of amount does not include interest and other fees and
charges validly made......

B. All future advances from Lender to Grantor or other future obligations of Grantor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Grantor in favor of Lender executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Grantor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Grantor, or any one or more Grantor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All other obligations Grantor owes to Lender, which may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Grantor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

In the event that Lender fails to provide any necessary notice of the right of rescission with respect to any additional indebtedness secured under paragraph B of this Section, Lender waives any subsequent security interest in the Grantor's principal dwelling that is created by this Security Instrument (but does not waive the security interest for the debts referenced in paragraph A of this Section).

Release of any part of the Secured Debt or of any part of the Property will not affect the borrower's personal liability under any instrument secured by this Security Instrument or this Security Instrument's priority.

5. **DEED OF TRUST COVENANTS.** Grantor agrees that the covenants in this section are material obligations under the Secured Debt and this Security Instrument. If Grantor breaches any covenant in this section, Lender may refuse to make additional extensions of credit and reduce the credit limit. By not exercising either remedy on Grantor's breach, Lender does not waive Lender's right to later consider the event a breach if it happens again.

**Payments.** Grantor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

**Prior Security Interests.** With regard to any other mortgage, deed of trust, deed to secure debt, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Grantor agrees to make all payments when due and to perform or comply with all covenants. Grantor also agrees not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written approval.

**Claims Against Title.** Grantor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Grantor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Grantor's payment. Grantor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Grantor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Grantor may have against parties who supply labor or materials to maintain or improve the Property.

**Property Condition, Alterations and Inspection.** Grantor will keep the Property in good condition and make all repairs that are reasonably necessary. Grantor shall not commit or allow any waste, impairment, or deterioration of the Property. Grantor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Grantor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Grantor will notify Lender of all demands, proceedings, claims, and actions against Grantor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Grantor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Grantor will in no way rely on Lender's inspection.

**Authority to Perform.** If Grantor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Grantor appoints Lender as attorney in fact to sign Grantor's name or pay any amount necessary for performance. Lender's right to perform for Grantor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.

**Leaseholds; Condominiums; Planned Unit Developments.** Grantor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Grantor will perform all of Grantor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

**Condemnation.** Grantor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Grantor authorizes Lender to intervene in Grantor's name in any of the above described actions or claims. Grantor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, deed to secure debt, security agreement or other lien document.

**Insurance.** Grantor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the

damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

**Financial Reports and Additional Documents.** Grantor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Grantor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Grantor's obligations under this Security Instrument and Lender's lien status on the Property.

6. **WARRANTY OF TITLE.** Grantor warrants that Grantor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, bargain, transfer, convey and sell the Property to Lender, with power of sale. Grantor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

8. **DEFAULT.** Grantor will be in default if any of the following occur:

   **Fraud.** Any Consumer Borrower engages in fraud or material misrepresentation in connection with the Secured Debt that is an open end home equity plan.

   **Payments.** Any Consumer Borrower on any Secured Debt that is an open end home equity plan fails to make a payment when due.

   **Property.** Any action or inaction by the Borrower or Grantor occurs that adversely affects the Property or Lender's rights in the Property. This includes, but is not limited to, the following: (a) Grantor fails to maintain required insurance on the Property; (b) Grantor transfers the Property; (c) Grantor commits waste or otherwise destructively uses or fails to maintain the Property such that the action or inaction adversely affects Lender's security; (d) Grantor fails to pay taxes on the Property or otherwise fails to act and thereby causes a lien to be filed against the Property that is senior to the lien of this Security Instrument; (e) a sole Grantor dies; (f) if more than one Grantor, any Grantor dies and Lender's security is adversely affected; (g) the Property is taken through eminent domain; (h) a judgment is filed against Grantor and subjects Grantor and the Property to action that adversely affects Lender's interest; or (i) a prior lienholder forecloses on the Property and as a result, Lender's interest is adversely affected.

   **Executive Officers.** Any Borrower is an executive officer of Lender or an affiliate and such Borrower becomes indebted to Lender or another lender in an aggregate amount greater than the amount permitted under federal laws and regulations.

9. **REMEDIES ON DEFAULT.** In addition to any other remedy available under the terms of this Security Instrument, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Grantor is in default. In some instances, federal and state law will require Lender to provide Grantor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions.

   At the option of the Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. Lender shall be entitled to, without limitation, the power to sell the Property.

   If there is a default, Lender may advertise and sell the Property as a whole or in separate parcels at public auction to the highest bidder for cash and convey absolute title free and clear of all right, title and interest of Grantor at such time and place as Lender designates. Lender shall give notice of sale including the time, terms and place of sale and a description of the property to be sold as required by the applicable law in effect at the time of the proposed sale.

   Upon sale of the property and to the extent not prohibited by law, Lender shall make and deliver a deed to the Property sold which conveys absolute title to the purchaser. Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. Lender may purchase the Property. The recitals in any deed of conveyance shall be prima facie evidence of the facts set forth therein.

   If the Property is sold pursuant to this section, Grantor, or any person holding possession of the Property through Grantor, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Grantor or such person shall be a tenant holding over and may be dispossessed in accordance with applicable law.

