**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF GEORGIA**

----------------------------

Jeffrey Cordtz,                     Case No. 1:21-cv-02003-MHC-LTW

Plaintiff

        **Versus**

Johnson Legal Offices, LLC;
FCI Lender Services, Inc.;
And Larry W. Johnson

**Defendants**
----------------------------

<u>**Response in Opposition to Johnson Legal Offices, LLC ("JLO") and Larry W.**</u>

<u>**Johnson's ("LWJ") (collectively the "Johnson Defendants") Motion for**</u>

<u>**Summary Judgment**</u>

## Introduction

Plaintiff took out a home equity revolving line of credit from a bank for personal expenses and defaulted on the loan. Although Plaintiff gave a security interest in his property, in this case the Johnson Defendants attempted to collect only the money owed and not to foreclose on the security interest. The Johnson Defendants do not dispute that this case involves plain vanilla debt collection that would be subject to the FDCPA if the Johnson Defendants are debt collectors.

Cordtz alleges the following FDCPA violations:

**1-**The Defendants bypassed Cordtz's attorney and sought to collect directly from him when the FDCPA requires communications to represented parties to be with a consumer's attorney.

**2-**The Johnson Defendants' April 2021 letter directly to Cordtz claimed that he owed $327,000+ which is $40,000 more than: a) the FCI Defendants claimed was owed in monthly statements sent directly to Cordtz both before and after that date; b) the Johnson Defendants themselves claim was owed in a February 2021 Gwinnett County counterclaim; c) the Johnson Defendants themselves claimed was owed in the January 2021 Fulton County lawsuit; d) James Maffucio claimed was owed in an affidavit.

**3**-The January 2021 Fulton County lawsuit brought on behalf of "Aspen Properties Group, LLC, as Trustee of the APG Holdings Revocable Trust" was in error. There is no dispute that that entity did not own the debt and did not have authority to collect from Plaintiff at the time that lawsuit was filed.

The single issue raised in this case is: *Whether the Johnson Defendants regularly collect debts.* Although Plaintiff has not moved for summary judgment, this Court should grant Plaintiff summary judgment on the issue of whether the Johnson Defendants are debt collectors. That is because, where a "legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided." Artistic Entertainment, Inc. v. City of Warner Robins 331 F.3d 1196, 1202 (11th Cir.2003) citing Burton v. City of Belle Glade, 178 F.3d 1175, 1204 (11th Cir.1999). The FDCPA's strictures generally only apply debt collectors. 1692(a)(6) defines a debt collector as "**any person who uses any instrumentality of interstate commerce or the mails in any business** the principal purpose of which is the collection of any debts, or **who *regularly* collects or attempts to collect, *directly or indirectly*, debts owed or due or asserted to be owed or due another**." Therefore, "Clearly, Congress must have intended the 'principal purpose' prong of § 1692a(6) to differ from the 'regularly' prong." Garrett v. Derbes, 110 F.3d 317, 318 (5th Cir. 1997).

Thus, the Johnson Defendants can be considered debt collectors if they regularly attempt to collect debt even though debt collection is not their principal purpose.

Indicative of Johnson's "regularly collect[ing] or attempt[ing] to collect, directly or indirectly debts owed or due or asserted to be owed or due another" is the $23,720 he earned in attorney's fees for collect Cordtz's consumer debt since September 2020 and the $23,721 Johnson has earned in attorney's fees since May 2018 collecting Selwyn Johnson's consumer medical debt. (The dollar amounts just happen to be very close according to Johnson's testimony).

Further indicative that the Johnson Defendants "regularly collects or attempts to collect, directly or indirectly debts owed or due or asserted to be owed or due another" is that since December 2018, $39,456.46 was paid to him by the law firm of Jauregui & Lindsey for non-judicial foreclosure. And also, since December 2018, $105,455.31 was paid to him by the mortgage servicer for State Home Mortgage for non-judicial foreclosures. This information was produced after the discovery period was over and only because of the Court's Order (Doc 60, Pgs. 1-2) that "*The Johnson Defendants, however, shall provide Plaintiff with affidavits from Jauregui & Lindsey, LLC and Georgia Home Mortgage detailing the services performed, the amount paid, and the number of hours billed by the Johnson Defendants. The affidavits shall be provided fourteen days from the docket entry date of this Order*." This Court also held when referring to this Order and granting

Plaintiff's motion for an extension that was opposed by the Johnson Defendants that "That evidence is relevant to Plaintiff's response to the pending Motion for Summary Judgment." Doc. 68, Pg. 2 of 5.