   The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Grantor's default, Lender does not waive Lender's right to later consider the event a default if it happens again.

10. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** If Grantor breaches any covenant in this Security Instrument, Grantor agrees to pay all expenses Lender incurs in performing such covenants or protecting its security interest in the Property. Such expenses include, but are not limited to, fees incurred for inspecting, preserving, or otherwise protecting the Property and Lender's security interest. These expenses are payable on demand and will bear interest from the date of payment until paid in full at the highest rate of interest in effect as provided in the terms of the Secured Debt. Grantor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. Where the Secured Debt is collected by or through an attorney after maturity, Grantor agrees to pay 15 percent of the principal and interest owing as attorneys' fees. To the extent permitted by the United States Bankruptcy Code, Grantor agrees to pay the reasonable attorneys' fees Lender incurs to collect the Secured Debt as awarded by any court exercising jurisdiction under the Bankruptcy Code. This Security Instrument shall remain

B. Except as previously disclosed and acknowledged in writing to Lender, Grantor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

C. Grantor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Grantor shall take all necessary remedial action in accordance with any Environmental Law.

D. Grantor shall immediately notify Lender in writing as soon as Grantor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

12. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Grantor will not be required to pay to Lender funds for taxes and insurance in escrow.

13. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Grantor signs this Security Instrument but does not sign an evidence of debt, Grantor does so only to convey Grantor's interest in the Property to secure payment of the Secured Debt and Grantor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Grantor, Grantor agrees to waive any rights that may prevent Lender from bringing any action or claim against Grantor or any party indebted under the obligation. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Grantor and Lender.

14. **SEVERABILITY; INTERPRETATION.** This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

15. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one grantor will be deemed to be notice to all grantors.

16. **WAIVERS.** Except to the extent prohibited by law, Grantor waives all homestead and other exemption rights provided for by the constitution and laws of Georgia relating to the Property.

17. **LINE OF CREDIT.** The Secured Debt includes a revolving line of credit. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

18. **APPLICABLE LAW.** This Security Instrument is governed by the laws as agreed to in the Secured Debt, except to the extent required by the laws of the jurisdiction where the Property is located, and applicable federal laws and regulations.

19. **RIDERS.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.
[Check all applicable boxes]

☐ Assignment of Leases and Rents  ☒ Other   Planned Unit Development Rider, Georgia Rider to the

20. ☐ **ADDITIONAL TERMS.**

**SIGNATURES:** By signing below, Grantor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Grantor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.
IN WITNESS WHEREOF, Grantor has signed and sealed this Security Instrument.

(Signature) JEFFREY D CORDTZ          (Date)          (Signature)          (Date)
(Seal)          (Seal)

Signed, sealed and delivered in the presence of

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 3RD day of April, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

213 SOUTHERN HILL DRIVE, DULUTH, GA 30097

*[Property Address]*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in Declaration of Covenants, Conditions, and Restrictions (the "Declaration"). The Property is a part of a planned unit development known as:

ST. IVES CC

*[Name of Planned Unit Development]*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire,

Loan No: ███████

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 1 of 3

Form 3150 01/01
14501MU 08/00 Rev. 11/04
©2004, The Compliance Source, Inc.



hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then:

(i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

*[Signatures on Following Page]*

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.— Page 2 of 3
www.compliancesource.com
Form 3150 01/01
14501MU 08/00 Rev. 11/04
©2004, The Compliance Source, Inc.

Deed Book 42616 Pg 334

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
JEFFREY D CORDTZ                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

[Sign Original Only]

Multistate PUD Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 3 of 3

Form 3150 01/01
14501MU 08/00 Rev. 11/04
©2004, The Compliance Source, Inc.

# GEORGIA
## RIDER TO THE SECURITY DEED

This Rider is deemed to amend and supplement the Security Instrument given by Borrower that secures Borrower's Note to Lender and covering the property described in the Security Instrument.

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Acknowledgement and Waiver of Borrower's Rights. By execution of this paragraph, Borrower expressly: (1) acknowledges the Right to Accelerate the Debt and the Power of Attorney given herein to Lender to sell the property by nonjudicial foreclosure upon default by Borrower without any judicial hearing and without any notice other than such notice as is required to be given under the provisions hereof; (2) waives any and all rights which Borrower may have under the Fifth and Fourteenth Amendments to the Constitution of the United States, the various provisions of the Constitution for the several states, or any other applicable law to notice and to judicial hearing prior to the exercise by Lender of any right or remedy herein provided to Lender, except such notice as is specifically required to be provided hereof; (3) acknowledges that Borrower has read the Security Instrument and specifically this paragraph and Borrower has been afforded an opportunity to consult with counsel of Borrower's choice prior to executing the Security Instrument; (4) acknowledges that all waivers of the aforesaid rights of Borrower have been made knowingly, intentionally and willingly by Borrower as part of a bargained for loan transaction; and (5) agrees that the provisions hereof are incorporated into and made a part of the Security Instrument.