Although Johnson points out that the FDCPA defines a law firm engaging in non-judicial foreclosure differently from other debt collectors, that is irrelevant to the question presented in this case of whether Johnson "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Both regular debt collectors and debt collectors that engage in non-judicial foreclosure are debt collectors as defined by the FDCPA. That non-judicial foreclosure is *only subject to certain provisions of the FDCPA* has no bearing on whether Johnson "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."

Obduskey v. McCarthy & Holthus LLP, 139 S. Ct. 1029, 1038 (2019) …. clarified that the FDCPA's definition of debt collectors consists of a 'primary definition' and a 'limited-purpose definition' found within the third sentence of Section 1692a(6). The primary definition of a "debt collector," found in the first sentence of § 1692a(6), is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or

asserted to be owed or due another." On the other hand, the limited-purpose

definition of "debt collector" that applies only to § 1692f(6) of the FDCPA

'also includes any person ... in any business the principal purpose of which

is the enforcement of security interests.'

Heagerty v. AMIP Management, LLC, 1:20-cv-02727-SCJ-RGV, 2021 WL
2587720 (N.D. Ga. April 20, 2021). (cleaned up).


## The Court's Guidelines for Summary Judgment Practice

This Court's Guidelines for Summary Judgment Practice requires factual

statements made in Johnson's brief to be followed by a citation to the record. Doc.

39, Page 4 of 12. The Court's guidelines, Doc. 39, Page 10 of 12, also provide:

"The statement of material facts to which the movant contends there is no genuine

issue to be tried shall not exceed fifteen (15) double-spaced pages." (Underlined by

the Court). Johnson did not follow either of these guidelines causing unnecessary

work for the Court and Plaintiff. As a sanction, Plaintiff asks the Court to strike

any portion of Johnson's statement of material facts from page 16 onwards. In the

interest of caution, Plaintiff responded to all pages but unfortunately need to go

slightly over the 30-page limit set by the Court. The Johnson Defendants

previously violated the guidelines for raising a discovery dispute by filing a

voluminous motion to compel before a pre-motion conference asserting that the guidelines were suggestions. See Docs. 42-44.

## Debt Collection in General

"In ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts." *Heintz v. Jenkins*, 514 U.S. 291, 294, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995). A mortgagee who hires a lawyer to collect upon a "mortgage" or a security interest in his personal home is an FDCPA "debt collector". See *Obduskey at* 1034.

## The Johnson Defendants are debt collectors because they regularly engage in debt collection and have ongoing relationships with a mortgage company and a debt collection law firm to provide them with debt collection services

'[A] business pursuing nonjudicial foreclosures would, under the capacious language of the Act's primary definition, be one that "regularly collects or attempts to collect, directly or indirectly, debts." § 1692a(6)". Ibid. "[E]very mortgage foreclosure, judicial or otherwise, is undertaken for the very purpose of obtaining payment on the underlying debt, either by persuasion (i.e., forcing a settlement) or compulsion (i.e., obtaining a judgment of foreclosure, selling the home at auction, and applying the proceeds from the sale to pay down the outstanding debt)." Glazer v. Chase Home Fin. LLC, 704 F.3d 453, 460–65 (6th Cir. 2013). Seeking to

collect a debt in connection with enforcement of security interests is "an attempt to collect a debt". The security interest enforcement the Johnson Defendants do is relevant to whether they regularly attempt to collect debts.

Regularly collecting debt is defined not in terms of whether the relief sought is money or property, but in terms of whether the debt collector's communication with the consumer is in connection with that consumer's obligation to pay money. Obduskey at 1036. The provision discussing the definition of regularly collecting debts "sweeps in both "direc[t]" and "indirec[t]" debt collection." Ibid. "So, even if nonjudicial foreclosure were not a direct attempt to collect a debt, because it aims to collect on a consumer's obligation by way of enforcing a security interest, it would be an indirect attempt to collect a debt." Ibid. at 1037. Thus, Johnson's non-judicial foreclosure activities count towards establishing that Johnson regularly collects debts.

Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 60 (2d Cir. 2004) reversed the district court's granting of summary judgment to the debt collector on grounds of it not being a debt collector. The debt collector "derived only $5,000 in revenues" from debt collection during a relevant one-year period where its total revenue was $10,000,000. $5,000 of $10,000,000 is a half of one-tenth percent or 0.05% of total revenues. The district court wrongly found because of the low percentage of Hutton's revenue derived from debt collection it

irregularly collects debts. Johnson's brief makes as if the district court's holding is the law by quoting from it extensively. Johnson's Brief, Dkt. 94, Pgs. 3-6. It is a reversed decision- Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 155 F.Supp.2d 60 (S.D.N.Y.2001). The Second Circuit held "the question of whether a lawyer or law firm "regularly" engages in debt collection activity within the meaning of section 1692a(6) of the FDCPA must be assessed on a case-by-case basis in light of factors bearing on the issue of regularity".

The Johnson Defendants' net income for the year 2020 was less than $100,000. Exhibit B Johnson Deposition, Page 43, lines 21-25; Page 44, lines 1-25. Larry W. Johnson was the managing partner of Johnson & Freedman up until the year 2013. Exhibit B- Johnson Deposition, Page 9, lines 14-21. Johnson & Freedman was a debt collection law firm. Exhibit B- Johnson Deposition, Page 5, lines 12-17. In 2013, Larry W. Johnson joined RCO Legal. Exhibit B Johnson Deposition, Page 8, lines 3-12. RCO Legal was a debt collection law firm. Exhibit B Johnson Deposition, Page 11, lines 3-7. Larry W. Johnson left RCO Legal in 2015. Exhibit B- Johnson Deposition, Page 8, lines 13-15. Shortly after leaving RCO Legal, Larry W. Johnson formed Johnson Legal Offices, LLC. Exhibit B Johnson Deposition, Page 8, lines 8-18. Larry W. Johnson is the owner of Johnson Legal Offices, LLC. Exhibit B- Johnson Deposition, Page 11, lines 17-23. No

action of Johnson Legal Offices, LLC was able to be done by anyone but Larry W. Johnson. Exhibit B- Johnson Deposition, Page 11, lines 17-23.

The Johnson Defendants may have $300,000 of income in the last 3 years related to non-judicial foreclosure consumer debt collection that is not accounted for below. Johnson Second Deposition, Exhibit T, Pages 76-86; 93-108.

The Johnson Defendants have an ongoing agreement with State Home Mortgage. Exhibit B- Johnson Deposition, Page 12, lines 12-23. During the 3 year period ending December 1, 2021, the Johnson Defendants had revenue of $105,455.31 from that continuous relationship. Exhibit K- See Affidavit of Michael Galloway authorized representative of State Home Mortgage, Para. 6. The Johnson Defendants agreement with State Home Mortgage dated February 19, 2016, is attached as Exhibit U. That agreement provides that Larry Johnson is to be paid $175 per hour for non-judicial foreclosure debt collection services. Johnson frequently collects money because of these activities and does not merely do security enforcement. See Johnson Second Deposition, Exhibit T, Pages 13-14. At that rate per hour, the Johnson Defendants would have worked more than 600 hours to get to $105,455.31.

JLO and LWJ had revenue for ongoing consumer debt collection services of $39,459.46 for the 3-year time-period between December 1, 2018, and December

1, 2021, from its of counsel relationship with Jauregui & Lindsey. Exhibit K- See affidavit of Jason Tingle.  Affidavit of Jason Tingle, [Doc. 71, Page 2 of 4], Johnson Deposition, Page 16, lines 21-25; Page 17, lines 1-10. The Johnson Defendants receive one third of any fee and Jauregui & Lindsey, LLC receives two thirds of the fee earned when they do work on foreclosure work together. Exhibit B- Johnson Deposition, Page 16, lines 21-25; Page 17, lines 1-10. The Of Counsel Agreement requires Jauregui & Lindsey to maintain malpractice insurance for the benefit of the Johnson Defendants. Exhibit R- See the Of Counsel Agreement between Jauregui and Lindsey and LWJ. Per the Of Counsel Agreement, each week the Johnson Defendants agree to provide Jauregui & Lindsey with availability for providing consumer debt collection services. Exhibit R- See the Of Counsel Agreement between Jauregui and Lindsey and the Johnson Defendants. On dozens of occasions, JLO and J&L have written a specific debt collection letter claiming that they were collecting a consumer debt together with J&L. Exhibit B- Johnson Deposition, Page 36, lines 16-25; Page 37, lines 1-25; Page 38, lines 1-6, See Exhibit V and Doc. 15, Pages 56, 57 of 57, for the collection letter from J&L and JLO. In Johnson's second deposition, he denied any involvement with that letter. See, Exhibit T, Larry Johnson Second Deposition Pgs. 15-33, lines 9-24. The Johnson Defendants are unsure whether they have an Of Counsel Agreement with any other law firm. Exhibit B- Johnson Deposition, Page 20, lines 12-21.