READ AND AGREED BY BORROWER:

_____ (Seal)
JEFFREY D. CORDTZ                -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

Georgia Rider to the Security Deed
— THE COMPLIANCE SOURCE, INC. —
To Order Call: (972) 980-2178 • Fax (972) 392-2891
www.compliancesource.com

(page 1 of 1 pages)
04591GA 07/00 Rev. 03/2000
©2000, The Compliance Source, Inc.

# FORECLOSURE DISCLOSURE
## (Georgia)

Georgia law requires you to be informed of the following:

O.C.G.A. SECTION 7-1-1014(3) REQUIRES THAT WE INFORM YOU THAT IF YOU
FAIL TO MEET ANY CONDITION OR TERM OF THE DOCUMENTS THAT YOU SIGN
IN CONNECTION WITH OBTAINING A MORTGAGE LOAN YOU MAY LOSE THE
PROPERTY THAT SERVES AS COLLATERAL FOR THE MORTGAGE LOAN
THROUGH FORECLOSURE.

_____     _____
JEFFREY D. CORDTZ          (Borrower) (Date)                                 (Borrower) (Date)


_____     _____
                           (Borrower) (Date)                                 (Borrower) (Date)

Foreclosure Disclosure (Georgia)
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 1 of 1

Application Number:   JEFFREY CORDTZ

01103GA 07/00 Rev. 09/04
©2004, The Compliance Source, Inc.

EXHIBIT "A"

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 329, 1ST DISTRICT, 1ST SECTION, FULTON COUNTY, GEORGIA, BEING LOT 491, POD 2, PHASE II OF ST. IVES COUNTRY CLUB, AS PER PLAT OF SURVEY RECORDED IN PLAT BOOK 171, PAGES 125, FULTON COUNTY GEORGIA RECORDS.

# CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Security Instrument and this Rider by the Borrower, I reviewed with and explained to Borrower the terms and provisions of the Security Instrument and particularly the provisions thereof authorizing Lender to sell the Property by a nonjudicial foreclosure under a power of sale, together with this Rider and informed Borrower of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower of Borrower's rights. After said review with and explanation to Borrower, Borrower executed the Security Instrument and this Rider.

Based on the review with and explanation to Borrower, it is my opinion that Borrower knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any nonjudicial foreclosure.

_____
Closing Attorney

Subscribed and sworn to on _____4/3/04_____

_____
Notary Public

Closing Attorney's Affidavit (Georgia)
—— THE COMPLIANCE SOURCE, INC. ——
To Order Call: (972) 980-2178 • Fax (972) 392-2891
www.compliancesource.com

(Page 1 of 1 pages)
04510GA 07/99 Rev. 03/2000
©2000, The Compliance Source, Inc.

Deed Book 49304 Pg 486
Filed and Recorded Aug-25-2010 07:44am
2010-0324222
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

MIMIC
123104983

Recording Requested by & ~~~~~ s to:
When Recorded Return To:
   Indecomm US Recordings
   2925 Country Drive
   St. Paul, MN 55117

Loan # 8800170089 / 123104983
160500815

The Federal Deposit Insurance Corporation, acting in any capacity, is exempt from all taxation imposed by any State, county, municipality, or local taxing authority, pursuant to 12 U.S.C. §§ 1825(b)(1) and 1823(d)(3)(A).

## ASSIGNMENT AND TRANSFER OF NOTE AND SECURITY INSTRUMENT

The Federal Deposit Insurance Corporation, as Receiver of IndyMac Bank, F.S.B. ("Assignor"), hereby grants, assigns and transfers to The Federal Deposit Insurance Corporation, as Receiver of IndyMac Federal Bank, FSB ("Assignee"), all right, title and interest in and to that certain Promissory Note dated  April 3, 2006  executed by  Jeffrey D. Cordtz  ("Borrower"), to the order of Assignor in the original principal sum of $ 200,000.00  (the "Note"), including all obligations and the amounts due thereon, with interest thereon at the times and in the amounts set forth therein, and that certain Deed of Trust dated  April 3, 2006 , executed by Borrower in favor of Assignor, filed and recorded on  May 19, 2006 , in Book  42616 , Page  328  Instrument No. __, in the Official Records of the County Recorder's Office of  Fulton  County, State of  Georgia  (the "Deed of Trust"), conveying the real property more particularly described in the Deed of Trust, which is hereby incorporated by this reference, to secure the indebtedness evidenced by the Note. The forgoing assignment and transfer is "As Is", "Where Is" and without recourse, representation or warranty.

IN WITNESS WHEREOF, Assignor has executed this Assignment and Transfer of Note and Security Instrument this ___3___ day of  August , 2010.

Federal Deposit Insurance Corporation as
Receiver of IndyMac Bank, F.S.B

By: _____

Name:  Michael J. LaBella
       Post Closing Asset Manager

EXHIBIT
C

# ACKNOWLEDGMENT

State of California
County of _____ Orange _____ )

On _August 3, 2010_ before me, _Kim P. Tran, Notary Public_
                                   (insert name and title of the officer)

personally appeared _Michael J. Labella_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

KIM P. TRAN
Commission # 1856956
Notary Public - California
Orange County
My Comm. Expires Jul 6, 2013

*U01445985+
1703  8/16/2010  76560815/1