The Johnson Defendants were paid to collect a medical consumer debt from Selwyn Johnson. Johnson Second Deposition, Exhibit T, Pg 7-9, lines 9-5. The Johnson Defendants were paid hourly fees for that case of $23,721.44 within the 3 years prior to the filing of this case. Although the Johnson Defendants claim that that the money was not entirely for debt collection, the Johnson Defendants have provided no evidence that any of the money was not paid for debt collection. There is a genuine issue of material fact as to whether the Johnson Defendants received $23,721.44 for consumer debt collection which would indicate that they regularly collect consumer debt.

The Johnson Defendants were paid to collect Cordtz's debt through litigation in Georgia state court $23,720.56 as of March 24, 2022, since it was hired in late 2020. See Second Deposition of Larry Johnson Page 95, lines 5-6. Although the Johnson Defendants claim that they were not paid all of the $23,720.56 money to collect the debt, the Johnson Defendants have not provided any evidence to show that any of that money paid to it was not in *connection* with the collection of the debt. Whether the Johnson Defendant's litigation activities bear on whether it regularly collects debt is determined by assessing whether those litigation activities can be said to be done in connection with that consumer's obligation to pay money. Obduskey at 1036. There is a genuine issue of material fact as to whether this $23,720.56 indicates that the Johnson Defendants are debt

collectors. The Johnson Defendants collected Cordtz's delinquent consumer debt based on an hourly rate. Exhibit C- 30(b)(6) Deposition of McMichael Taylor, Page 16, lines 10-21.  The Johnson Defendants were paid hourly for consumer debt collection services in the amount of $412.50 on February 4, 2021, in the amount of $2,933.61 on February 22, 2021, in the amount of $585.70 on April 9, 2021, in the amount of $5,480.85 on June 4, 2021, in the amount of $2,059.40 on July 22, 2021, in the amount of $110 on August 24, 2021, and in the amount of $3,102.60 on September 20, 2021, $2,373.32 on November 3, 2021, $2,754.92 on December 16, 2021, $2,892.58 on January 20, 2022 and $1,015.08 on February 11, 2022. add Additional invoices. Exhibit O- See Invoices with Checks. Thus, the Johnson Defendants have regularly been collecting Cordtz's consumer debt and other consumer debts since hired in late 2020, when this lawsuit was brought and since then.

Plaintiff opened a revolving line of credit. Exhibit A-Cordtz Dep., Page 24, lines 16-25; Page 25, lines 1-6. Plaintiff used the money to pay personal, family and household expenses. Exhibit A- Cordtz Dep., Page 27, lines 6-25; Page 28, lines 1-6. The money was used for medical procedures and expenses and home repair. Exhibit A- Cordtz Dep., Page 27, lines 6-25; Page 28, lines 1-6. None of the money was used for business expenses. Exhibit A- Cordtz Dep., Page 28, lines 4-6.

Plaintiff defaulted on the loan. Exhibit A- Cordtz Dep., Page 29, lines 3-8; Page 33 lines 22-25; Page 34 lines 1-7.

Plaintiff has a special needs child named Robert. Exhibit A Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert lives with Plaintiff. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has multiple serious medical issues. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has had both of his hips replaced. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has had steel plates put in his shin. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has had surgery on his jaw. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has cracked vertebrae from a degenerative bone condition. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert has great difficulty walking up and down steps. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Robert's condition would be alleviated by moving to a warmer climate. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. The layout and location of Plaintiff's house is not conducive to Robert's existence. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22.

Plaintiff desires to sell his home and move to a warmer climate. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22. Plaintiff is stressed having to see his son suffer. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines

1-22. Plaintiff suffers extreme anxiety from not being able to provide a comfortable living arrangement for his son. Exhibit A- Cordtz Dep., Page 70, lines 13-25; Page 71, lines 1-22.

FCI has stipulated that it is a debt collector as defined by the FDCPA. Exhibit D- See "Response 2" of FCI's Supplemental Response to Request for Production of Documents. FCI has written agreements with J Taylor Law, LLC ("J Taylor"). Exhibit E- See attached written agreements between FCI and J Taylor. McMichael Taylor Gray, LLC ("MTG" or "McMichael" or "McMichael Taylor") is subject to J Taylor's written agreement with FCI. Exhibit C- See Taylor Dep. Pg. 14,15, lines 17-25, 1-13. In that agreement FCI refers to itself as managing the foreclosure process for investors. Exhibit E- See attached written agreements between FCI and J Taylor. FCI also states it works with "financial institutions that look to [it] as a "one-stop" partner in handling their [] foreclosure [] needs". Exhibit E- See attached written agreements between FCI and J Taylor. MTG reached an agreement or understanding with LWJ and JLO. Exhibit B- Johnson Deposition, Page 25, lines 9-25. The understanding was not reduced to writing. Exhibit B- Johnson Deposition, Page 25, lines 9-25. The understanding related to the terms by which LWJ and JLO were to collect Plaintiff's debt on behalf of MTG. Exhibit B- Johnson Deposition, Page 33, lines 11-24.

LWJ and JLO did not collect pursuant to a written agreement with the alleged owner of the HELOC. Exhibit L- See Email from Mark Baker dated October 14, 2021. The owner of the HELOC was MTG's client and not LWJ or JLO's client. Exhibit B- Johnson Dep. Page 25, 26 lines 9-25, 1-2. LWJ and JLO were not even aware of the agreement between APG and FCI which allowed FCI to select the lawyer for APG. Exhibit B- See Johnson Dep., Page 27, lines 4-7. MTG itself did not believe it had an agreement with the owner of the HELOC. Exhibit L- See Email from Mark Baker dated October 14, 2021.

Aspen Properties Group, LLC, as Trustee of the APG Holdings Revocable Trust ("APG") allegedly bought Plaintiff's consumer loan sometime in 2018. Exhibit F- See APG Welcome letter. FCI began servicing Plaintiff's loan at about the same or the same time as APG bought Plaintiff's loan. Exhibit G- See Welcome Letter from FCI. FCI has a written agreement with APG dated March of 2018. Exhibit H- See written Agreement between APG and FCI. That agreement specifically concerns Plaintiff's loan. Exhibit H- See Addendum to Agreement between FCI and APG. The agreement provides that FCI has the exclusive right to coordinate collection of Plaintiff's loan by means of an attorney chosen by FCI. Exhibit H- See Agreement between FCI and APG Section 5.0. That agreement also provides that client can never start or coordinate collection of Plaintiff's loan. Exhibit H- See Agreement between FCI and APG Section 5.0. The agreement

provides that APG "must notify [FCI] promptly, in writing, of…[the] sale of the loan by [APG]…… [and] shall immediately supply supporting documentation and/or information regarding such change in status to [FCI]." Exhibit H See Agreement between FCI and APG Section 10.1. Per the contract (and common sense) APG should have known, and should have told FCI, that APG had sold Cordtz's loan on 1/14/21.

The Johnson Defendants filed a lawsuit in January 2021 seeking to collect on Plaintiff's allegedly owed to APG. Exhibit P- See January 2021 lawsuit- Doc. 53-5, Page 1-6 of 6. They sued on behalf of APG. Ibid. They claimed money was owed to APG. Ibid. They claimed that APG was the owner of Plaintiff's debt. Ibid. They claimed that APG was "the proper entity to enforce the instrument." Ibid. Para 7. They claimed that APG could seek a judgment against Cordtz. Ibid. Wherefore Clause. At the time of the lawsuit APG did not own the debt and they were not the proper entity to enforce the debt. Exhibit I- See Motion to Substitute with Real Party in Interest dated 2/11/21. APG had sold or transferred the debt prior to the January 2021 lawsuit being brought. Exhibit I- Motion to Substitute Real Party in Interest dated 2/11/21. JLO and LWJ believe that the debt was sold or transferred to an entity unrelated to APG prior to bringing the lawsuit on behalf of APG. Exhibit B- Johnson Deposition, Page 31, lines 10-25; Page 32, line 1.

The Johnson Defendants mailed a letter to Cordtz on April 8, 2021, seeking to collect $327,000+. (Doc. 55, Page 24 of 33). At the time they sent the letter they knew he was represented by counsel. The Johnson Defendants began trying to collect the debt in September 2021. See Declaration of Larry W. Johnson, Doc. 53, Pages 3, 4 of 18, Paras. 12-13.  The Johnson Defendants knew Alembik represented Cordtz on or before February 12, 2021, as they had been communicating with Alembik as counsel for Cordtz. See Declaration of Larry W. Johnson, Doc 53, Page 5 of 18, Para. 17.

JLO and LWJ's own Fulton County lawsuit filed on behalf of the owner of the HELOC on January 21, 2021, asks for $246,162.04 plus $44.75 daily (Para. 25) since November 5, 2018. Exhibit P- See Fulton County Lawsuit Doc 53-5, Page 5 of 6. A simple calculation shows that this number is far less than he was seeking in the letter written April 2021. The same applies to his counterclaim filed on February 26, 2021, in Gwinnett County where JLO and LWJ sought on behalf of the owner of the HELOC the same $246,162.04 plus $44.75 daily since November 5, 2018. Exhibit Q- See Gwinnett County Counterclaim (Para. 14). A simple calculation also show that number would be less than $327,917.83.

An affidavit claiming authorization to speak for the owner of Plaintiff's HELOC claimed that there was $282,190.58 owed as of March 31, 2021, due and owing on the note with interest of $44.75 daily. Exhibit M- See 4/30/21 affidavit of

James Maffucio. Again, an amount far less than $327,917.83 as of April 8, 2021.

Co-defendant FCI, claimed in monthly statements on 5/21, 4/21 and 3/22, 2021,

respectively, that the balance Plaintiff owed was $285,466.86, $284,403.87, and

$283,305.45. Exhibit N- See attached FCI Statements. These amounts also are less

than the Johnson Defendants were seeking in their April 8, 2021, letter.

**The FDCPA**

In enacting the FDCPA, Congress recognized that abusive debt-collection

practices may lead to marital instability and intrude on another's privacy interests.

See 15 U.S.C. § 1692(a) ("Abusive debt collection practices contribute to the

number of personal bankruptcies, to marital instability, to the loss of jobs, and to

invasions of individual privacy."). "Congress thus sought to protect consumers'

concrete economic interests in enacting these provisions." *Cohen v. Rosicki,*

*Rosicki & Assocs., P.C.*, 897 F.3d 75, 81 (2d Cir. 2018). "Congress enacted the

FDCPA to protect against the abusive debt collection practices likely to disrupt a

debtor's life." *Id.* (internal quotation marks and citation omitted)).

**LWJ and JLO violated the FDCPA by bypassing communicating with his**

**attorney Alembik and Threatening Cordtz with a letter saying that if he**

**didn't pay $327,917.83 within 10 days then statutory attorney's fees in excess**

**of $32,000 would be added to his debt**

Georgia Rule of Professional Conduct 4.2(a) titled communication with person represented by Counsel provides:

> A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or court order.

This Rule is intended to "provide protection of the represented person against overreaching by adverse counsel, safeguard the client-lawyer relationship from interference by adverse counsel, and reduce the likelihood that clients will disclose privileged or other information that might harm their interests." ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 95-396 (1995). Here, LWJ and JLO communicated with Plaintiff after it knew that he was represented by counsel. Indeed, it appears as though the communication was designed to specifically interfere with the attorney client relationship between Plaintiff and Alembik. (2 months later LWJ filed a 4-million-dollar lawsuit against Plaintiff and both his state court and federal court lawyers which would at the very least indicate an intention to interfere with Plaintiff's relationships with his attorneys). LWJ and JLO's April communication to Cordtz served no purpose. The OCGA 13-1-11 statutory attorney's fee notice had previously been provided on numerous occasions and there was no requirement that the OCGA 13-1-11 statutory attorney's fee notice needed to be provided again and at the time.

JLO and LWJ violated 1692c(a)(2) because they contacted Cordtz after knowing that he was represented by an attorney. *Young v. NPAS, Inc*., 361 F. Supp. 3d 1171 (D. Utah 2019) ("Medicredit violated 15 U.S.C. § 1692c(a)(2) because they contacted Ms. Young after knowing she was represented by an attorney.")

At common law, courts readily recognized a concrete injury arising from the tort of intrusion upon seclusion—a tort protecting against defendants who intrude into the private solitude of another. See Restatement (Second) of Torts § 652A(2)(a) (1977); see also id. § 652B. And the Supreme Court recently cited "intrusion upon seclusion" as a harm "traditionally recognized as providing a basis for [a] lawsuit[ ] in American courts." *TransUnion LLC v. Ramirez*, —— U.S. ——, 141 S. Ct. 2190, 2204, 210 L.Ed.2d 568 (2021) (citing *Gadelhak v. AT&T Servs., Inc*., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.), cert denied, —— U.S. ——, —— S.Ct. ——, 209 L.Ed.2d 568 (2021)).

Plaintiff was injured by the communication because it caused him to have to deal with the situation that he had hired a lawyer to deal with thus causing him to think of the harm this lawsuit was causing to his son. Cordtz did not want to have this lawsuit in his life except when on his terms. He wanted to be able to call his lawyer when he wanted an update on the case. He did not want to receive any unwanted debt collection communications from LWJ or JLO because it interferes

with his privacy. See *Gadelhak*, 950 F.3d at 462–63 (determining that a consumer's receipt of a few unwanted text messages under the Telephone Consumer Protection Act is "a modern relative" of the tort of intrusion upon seclusion—a tort with "long common law roots").

Spokeo, Inc. v. Robins, 578 U.S. 330, 341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) instructs Courts to analogize to harms recognized by the common law for a "close relationship" in kind, not degree. In other words, while the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy. Congress's power is greater than that: it may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law. An unwanted letter may be too minor an annoyance to be actionable at common law. But such a letter nevertheless poses the same kind of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable. So too here. Though a letter may not intrude to the degree required at common law, that letter poses the same kind of harm recognized at common law—an unwanted intrusion into a plaintiff's peace and quiet. See *TransUnion LLC*, 141 S. Ct. at 2204 ("*Spokeo* does not require an exact duplicate in American history and tradition.").

## The Johnson Defendants violated the FDCPA by Bringing the January Fulton County lawsuit on behalf of Aspen Properties Group, LLC, as Trustee of the APG Holdings Revocable Trust when it was the wrong party to

The common law elements of abuse of process are that the defendants made an illegal, improper, or perverted use of process and that the plaintiff suffered damage. See White v. Lemma, 947 F.3d 1373, 1376 (11th Cir. 2020). The filing of a legally defective debt collection suit violates § 1692e where the filing falsely implies that the debt collector has legal recourse to collect the debt. In *Gearing v. Check Brokerage Corp.*, 233 F.3d 469 (7th Cir.2000), a company called Check Brokerage purchased from Ayerco, a convenience store, a bad check that Gearing had written to Ayerco; Check Brokerage then brought a debt collection action against Gearing. *Id*. at 471. Illinois law provided at the time that the subrogee of a bad check's payee could sue for the face value of the check, treble damages up to $1,500, and attorney fees and costs. Ibid. Unfortunately for Check Brokerage, its purchase agreement with Ayerco did not make it Ayerco's subrogee, meaning that it was prohibited from suing Gearing on the check. *Id*. at 472. The Seventh Circuit held that Check Brokerage had violated § 1692e because its state court complaint incorrectly alleged that it was Ayerco's subrogee, thus giving "a false impression as to the legal status it enjoyed." Ibid.; see also *Manlapaz v. Unifund CCR Partners*, 2009 WL 3015166, *2–3, *5 (N.D.Ill. Sept. 15, 2009) (holding that the plaintiff

stated an FDCPA claim where the defendant allegedly filed a debt collection suit for an account it did not own); *Matmanivong v. Unifund CCR Partners*, 2009 WL 1181529, *5 (N.D.Ill. Apr. 28, 2009) (same); *Foster v. Velocity Investments, LLC*, 2007 WL 2461665, at *2 (N.D.Ill. Aug. 24, 2007) (same). *Gearing* applies where LWJ and JLO brought a debt collection action against Plaintiff thus giving the "false impression" that it had the "legal status" necessary to file the suit. Cordtz needed to obtain an attorney to respond to that lawsuit. See *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 576 (D.C. Cir. 2003) ("the funds necessarily expended to defend against the wrongful legal proceedings" can be "damages for 'loss of property' "). Cordtz also spent time defending against the meritless suit, itself an injury. See *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 692 (7th Cir. 2015) (individuals alleging fraudulent credit-card charges suffered Article III injury—"the aggravation and loss of value of the time needed to set things straight"). See also *Wells v. Willow Lake Estates, Inc*., 390 Fed.Appx. 956, 959 (11th Cir. 2010) (being "forced to spend time and money complying with [selectively-enforced] regulations ... is an injury in fact.").

## **LWJ and JLO violated the FDCPA by claiming a balance owed of $327,917.83 in principal and interest when that amount was not due**

LWJ and JLO did not own the debt and were not authorized to seek amounts unauthorized by the client. In the April 8, 2021, letter, LWJ and JLO sought

$327,917.83 an amount never authorized by the alleged owner of the HELOC. Subsection 1692f(1) of the FDCPA addresses the abusive practice of collecting an amount greater than that which is owing. S.Rep. 382 95th Cong., 1st Sess. 4 reprinted in 1977 U.S.Code Cong. & Admin.News 1695, 1698. Subsection 1692e(2)(A) addresses the false representation of the amount of the debt.

LWJ and JLO claim authorization to speak for the owner of the HELOC but the owner of the HELOC never authorized JLO and LWJ to seek $327,917.83. JLO and LWJ's own Fulton County lawsuit filed on behalf of the owner of the HELOC on January 21, 2021, asks for $246,162.04 plus $44.75 daily (Para. 25) since November 5, 2018. Exhibit P. A back of the envelope calculation shows that this is less than the $327,000+ that he was seeking in the letter written April 2021.

The same applies to his counterclaim filed on February 26 in Gwinnett County where JLO and LWJ sought the same $246,162.04 plus $44.75 daily since November 5, 2018, Exhibit Q- (Para. 14 of the Counterclaim). Finally, an April 30, 2021, affidavit by a James Maffucio also claiming authorization to speak for the owner of Plaintiff's HELOC claimed that there was $282,190.58 owed as of March 31, 2021, due and owing on the note with interest of $44.75 daily. Exhibit M. Again, an amount less than $327,917.83. Co-defendant FCI, claimed in monthly statements on May 21, April 21 and March 22, 2021, respectively, that the balance Plaintiff owed was $285,466.86 on May 21, 2021, $284,403.87 on April 21, 2021,

and $283,305.45 on March 22, 2021. Exhibit N- See attached Statements. These amounts are less than JLO and LWJ were seeking in their April 8, 2021, letter.

## FCI is vicariously liable for the Johnson Defendants' FDCPA violations in bringing the Fulton County Lawsuit

FCI, a debt collector, employed MTG which worked with the Johnson Defendants to carry out the bringing of the Fulton County lawsuit in the name of an entity that did not own Cordtz's debt. FCI is vicariously liable for its agent's conduct. "Debt collectors employing attorneys or other agents to carry out debt collection practices that violate the FDCPA are vicariously liable for their agent's conduct." *Martinez v. Albuquerque Collection Servs., Inc*., 867 F. Supp. 1495, 1502 (D.N.M. 1994). Otherwise, a debt collector "could evade the FDCPA by hiring [an] attorney to do what it could not do." *Id*. (citing 17 Am. Jur. Consumer Protection § 200 (2d ed. 1990)). It would be contrary to the reasoning expressed in *Martinez* and the remedial purpose of the FDCPA to permit principals to avoid liability by hiring agents to do their bidding while keeping the agents in the dark about violations they may be committing. See, e.g*., Schutz v. Arrow Financial Servs., LLC*, 465 F. Supp. 2d 872, 876 (N.D. Ill. 2006); *Beach v. LVLN Funding, LLC*, No. 12-CV-778, 2013 WL 1878938, *2 (E.D. Wis. May 3, 2013).

## Conclusion

LWJ and JLO's Motion for Summary should be denied.

Dated this 28th day of April 2022.

Respectfully submitted,
By: /s/ Shimshon Wexler
GA Bar No. 436163
S Wexler LLC
2244 Henderson Mill Rd, Ste 108
Atlanta, GA 30345
(212) 760-2400
(917) 512-6132 (FAX)
swexleresq@gmail.com