Page 1

1

UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF GEORGIA
            Case 1:21-cv-02003-MHC-LTW
3
4
JEFFREY CORDTZ,
5                                  DEPOSITION UPON ORAL
        Plaintiff,          EXAMINATION OF:
6
    -vs-                     LARRY JOHNSON, ESQ.
7
JOHNSON LEGAL OFFICES,
8   LLC; FCI LENDER
SERVICES, INC.; AND
9   LARRY W. JOHNSON,
10        Defendants.
        – – – – – – – – – – –
11
12              T R A N S C R I P T  of the
13        above-entitled matter as taken
14        stenographically by and before SERAFINA R.
15        ZINCKGRAF, CSR, RPR, License No. XI01637, a
16        Certified Court Reporter, Registered
17        Professional Reporter and Notary Public of
18        the State of New Jersey, taken virtually, on
19        Thursday, March 24, 2022, commencing at
20        12:07 p.m.
21
22
        PRIORITY-ONE COURT REPORTING SERVICES, INC.
23              290 West Mt. Pleasant Avenue
                    Suite 2260
24           Livingston, New Jersey 07039
                Job No. P1-5147340
25

Page 2

```
 1       A P P E A R A N C E S :
 2
 3   LAW OFFICE OF SHIMSHON WEXLER, PC
     2244 Henderson Mill Rd
 4   Suite 108
     Atlanta, Georgia 30345
 5   Attorney for the Plaintiff
 6   MCMICHAEL, TAYLOR & GRAY, LLC
     22 Century Blvd
 7   Suite 450
     Nashville, Tennesse 37214
 8   BY: MARK BAKER, ESQ.
     Attorney for the Defendant, FCI Lender
 9   Services, Inc.
10
     JOHNSON LEGAL OFFICES, LLC
11   138 Hammond Drive
     Suite B
12   Atlanta, Georgia 30328
     BY: LARRY W. JOHNSON, ESQ.
13   Attorney for Larry W. Johnson and Johnson
     Legal Offices, LLC
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
 2   WITNESS:      DIRECT  CROSS  REDIRECT  RECROSS
 3   LARRY JOHNSON
     By Mr. Wexler      4
 4
 5
 6        E X H I B I T S
 7          (none)
 8
 9
     INFORMATION AND/OR DOCUMENTS REQUESTED
10
            (none)
11
12
     QUESTIONS MARKED FOR RULINGS
13
            (none)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   L A R R Y   J O H N S O N , E S Q . ,  138
 2   Hammond Drive, Suite B, Atlanta, Georgia,
 3   having been duly sworn according to law,
 4   testifies as follows:
 5
 6   DIRECT EXAMINATION BY MR. WEXLER:
 7
 8       Q.   Good morning, Mr. Johnson --
 9   good afternoon, actually.  When you're
10   speaking for yourself today, you are
11   speaking on behalf of Johnson Legal Offices,
12   LLC, as well; is that correct?
13       A.   It appears on the question, but,
14   generally speaking, I speak for myself, as
15   well as for my law firm.
16       Q.   Okay.  And your law firm
17   consists solely of you; is that right?
18       A.   That's right.  That's correct.
19       Q.   Okay.  Now, can you tell me a
20   little bit about Selwyn Johnson case as far
21   as information regarding your fees
22   obtained -- obtained for -- for work related
23   to that case?
24       A.   Sure.  That case was initially
25   filed in magistrate court by another law
```

Page 5

```
 1   firm, and it was -- an Answer was filed with
 2   a counterclaim on behalf of the
 3   borrower/debtor, and he was represented by
 4   counsel, as well.  They had a -- you know, a
 5   hearing or a trial in magistrate court
 6   in which a judgment was entered in favor of
 7   Mr. Johnson, Mr. Selwyn Johnson.  That's
 8   S-e-l-w-y-n, and my client sent -- they were
 9   suing for around $1,800 and he got a
10   judgment on his counterclaim for about
11   $2,100.
12       My client sent his check over to
13   Mr. Johnson's counsel in that case.  He
14   rejected -- for the $2,100, the amount of
15   the judgment.  They rejected that and filed
16   an appeal to either state or superior court,
17   I don't remember which one off the top of my
18   head.
19       After that point, Melissa
20   Meggison, who was in-house counsel for that
21   company and used to work with me, reached
22   out to me to see if I would take over the
23   litigation in that matter.  They were hoping
24   that it would be done with, but the party
25   who won the case below filed an appeal.
```

Johnson - direct

Page 6

1  They thought they could to do better, and so
2  they retained me to represent them in the
3  appeal of that magistrate court ruling.
4      Q.   Okay.  But how much in fees were
5  you paid for that case?
6      A.   And I've got your Notice of
7  Deposition with a list of issues you wanted
8  to cover; I appreciate that because it
9  allowed me to put some of that together.
10      So in the Johnson matter from
11  December 1st, 2018, forward, I was paid
12  $18,464.95.
13      Q.   Can you repeat that number;
14  18,000 --
15      A.   Sure.  $18, 464.95.  That
16  includes fees and costs.
17      Q.   Okay.  And -- and what about
18  from May -- May 1st, 2018 until
19  December 1st, 2018?
20      A.   I -- I -- in November of 2018, I
21  was paid an additional amount of $5,256.49.
22      Q.   Okay.
23      A.   That's the total amount that was
24  paid on that case.
25      Q.   Five thousand -- again, I'm --

Page 7

1  I'm -- can you repeat that number?
2      A.   Sure.  $5,256.49.
3      Q.   Okay.  So the total amount you
4  were paid on that case is 5,256 plus 18,464?
5      A.   Yes.  Plus the change.
6      Q.   Okay.  And were you paid
7  anything in addition to that?
8      A.   No.
9      Q.   Okay.  Okay.  And did you get a
10  judgment against Selwyn Johnson?
11      A.   Yes.  We got a judgment against
12  him both on our underlying claim as well as
13  on his counterclaim.
14      Q.   Okay.  So how much -- what was
15  the judgment that you got?
16      A.   I don't have the exact amount in
17  front of me, but it was $1,800 and some --
18  between eighteen hundred and $1,900, the
19  debt, and I don't -- I don't know the exact
20  number.
21      Q.   What did that number represent?
22      A.   It represented -- to my
23  understanding, it represented medical bills.
24      Q.   I'm sorry?
25      A.   I don't know if I can turn this

Page 8

1  up or not --
2      Q.   No, that wasn't your fault.  I'm
3  pouring -- I'm pouring a cup of coffee while
4  you're talking.  So --
5      A.   All right.  It's my recollection
6  that that was for unpaid medical bills.
7      Q.   Okay.  So would you say that
8  that's consumer debt collection?
9      A.   I don't know.
10      Q.   Unpaid medical bills, do you
11  have any reason to believe that it's not
12  consumer debt collection?
13      A.   I just hadn't done -- I hadn't
14  looked at it, because I didn't really look
15  at it from the standpoint of the consumer
16  debt collection.
17      Q.   Do you have any reason to
18  believe that that was not consumer debt
19  collection?
20      A.   I'm -- I'm just not sure either
21  way, because I don't -- I don't practice in
22  that area generally speaking.  I was
23  retained mostly to handle the -- the
24  counterclaim which they were concerned
25  about.

Page 9

1      Q.   But when you got the -- that he
2  owed the $1,800 and change, that amount
3  represented a debt that he owed to a
4  medical -- for medical services.  Correct?
5      A.   That's my understanding, yes.
6      Q.   Okay.  Now, I went -- I'm going
7  to represent to you that I went on the --
8  some -- some type of court website to
9  look -- to look up your name regarding the
10  lawsuits that -- that you have -- that --
11  that you've been involved in.
12      Do you believe if I -- if I had
13  done that prior to bringing this lawsuit,
14  that that would be a proper investigation as
15  to whether you are a debt collector or not?
16      A.   I think trying to determine
17  whether or not I collected debt before suing
18  me as being a debt collector would be
19  something that would be part of a pretrial
20  or a pre-complaint investigation, yes.
21      Q.   Okay.  Right.  That's not --
22  that's not what I asked.  What I was asking
23  was do you think if I had done an
24  investigation -- I had done an
25  investigation -- that do you think that if I

3 (Pages 6 - 9)

Johnson - direct

1  had done an investigation by looking up the
2  cases that you have been involved in, that
3  would have been sufficient to determine
4  whether you regularly collect debts?
5      A.   I don't know if it was
6  sufficient just looking on a court website.
7  You haven't told me which website or what
8  that website covers.  You haven't identified
9  the particular website, but, certainly, I do
10  think looking at cases that I had filed
11  would be a part of determining whether or
12  not I was a debt collector.  If that's what
13  you're basing my debt collection on?  Yes.
14      Q.   So I got some -- I got some
15  names of -- of cases, and I was just hoping
16  that you could -- you could help me
17  understand whether these are debt collection
18  cases.
19      A.   Okay.
20      Q.   What's this one Giggey -vs-
21  Johnson in Gwinnett State Court.  It's
22  classified as an auto tort.
23      A.   What's the first name?
24      Q.   Giggey, G-i-g-g-e-y.
25      A.   I don't recognize that.

1      Q.   Okay.  Gwinnett State Court.
2      A.   Was that Johnson a defendant in
3  that case?
4      Q.   Yeah.  Yes.
5      A.   And did you think I represented
6  Giggey?
7      Q.   No.  Maybe you represented
8  Johnson.
9      A.   No.  I don't recognize that --
10  that case at all.
11      Q.   Okay.  Okay.  Understand.  I
12  mean, these court records aren't -- aren't
13  perfect as far as identifying -- identifying
14  you.
15      A.   Sure.
16      Q.   And I see something US Secretary
17  of Housing and Urban Development -vs- Betty
18  Blair, and that was -- that looks like a
19  magistrate dispossessory it's classified
20  under.  What -- what is that one about?
21      A.   It's an eviction.  We're not
22  seeking any rent --
23      Q.   I'm sorry?
24      A.   We're not seeking any rent;
25  we're just seeking possession of the

1  property.
2      Q.   Okay.  And what -- what does the
3  case arise from?  Why -- why did that person
4  deserve to be evicted?
5      A.   I believe it's a
6  post-foreclosure matter.
7      Q.   Okay.  And who handled the
8  foreclosure?
9      A.   I'm not -- I'm not sure.  We --
10  I could have handled it along with
11  Jauregui & Lindsey.  They could have handled
12  it.  I don't --I don't remember that on the
13  foreclosure side, but they could have --
14  they could have done the foreclosure.
15      Sometimes we do post-foreclosure
16  evictions where we did not handle the
17  foreclosure.
18      Q.   Okay.
19      A.   I just don't remember on that
20  specific case.
21      Q.   Do you remember a Betty
22  Blair?
23      A.   I remember that name.
24      Q.   Okay.  Do you remember
25  collecting any money from her?

1      A.   I remember not collecting any
2  money from her, if that makes sense.
3      Q.   Okay.
4      A.   We did not attempt to collect
5  any debt or any money from her at all.
6      Q.   Okay.  What, what -- so what
7  happened?  You -- you helped foreclose on
8  her house?
9      A.   I don't recall if we did the
10  foreclosure or not.
11      Q.   Okay.  But you may have; is that
12  right?
13      A.   Sure.  I'm involved in
14  non-judicial foreclosures.
15      Q.   Okay.  So how does the -- how
16  does the -- the none -- the none -- the
17  non-judicial foreclosure work?  Can you tell
18  me a little bit about that as far as how
19  does -- how does a -- how does a -- how does
20  a -- a tenant stop the -- how does a tenant
21  stop a foreclosure?
22      A.   Typically, it's a borrower, not
23  a tenant.
24      Q.   Okay.
25      A.   There's several ways for a

Johnson - direct

1    borrower to stop a foreclosure.  They can
2    pay the debt that's due; that's one way to
3    stop a foreclosure.  They could file
4    bankruptcy; that's another way that would
5    stop a foreclosure.  Sometimes they can seek
6    an injunction to enjoin the foreclosure by
7    filing lawsuit to enjoin the foreclosure.
8            That's the three typical off
9    the top of my head that I could think about.
10       Q.   Okay.
11       A.   Have to do a loan modification
12   or they do a loan workout.  So that would
13   stop a foreclosure, as well.
14       Q.   Okay.  And do you offer that?
15   Do you offer in a -- to the homeowners to --
16   to-- to stop the foreclosure?
17       A.   Typically, that's something
18   between the lender and the borrower.  I
19   don't have any decision-making authority in
20   those matters.  It's something for my client
21   to decide.
22       Q.   I'm not asking about
23   decision-making authority.  I'm asking if
24   you offer that to the people?
25       A.   So I don't know what you mean by

1    offer it.  What I will say is that under
2    Georgia law, I believe we have to provide a
3    name and contact information in the
4    foreclosure ad so that if the borrower wants
5    to seek that, they can reach out directly to
6    someone who has authority.  That's not with
7    my firm, it's usually with the client
8    lender.
9        Q.   Okay.  For example, do you send
10   out letters telling them that -- that
11   they're able to stop the foreclosure in a
12   certain way?
13       A.   It really depends on the client
14   ad.  Some clients wants you to send things,
15   you know, with your foreclosure notices or
16   what have you, but I -- beyond that, I can't
17   really answer your question anymore beyond
18   that.
19       Q.   Okay.  So -- so in the O'Hai
20   case, I hope I'm pronouncing that correctly,
21   O-h- --
22       A.   I think it's pronounced O'Hai.
23       Q.   Okay.  O'Hai.  There was a
24   letter that I found searching through Pacer,
25   and I wanted to know if that is a typical

1    letter that you send to -- to people --
2    people that you're doing a foreclosure on
3    against?
4        A.   I don't have that letter in
5    front of me.  I don't have it memorized.  I
6    don't know.
7        Q.   Is it a typical letter; do you
8    know?
9        A.   I don't have the letter in front
10   of me, I didn't memorize it.  I'm not really
11   sure what that letter says.
12       Q.   Okay.  Do you sometimes send
13   specific letters to -- to people or they're
14   all -- it's all -- is it all a form letter,
15   like a letter provided to you by the client,
16   or do you sometimes send -- do you sometimes
17   send your own letters?
18       A.   So every letter is different,
19   but we try to comply with both any state law
20   or federal laws that we believe apply in
21   providing notices to the borrower.
22           So in -- in most instances,
23   those notices are -- are similar for each
24   borrower, because it's based on either State
25   or Federal law, but there's also differences

1    in each letter.
2            So I would have to look at the
3    specific letter for sure.
4        Q.   Okay.  But you haven't produced
5    any letters; is that right?
6        A.   I produced a lot of things in
7    this case.  I believe I would have produced
8    letters relating to this case.  The O'Hai is
9    a separate case that you're aware of, and
10   we've -- I actually mentioned that case in
11   court Pleadings.
12           So I don't know if I produced
13   anything from the O'Hai case.  In this case,
14   I may have.  I just don't remember.
15       Q.   I'm saying debt collection
16   notices that you sent -- that you sent to --
17   that you sent to borrowers.
18           I'm asking specifically if you
19   produced any debt collection notices that
20   you sent to borrowers in the past three
21   years prior to the filing of this complaint?
22       A.   I don't believe I sent debt
23   collection notices.  The cases I've gotten
24   involved in, I've got involved after they
25   were filed.  If you're referring to

Johnson - direct

Page 18

1 additional foreclosure notices that are
2 required by state and/or federal law, I
3 don't remember you requesting copies of
4 those.
5          And I produced what I produced.
6 I don't remember every page of what I
7 produced, but I believe I produced hundreds
8 of pages of documents to you.
9     Q.   I'm asking specifically about
10 debt collection notices where you asked --
11 where you asked the person either directly
12 or indirectly to pay -- to pay the -- to pay
13 the debt.
14          So, for example, I'm going to
15 represent to you that in the O'Hai letter,
16 you told them we're going to go through with
17 the foreclosure unless you pay this amount,
18 and this is an attempt to collect a debt;
19 you sent such a notice.
20          You didn't produce any of those
21 notices to me, even though you -- you've
22 sent numerous of those -- those notices.
23     A.   I don't know if you're
24 testifying for me or not, but I don't recall
25 you asking me to produce those types of

Page 19

1 letters to you in this case.
2          Are you referring to a specific
3 request? I'm happy to look at it, but I've
4 gotten no letter from you or nothing from
5 you prior to you now asking me questions
6 about it saying that you did not believe
7 that I had produced anything in response to
8 your questions.
9          So I believe I've been fully
10 responsive to all of your requests.
11     Q.   Okay. In your -- in your
12 discovery responses, you say that you -- I'm
13 sorry, it was maybe in your last
14 deposition -- you said you've sent letters
15 similar to the O'Hai letter on numerous
16 occasions; is that right?
17     A.   I'm not sure that letter has my
18 name on it.
19     Q.   Okay. It has -- it has -- it
20 has -- it has -- I think it's Jauregui on
21 the top, and it says this firm along with
22 Larry Johnson is collecting this debt,
23 something -- something along those lines.
24     A.   I don't believe that's my
25 letter. I don't believe I signed that

Page 20

1 letter. I don't believe that letter is
2 actually indicated to be from me.
3     Q.   Okay.
4          MR. WEXLER:  Court reporter, can
5 we take a five-minute break please.
6          (Recess occurred.)
7          MR. WEXLER:  Back on the record.
8     Q.   Okay. We're looking at this --
9 at this letter from Jauregui and Lindsey to
10 O'Hai dated July 17th, 2019?
11     A.   Right.
12     Q.   Can you read the first sentence
13 of the letter, please?
14     A.   Sure. "This law firm, along
15 with Johnson Legal Offices, LLC, represent
16 Park Tree Investments 20, LLC the creditor
17 on the above-referenced loan."
18     Q.   Okay. The next sentence,
19 please?
20     A.   Okay. "This letter is to advise
21 you that we have been retained to collect
22 the loans secured by the above-referenced
23 property, which may involve foreclosure
24 proceedings against said property."
25     Q.   Okay. And your contention is

Page 21

1 that this letter is not an attempt to
2 collect a debt by you?
3     A.   Well, it's not my letter.
4     Q.   That wasn't the question, Mr.
5 Johnson. My question is whether this letter
6 is an attempt to collect a debt by you?
7     A.   It's not, because it's not my
8 letter.
9     Q.   Okay, it's not, because --
10     A.   It's not my letter.
11     Q.   Okay. Did you authorize your
12 name to be used on this letter?
13     A.   I don't recall.
14     Q.   Okay. So you're not sure if
15 Jauregui just put your name -- just put your
16 name on the letter even though you
17 weren't -- you weren't collecting -- you
18 weren't collecting it? You're not sure?
19     A.   Well, like I say, that's not my
20 letter. I think your question was is this
21 letter an attempt by me to collect a debt
22 and it's not, because it's not my letter.
23     Q.   Is the letter an attempt to
24 collect a debt?
25     A.   I do not believe so under the US

6 (Pages 18 - 21)

Johnson - direct

Page 22

1 Supreme Court involving Obduskey. It's a
2 Supreme Court case, O-b-d-u-s-k-e-y, and
3 it's a foreclosure process or non-judicial
4 foreclosure process.
5      Q.   Did you represent Park Tree
6 Investments 20, LLC?
7      A.   I represented them in that
8 litigation.
9      Q.   Okay.  Were you retained to
10 collect the loan?
11     A.   No.
12     Q.   Okay.  The letter says, and you
13 just read, that we have been retained to
14 collect the loan, but you still -- you still
15 contend that you were not retained to
16 collect the loan?
17     A.   So that's not my letter.  We can
18 talk about that again.  So it's not me
19 saying that because it's not my letter.
20     Q.   Okay.
21     A.   However, there was a
22 non-judicial foreclosure that was referred.
23 It was -- it was discussed in the
24 litigation.  We had a whole hearing about
25 whether or not the -- the client could move

Page 23

1 forward with the non-judicial foreclosure,
2 and I do not believe non-judicial
3 foreclosures are the collection of debt
4 under the Obduskey case, which is a US
5 Supreme Court case.
6      Q.   The question is whether you were
7 retained to collect the loan or not.
8      A.   No, I wasn't.
9      Q.   Okay.  And though you
10 acknowledge that the letter actually says
11 this letter is to advise you that we have
12 been retained to collect the loan, you're
13 aware of that?
14     A.   That's not my letter.
15     Q.   Okay.  Did you ever protest with
16 Jauregui & Lindsey to tell them that this is
17 not your letter?  Did you ever tell them
18 that, not to include you on any future
19 letters?
20     A.   Not that I recall.
21     Q.   Okay.  Is there any other
22 indication besides -- besides your statement
23 that you were not retained to collect the
24 loan which would indicate that you were not
25 actually retained to collect the loan; is

Page 24

1 there anything -- is there anything to
2 indicate that -- that what you're saying
3 is -- is correct?
4      A.   Sure.  We have an entire federal
5 lawsuit that's still pending between my
6 client and O'Hai.  So the entire record in
7 that case, I think, is pretty evident.
8           There's no claim against
9 Mr. O'Hai for the debt in that case; and I
10 think if you look through the case, you will
11 see over and over again that that case is
12 not attempting to collect the debt.
13     Q.   I'm not saying that that case is
14 an attempt to collect the debt.  My question
15 is specifically whether you were retained to
16 collect the loan to O'Hai.
17     A.   No.
18     Q.   Okay.  Do you have anything to
19 indicate that that's true other than you
20 saying today that it's not true?  Is there
21 anything to indicate that what you're saying
22 is accurate?
23     A.   The entire record in the federal
24 case.
25     Q.   Is there anything in the record

Page 25

1 in the federal case which says that you are
2 not collecting -- you are not retained to
3 collect O'Hai's loan?
4      A.   I don't recall.
5      Q.   What indication do you have
6 other than you saying that you are not
7 retained to collect O'Hai's loan?  Is there
8 other than what your -- other than you
9 saying that you are not retained to collect
10 the loan?
11     A.   The entire record in the O'Hai
12 federal case is an indication that I was not
13 retained to collect the loan.
14     Q.   Okay, but what -- which -- what
15 part of that -- of that case demonstrates
16 that you are not retained to collect that
17 loan?
18     A.   Every Pleading that we filed, as
19 well as the transcript that was filed in the
20 case, because we actually had a hearing in
21 that matter.  Everything in that case.
22     Q.   So can you point to your best --
23 your best evidence that you were not
24 retained to collect the debt -- to collect
25 O'Hai's debt?  What's your best piece of --

Johnson - direct

1    of -- of evidence?
2         A.   I don't know.
3         Q.   Do you believe that the entire
4    O'Hai record demonstrates that you are not
5    retained to collect O'Hai's debt?
6         A.   Correct.
7         Q.   Which part of the O'Hai record
8    demonstrates that you were not retained to
9    collect O'Hai's debt?
10        A.   The entire record.
11        Q.   Okay. Can you point -- can you
12   explain to me how -- how the O'Hai record
13   demonstrates that you were not retained to
14   collect the debt? Was the O'Hai matter
15   involving whether you were retained to
16   collect the debt? Was that an issue of
17   contention in the O'Hai case?
18        A.   Well, you know, I don't really
19   understand your question. I represented the
20   lender in that case, and representing a
21   lender sometimes plaintiffs' lawyers, like
22   yourself, will accuse other people of trying
23   to collect a debt or the FDCPA. And so the
24   entire record shows that I was not doing
25   that in that matter.

1         So you're asking me to prove a
2    negative. If you got a document from me --
3    that's a very extensive file. It takes up
4    almost an entire file cabinet drawer in my
5    office.
6         So, you know, the entire case
7    shows that I'm not doing it. So I don't
8    really know how to answer your question
9    beyond that.
10        Q.   But I'm asking a very specific
11   question. I -- this letter seems to
12   indicate that you were retained by Park Tree
13   Investments 20, LLC to collect O'Hai's loan,
14   and you're saying that that's not true, and
15   I'm asking you what -- why is that not true?
16   So you're saying the letter is not true?
17        A.   I didn't say that. I just said
18   it's not my letter.
19        Q.   Okay. But is the letter -- were
20   you retained to collect O'Hai's loan?
21        A.   No.
22        Q.   Okay. What were you retained by
23   Park Tree Investments 20, LLC to do?
24        A.   To defend that federal lawsuit
25   brought by Mr. O'Hai, the borrower.

1         Q.   So you were retained by Park
2    Tree Investments 20, LLC to defend the
3    federal lawsuit brought by O'Hai?
4         A.   Yes. That case is still
5    ongoing, and I still represent them in that
6    case.
7         Q.   You also represent FCI Lender
8    Services in that case?
9         A.   That's correct.
10        Q.   As well as -- as well as
11   Jauregui?
12        A.   Jauregui & Lindsey is how they
13   pronounce it. I know it's a difficult name.
14        Q.   Okay.
15        A.   I think I also represent an
16   individual named Dean in that case. I
17   forget his last name.
18        Q.   Okay. The federal lawsuit
19   appears to have been filed in May 2020.
20   Does that sound right to you?
21        A.   I don't have it in front of me,
22   but that sounds -- that sounds like it could
23   be correct.
24        Q.   Okay. Now, this letter that --
25   this letter, this July 17th, 2019 letter to

1    O'Hai from Jauregui is dated July 17th,
2    2019. That's about eight or nine months
3    before he actually brought the lawsuit.
4         So at that point, you were not
5    representing Park Tree Investments 20, LLC?
6         A.   I don't remember the dates. I
7    just don't have the dates in front of me.
8         Q.   Okay. I'm looking at this
9    July 17th, 2019, letter, and it says that
10   you -- you represent Park Tree Investments
11   20, LLC.
12        A.   Well, it's not my letter. We
13   talked about that letter a lot already. So
14   I'm familiar with what letter you're talking
15   about.
16        Q.   And what did you do for Park
17   Tree Investments 20, LLC?
18        A.   I don't recall. What I do know
19   is they hired me, and I defended them in
20   that federal lawsuit.
21        Q.   What did you do -- what did you
22   do for them prior to that?
23        A.   I don't remember the dates of
24   those. I mean, there was a foreclosure sale
25   that occurred with the federal court's

Johnson - direct

Page 30

1  permission after they -- the TRO was --
2  after the plaintiff tried to seek a TRO from
3  the judge and the judge denied it, and there
4  was a foreclosure sale that occurred; but
5  once again, it's my position that a
6  non-judicial foreclosure sale is not the
7  collection of a debt under the Obduskey
8  case.
9      Q.  Okay.  You didn't really answer
10 my question.  My question was:  On
11 July 17th, 2019, what were you doing for
12 Park Tree Investments 20, LLC?
13     A.  I don't remember.
14     Q.  Were you representing them on
15 July 17th, 2019?
16     A.  That was almost three years ago
17 now, and I just don't remember the timing.
18     Q.  Do you have any reason to
19 believe that you were not representing Park
20 Tree Investments 20, LLC before you brought
21 the -- before O'Hai brought the federal
22 lawsuit?
23     A.  Could you -- could you ask that
24 question again?
25     Q.  Sure.  Do you have any reason to

Page 31

1  believe that you were not representing Park
2  Tree Investments 20, LLC before O'Hai
3  brought his federal lawsuit?
4      A.  I don't remember.
5      Q.  Do you have any reasons to
6  believe that you were not representing Park
7  Tree Investments 20, LLC before O'Hai
8  brought his federal lawsuit?
9      A.  I don't know.
10     Q.  I asked you do you have any
11 reason to believe.  So it's a "yes" or "no"
12 question.  Do you -- do you -- do you think
13 this letter is false, this July 17th, 2019
14 letter is false that -- that you were --
15 that you were retained to collect O'Hai's
16 loan?
17     A.  I don't know.  Sometimes dates
18 on letters aren't accurate.  I don't know if
19 that one is or if it isn't so I just don't
20 know.
21     Q.  What would be a reason why it on
22 would -- why you would think that it might
23 be false?
24     A.  I've seen letters sometimes when
25 people generate them, and they forget to put

Page 32

1  on the auto date.  So it actually includes a
2  date that's a prior date.  Sometimes by
3  months, sometimes even the year is wrong.
4      So based on me having seen that
5  in the past and without me actually
6  investigating, that wasn't one of the topics
7  you listed you wanted to cover.  Although,
8  certainly I can, but I did not look at the
9  O'Hai case or the O'Hai file in preparation
10 of this deposition, and you didn't ask me to
11 do that, and so I'm just going based on my
12 recollection, and I don't really remember.
13 I mean, it's several years ago.  So I just
14 don't remember the timing.
15     Q.  Do you have -- is there -- is
16 there anything that leads you to believe
17 that you -- you were not retained to collect
18 O'Hai's loan by Park Tree Investments 20,
19 LLC?
20     A.  I've never done anything to
21 collect the loan on their behalf that I can
22 recall on that case or any other case so...
23     Q.  So that's your only indication
24 that you were not actually retained to
25 collect the loan?

Page 33

1      A.  Yeah, the fact that I do not
2  recall ever being retained by Park Tree
3  Investments 20 to collect any loan, the loan
4  involving O'Hai or any other loan.
5      Q.  All right.  But you were
6  retained by Jauregui to collect the Park
7  Tree Investments 20, LLC loan; isn't that
8  right?
9      A.  No.
10     Q.  Do you have any deal with
11 Jauregui to collect the -- to collect the
12 Park Tree Investments 20, LLC loan?
13     A.  So I'm not sure I understand the
14 question.  I provided you my "of counsel,"
15 agreement with them.
16     So when we do legal work, we
17 have an agreement on how to handle that
18 legal work, but Park Tree would be -- would
19 be the client.  They would have to hire us
20 to do the work.  So I'm not exactly sure I
21 understand the question, and to the extent
22 we have an agreement, we have that "Of
23 Counsel" agreement that we produced to you
24 that explains our agreement.
25     Q.  And is that "Of Counsel"

9 (Pages 30 - 33)

Johnson - direct

Page 34

1   agreement that you provided -- is that
2   accurate?
3        A.   Is it accurate?
4        Q.   The one that I filed with -- the
5   one that I filed -- the one that I filed in
6   opposition to your Summary Judgment, and you
7   made a Motion to strike saying that it
8   wasn't -- it wasn't admissible.
9            So I'm asking you if that -- if
10  that actually is a true -- it's a true --
11  it's -- it's the agreement that you have
12  with them?
13       A.   So what I'll say, because I
14  don't remember what was attached and if it
15  had something -- if it had other markings on
16  it that weren't the ones I produced, but the
17  ones I produced to you I believe was an
18  accurate copy of the agreement.
19       Q.   Okay.  So -- so I think you said
20  that you did review my deposition notice,
21  and one of the topics on the deposition
22  notice was whether certain -- whether
23  certain exhibits were accurate, and I
24  attached -- I attached -- I asked you the
25  genuineness and authenticity of the

Page 35

1   documents represented by -- by -- certain
2   filings with the court, and you didn't look
3   those over?
4        A.   I did.
5        Q.   Okay.  So did you see an "Of
6   Counsel" agreement in one of those?
7        A.   I don't remember.  You want to
8   direct me to it?  I'll be happy to look in
9   my file.
10       Q.   Sure.
11       A.   I mean that -- since you did
12  list it on that notice, I do have it in
13  front of me.  Which one are you referring
14  to?
15       Q.   Okay.  74-19?
16       A.   Okay.  7419.
17       Q.   Yeah.
18       A.   Okay.  I'm there.
19       Q.   So is that an accurate -- is
20  that an accurate "Of Counsel" agreement?  Is
21  that the one you had with them?
22       A.   It appears to be the case;
23  although, this particular one is not signed
24  by Jauregui & Lindsey.
25       Q.   Okay.  Is that the one you

Page 36

1   provided to me?
2        A.   I don't recall.  Probably.
3        Q.   Okay.  Did you have any talks
4   with Jauregui before -- before that
5   agreement was signed?
6        A.   Yes.
7        Q.   Did you negotiate that
8   agreement?
9        A.   Yes, we discussed it.
10       Q.   Okay.  Do you know if there's an
11  actual signature from Jauregui somewhere?
12       A.   There is.
13       Q.   Okay.  Do you know why you
14  didn't produce that one to me?
15       A.   I wouldn't have had it in my
16  file.
17       Q.   Okay.  But it's the same one?
18       A.   Yes.
19       Q.   Okay.  It's the same one?
20       A.   Yes.
21       Q.   So that's an accurate -- that's
22  an accurate one?
23       A.   Yes, except it's not the one
24  with his actual signature on it.
25       Q.   And now can we look at 74-16.

Page 37

1        A.   Okay.
2        Q.   Those are various checks that
3   you received.  Are those accurate?
4        A.   Let's see.  It appears to be
5   seven check copies or copies of seven
6   checks.  They appear to be accurate to me.
7        Q.   Okay.  Have you gotten more
8   checks since the last one?
9        A.   I'm sure that I have.
10       Q.   Okay.  Have you produced those
11  to me?
12       A.   I don't recall.
13       Q.   Okay.  I'm going to represent
14  that you have not produced -- you have not
15  produced them to me.
16           Can you make a commitment to
17  produce them to me, let's say, by the end of
18  this week?  I guess it's -- is it Thursday?
19  Yeah, it's Thursday.
20       A.   I'll get them to you.  I should
21  be able to get them to you before I leave
22  tomorrow.  I have a couple of deadlines I'm
23  working on so it might be the first of next
24  week.
25       Q.   Okay.  Are you being paid to

10 (Pages 34 - 37)

Johnson - direct

Page 38

1  defend this federal lawsuit against --
2  against you and your law firm?  Is anybody
3  paying you to defend the lawsuit?
4       A.   Are you talking about the one
5  that you brought?
6       Q.   Yes.
7       A.   I'm not being paid, no.
8       Q.   Okay.  So we're on -- back to
9  here.  We have Betty Blair, and then we have
10  Yates -vs- Lunsford?
11      A.   Uh-huh.
12      Q.   What's that one about?
13      A.   I represent the defendant.  The
14  plaintiff was a prior tenant of his who is
15  basically suing him for, like, mold.
16      Q.   Okay.  And do you -- do you have
17  an approximate amount that you were paid for
18  that case?
19      A.   No.
20      Q.   Okay.  Do you have an
21  approximate amount you were paid for the
22  Betty Blair case?
23      A.   No, I don't -- I think that case
24  is still ongoing, and, typically, there's no
25  payment made until the case is over, I

Page 39

1  believe.
2       Q.   Smith -vs- Fidelity Brokerage
3  Services Delaware?
4       A.   Yes.
5       Q.   What's that one about?
6       A.   That was my brother's widow.
7  Her name is Pam Smith, and she had a prior
8  husband who had who had a brokerage -- with
9  Fidelity, and she was listed as -- as the
10  sole beneficiary, but they refused to pay
11  her.  So that was a lawsuit against Fidelity
12  for them to pay her.
13      Q.   Okay.  How much were you paid
14  after that one?
15      A.   You know, I don't remember if I
16  was paid anything, to be honest.  It was my
17  brother's widow, and I was trying to help
18  her.  I don't recall being paid any fee on
19  that one.
20      Q.   State -vs- Kristin Callahan?
21      A.   Sure.  That was a friend of the
22  family who was charged with a DUI.  I don't
23  generally do criminal defense work.
24      Q.   Okay.
25      A.   But because she was a friend

Page 40

1  of the family, I assisted her in that
2  matter.
3       Q.   And how much did you get paid
4  for that one?
5       A.   Nothing.
6       Q.   Secretary of Housing and Urban
7  Development -vs-, I hope I'm pronouncing
8  this correctly, Virgilia Perryman [ph]?
9       A.   Yes, I'm familiar with that.
10      Q.   Okay.  What's that one about?
11      A.   That's a post-foreclosure
12  eviction.
13      Q.   Okay.  What was your involvement
14  in that case?
15      A.   I represented HUD, I just call
16  them HUD as a short, as the owner and
17  seeking possession of the property.
18      Q.   Okay.
19      A.   Seeking --
20      Q.   I'm sorry?
21      A.   Seeking only possession of the
22  property.
23      Q.   Okay.  Did you -- did you
24  represent them on the foreclosure?
25      A.   I don't recall.

Page 41

1       Q.   Okay.  And how much were you
2  paid for that one?
3       A.   It's still pending.
4       Q.   So you weren't paid?
5       A.   To my knowledge, there's been no
6  payment made.  Right.
7       Q.   Okay.  So HUD -vs- Marion
8  Wilhoyt [ph], does that --
9       A.   That rings a bell.
10      Q.   Okay.  What's that one about?
11      A.   That would be a post-foreclosure
12  eviction.
13      Q.   Okay.  And have you been paid on
14  that one?
15      A.   I don't -- I just don't know.
16      Q.   Okay.  And did you represent HUD
17  on the foreclosure?
18      A.   I don't recall representing HUD
19  on the foreclosure.
20      Q.   Would it have been HUD who did
21  the foreclosure or is it a different entity?
22      A.   You know, that's a great
23  question.  It could have been a different
24  entity, because they typically will transfer
25  the HUD after the foreclosure.  Most of

Johnson - direct

1    those cases, we do not do the foreclosure,
2    but we do the eviction in most of the cases.
3        Q.    Okay.  How much are you paid on
4    that for doing an eviction, or is it an
5    hourly rate or it's by --
6        A.    I believe it's like a flat fee,
7    and I don't remember what that number is.
8        Q.    Okay.  Regardless of how long
9    the case lasts?
10       A.    Typically, that's true;
11   although, sometimes you can ask for more
12   money if it becomes fairly contentious, but
13   most of the time they're not.  So, again,
14   you can get more than a flat fee in some
15   instances.  I don't recall ever getting more
16   than a flat fee in a HUD case.
17       Q.    And then we have US Bank Trust
18   -vs- Ricky Blant.  Do you remember that one?
19       A.    That sounds familiar.  I don't
20   recall what that case is about.
21       Q.    It has it under the category of
22   dispossessory, possession only.
23       A.    That's right.
24       Q.    Okay.  So that would be -- what
25   is it?

1        A.    That would be a pose foreclosure
2    eviction where he sought possession only and
3    no -- no money for rent or -- we didn't seek
4    any money for judgment against them.
5        Q.    Okay.  Is that one over?
6        A.    You know, I do recall the name
7    and I do believe it's finished.
8        Q.    Okay.  And that's in Spalding,
9    and did you represent them on the
10   foreclosure?
11       A.    I just don't recall.  We get --
12   we get some eviction referrals.  We don't do
13   the -- we do the foreclosures.  I just don't
14   recall if we represented them in a
15   foreclosure or not.
16       Q.    I may have said this one before,
17   Virgilia Perryman?
18       A.    Yeah, you did mention that one
19   before; it's still pending.
20       Q.    That's HUD.  Okay.  And then US
21   -vs- Ricky Bland.  US Bank Trust -vs-
22   Cassandra Dustin, does that one --
23       A.    Yes, that rings a bell.
24       Q.    Okay.  What's that one?  What's
25   that one about?

1        A.    That's a pose foreclosure
2    eviction where there was no money judgment
3    sought.
4        Q.    And is that one over with?
5        A.    It is.
6        Q.    Okay.  Do you know how much you
7    got paid?
8        A.    I don't.
9        Q.    And how do you get an expertise
10   in this post-foreclosures evictions?
11       A.    Experience.
12       Q.    HUD -vs- Velma White.  What's
13   that one about?
14       A.    You know, that one doesn't sound
15   familiar, that name.  I mean, it's -- it
16   could be one that I handled.  I just don't
17   recall the name.
18       Q.    Okay.  And then Guild Mortgage
19   -vs- Larry Johnson?
20       A.    Uh-huh.
21       Q.    What's that one about?  It's
22   under injunction.
23       A.    Yeah, it's -- it's -- it's -- I
24   don't remember them suing me.  I think it
25   was me suing them.

1        Q.    Okay.
2        A.    And it related to -- it related
3    to legal fees.
4        Q.    Okay.  Legal fees for what?
5        A.    For doing legal work.
6        Q.    What type of legal work?
7        A.    I don't recall the exact cases
8    that were handled.  I just don't remember.
9    They're not a big client.  I don't -- I
10   don't remember.
11       Q.    Are they still a client?
12       A.    I don't do any work for them,
13   but I mean I haven't officially been like
14   terminated as an attorney, but just don't do
15   any work for them.
16       Q.    Okay.  So you were involved in
17   this.  What type of work did you do for them
18   in the past?
19       A.    Probably would have been
20   non-judicial foreclosures, maybe some
21   evictions.  It's typically what we do for
22   the mortgage companies.
23       Q.    Teresa Halt -vs- Tamika Davis?
24       A.    That is a case where I represent
25   a purchaser in a foreclosure sale, and there

12 (Pages 42 - 45)

Johnson - direct

Page 46

1   was a lawsuit filed basically by the
2   daughter of the borrower against a financial
3   advisor for her mom who I believe her mom
4   was deceased, and that's still an ongoing
5   case, and I'm still technically representing
6   my client in that case, but it was tendered
7   to some title insurance companies who have
8   taken over the handling of that case.  So
9   that's my overall recollection in that case.
10      Q.   How much were you paid on that
11  case?
12      A.   I don't know.
13      Q.   Okay.  But you were paid?
14      A.   I was paid some amount, yes.
15      Q.   Okay.  KG USA, Inc. -vs- Kim?
16      A.   So I believe it's Mr. Kim and
17  his wife and they were either employees or
18  officers or executives with KG USA.  So my
19  recollection is that they have some --
20  absconded with some money and something like
21  that, and they were trying to -- to address
22  that.  It had to do with some cranes.  I
23  believe there were cranes in Mexico that
24  were part of the KG USA Company.  It's a
25  Korean company.

Page 47

1       Q.   Okay.  USA -- US Bank Trust -vs-
2   Tracy Gray and William Gray?
3       A.   I mean I don't remember that.
4   It's like a White case; now we have a Gray
5   case.  It's just names I don't recall.  If I
6   was involved, it was probably a non-judicial
7   foreclosure eviction after a non-judicial
8   foreclosure where we did not seek rent, but
9   I don't have a recollection specifically of
10  that name.
11      Q.   Okay.  These are the lawsuits
12  that I was able to find in the past -- in
13  the past three or so years.  Am I missing
14  any?
15      A.   Maybe.
16      Q.   Do you know -- do you know which
17  ones?
18      A.   I don't have a list, but in the
19  past three years, I would be surprised if I
20  didn't have more.  I don't know -- what
21  system did you look at?  Was that the
22  Odyssey system?
23      Q.   The Odyssey system, yes.
24      A.   So there's some matters on Peach
25  Court as, you know, and there's some matters

Page 48

1   in Henry County that I handled.  The
2   specific one off the top of my head was by a
3   church called Turning Point Church.  They
4   hired my client to -- not really renovate,
5   but add another building and attach it;
6   renovate the whole part and also build a new
7   part.
8        They had a dispute about a
9   construction relating to the church, and I
10  defended the -- the construction company.
11      Q.   Okay.
12      A.   And we resolved that, and he's
13  actually retained me, and I sued a couple of
14  his subcontractors based on some of the
15  allegations that were made in the underlying
16  case.
17       He sued some of the
18  subcontractors under theories of, like,
19  negligent construction, and things like
20  that.
21      Q.   So how much were you paid for
22  that case?
23      A.   I don't recall.  That's still
24  ongoing.  That's a still ongoing matter.
25  Yeah, that's -- yeah, still ongoing.

Page 49

1       Q.   So a few cases in Henry County,
2   and you can't name any other one other than
3   the Turning Point Church; is that right?
4       A.   The Turning Point Church, plus
5   he sued one of the other subcontractors.  It
6   was called Queen Capital.  It was, I
7   believe, like a plumbing -- I'm sorry -- it
8   was an electrician, but we made a demand but
9   haven't sued another guy who did some of the
10  walls.  So we haven't sued him yet, and I
11  have some personal injury matters that you
12  didn't mention that I've -- that I'm
13  involved in.  One of those is in Clayton
14  County, so I'm surprised you didn't see that
15  one.
16      Q.   Okay.
17      A.   Kristin Harden and her -- she
18  has a four-year old daughter and they were
19  involved in a car wreck, and that's all I
20  can think of off the top of my head.
21      Q.   Okay.  Of all the litigation
22  relating to that Turning Point Church case,
23  would you say you were paid over $100,000 in
24  legal fees on that one?
25      A.   No.

13 (Pages 46 - 49)

Johnson - direct

Page 50

1    Q.    Fifty thousand?
2    A.    No.
3    Q.    Is a fair estimate 20,000?
4    A.    It could have been in that -- in
5    that -- it wasn't 50; it was less than 50.
6    It could have been around in the 20,000
7    range for that.
8    Q.    Okay.  So we have personal
9    injury in Clayton, the car wreck.  That's
10    ongoing?
11    A.    Yes.
12    Q.    And I assume that's a
13    contingency case?
14    A.    Yes.
15    Q.    Are you the defendant or --
16    A.    Plaintiff.
17    Q.    Okay.  Okay.  Any other -- any
18    other cases?
19    A.    Well, you know, I was involved
20    in a case personally against my prior
21    employer who was RCO Legal.  So I had an
22    arbitration against them under my employment
23    agreement.  That was in Seattle.
24    Q.    Right.
25    A.    And we wound up getting an

Page 51

1    arbitration award that we then had to file
2    something in federal court, they had that
3    award and a judgment --
4    Q.    Right.
5    A.    That was something I also sued
6    them for slander in DeKalb County, and that
7    was -- that was -- that has been resolved.
8    Q.    Okay.
9    A.    You asked me for the last three
10    years.  So I'm just trying to answer --
11    Q.    Okay.
12    A.    I'm surprised you didn't see
13    that one, too --
14    Q.    No, that one -- that one I
15    actually -- I actually saw.  I didn't -- I
16    didn't -- I didn't classify you as counsel.
17    That was -- that was -- okay?
18    A.    I was counsel in that one, and I
19    initially brought that lawsuit.  I actually
20    was counsel for the first year or so.
21    Q.    Okay.
22    A.    And then brought in co-counsel.
23    But I was definitely counsel and I remained
24    counsel in that case.
25    Q.    Okay.  You got over $800,000

Page 52

1    from that case?
2    A.    From that case?
3    Q.    Yeah, from the judgment in
4    federal court that you had against Wells
5    Fargo?
6    A.    So, yeah, that was -- I believe
7    the arbitration award in that case was over
8    800,000, yes.
9    Q.    Okay.
10    A.    You know, I'm trying to remember
11    exactly what I got, because -- because it
12    was a lot of stuff going on then.
13    Q.    Okay.
14    A.    You know, so, yeah, it was an
15    award, and I got a good bit of it.
16    Q.    And what was the award for?
17    A.    It was for wrongful -- for
18    violating the terms of my employment
19    agreement.
20    Q.    Oh, wow.  Okay.  There wasn't
21    any debt collection fees.  Correct?
22    A.    No.
23    Q.    Okay.  Any other -- any other
24    cases that you could think of?
25    A.    Yeah, you didn't -- you

Page 53

1    didn't -- I mean you didn't mention the case
2    that's going on with the case --
3    Q.    Cordtz?  Okay.  Okay.
4    A.    They sued my client.  I got
5    involved in it later in the case to defend
6    the case and then ultimately we did file a
7    counterclaim in that case.  You didn't
8    mention the other slander case that I filed
9    against you guys.
10    Q.    Right.
11    A.    So that's another case that is
12    pending.
13    Q.    But you haven't been paid any
14    legal fees on that one?
15    A.    No.
16    Q.    Okay.
17    A.    That's all I can think of right
18    now.  I mean I'm trying to answer fully, but
19    that's all I can think of right now.
20    Q.    Okay.  Do you remember any cases
21    that you worked on this week, this week with
22    your law firm that were not one of the --
23    one of these -- one of these cases listed
24    that we went over that we mentioned --
25    A.    Let's see.  So the personal

14 (Pages 50 - 53)

Johnson - direct

1 injury cases, I've done some work this week.
2 I also have another case that you didn't
3 mention was -- was the 575 Boulevard case,
4 and that is actually -- there's been a Writ
5 of Certiorari by the other -- or an
6 application for a Writ of Certiorari in the
7 Georgia Supreme Court.
8    Q.   Okay.
9    A.   I've talked to my client some on
10 that this week. I've worked on that --
11    Q.   What's that case about?
12    A.   My client owns a church that was
13 converted into offices.
14    Q.   Okay.
15    A.   This particular tenant rented
16 the auditorium space part of the church, and
17 he's been trying to get him out of that
18 space for a couple of years now.
19    Q.   Wow. Okay.
20    A.   So he initially filed pro se and
21 won at the magistrate court level. The
22 other side appealed to the Fulton Superior
23 Court. So since it's a company, he had to
24 hire an attorney. We actually had a one-day
25 trial in that case which we won. The other

1 side directly appealed it, and we filed a
2 Motion to dismiss because it had already
3 been appealed once. They didn't do it
4 correctly. The Court of Appeals dismissed
5 it and they have now filed for an
6 application for a Writ of Certiorari with
7 the Georgia Supreme Court to try to squeeze
8 some more time-out of -- you know, out of
9 their possession of this property.
10    Q.   Okay.
11    A.   There's been a couple of things
12 filed this week in the O'Hai case that I had
13 to look at.
14    Q.   How much were you -- have you
15 been paid in the O'Hai case, would you say?
16    A.   Yes.
17    Q.   How much?
18    A.   I don't -- you know, that case
19 has been around awhile. I don't really know
20 how much.
21    Q.   Okay. Okay. So would you say
22 for the entire year of 2000 -- 2021, your
23 grows -- your gross legal fees were about
24 $75,000; is that fair?
25    A.   Sorry?

1    Q.   Your gross legal fees in the
2 year 2021 that you received, were they
3 $75,000?
4    A.   No.
5    Q.   How much, were they?
6    A.   So I looked -- because this is
7 one of the topics you wanted to cover, and I
8 looked -- actually the last 18 months is the
9 way I did it. So it would be this week, go
10 back 18 months, and I show that I had a
11 $1,040,819.30, and that was over an 18-month
12 period.
13    Q.   Okay. And does that include
14 the -- the -- the western -- the Washington
15 RCO -- the RCO award, the million 40?
16    A.   It doesn't include the award,
17 but there were fees that were -- that were
18 actually included in that award.
19    Q.   Okay. It doesn't include. So I
20 don't see how, you know, the cases we went
21 over, I don't see -- could you tell me a
22 little bit about that composition of the
23 million dollars over the last 18 months?
24    A.   Yeah. It was mostly for
25 litigation. I have some contingency fee

1 cases that have done well, and then I have
2 hourly cases that, obviously, I do, as well.
3 So it's -- it's mostly for litigation fees.
4    Q.   Which litigation?
5    A.   So defending clients like I
6 mentioned, you know, in all the cases where
7 I'm defending the clients.
8    Q.   Which -- which specific case?
9 Can you talk about which specific case would
10 you say you earned the most fees in the last
11 18 months? What's the biggest number of
12 that?
13    A.   I don't know, because I have,
14 you know, I have many cases that I handled
15 over the last 18 months, and so I --
16 certainly, some of the cases involving, for
17 instance, O'Hai is a case that I've been
18 paid, you know, well on. I don't know how
19 much because I didn't look at this, you
20 know, as far as related to all the other
21 specific cases where I've been paid, but
22 that one has been one.
23        The one involving the church was
24 a decent one.
25        Some of the personal injury

15 (Pages 54 - 57)

Johnson - direct

1    cases that I've gotten, you know --
2        Q.   Could you -- could you talk
3    about specifics?  So O'Hai, 250,000, you got
4    from O'Hai?  Is that fair to say?
5        A.   I don't know how much I've
6    gotten from O'Hai.
7        Q.   Okay.  So we've done -- I don't
8    know.  We have -- I think you mentioned
9    three or four cases that you actually got
10   paid on in the last 18 months, and I'm just
11   trying to figure out how that adds up to a
12   million dollars, because I want to find out,
13   you know, I really -- the real question is
14   debt collection; how much of your practice
15   does it make up, and, you know, compared to
16   the rest of your practice, and I'm trying to
17   find some context here to see what debt
18   collection is -- how much of that million
19   dollars is not debt collection because you
20   haven't told me -- you haven't told me
21   anything other than you earned -- from the
22   relationship with Jauregui, what was it
23   40,000, and from Home Mortgage, over a
24   hundred thousand.
25           So I'm just trying to find out

1    what the other $850,000 is.  You know, part
2    of that 18 months, it probably doesn't even
3    include that.  So I'm just trying to figure
4    out is it ten percent, is it 50 percent?  Is
5    it 75 percent?  You contend it's two
6    percent.  So I'm just trying to figure this
7    out.  So I'm asking you for help.
8        A.   Sure.  So I didn't -- I didn't
9    go and get that number by looking at the
10   cases and where they came from.
11           What I did was I bank with Wells
12   Fargo bank, and I went and looked at all of
13   the deposits and I came up with that number.
14           So I can't tell you where --
15   exactly where it all came from, because I
16   handle hundreds of cases and some generate
17   more than others, but, you know, --
18       Q.   Wait.  You handle hundreds of
19   cases?  I thought we just went through all
20   of them that you've handled --
21       A.   No --
22       Q.   That was about ten.
23       A.   No, what you did is you asked me
24   questions about the cases that were active I
25   believe is the way you described it, and

1    I've tried to explain to you cases that were
2    active.
3            So you talked about the last
4    three years.  Those are not all of the cases
5    that I handled in the last three years.  I
6    also had a five-year, you know, analysis in
7    this case, because I'm not really sure what
8    time frame that is, but certainly in the
9    last five years, I've handled hundreds of
10   cases --
11       Q.   We're talking -- so 18 months,
12   you have a million -- you have a million
13   dollars.
14       A.   Uh-huh.
15       Q.   Where -- where is that -- which
16   case is that?  Which cases is that from?  Do
17   you not know?
18       A.   I don't know specifically off
19   the top of my head, because I've handled a
20   lot of different cases that make up that
21   number.
22       Q.   Okay.  Did we miss any -- were
23   any of the cases that we mentioned --
24   scratch that.
25           Are there any other cases that

1    you could name that caused you to reach this
2    million and 40,000 over 18 months other than
3    the ones we -- we went through?
4        A.   That's all I recall right now
5    sitting here today.  A lot of them you asked
6    me what I made and I said I just didn't
7    know.  So, you know, for you to say it's
8    only been 75,000 or whatever is not
9    accurate.
10           I just don't know how much I
11   made on any specific cases or particular
12   cases, and the way I got that number is I
13   went to the bank.  So I only went back to
14   18 months.  You got to pay them a bunch of
15   money to go beyond 18 months.
16           So in preparing for this
17   deposition, I went and looked and that's the
18   number that indicated being deposited
19   relating to fees.  That's where I came up
20   with a number.  I didn't do a whole
21   breakdown of analysis of it.
22       Q.   Okay.  But you don't know where
23   those fees came from?
24       A.   My legal work.
25       Q.   Which?  For what -- is some of

16 (Pages 58 - 61)

Johnson - direct

Page 62

1     that for debt collection?
2          A.   No.  The only two matters that I
3     identified is the Cordtz matter, and I've
4     given you those checks, and I'll give you
5     the rest of the checks today or tomorrow,
6     hopefully, and the Johnson case which I
7     already gave you the number.
8               Those are the only two that I
9     was hired for.  Well, in the Cordtz case,
10    there was no claim -- there was no debt
11    collection a case claimed when I was brought
12    on and entered an appearance in that case
13    and the other case, the Johnson case.
14              Those are the only two instances
15    that I'm aware that could be argued that
16    there was a debt collection aspect, a
17    consumer debt --
18         Q.   So you -- your contention is
19    that non-judicial foreclosure cannot be --
20    is not debt collection?  I don't have a fair
21    contention?  So you're ignoring any -- any
22    income you've earned from non-judicial
23    foreclosure?  You're not including that in
24    -- how much income from non-judicial
25    foreclosure in the past 18 months would you

Page 63

1     say you have?
2          A.   I don't know.  Not a lot.  But I
3     don't know the exact number.
4          Q.   Okay.  But you said it was less
5     than two percent?  You said -- do you
6     believe that that is debt collection when you
7     engage in non-judicial foreclosure?
8          A.   You know, I've said it several
9     times, but I'm happy to say it again.  In
10    reading the Obduskey US Supreme Court case,
11    I do not believe that's part of consumer
12    debt collection under the decision in that
13    case, and it's been followed at least twice
14    that I'm aware of in Georgia and to the same
15    conclusion.
16         Q.   Do you believe that I believe
17    that non-judicial foreclosure is debt
18    collection?
19         A.   I don't know.
20         Q.   Okay.  I do believe that
21    non-judicial foreclosure is debt collection.
22    Are you -- are you just not telling me about
23    non-judicial -- your non-judicial
24    foreclosure activities because you don't
25    think it's relevant?

Page 64

1          A.   No, I've told you -- I've told
2     you about them.  For instance, we talked
3     about O'Hai.  So I'm not really sure what
4     you're talking about.
5               We do non-judicial foreclosures.
6     I do not believe that it's consumer debt
7     collection under the Obduskey case.  I know
8     there's cases in Georgia that have already
9     come to that conclusion, as well.  So --
10         Q.   I'm not asking you whether you
11    believe it's debt collection or not.  I'm
12    asking you about the extent of non-judicial
13    foreclosure activities that you engage in.
14         A.   Very little.
15         Q.   Okay.  Do you think the State
16    Home Mortgage that you earned -- the
17    Declaration showed over $100,000.  Is that
18    very little to you?  Is that considered very
19    little?
20         A.   I don't know what time frame it
21    was.  Was it over a three-year process, do
22    you remember?
23         Q.   Yeah, three years back from
24    December 1st.
25         A.   Yeah, so it would be like 30,000

Page 65

1     a year.  Is that what you're --
2          Q.   You know, you -- if -- you have
3     that information.  You did the work.  I
4     don't -- I didn't do the work.
5          A.   Well, we provided an Affidavit
6     in that regard.  So whatever the Affidavit
7     says, I would agree with.
8          Q.   Okay.  Do you think that -- do
9     you think that whatever that income number
10    is not a lot?  It's insignificant?
11         A.   I don't know what that number
12    is, but if it's 100,000, you know -- is that
13    what you said?  You want to -- let me look
14    and then see what it says instead of
15    guessing.
16              Do you have that in front of
17    you?
18         Q.   Let me --
19         A.   Do you have a recollection?
20         Q.   So you have $105,455.31 from --
21         A.   Is that --
22         Q.   -- from Home Mortgage?
23         A.   That covers a three-year period?
24         Q.   December 1st, 2018 to
25    December 1st, 2021.

17 (Pages 62 - 65)

Johnson - direct

1    A.   Okay.
2    Q.   Is that insignificant?
3    A.   You know, I believe that covers
4  costs and fees.  So for non-judicial
5  foreclosure matters, the costs are really
6  high.  So a lot of that is built into that
7  number.  It's not even a fee.  It's -- it
8  includes the cost for instance, for running
9  a foreclosure ad, getting a title search
10  done, things like that.
11       So it would whittle down that
12  number.  But, you know, it depends what you
13  compare it to.  If you compare it to a billion
14  dollars, then it's not a big number; if you
15  compare it to 10,000, then that's a bigger
16  number.
17       So, you know, saying it's
18  insignificant depends what you're comparing it
19  to.  So I'm not really sure how to answer
20  the question.
21    Q.   Okay.  Were you paid hourly fees
22  by State Home Mortgage?
23    A.   No.
24    Q.   Okay.  What was the rate, the
25  flat rate?  How many -- how many -- how many

1  foreclosure cases is $105,000?
2    A.   I don't know how many that would
3  be, and I don't -- I don't remember what the
4  flat rate is.
5    Q.   Okay.  What are you paid
6  approximately per non-judicial foreclosure?
7    A.   Well, it depends, because
8  sometimes you stop the case early because
9  the other side, you know, reinstates or gets
10  a new loan and pays your loan off.
11  Sometimes I file bankruptcy.  It's really
12  hard to say because you don't -- you don't
13  bill the full amount in those instances.
14  You bill pieces of the -- of the flat fee
15  that they allow for.  So I don't really -- I
16  don't really know as a result.
17    Q.   What's -- what's the
18  approximate, would you say, an approximate
19  for non-judicial foreclosure fee for each
20  case?  How many -- how many cases does
21  105,000 encompass?
22    A.   I have no idea.
23    Q.   Okay.  When was the last payment
24  you received from -- from -- for doing work
25  from State Home Mortgage?  Do you know what

1  date that is?
2    A.   I don't.
3    Q.   Okay.  How often do they pay
4  you?
5    A.   You know, it depends.  Sometimes
6  we send invoices, we don't get paid for six
7  months.  Sometimes we send an invoice and
8  they pay within 60 days.  It just depends
9  and I don't know why.
10    Q.   Okay.  And you don't know what
11  your invoices say?  You don't have a record
12  of them?
13    A.   I don't have them in front of
14  me.  I don't remember off the top of my
15  head.
16    Q.   Now, I'm looking at this
17  Administrative Order, and it says that
18  you're paid $175 an hour?
19    A.   Right.
20    Q.   So $175 an hour, 100,000
21  hours [sic] is about 600 hours --
22    A.   They never pay me hourly.
23    Q.   Right.  They never paid you
24  hourly, but that was the agreed upon fee?
25    A.   If I billed hourly, that's what

1  they wanted me to bill the hourly amount
2  for, but I never billed them hourly --
3    Q.   But you don't have an agreement
4  where they pay you a flat fee.  Right?
5    A.   Not in that document.  That is
6  the course of business that we've done from
7  the beginning.
8    Q.   Where do you have an agreement
9  with them that they pay you a flat fee?
10    A.   We send them an invoice and they
11  pay it.
12    Q.   Where do you have an agreement
13  that they pay you a flat fee?
14    A.   I don't have a written
15  agreement, if that's what you're asking?
16    Q.   You don't have a written
17  agreement with State Home Mortgage that they
18  pay you a flat fee?
19    A.   That's right.
20    Q.   Do you have -- let's try to make
21  it clear for the record.  You don't have a
22  written agreement with State Home Mortgage
23  where they pay you a flat fee?
24    A.   That's correct.
25    Q.   Okay.  Do you know if the flat

18 (Pages 66 - 69)

Johnson - direct

1    fee is more or less than $175 an hour, how
2    it -- how it comes out?  Have you ever done
3    any kind of estimate?
4         A.   No.
5         Q.   If you had to figure out, you
6    would say that you're paid $100 an hour for
7    the work you do for State Home Mortgage if
8    you -- if you added up all the amount of
9    hours you've done and the amount you've been
10   paid, would you say that the average amount
11   that you've been paid is $100 an hour?
12        A.   I have no idea.
13        Q.   Would you say it's $500 an hour?
14        A.   I have no idea.
15        Q.   Would you say in the last year
16   you've worked more than 100 hours for State
17   Home Mortgage?
18        A.   I don't know.
19        Q.   How many hours in the last year
20   did you work for State Home Mortgage?
21        A.   I don't know.
22        Q.   How many hours in the last three
23   years did you work for State Home Mortgage?
24        A.   I don't know.
25        Q.   Do you have a copy of the

1    invoices on your computer of how much you've
2    invoiced State Home Mortgage?
3         A.   I don't think I do.
4         Q.   I'm sorry?
5         A.   I don't think that I do.
6         Q.   Could you take a minute to look?
7         A.   I wouldn't even know where to
8    look.
9         Q.   So you don't know where you keep
10   your invoices for State Home Mortgage?
11        A.   Generally, they're paper, and,
12   generally, they're in the file.
13        Q.   Could you go get the file right
14   now?
15        A.   I don't know what file you're
16   talking about.
17        Q.   The State Home Mortgage file
18   where you show you're billing them.
19        A.   Can I go get the file?  I'm sure
20   I could find a file, but you haven't asked
21   about that.  That's not one of the issues,
22   and I didn't bring anything here to the
23   deposition.
24        Q.   Okay.  Can you -- can you get it
25   right now?

1         A.   No.
2         Q.   Okay.  Why not?
3         A.   I wasn't asked to bring it to
4    the deposition.  So I'm not going to get it.
5         Q.   Do you think it is relevant to
6    determine what percentage debt collection
7    makes up of your total practice?
8         A.   I don't know.
9         Q.   What?
10        A.   I don't know.
11        Q.   Do you think that if you did
12   100 percent debt collection work, that it
13   would be considered that you regularly
14   attempt to collect debt?
15        A.   Not necessarily.
16        Q.   Okay.  What's the -- what's the
17   qualification?
18        A.   It could be commercial; and if
19   it's commercial, then it wouldn't be a
20   consumer debt collection under the FCPA.
21        Q.   Okay.  If it was consumer debt
22   collection --
23        A.   What's the question?
24        Q.   If it was consumer debt
25   collection and 100 percent of the million

1    and $40,000 was because of debt collection,
2    would that be relevant to whether you
3    regularly attempt to collect debt?
4         A.   I'm assuming you're talking
5    about consumer debt, not commercial debt,
6    but, yeah, it probably would be relevant.
7         Q.   Okay.  Would it be relevant to
8    determine whether 500,000 of that million
9    and 40 would be would be consumer debt
10   collection?  Is that relevant to -- to the
11   question of whether you regularly attempt to
12   collect debt?
13        A.   It could be relevant.
14        Q.   Okay.  How about 100,000 of the
15   million and 40; is that relevant?
16        A.   It could be relevant.
17        Q.   Okay.  But sitting here right
18   now, you don't know whether you did 100,000
19   of debt -- of debt collection work; of the
20   million and 40, whether 100,000 was debt
21   collection work or 500,000 was debt
22   collection work; is that right?
23        A.   No.
24        Q.   "No" -- "no" what?  Do you know
25   or do you not know?

19 (Pages 70 - 73)

Johnson - direct

Page 74

1    A.   Exact number?  I do not know.
2    Q.   So you don't know if debt
3  collection makes up over 500,000 of the
4  million and 40 number?
5    A.   No, it does not make up 500,000,
6  no.
7    Q.   How much does it make up?
8    A.   I don't know the exact number.
9    Q.   But it's not over 500,000?
10   A.   No.
11   Q.   Is it over $50,000?
12   A.   I'm not really sure of the exact
13  number, and part of it involves, like, for
14  instance, in the Cordtz matter when I was
15  initially hired, there was no debt
16  collection claim.  So prior to filing any
17  kind of claim in that matter, it could not
18  have been work that was geared towards debt
19  collection.
20      So there's a portion of that
21  amount that you say and you claim that it's
22  all of it is debt collection fees, and it's
23  my position that it's not.
24      So it would be -- I'd have to
25  look at those numbers and see what, you

Page 75

1  know, what numbers would apply to and what
2  numbers would not apply to.  So that's the
3  reason why -- I mean I really don't know the
4  exact number.
5    Q.   If the entire case is debt
6  collection but we have -- we have your
7  checks from the Cordtz matter --
8    A.   Uh-huh.
9    Q.   -- so that's only 15 or $20,000.
10  If that's not considered debt collection,
11  how much -- how much -- so you don't know --
12  but you don't know any other debt collection
13  that you've done?  You think you've done
14  zero debt collection; is that right?
15   A.   I think those two cases probably
16  involved some consumer debt collection
17  aspect to them.
18   Q.   Okay.
19   A.   The case is over five years,
20  yeah.
21   Q.   So those two are the only
22  ones -- are the only ones that you believe
23  are consumer debt collection?
24   A.   I don't believe they're consumer
25  debt collection.  I believe there's a

Page 76

1  consumer debt collection aspect to it.
2    Q.   Aspect?  Aspect?
3    A.   Yes.  For instance, in Cordtz
4  when I came on, there was no claim for any
5  debt.  So, you know, certainly that time
6  that I was involved just defending the case
7  would not be considered debt collection.  So
8  that's what I'm talking about.
9    Q.   So how much of the million and
10  40 is made up of non-judicial foreclosure?
11   A.   I don't know.
12   Q.   You don't know any composition
13  of that -- of that?  You don't even know --
14  could you tell me where 100,000 of that came
15  from?
16   A.   No, because I didn't look at it
17  from that aspect.  So I mean there's
18  different -- there's different kinds of fees
19  built in there, but I didn't look at it from
20  that standpoint.
21   Q.   Okay.
22   A.   You asked about total revenue,
23  and that's what I kind of concentrated on;
24  just the total revenue.
25   Q.   Okay.  You say that consumer

Page 77

1  debt collection activity makes up less than
2  a half of a percent over the last five
3  taxable years?
4    A.   Yes, I believe that's true.
5    Q.   Okay.  What's the income over
6  the last five taxable years; do you know?
7    A.   I don't --
8    Q.   Revenues --
9    A.   Yeah, I don't know off the top
10  of my head.
11   Q.   But you had to have calculated
12  it, right, because you determined that it
13  was less than a half of a percent?
14   A.   Yeah.  Well, yeah, as I put it
15  in my documents that I filed, I believe I
16  made over $250,000 a year for each of those
17  years, and certainly in the last year and a
18  half, which 250 over a year and a half would
19  translate to 375,000 if you're using that
20  average of 250 a year over a million
21  dollars.
22      So if you add everything
23  together, yeah, you know, I would say
24  probably around over that five-year period,
25  you know, over two million dollars.

20 (Pages 74 - 77)

Johnson - direct

Page 78

1    Q.   All right.  A half a percentage,
2  100,000.  So when you -- when you engaged in
3  this -- in this calculation to say that it
4  was less than a half of a percent over the
5  last five taxable years, you did -- how did
6  you make that calculation?  How did you do
7  that calculation?
8    A.   I don't know if it's taxable
9  years, but the taxable year, you know, for
10  an individual is the same as a calendar
11  year.  So I looked at my account.  I looked
12  at various things.  I looked at -- you know,
13  I don't really remember exactly how I did
14  that as far as exactly which documents I
15  looked at, but I came to the conclusion it
16  was over $250,000 a year for each year.
17    Q.   You said under oath, right,
18  that's the deposition, it starts out that
19  you said it under oath that less than two
20  percent in any individual taxable year, any
21  fees earned in the above-referenced civil
22  action -- so -- so two percent -- so what --
23  what -- what two percent, what were you --
24  what were you including in that two percent?
25  Were you -- it was -- was it just a number

Page 79

1  that you were saying that the amount -- is
2  that just the amount that you believe that
3  was debt collection?  Like how did you
4  calculate that number?
5    A.   So I looked at the revenue from
6  a three-year period, which at the time I
7  just estimated to be 750.  It's actually
8  more than that, a good bit more than that,
9  and I looked at -- when I did that, I looked
10  at the -- so that Cordtz case, and the
11  numbers that we had.  I did not consider the
12  Johnson case, okay, but certainly now I
13  consider the Johnson case; but when I
14  actually look at the numbers, they were more
15  than what I thought they were going to be.
16  At the time, that's what I looked at.
17    I also looked at the fact that
18  there was a significant portion in both the
19  Cordtz and Johnson case, they were really
20  solely looking at defending the
21  counterclaim --
22    Q.   Wait.
23    A.   -- in the Cordtz -- let me
24  finish what I'm saying -- in the Cordtz
25  matter defending the underlying claim that

Page 80

1  was brought as a claim.  I looked at the
2  Johnson case and there was a counterclaim,
3  and they're the ones that appealed that; and
4  the fact that my client spent as much money
5  as they did, which is over ten times the
6  amount of that they were seeking,
7  the $1,800 they were seeking, so the
8  percentages -- I looked at the percentages
9  of what I consider to be out of that number
10  was collecting debt and what was not, what
11  was defending other claims.
12    Q.   So you say less than a half of a
13  percent over the last five taxable years,
14  and, again, that was an estimate?  I mean
15  you did it under oath.  This was -- this
16  seems like you have to get it right, unless
17  you -- are you withdrawing this Affidavit
18  here?
19    A.   No, I'm not.
20    Q.   You're standing -- you're
21  standing by it that less than two percent in
22  any individual tax year; you're standing by
23  that?
24    A.   Right now I am, sure.
25    Q.   Okay.  Okay.  So how did you get

Page 81

1  to that?  My question is the State Home
2  Mortgage Affidavit, plus the Jauregui
3  Affidavit is about 140,000.  The Selwyn
4  Johnson -- Selwyn Johnson is -- I don't know
5  what we said -- about 20 -- 20,000, and then
6  this Cordtz case is about, let's say,
7  30,000.  So that's 190,000.
8    A.   Cordtz is not 30,000.
9    Q.   Okay.  Let's just say 180,000.
10  Now, that's -- so you divide that by three
11  and you get 60 -- 60,000, and then according
12  to my calculations, even if you made 10
13  million a year, that 60,000 is more than a
14  half of a percent.
15    A.   So there's two things I want to
16  talk about.  No. 1 the Cordtz case was over
17  a three- or four-year period.  You're acting
18  like it's all in one year, and it's not.
19  It's over a three- or four-year period.  The
20  Cordtz case has been over a couple of years.
21  So you have to look the at actual number if
22  you're looking at the calendar year, No. 1.
23    You also have to look at what
24  percentage of that would be debt collection
25  income or revenue versus the non-debt

Johnson - direct

Page 82

1  collection spec'd out.
2       And the other thing is that I do
3  not consider non-judicial foreclosures to be
4  the collection of debt under the Obduskey
5  case that was decided by the US Supreme
6  Court.
7       Q.   Okay.
8       A.   And it gets really clear, that
9  decision is super clear.  I'm aware of two
10 courts in Georgia that already followed it
11 with the same decision or rationale that I'm
12 talking about.
13      So I'm not aware of any case in
14 Georgia that has said that it is -- after
15 the Obduskey case, I'm not aware of a single
16 case in Georgia that says that non-judicial
17 foreclosures are consumer debt collection
18 anymore.
19      So that's what I'm basing mine
20 off of.  I realize you're a plaintiff's
21 attorney and want to try to prove your case,
22 but it's hard to ignore the US Supreme
23 Court's decisions.
24      Q.   But the case we're dealing with
25 now is not -- the Cordtz case that you're

Page 83

1  representing -- that you're trying to
2  collect the debt, that's not non-judicial
3  foreclosure; that's just plain debt
4  collection; is that right?
5       A.   Actually, it's not plain debt
6  collection, because we defended that case.
7  Mr. Cordtz brought that case, not my client.
8       Now, there is an aspect to debt
9  collection to that case which I've admitted
10 a couple of times now, but not the entire
11 case.
12      Q.   When you said that it was less
13 than a half of a percent of your income, the
14 consumer debt collection activity, did you
15 do a calculation, or did you just say it
16 without doing a calculation?
17      A.   No, I looked at the numbers,
18 and, you know, it looked less than a half
19 percent to me.  I didn't say an exact
20 personal -- it could be instead of .5, it
21 could be .2, it could be .3, it could be .4.
22 I didn't say an exact number, but I felt
23 real comfortable that it was less than a
24 half percent.
25      Q.   I'm going to the top here.  This

Page 84

1  is Document No. 53, Page 1 of 18; Affidavit
2  of Larry Johnson.  "Personally appeared
3  before the undersigned, dually authorized to
4  administer oaths, Larry Johnson, who after
5  being dually sworn, deposes and states on
6  oath as follows:"  And then we're going down
7  to Paragraph 49 "that any consumer debt
8  collection activity in which Larry W.
9  Johnson or his solely-owned law firm,
10 Johnson Legal Offices, LLC is involved is a
11 very small percentage of their revenues.
12 Less than a half percent over the last five
13 taxable years, and less than two percent in
14 any individual taxable year, the majority of
15 which, if not the total of which, being any
16 fees earned in the above-referenced civil
17 actions involving Jeffrey Cordtz."
18      Now, I'm asking you how you did
19 that calculation?  Did you do any
20 calculation, or are you just saying that?
21 Are you just saying that it's less than a
22 half of a percent over the last five taxable
23 years, or do you have any -- are you just
24 saying that?  How do you know -- how do you
25 know that that's true?

Page 85

1       A.   Because I believe that when I
2  looked at the numbers, I had made over
3  250,000 -- over 250,000.  So I just used the
4  250,000 number being conservative, because
5  it's actually more.  That's why I say "over
6  250,000."  If you do 250,000 times five,
7  that's 1.25, if I do my math right, and so I
8  felt like it was less than a half percent.
9       Q.   How much is a half of a percent
10 of a million -- of a million, 25?
11      A.   I don't know off the top of my
12 head.  Do you know?
13      Q.   No.  I have to pull up a
14 calculator.  I didn't make the oath.
15      A.   Yeah, I don't know off the top
16 of my head.
17      Q.   Okay.  I just did my calculator
18 and it shows $5,125.  So you don't believe
19 that you don't believe -- you didn't believe
20 that your debt collection made that number?
21 It was --
22      A.   At the time, I was not including
23 the Johnson case and the Cordtz case was
24 less in fees, and I thought a substantial
25 portion of the fees were non-debt collection

22 (Pages 82 - 85)

Johnson - direct

Page 86

1  related.  I was initially hired, and there
2  was no claim for debt collection in that
3  matter.  So that's where I had based that.
4       Q.   And less than two percent in any
5  individual taxable year, you did -- you did
6  that calculation, too, I guess, 250,000 --
7  so 5,000 -- less than 5,000 in any
8  individual taxable year?
9       A.   Yeah.
10      Q.   So are you -- do you want to
11  withdraw this Affidavit?  Are you
12  withdrawing this Affidavit, or you're
13  standing by it now that you know about the
14  Johnson case?
15      A.   No, I'm going to look at that
16  and look at the numbers in the Johnson case
17  and make a decision about that.
18      Q.   Okay.
19      A.   Because if you'll remember -- I
20  think it's closer another to -- if you'll
21  remember, there was more revenue than I
22  thought, and so I think it's -- the number
23  is actually closer to two million.
24           So I have to look at both the
25  revenue amount as well as the -- the fee

Page 87

1  amount to see what percent I think that
2  might be.
3       Q.   And it says here that you've
4  been involved in just three -- approximately
5  three non-judicial foreclosure referrals in
6  the 12 months preceding May 11th, 2021; is
7  that right?
8       A.   Yes.
9       Q.   How many is it?
10      A.   I believe it was three.
11      Q.   Okay.  But you have $140,000
12  income from the judicial -- from the
13  non-initial foreclosures, is that right,
14  from State Home Mortgage and Jauregui?
15      A.   Not from that year.
16      Q.   Okay.  What type of advertising
17  does your law firm do?  Does it do any
18  advertising?
19      A.   No.
20      Q.   Okay.  What type of work do
21  you -- do you -- do you rely upon for your
22  your -- for your business?
23      A.   Litigation.
24      Q.   What type of litigation?
25      A.   Mostly defensive litigation, but

Page 88

1  I do have some plaintiff's cases, as well,
2  like personal injury type cases that I --
3       Q.   But I'm asking you what you rely
4  on, what you rely on for your business.  Do
5  you have anybody that you rely on?
6       A.   I rely on all my clients.
7       Q.   Okay.
8       A.   I'm a sole practitioner.  I rely
9  on all of my clients.
10      Q.   Okay.  And that includes -- that
11  includes clients who would ask you to do
12  debt collection.  Right?
13      A.   No.
14      Q.   But that's one of your clients?
15  If you had a client who asked you to do debt
16  collection, you would do it for them,
17  wouldn't you?
18      A.   Well, you know, it depends on
19  your definition of debt collection, but, no,
20  I don't do debt collection.
21      Q.   Okay.  If someone asked you to
22  file a lawsuit to collect money, would you
23  do it?  To engage in litigation to collect
24  money, would you do it?
25      A.   I don't know.  I would have to

Page 89

1  look at the specific case.  I turn some
2  cases away; so I don't know.
3       Q.   Okay.  So I'm looking at the
4  Notice of Deposition now.
5       A.   Uh-huh.
6       Q.   The top, it's the identification
7  of the name of each case -- this is No. 1 --
8  "the identification of the name of each case
9  where you were engaged in or were paid for
10 attempting to collect on a defaulted loan in
11 the last three years since December 1st,
12 2018," and so what's the answer to that?
13      A.   The two cases that we talked
14 about, Jeffrey Cordtz case and Selwyn
15 Johnson case.
16      Q.   Okay.  Let's go to topic No. 5,
17 "The extent that legal work, which does not
18 involve collections, is anticipated or
19 relied upon, including a description of what
20 that legal work is since December 1st,
21 2018."
22      A.   Litigation.
23      Q.   And again, litigation includes
24 debt collection litigation; is that right?
25      A.   Just those two cases that have

23 (Pages 86 - 89)

Johnson - direct

Page 90

1   an aspect of it that I've already
2   identified.
3        Q.   But, again, you're relying upon
4   litigation.  That's what you're relying
5   upon, and you won't automatically turn
6   away -- just because it's a debt collection
7   case, you wouldn't automatically turn it
8   away.  Right?
9        A.   I don't know.
10       Q.   Well, would you automatically
11  turn away a debt collection case?
12       A.   I don't know.  It depends on the
13  specifics of the case.
14       Q.   Okay.  So that means that you
15  wouldn't automatically turn away a debt
16  collection litigation case?
17       A.   I don't -- I don't know how to
18  answer you on that without actually seeing
19  the case.
20       Q.   So it depends on the case; in
21  some cases, yes; and in some cases, no; it
22  just depends on the case?
23       A.   I don't really know unless I
24  actually had the case to look at.  So I
25  don't know.

Page 91

1        Q.   Okay.  But you didn't turn away
2   this case, the Cordtz case, even though --
3   even though you were asked to collect a
4   debt; is that right?
5        A.   No, that's incorrect.  I was
6   actually hired initially to defend the case.
7        Q.   Okay.
8        A.   We felt like we had to file a
9   counterclaim.  So actually the borrower
10  forced us into a scenario where we had to
11  file a compulsory counterclaim.  No, I was
12  not hired to collect on the debt in that
13  case.
14       Q.   I simply asked if you -- if you
15  turned away this litigation case because it
16  involved debt collection?
17       A.   It didn't involve debt
18  collection when it was referred to me.
19       Q.   Okay.  Did you turn -- did you
20  turn the case away once you learned that it
21  involved debt collection?
22       A.   I'm still involved in that case
23  and we filed a counterclaim, because we felt
24  like we had to under the compulsory
25  counterclaim rules.

Page 92

1        Q.   Did you turn -- did you turn the
2   case away after you learned that it involved
3   debt collection?
4        A.   I'll answer it again.  I'm still
5   involved in that case.  We felt like that in
6   order to comply with our ethical duties and
7   responsibilities, we had to bring a
8   compulsory counterclaim.  We did that, and
9   I'm still in the case.
10       Q.   Okay.  You didn't withdraw from
11  the case after you ethically felt like you
12  needed to bring a counterclaim; is that
13  right?
14       A.   That's correct.
15       Q.   So you went ahead and filed the
16  debt collection counterclaim; is that
17  correct?
18       A.   Yes, we filed a counterclaim on
19  the note.
20       Q.   And that was a litigation case
21  that you didn't turn away?
22       A.   Yeah, but at the time we weren't
23  even aware whether it was consumer or it was
24  commercial.
25       Q.   So you thought that perhaps

Page 93

1   Cordtz, the debt, was a business debt or you
2   just weren't sure?
3        A.   Wasn't sure either way.
4        Q.   And if it had been a consumer
5   debt, you might have turned it away?
6        A.   Well, I'll tell you what I did;
7   I did not withdraw.
8        Q.   Okay.  No. 6 is "The
9   classification character, kind, type,
10  variety, amount, description and nature of
11  total revenue earned for legal work for
12  Larry W. Johnson, and Johnson Legal Offices,
13  LLC since December 1st, 2018."  Could you
14  tell me about that?
15       A.   Sure.  It's litigation.
16       Q.   Okay.
17       A.   We also have some non-judicial
18  foreclosure work in there.  We have some
19  eviction work in there, as, you know, from
20  citing some of the cases we got.  That's
21  pretty much the kind of work -- that's
22  pretty much it.
23       Q.   What about the amount --
24       A.   So the amount over the last
25  18 months is, what I could determine, which

24 (Pages 90 - 93)

Johnson - direct

1  would be from -- which would cover
2  probably from 2019 -- 18  months --
3  I did it this week.
4      Q.   But you don't know -- the
5  18 months, you told meet million forty --
6      A.   Yeah, that's right.
7      Q.   So -- but you can't determine
8  anything related to the composition of that
9  amount; is that right?
10     A.   Well, I know it's for those fees
11  for those cases that I just mentioned.
12     Q.   Which cases?
13     A.   Litigation cases, non-judicial
14  foreclosure, eviction.
15     Q.   How much -- how much of it is
16  non-judicial foreclosure?  Is it ten
17  percent?
18     A.   I don't know.
19     Q.   Twenty percent?
20     A.   I don't know percentage.
21     Q.   Thirty percent?
22     A.   I don't know the percentage.
23     Q.   And Cordtz -- so Cordtz, I guess
24  we could figure out.  Thirty -- the total
25  amount from Cordtz is -- is 30 -- 30,000,

1  and, you know, about three percent or
2  whatever that is?
3      A.   I'll give you the number.  Use
4  the 30,000 number, because you asked it
5  under No. 3, depositions.  To date, I've
6  been paid $23,720.56 in Cordtz.
7      Q.   Okay.
8      A.   Instead of guessing, I'll just
9  go ahead and tell you.
10     Q.   Okay.  And so that's --
11     A.   Through today.
12     Q.   Okay.  So that percent -- so
13  23,720 out of the million 40 is -- is -- it
14  looks like 2.2 percent.
15     A.   Okay.
16     Q.   All right.  So that's the
17  percentage -- that's the percentage from --
18  from -- of this amount that is the Cordtz
19  that represents debt collection from
20  Cordtz?
21     A.   No.  As I explained, there's a
22  portion of that that is not debt collection.
23  So, you know, --
24     Q.   What was your determination --
25  what portion represents debt collection, and

1  what portion does not represent debt
2  collection?
3      A.   Well, certainly any work that
4  was done prior to actually filing any kind
5  of counterclaim or any kind of claim for a
6  debt would not be debt collection.
7      Q.   And how much -- how much -- how
8  much of the 23,720 was debt collection, and
9  how much of it was not debt collection?
10     A.   I haven't -- I don't know.
11     Q.   Did you ever do -- did you ever
12  do that calculation?
13     A.   I never looked at it
14  dollar-for-dollar wise, no.
15     Q.   Okay.  But you said that --
16  that -- you said that it represents less
17  than two percent in any taxable year.  Okay.
18  And the Selwyn Johnson case, what's that
19  income, the total?  That was before the
20  18 months?
21     A.   Yes, yeah.
22     Q.   And how much of the -- of the
23  million -- did I ask you this -- how much of
24  the million 20 is -- is -- for non-judicial
25  foreclosure; do you know?

1      A.   It's a million 40, but I don't
2  know.
3      Q.   And I think we went over -- did
4  we say ten percent and you weren't sure?
5  Ten percent?
6      A.   Yeah, I think you went through
7  10, 20, 30 --
8      Q.   Okay.  So just to make sure,
9  you're not sure if it's 50 percent if it's
10  non-judicial foreclosure?
11     A.   No, I think I answered that
12  before.  It's certainly not 50 percent, but
13  I just don't know the exact percentage.
14     Q.   Okay.  Could you -- could you
15  get me the exact percentage?
16     A.   I don't know, because I don't
17  really have -- I'm a sole practitioner.  So
18  I do everything by hand.  So it's a not like
19  I have a system where I can go in and figure
20  all that kind of stuff out.
21     Q.   What's the case that you wrote
22  against in your -- you wrote somewhere that
23  "defendants have been involved in some
24  matters which they believed were commercial
25  matters that do not apply here," and you

Johnson - direct

Page 98

1   have Mixdeity case.
2       A.   We already talked about that
3   one. That's the one I said it was 575
4   Boulevard -vs- Mixdeity --
5       Q.   Okay.
6       A.   The church and -- you know, it's
7   still at the Supreme Court of Georgia level,
8   because the other side has filed an
9   application for a Writ of Certiorari.
10      Q.   And Bloomfield?
11      A.   That involved -- I believe the
12  way the client explained it to me, was a
13  commercial vehicle.
14      Q.   Okay. Now, you said you
15  couldn't figure out what percentage is
16  non-judicial foreclosure --
17      A.   Yeah, I haven't looked at it for
18  percentage.
19      Q.   Okay. Well, can't we say that
20  it's those two numbers is the maximum that
21  you've made over the last three years from
22  initial foreclosures, the amount from State
23  Home Mortgage and the amount from Jauregui?
24      A.   I know it's hard to pronounce,
25  Jauregui I think is how he pronounces it.

Page 99

1           Those are the two main ways that
2   I have been involved in matters that were
3   non-judicial, but I couldn't under oath say
4   that that's 100 percent of everything, even
5   though it probably is. I just can't think
6   of another and I didn't really look at it in
7   preparation of -- for this deposition. So
8   I'm just not sure what the percentage would
9   be, and those amounts also that were
10  included in those Affidavits were not just
11  non-judicial foreclosures. They also
12  involved evictions that where we were
13  seeking possession only, and there was no
14  attempt to try to get any money judgment.
15          So that's not 100 percent
16  non-judicial foreclosure. Those numbers do
17  not represent that.
18      Q.   Okay. So much to say, it's --
19  those two numbers are 150,000, and let's
20  just that it's in the last 18 months. Isn't
21  that 15 percent? Why aren't you willing to
22  say that it's less than 15 percent
23  non-judicial foreclosure?
24      A.   Because under the Obduskey case,
25  non-judicial foreclosures are not consumer

Page 100

1   debt collection. So that's why I was not
2   including.
3       Q.   No, that's not what I'm asking
4   you. I'm asking you why are you not
5   comfortable saying that of the million 40 of
6   income over the last 18 months that less
7   than 15 percent of it is non-judicial
8   foreclosure?
9       A.   Oh, I believe those Affidavits
10  were over three years and a million 90 was
11  over 18 months. So I'm not even sure
12  exactly of the breakdown of that three-year
13  period. We were trying to comply with the
14  court's Order, and we received no objection
15  to that.
16          So it's hard to say that it's a
17  three-year deal versus a 18-month deal.
18  You're kind of doing apples and oranges
19  there. It's also just not a fee.
20          So there are costs involved that
21  are substantial when it comes to the
22  non-judicial foreclosure process, and that
23  Affidavit doesn't break those out.
24          If you want to be -- you know,
25  give an analysis, you have to know the

Page 101

1   answer to those questions.
2       Q.   Okay, but I said let's just
3   pretended that the full 140 was -- was --
4   was earned in the last 18 months, and we
5   know that it wasn't. We know that it
6   probably wasn't, most likely wasn't, and you
7   have a million 40 in the last 18 months.
8           Why are you not comfortable
9   sayings that non-judicial foreclosure is
10  less than 15 percent of that amount? You
11  weren't comfortable saying -- you weren't
12  comfortable saying an amount. When I said
13  40 percent, you said it's possible. Why
14  were you not comfortable saying it?
15      A.   Well, first of all, you
16  mischaracterized my testimony. I never said
17  it's possible, ever said it was possible at
18  40 percent. Nowhere near that. So I just
19  said I didn't know what the number was. So
20  please don't mischaracterize my testimony.
21          And so if you're asking for a
22  percentage, if you want to say what's
23  15 percent of a million dollars, it's
24  15,000 [sic] you can do that on a calculator.
25      Q.   It's 150,000. Okay.

26 (Pages 98 - 101)

Johnson - direct

1    A.   So I am not really sure what
2   you're asking me.  Are you asking me to get
3   my calculator out and tell you what a
4   percentage is --
5    Q.   Of the million 40, is more than
6   150,000 of it non-judicial foreclosure?
7    A.   I'm sure that it's not, but I
8   haven't gone through an analysis to look at
9   the actual numbers, but I'm sure that it's
10  not.
11   Q.   But what -- so you're saying
12  that it's possible that you've done some
13  non-judicial foreclosures besides what's in
14  that Affidavit, besides what's in those
15  Affidavits the last 18 months?
16   A.   I don't recall doing any, but
17  I'm just uncomfortable saying under oath
18  that I haven't -- I can't come up with any
19  right now, but I'm not sure because I
20  haven't gone through my files to determine
21  that.
22       That wasn't one of the topics
23  you wanted to cover, and I'm happy to answer
24  any questions that I can.  I'm just not
25  sure.

1    Q.   And you don't have any idea
2   about the million 40 -- it could be
3   40 percent of non-judicial foreclosures; you
4   could have left out 25 percent of that
5   million 40 could be non-judicial
6   foreclosures, you're just not sure; is that
7   right?
8    A.   No.
9    Q.   Okay.  But -- so it's not
10  40 percent?  Forty percent is not the
11  non-judicial foreclosures of the -- it's not
12  $400,000?  I want to talk numbers.
13       You didn't earn 400,000 in the
14  last 18 months from non-judicial
15  foreclosures?
16   A.   No.
17   Q.   Did you earn 300,000 in the last
18  18 months from non-judicial foreclosures?
19   A.   I'm sure I haven't.  I haven't
20  done an analysis looking at it, but I'm sure
21  I haven't done 300,000.
22   Q.   So I am not asking you whether
23  you've done an analysis.  Do you know
24  whether you've -- you've done over 300,000
25  in non-judicial foreclosures in the last

1   18 months or not?
2    A.   I haven't looked at it.  I'd
3   be -- I'd be shocked if there was a number
4   above that number.
5    Q.   But you would be shocked if you
6   found that you have any non-judicial
7   foreclosure income besides the ones you
8   provided in the Affidavit; is that right?
9    A.   I don't know what non-judicial
10  foreclosure -- you're talking about in an
11  Affidavit?  I'm just not comfortable saying
12  that under oath that I may not have gotten
13  it from somewhere else other than State Home
14  Mortgage or -- or through or involving
15  Jauregui & Lindsey.  There could have been
16  another one that came in.
17       I just don't recall; so I'm not
18  willing to testify that there might not be
19  one other case.  If I do that, then you'll
20  come back and say, I'm misleading you, I'm
21  not telling the truth, I'm trying to hide
22  stuff, and like you have before.
23       I'm not 100 percent certain and
24  that's why I'm not willing to testify to
25  100 percent certainty.

1    Q.   I am asking you about $250,000
2   and you're not -- over the last 18 months --
3   and you're not certain about you've earned
4   $250,000 from -- from a source that you
5   can't tell me about?
6    A.   I'm sorry, what is your
7   questions?
8    Q.   You can't -- you're not sure
9   whether you've earned 250,000 from
10  non-judicial foreclosure in addition to --
11  in addition to -- in addition to what's in
12  the Affidavits over the last 18 months?
13   A.   I don't know what Affidavits
14  you're talking about.
15   Q.   The State Home Mortgage
16  Affidavit and the Jauregui Affidavit.
17   A.   Okay.
18   Q.   Those two Affidavits, and my --
19  my contention in this case is that -- is
20  that any non-judicial foreclosure work that
21  you've done is counted as part of debt -- as
22  part of the test of whether you regularly
23  collect debts or not.
24       So I was trying to determine the
25  extent that you engage in non-judicial

27 (Pages 102 - 105)

Johnson - direct

1  foreclosure, and you're telling me it's
2  possible that you left out some -- some
3  income you've earned from the last 18 months
4  involving non-judicial foreclosure; is that
5  right?
6       A.   No, no.  That's not what I said
7  at all.  You keep mischaracterizing my
8  testimony, but I'm getting used to that, I
9  guess.
10       What I'm saying is that I'm not
11  aware of any others outside of what's
12  included in those two Affidavits, but I'm
13  not willing to say there isn't anything that
14  I've forgotten about, but I'm not aware of
15  any others.
16       If there are any others, there
17  might be a onesie or twosie, which is why I
18  may not remember them, and I don't want to
19  be accused of misleading you, and that's the
20  reason why I'm answering in this fashion.
21       You didn't list them here that
22  you wanted to know percentages of
23  non-judicial foreclosures in your deposition
24  notice, I didn't prepare, go through that
25  extra analysis, but I'm not aware of any.

1  But could there be one or two or something?
2  There could be, and I just don't want you to
3  say that I'm misleading you by saying there
4  definitely is not.
5       Q.   I am not asking you about one or
6  two.  I'm asking you whether it is $200,000
7  of the --
8       A.   What you asked me is -- what you
9  asked me is are there any others.  So
10  "other" could be -- and if I find out
11  there's one other --
12       Q.   I'm changing -- --
13       A.   I'm trying to answer the
14  question, and I'd just like to have the
15  opportunity to answer the question.  It's
16  not like you asked me previously.  If you're
17  going to restate your question, I'm happy to
18  listen to it.
19       Q.   So I'm restating the question.
20  Of the million -- of the million and 40 that
21  you've identified in income over the last
22  18 months, is 300,000 of it for doing work
23  related to non-judicial foreclosure?
24       A.   I don't think so.
25       Q.   Okay.  But that's 100 -- that's

1  $150,000 that you would have forgotten
2  about, is that why you don't think so?  I'm
3  just trying to figure out -- like I could --
4  like I -- I could tell you within a few
5  thousand dollars of, you know, I'm not
6  asking you about 2,000 or 3,000, I'm asking
7  you whether there's $100,000 of judicial --
8  of non-judicial foreclosure income that you
9  haven't disclosed?
10       A.   Not that I'm aware of.
11       Q.   And what investigation have you
12  done to determine whether there -- whether
13  there was other non-judicial foreclosure
14  income or not?
15       A.   Other than knowing my files,
16  because it's only me here and based on my
17  knowledge and recollection, but you didn't
18  list it in your -- in your notice to take
19  deposition.  I didn't do an investigation
20  that regarded that prior to this deposition.
21       Q.   Do you -- do you anticipate or
22  rely upon non-judicial foreclosure work as
23  part of your practice?
24       A.   That's a very small part of my
25  practice, but I actually, you know, being a

1  sole practitioner, you know, it's a part
2  of our practice.
3       Q.   Did you -- do you anticipate
4  that work or rely upon it?
5       A.   I think that I'll probably be
6  getting some more foreclosure referrals.  Is
7  that what you're asking me?
8       Q.   No, I'm asking you if you
9  anticipate or rely upon it?
10       A.   I believe that I'll be getting
11  more non-judicial foreclosure referrals in
12  the future, yes.
13       Q.   Okay.  So now the Topic No. 5,
14  "The extent that legal work, which does not
15  involve collections, is anticipated or
16  relied upon, including a description of what
17  that legal work is since December 1st,
18  2018."
19       A.   And I already answered that, but
20  I'm happy to answer that again.
21  Non-judicial foreclosure referrals,
22  evictions and litigation.
23       Q.   Okay.
24       A.   I disclosed that when we talked
25  about it before.  I guess that's why I'm

28 (Pages 106 - 109)

Johnson - direct

Page 110

1  than confused that you keep asking about
2  it again.
3       Q.   And then we have under No. 6,
4  "The classification, character, kind, type,
5  variety, amount, description and nature of
6  total revenue earned for legal work for
7  Larry W. Johnson and Johnson Legal Offices
8  LLC since December 1st, 2018." And I'm
9  asking you how much of that is non-judicial
10 foreclosure and you don't know the answer;
11 is that right?
12      A.   I cannot tell you the exact
13 number, no.
14      Q.   And you don't know --
15      A.   And if -- let me say one thing.
16 I could say one thing, when you get to a
17 stopping point to take a break, I need to
18 take a break for a second.
19      Q.   Sure.  Let's take a ten-minute
20 break now.
21      A.   Okay.
22           (Recess occurred.)
23           MR. WEXLER:  Back on the record.
24      Q.   Do you think that it's a fair --
25 that it's a fair request for me to learn

Page 111

1  about the million 40 composition over the
2  last 18 months?  Do you think that's
3  relevant to this case?
4       A.   Are we back on the record?
5       Q.   Yes.  I thought that's what the
6  court reporter said.
7       A.   Mark is not here.
8       Q.   Oh, okay.  Okay.
9            MR. BAKER:  Sorry.  I'm here,
10 I'm just monitoring.
11      Q.   Where -- where would you be able
12 to determine whether you did any other
13 non-judicial foreclosures in the -- in the
14 last 18 months?  Do you know where you would
15 look?
16      A.   I probably would have to pull
17 all my files from storage that have been
18 closed and go through a file-by-file basis.
19      Q.   Pull up off of what option
20 stores [sic] --
21      A.   Out of storage.
22      Q.   Oh, out of storage.  What kind
23 of files -- do you have files for anything
24 else other than the cases that we went
25 through earlier?

Page 112

1       A.   I generally create a separate
2  file for any separate matter.
3       Q.   Okay.  So you create a separate
4  file for each non-judicial foreclosure file?
5       A.   Yes.
6       Q.   How many files do you have open
7  right now?
8       A.   Right now?
9       Q.   Yeah.
10      A.   A very small number.  I think it
11 might be -- I am not really sure -- I'm
12 pretty sure it would be less than five.
13      Q.   Okay.  Is that total files or
14 that's only non-judicial foreclosure files?
15      A.   You asked me for non-judicial
16 foreclosure files so I was answering.
17      Q.   Okay.
18      A.   I doubt that I have 50 files
19 where a sale has been scheduled.  Sometimes
20 when we get files and there's title issues
21 that have to be resolved so the file gets
22 put aside until the title company can
23 resolve whatever title issues -- I may have
24 a couple of those that are not active but I
25 still have a file.

Page 113

1            Generally in Georgia, you know,
2  it's fairly quick for my advertising
3  standpoint, it's just for four weeks.  So I
4  don't think I have any -- I don't think I
5  have certainly less than five that are
6  advertised for sale or scheduled to be
7  advertised for some next month.
8       Q.   All right.  Could you name the
9  five?
10      A.   I don't know the names.
11      Q.   All right.  Do you know where
12 you got the five on?  Are any of them for
13 State Home Mortgage?
14      A.   Probably.
15      Q.   Okay.  And are any of them from
16 Jauregui?
17      A.   Well, they're not from Jauregui,
18 but a client that they have is the way I
19 would answer that question, and it would be
20 a combination of those two.  Right now I
21 don't have any files open that wouldn't
22 either come from State Home Mortgage or a
23 client of Jauregui.
24      Q.   And the clients, Jauregui, do
25 they ever pay you directly?

29 (Pages 110 - 113)

Johnson - direct

Page 114

1    A.   Yes.  Sometimes they do.
2    Q.   So that wouldn't be included in
3  the amount that Jauregui paid you?
4    A.   If they didn't pay you, then I
5  doubt they would have included it in their
6  amount, yeah.  I think that's the way that
7  Affidavit was -- was draft on what they paid
8  me.  So.
9    Q.   How much do you get paid by
10 those clients -- how much would you say
11 Jauregui paid you the same amount generally,
12 checks from Jauregui are the same amount?
13 Or the clients pay you more?
14   A.   No, they don't pay me more.
15 It's probably only happened once or twice
16 over the last three or four years.  So I
17 don't -- I don't remember the specific
18 circumstances.  I just don't recall.
19   Q.   It's happened once or twice, or
20 it could have been $200,000.  Right?
21   A.   No.
22   Q.   It could have been $200,000 from
23 non-judicial foreclosure income?
24   A.   No, no.  The onesie-twosie's
25 that I get might be like a one-off.  It

Page 115

1  might not be a foreclosure itself or even an
2  eviction.  It might be sometimes I get
3  referrals if there's a foreclosure sale that
4  results in excess proceeds, for instance,
5  and so somebody has to deal with the excess
6  proceeds.  So from time to time, I'll get a
7  file like that where they pay me directly to
8  go handle finding out who the extra money
9  should go to.  Typically, it goes to the
10 borrower unless there's a subordinate lien
11 that got wiped out.  So you have to go
12 through a process for that.
13         So there's things like that that
14 are one-off's from time to time that happens
15 that sometimes I may handle directly.
16   Q.   So let's go back to the million
17 40.  Do you have $100,000 of non-judicial
18 foreclosure income that's not from Jauregui
19 or State Home Mortgage that wasn't paid by
20 them?
21   A.   Over the last 18 months?
22   Q.   Yes.
23   A.   No.
24   Q.   How much do you have?
25   A.   I don't know exactly, because I

Page 116

1  didn't look at it before this deposition,
2  because I didn't realize you were going to
3  try to go into this depth of that, but very
4  few.  And it may be zero.  I just don't -- I
5  feel uncomfortable saying zero, because I
6  feel like if we find one --
7    Q.   No, I said -- I said one is
8  fine --
9    A.   Yeah.
10   Q.   -- two is fine, but I'm trying
11 to find out, you know, the specific question
12 is:  Do you -- do you regularly attempt to
13 collect debts, and I think it depends -- I
14 feel it depends on how much the million 40,
15 at least in part, how much of the million 40
16 came from non-judicial foreclosures, and you
17 don't even have that answer, do you?
18   A.   I don't have an exact number,
19 no.
20   Q.   You don't have an estimate
21 either, do you?
22   A.   I don't know if the
23 percentage -- I think you're asking me based
24 on my knowledge right now, and I don't want
25 to guess at it.

Page 117

1    Q.   I am not asking you on a
2  percentage.  I'm asking you based on an
3  amount.
4    A.   Yeah, I think you asked me what
5  percentage of that is for non-judicial.  So
6  you actually did ask me a percentage.
7    Q.   I'm changing the question;
8  what's the amount?
9    A.   And I don't know the exact
10 amount.
11   Q.   Okay.  Is it $400,000?
12   A.   What does -- I don't know what
13 "it" is.  What are you asking me?  What is
14 400,000?
15   Q.   The non-judicial foreclosure
16 income is $400,000 of the million and 40?
17   A.   No.
18   Q.   Is it $300,000?
19   A.   Not that I'm aware of.
20   Q.   What are you aware of?
21   A.   I don't understand the question.
22   Q.   You said "not that I'm aware
23 of."  That implies that you are aware of
24 something.  So what are you aware of?
25   A.   I don't understand the question.

Johnson - direct

1    Q.   How much non-judicial
2  foreclosure income over the last 18 months
3  are you aware of?
4    A.   It's a very small percentage,
5  but I don't know the exact number or the
6  exact percentage.
7    Q.   Is it more or less than
8  $150,000?
9    A.   I don't know the exact number,
10  but based on your representation that it was
11  $150,000 in those two Affidavits of which
12  probably only half is the fee, I probably
13  have to say less.  I don't know the exact
14  number nor the exact percentage.
15    Q.   Is it more than $200,000.
16    A.   It's -- if it's probably less
17  than 150, then it's probably less than 200.
18    Q.   Okay.  I'm asking you for
19  certainty.  You don't have any certainty?
20    A.   I don't have an exact number nor
21  exact percentages.  That's correct.
22    Q.   Did you verify that the
23  Affidavit provided by Jauregui was accurate?
24    A.   Not that I remember.
25    Q.   Do you know if it, in fact, is

1  accurate?
2    A.   I trust his testimony, but I
3  didn't verify it.
4    Q.   Now, when you get paid directly
5  from clients of Jauregui, how does that
6  work?
7    A.   I don't get foreclosure --
8  non-judicial foreclosures from them, but
9  they're one-off type issues that I might
10  have had a couple.  The way that would work,
11  generally, I would send them an invoice and
12  they would send me a check.
13    Q.   So -- but you don't know who is
14  sending you any other non-judicial
15  foreclosures or if, in fact, there are any?
16    A.   I don't -- I don't recall any
17  others but there might be a onesie or a
18  twosie.
19    Q.   There might be more.  Right?
20    A.   I don't think so, but I'm not
21  100 percent certain.  So I'd hate to say
22  with 100 percent certainty, you know, a
23  response to that, because I don't know the
24  exact number.
25    Q.   Okay.  I'm done.

1        MR. WEXLER:  Mr. Baker?
2        MR. BAKER:  I have no questions.
3        (Deposition concluded at
4  3:10 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        A C K N O W L E D G E M E N T.
2
3  STATE OF GEORGIA
4   :SS:
5  COUNTY OF
6
7
8        I, LARRY W. JOHNSON, hereby certify
9  that I have read the transcript to my
10  testimony taken under oath in my deposition
11  of March 24, 2022; that the transcript is a
12  true, complete, and correct record of what
13  was asked, answered, and said during this
14  deposition, and that the answers on the
15  record as given by me are true and correct.
16
17
18
19        LARRY W. JOHNSON
20
21  Subscribed and sworn to before
22  me this     day
23  of     , 2022
24  NOTARY PUBLIC
25

31 (Pages 118 - 121)

Page 122

```
 1              C E R T I F I C A T E
 2        I, SERAFINA R. ZINCKGRAF, a
 3   Certified Court Reporter, Registered
 4   Professional Reporter, do hereby certify that
 5   prior to the commencement of the examination,
 6   the witness was duly sworn by me to testify
 7   the truth, the whole truth and nothing but
 8   the truth.
 9        I DO FURTHER CERTIFY that the
10   foregoing is a true and accurate transcript
11   of the testimony as taken stenographically by
12   and before me at the time, place and on the
13   date hereinbefore set forth, to the best of
14   my ability.
15        I DO FURTHER CERTIFY that I am
16   neither a relative nor employee nor attorney
17   nor counsel of any of the parties to the
18   action; and that I am neither a relative nor
19   employee of such attorney or counsel; and
20   that I am not financially interested in the
21   action.
22
23
         SERAFINA R. ZINCKGRAF, CCR, RPR
24        License No. XI01637
25
```

Page 124

```
 1        Veritext Legal Solutions
          290 W. Mt. Pleasant Ave. - Suite 3200
 2        Livingston, New Jersey 07039
          Toll Free: 800-567-8658  Fax: 973-629-1287
 3        erratas-cs@veritext.com
 4   April 11, 2021
 5   To: Larry Johnson, Esq.
 6   Case Name: Cordtz v. Johnson Legal Offices
 7   Veritext Reference Number: 5147340
 8   Witness:  Larry Johnson     Deposition Date:  3/24/2022
 9
     Dear Sir/Madam:
10
     Enclosed please find a deposition transcript.  Please have the witness
11   review the transcript and note any changes or corrections on the
     included errata sheet, indicating the page, line number, change, and
12   the reason for the change.  Have the witness' signature at the bottom
     of the sheet notarized except in California where they are signing
13   under penalty of perjury and email the errata sheet back to us at the
     address shown above.
14
15
16   If the jurat is not received within thirty days of your receipt of
17   this letter, the reading and signing will be deemed waived.
18
19
20   Sincerely,
21
22   Production Department
23
24   Encl.
25   Cc: All Counsel
```

Page 123

```
 1        ERRATA SHEET
          Priority-One Court Reporting/Veritext
 2        718-983-1234
     ASSIGNMENT NO. P1-5147340
 3   CASE NAME: Cordtz v. Jonson Legal Offices
     DATE OF DEPOSITION: 3/24/2022
 4   WITNESS' NAME: Larry Johnson
 5
     PAGE/LINE(S)/   CHANGE        REASON
 6   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
 7   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
 8   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
 9   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
10   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
11   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
12   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
13   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
14   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
15   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
16   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
17   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
18   ___/____/_____/_____/_____/
     ___/____/_____/_____/_____/
19   ___/____/_____/_____/_____/
20
21   (Notary not required in California)
     SUBSCRIBED AND SWORN TO
22   BEFORE ME THIS_____DAY
     OF_____, 2022.
23
     _____
24     NOTARY PUBLIC
25   MY COMMISSION EXPIRES_____
```

**[& - 575]**                                                      Page 1

| & |
| --- |
| **&**  2:6 12:11 23:16 28:12 35:24 104:15 |

| 0 |
| --- |
| **02003**  1:2 |
| **07039**  1:24 124:2 |

| 1 |
| --- |
| **1**  81:16,22 84:1 89:7 |
| **1,040,819.30**  56:11 |
| **1,800**  5:9 7:17 9:2 80:7 |
| **1,900**  7:18 |
| **1.25**  85:7 |
| **10**  81:12 97:7 |
| **10,000**  66:15 |
| **100**  70:6,11,16 72:12,25 99:4,15 104:23,25 107:25 119:21,22 |
| **100,000**  49:23 64:17 65:12 68:20 73:14,18,20 76:14 78:2 108:7 115:17 |
| **105,000**  67:1,21 |
| **105,455.31**  65:20 |
| **108**  2:4 |
| **11**  124:4 |
| **11th**  87:6 |
| **12**  87:6 |
| **12:07**  1:20 |
| **138**  2:11 4:1 |
| **140**  101:3 |
| **140,000**  81:3 87:11 |
| **15**  75:9 99:21,22 100:7 101:10,23 |
| **15,000**  101:24 |
| **150**  118:17 |

| 150,000  99:19 |
| --- |
| 101:25 102:6 108:1 118:8,11 |
| **175**  68:18,20 70:1 |
| **17th**  20:10 28:25 29:1,9 30:11,15 31:13 |
| **18**  6:15 56:8,10,11 56:23 57:11,15 58:10 59:2 60:11 61:2,14,15 62:25 84:1 93:25 94:2,5 96:20 99:20 100:6 100:11,17 101:4,7 102:15 103:14,18 104:1 105:2,12 106:3 107:22 111:2,14 115:21 118:2 |
| **18,000**  6:14 |
| **18,464**  7:4 |
| **18,464.95.**  6:12 |
| **180,000**  81:9 |
| **190,000**  81:7 |
| **1:21**  1:2 |
| **1st**  6:11,18,19 64:24 65:24,25 89:11,20 93:13 109:17 110:8 |

| 2 |
| --- |
| **2**  83:21 |
| **2,000**  108:6 |
| **2,100**  5:11,14 |
| **2.2**  95:14 |
| **20**  20:16 22:6 27:13,23 28:2 29:5,11,17 30:12 30:20 31:2,7 32:18 33:3,7,12 81:5 96:24 97:7 |

| 20,000  50:3,6 75:9 |
| --- |
| 81:5 |
| **200**  118:17 |
| **200,000**  107:6 114:20,22 118:15 |
| **2000**  55:22 |
| **2018**  6:11,18,19,20 65:24 89:12,21 93:13 109:18 110:8 |
| **2019**  20:10 28:25 29:2,9 30:11,15 31:13 94:2 |
| **2020**  28:19 |
| **2021**  55:22 56:2 65:25 87:6 124:4 |
| **2022**  1:19 121:11 121:23 123:22 |
| **22**  2:6 |
| **2244**  2:3 |
| **2260**  1:23 |
| **23,720**  95:13 96:8 |
| **23,720.56**  95:6 |
| **24**  1:19 121:11 |
| **25**  85:10 103:4 |
| **250**  77:18,20 |
| **250,000**  58:3 77:16 78:16 85:3,3,4,6,6 86:6 105:1,4,9 |
| **290**  1:23 124:1 |

| 3 |
| --- |
| **3**  83:21 95:5 |
| **3,000**  108:6 |
| **3/24/2022**  123:3 124:8 |
| **30**  94:25 97:7 |
| **30,000**  64:25 81:7 81:8 94:25 95:4 |
| **300,000**  103:17,21 103:24 107:22 117:18 |

| 30328  2:12 |
| --- |
| **30345**  2:4 |
| **3200**  124:1 |
| **37214**  2:7 |
| **375,000**  77:19 |
| **3:10**  120:4 |

| 4 |
| --- |
| **4**  3:3 83:21 |
| **40**  56:15 73:9,15 73:20 74:4 76:10 95:13 97:1 100:5 101:7,13,18 102:5 103:2,3,5,10 107:20 111:1 115:17 116:14,15 117:16 |
| **40,000**  58:23 61:2 73:1 |
| **400,000**  103:12,13 117:11,14,16 |
| **450**  2:7 |
| **464.95.**  6:15 |
| **49**  84:7 |

| 5 |
| --- |
| **5**  83:20 89:16 109:13 |
| **5,000**  86:7,7 |
| **5,125**  85:18 |
| **5,256**  7:4 |
| **5,256.49.**  6:21 7:2 |
| **50**  50:5,5 59:4 97:9,12 112:18 |
| **50,000**  74:11 |
| **500**  70:13 |
| **500,000**  73:8,21 74:3,5,9 |
| **5147340**  124:7 |
| **53**  84:1 |
| **575**  54:3 98:3 |

**[6 - asked]**                                                                   Page 2

| **6** | accused 106:19 | affidavits 99:10 | 113:19 116:17 |
|---|---|---|---|
| **6** 93:8 110:3 | acknowledge | 100:9 102:15 | answered 97:11 |
| **60** 68:8 81:11 | 23:10 | 105:12,13,18 | 109:19 121:13 |
| **60,000** 81:11,13 | acting 81:17 | 106:12 118:11 | answering 106:20 |
| **600** 68:21 | action 78:22 | afternoon 4:9 | 112:16 |
| **7** | 122:18,21 | ago 30:16 32:13 | answers 121:14 |
| **718-983-1234** | actions 84:17 | agree 65:7 | anticipate 108:21 |
| 123:2 | active 59:24 60:2 | agreed 68:24 | 109:3,9 |
| **74-16** 36:25 | 112:24 | agreement 33:15 | anticipated 89:18 |
| **74-19** 35:15 | activities 63:24 | 33:17,22,23,24 | 109:15 |
| **7419** 35:16 | 64:13 | 34:1,11,18 35:6,20 | anybody 38:2 88:5 |
| **75** 59:5 | activity 77:1 83:14 | 36:5,8 50:23 | anymore 15:17 |
| **75,000** 55:24 56:3 | 84:8 | 52:19 69:3,8,12,15 | 82:18 |
| 61:8 | actual 36:11,24 | 69:17,22 | appeal 5:16,25 6:3 |
| **750** 79:7 | 81:21 102:9 | ahead 92:15 95:9 | appealed 54:22 |
| **8** | ad 15:4,14 66:9 | allegations 48:15 | 55:1,3 80:3 |
| **800,000** 51:25 52:8 | add 48:5 77:22 | allow 67:15 | appeals 55:4 |
| **800-567-8658** | added 70:8 | allowed 6:9 | appear 37:6 |
| 124:2 | addition 7:7 | amount 5:14 6:21 | appearance 62:12 |
| **8171** 122:22 | 105:10,11,11 | 6:23 7:3,16 9:2 | appeared 84:2 |
| **850,000** 59:1 | additional 6:21 | 18:17 38:17,21 | appears 4:13 |
| **9** | 18:1 | 46:14 67:13 69:1 | 28:19 35:22 37:4 |
| **90** 100:10 | address 46:21 | 70:8,9,10 74:21 | apples 100:18 |
| **973-629-1287** | 124:13 | 79:1,2 80:6 86:25 | application 54:6 |
| 124:2 | adds 58:11 | 87:1 93:10,23,24 | 55:6 98:9 |
| **a** | administer 84:4 | 94:9,25 95:18 | apply 16:20 75:1,2 |
| | administrative | 98:22,23 101:10 | 97:25 |
| ability 122:14 | 68:17 | 101:12 110:5 | appreciate 6:8 |
| able 15:11 37:21 | admissible 34:8 | 114:3,6,11,12 | approximate |
| 47:12 111:11 | admitted 83:9 | 117:3,8,10 | 38:17,21 67:18,18 |
| absconded 46:20 | advertised 113:6,7 | amounts 99:9 | approximately |
| account 78:11 | advertising 87:16 | analysis 60:6 | 67:6 87:4 |
| accurate 24:22 | 87:18 113:2 | 61:21 100:25 | april 124:4 |
| 31:18 34:2,3,18,23 | advise 20:20 23:11 | 102:8 103:20,23 | arbitration 50:22 |
| 35:19,20 36:21,22 | advisor 46:3 | 106:25 | 51:1 52:7 |
| 37:3,6 61:9 | affidavit 65:5,6 | answer 5:1 15:17 | area 8:22 |
| 118:23 119:1 | 80:17 81:2,3 84:1 | 27:8 30:9 51:10 | argued 62:15 |
| 122:10 | 86:11,12 100:23 | 53:18 66:19 89:12 | aside 112:22 |
| accuse 26:22 | 102:14 104:8,11 | 90:18 92:4 101:1 | asked 9:22 18:10 |
| | 105:16,16 114:7 | 102:23 107:13,15 | 18:11 31:10 34:24 |
| | 118:23 | 109:20 110:10 | 51:9 59:23 61:5 |

71:20 72:3 76:22 88:15,21 91:3,14 95:4 107:8,9,16 112:15 117:4 121:13

**asking** 9:22 14:22 14:23 17:18 18:9 18:25 19:5 27:1 27:10,15 34:9 59:7 64:10,12 69:15 84:18 88:3 100:3,4 101:21 102:2,2 103:22 105:1 107:5,6 108:6,6 109:7,8 110:1,9 116:23 117:1,2,13 118:18

**aspect** 62:16 75:17 76:1,2,2,17 83:8 90:1

**assignment** 123:2

**assisted** 40:1

**assume** 50:12

**assuming** 73:4

**atlanta** 2:4,12 4:2

**attach** 48:5

**attached** 34:14,24 34:24

**attempt** 13:4 18:18 21:1,6,21,23 24:14 72:14 73:3 73:11 99:14 116:12

**attempting** 24:12 89:10

**attorney** 2:5,8,13 45:14 54:24 82:21 122:16,19

**auditorium** 54:16

**authenticity** 34:25

**authority** 14:19,23 15:6

**authorize** 21:11

**authorized** 84:3

**auto** 10:22 32:1

**automatically** 90:5,7,10,15

**ave** 124:1

**avenue** 1:23

**average** 70:10 77:20

**award** 51:1,3 52:7 52:15,16 56:15,16 56:18

**aware** 17:9 23:13 62:15 63:14 82:9 82:13,15 92:23 106:11,14,25 108:10 117:19,20 117:22,23,24 118:3

**awhile** 55:19

**b**

**b** 2:11 3:6 4:2 22:2

**back** 20:7 38:8 56:10 61:13 64:23 104:20 110:23 111:4 115:16 124:13

**baker** 2:8 111:9 120:1,2

**bank** 42:17 43:21 47:1 59:11,12 61:13

**bankruptcy** 14:4 67:11

**based** 16:24 32:4 32:11 48:14 86:3 108:16 116:23 117:2 118:10

**basically** 38:15 46:1

**basing** 10:13 82:19

**basis** 111:18

**beginning** 69:7

**behalf** 4:11 5:2 32:21

**believe** 8:11,18 9:12 12:5 15:2 16:20 17:7,22 18:7 19:6,9,24,25 20:1 21:25 23:2 26:3 30:19 31:1,6 31:11 32:16 34:17 39:1 42:6 43:7 46:3,16,23 49:7 52:6 59:25 63:6 63:11,16,16,20 64:6,11 66:3 75:22,24,25 77:4 77:15 79:2 85:1 85:18,19,19 87:10 98:11 100:9 109:10

**believed** 97:24

**bell** 41:9 43:23

**beneficiary** 39:10

**best** 25:22,23,25 122:13

**better** 6:1

**betty** 11:17 12:21 38:9,22

**beyond** 15:16,17 27:9 61:15

**big** 45:9 66:14

**bigger** 66:15

**biggest** 57:11

**bill** 67:13,14 69:1

**billed** 68:25 69:2

**billing** 71:18

**billion** 66:13

**bills** 7:23 8:6,10

**bit** 4:20 13:18 52:15 56:22 79:8

**blair** 11:18 12:22 38:9,22

**bland** 43:21

**blant** 42:18

**bloomfield** 98:10

**blvd** 2:6

**borrower** 5:3 13:22 14:1,18 15:4 16:21,24 27:25 46:2 91:9 115:10

**borrowers** 17:17 17:20

**bottom** 124:12

**boulevard** 54:3 98:4

**break** 20:5 100:23 110:17,18,20

**breakdown** 61:21 100:12

**bring** 71:22 72:3 92:7,12

**bringing** 9:13

**brokerage** 39:2,8

**brother's** 39:6,17

**brought** 27:25 28:3 29:3 30:20 30:21 31:3,8 38:5 51:19,22 62:11 80:1 83:7

**build** 48:6

**building** 48:5

**built** 66:6 76:19

**bunch** 61:14

**business** 69:6 87:22 88:4 93:1

**c**

**c** 1:12 2:1 121:1
  122:1,1
**cabinet** 27:4
**calculate** 79:4
**calculated** 77:11
**calculation** 78:3,6
  78:7 83:15,16
  84:19,20 86:6
  96:12
**calculations** 81:12
**calculator** 85:14
  85:17 101:24
  102:3
**calendar** 78:10
  81:22
**california** 123:21
  124:12
**call** 40:15
**callahan** 39:20
**called** 48:3 49:6
**capital** 49:6
**car** 49:19 50:9
**case** 1:2 4:20,23
  4:24 5:13,25 6:5
  6:24 7:4 11:3,10
  12:3,20 15:20
  17:7,8,9,10,13,13
  19:1 22:2 23:4,5
  24:7,9,10,11,13,24
  25:1,12,15,20,21
  26:17,20 27:3,6
  28:4,6,8,16 30:8
  32:9,22,22 35:22
  38:18,22,23,25
  40:14 42:9,16,20
  45:24 46:5,6,8,9
  46:11 47:4,5
  48:16,22 49:22
  50:13,20 51:24
  52:1,2,7 53:1,2,5,6

  53:7,8,11 54:2,3
  54:11,25 55:12,15
  55:18 57:8,9,17
  60:7,16 62:6,9,11
  62:12,13,13 63:10
  63:13 64:7 67:8
  67:20 75:5,19
  76:6 79:10,12,13
  79:19 80:2 81:6
  81:16,20 82:5,13
  82:15,16,21,24,25
  83:6,7,9,11 85:23
  85:23 86:14,16
  89:1,7,8,14,15
  90:7,11,13,16,19
  90:20,22,24 91:2,2
  91:6,13,15,20,22
  92:2,5,9,11,20
  96:18 97:21 98:1
  99:24 104:19
  105:19 111:3
  123:3 124:6
**cases** 10:2,10,15
  10:18 17:23 42:1
  42:2 45:7 49:1
  50:18 52:24 53:20
  53:23 54:1 56:20
  57:1,2,6,14,16,21
  58:1,9 59:10,16,19
  59:24 60:1,4,10,16
  60:20,23,25 61:11
  61:12 64:8 67:1
  67:20 75:15 88:1
  88:2 89:2,13,25
  90:21,21 93:20
  94:11,12,13
  111:24
**cassandra** 43:22
**category** 42:21
**caused** 61:1

**cc** 124:25
**ccr** 122:23
**century** 2:6
**certain** 15:12
  34:22,23 35:1
  104:23 105:3
  119:21
**certainly** 10:9
  32:8 57:16 60:8
  76:5 77:17 79:12
  96:3 97:12 113:5
**certainty** 104:25
  118:19,19 119:22
**certified** 1:16
  122:3
**certify** 121:8
  122:4,9,15
**certiorari** 54:5,6
  55:6 98:9
**change** 7:5 9:2
  123:5 124:11,12
**changes** 124:11
**changing** 107:12
  117:7
**character** 93:9
  110:4
**charged** 39:22
**check** 5:12 37:5
  119:12
**checks** 37:2,6,8
  62:4,5 75:7
  114:12
**church** 48:3,3,9
  49:3,4,22 54:12,16
  57:23 98:6
**circumstances**
  114:18
**citing** 93:20
**civil** 78:21 84:16
**claim** 7:12 24:8
  62:10 74:16,17,21

  76:4 79:25 80:1
  86:2 96:5
**claimed** 62:11
**claims** 80:11
**classification** 93:9
  110:4
**classified** 10:22
  11:19
**classify** 51:16
**clayton** 49:13 50:9
**clear** 69:21 82:8,9
**client** 5:8,12 14:20
  15:7,13 16:15
  22:25 24:6 33:19
  45:9,11 46:6 48:4
  53:4 54:9,12 80:4
  83:7 88:15 98:12
  113:18,23
**clients** 15:14 57:5
  57:7 88:6,9,11,14
  113:24 114:10,13
  119:5
**closed** 111:18
**closer** 86:20,23
**coffee** 8:3
**collect** 10:4 13:4
  18:18 20:21 21:2
  21:6,21,24 22:10
  22:14,16 23:7,12
  23:23,25 24:12,14
  24:16 25:3,7,9,13
  25:16,24,24 26:5,9
  26:14,16,23 27:13
  27:20 31:15 32:17
  32:21,25 33:3,6,11
  33:11 72:14 73:3
  73:12 83:2 88:22
  88:23 89:10 91:3
  91:12 105:23
  116:13

collected 9:17
collecting 12:25
13:1 19:22 21:17
21:18 25:2 80:10
collection 8:8,12
8:16,19 10:13,17
17:15,19,23 18:10
23:3 30:7 52:21
58:14,18,19 62:1
62:11,16,20 63:6
63:12,18,21 64:7
64:11 72:6,12,20
72:22,25 73:1,10
73:19,21,22 74:3
74:16,19,22 75:6
75:10,12,14,16,23
75:25 76:1,7 77:1
79:3 81:24 82:1,4
82:17 83:4,6,9,14
84:8 85:20,25
86:2 88:12,16,19
88:20 89:24 90:6
90:11,16 91:16,18
91:21 92:3,16
95:19,22,25 96:2,6
96:8,9 100:1
collections 89:18
109:15
collector 9:15,18
10:12
combination
113:20
come 64:9 102:18
104:20 113:22
comes 70:2 100:21
comfortable 83:23
100:5 101:8,11,12
101:14 104:11
commencement
122:5

commencing 1:19
commercial 72:18
72:19 73:5 92:24
97:24 98:13
commission
123:25
commitment
37:16
companies 45:22
46:7
company 5:21
46:24,25 48:10
54:23 112:22
compare 66:13,13
66:15
compared 58:15
comparing 66:18
complaint 9:20
17:21
complete 121:12
comply 16:19 92:6
100:13
composition 56:22
76:12 94:8 111:1
compulsory 91:11
91:24 92:8
computer 71:1
concentrated
76:23
concerned 8:24
concluded 120:3
conclusion 63:15
64:9 78:15
confused 110:1
conservative 85:4
consider 79:11,13
80:9 82:3
considered 64:18
72:13 75:10 76:7
consists 4:17

construction 48:9
48:10,19
consumer 8:8,12
8:15,18 62:17
63:11 64:6 72:20
72:21,24 73:5,9
75:16,23,24 76:1
76:25 82:17 83:14
84:7 92:23 93:4
99:25
contact 15:3
contend 22:15
59:5
contention 20:25
26:17 62:18,21
105:19
contentious 42:12
context 58:17
contingency 50:13
56:25
converted 54:13
copies 18:3 37:5,5
copy 34:18 70:25
cordtz 1:4 53:3
62:3,9 74:14 75:7
76:3 79:10,19,23
79:24 81:6,8,16,20
82:25 83:7 84:17
85:23 89:14 91:2
93:1 94:23,23,25
95:6,18,20 123:3
124:6
correct 4:12,18
9:4 24:3 26:6 28:9
28:23 52:21 69:24
92:14,17 118:21
121:12,15
corrections 124:11
correctly 15:20
40:8 55:4

cost 66:8
costs 6:16 66:4,5
100:20
counsel 5:4,13,20
33:14,23,25 35:6
35:20 51:16,18,20
51:22,23,24
122:17,19 124:25
counted 105:21
counterclaim 5:2
5:10 7:13 8:24
53:7 79:21 80:2
91:9,11,23,25 92:8
92:12,16,18 96:5
county 48:1 49:1
49:14 51:6 121:5
couple 37:22
48:13 54:18 55:11
81:20 83:10
112:24 119:10
course 69:6
court 1:1,16,22
4:25 5:5,16 6:3
9:8 10:6,21 11:1
11:12 17:11 20:4
22:1,2 23:5 35:2
47:25 51:2 52:4
54:7,21,23 55:4,7
63:10 82:6 98:7
111:6 122:3 123:1
court's 29:25
82:23 100:14
courts 82:10
cover 6:8 32:7
56:7 94:1 102:23
covers 10:8 65:23
66:3
cranes 46:22,23
create 112:1,3
creditor 20:16

**criminal** 39:23
**cross** 3:2
**cs** 124:3
**csr** 1:15
**cup** 8:3
**cv** 1:2

**d**

**d** 3:1 22:2 121:1
**date** 32:1,2,2 68:1
  95:5 122:13 123:3
  124:8
**dated** 20:10 29:1
**dates** 29:6,7,23
  31:17
**daughter** 46:2
  49:18
**davis** 45:23
**day** 54:24 121:22
  123:22
**days** 68:8 124:16
**deadlines** 37:22
**deal** 33:10 100:17
  100:17 115:5
**dealing** 82:24
**dean** 28:16
**dear** 124:9
**debt** 7:19 8:8,12
  8:16,18 9:3,15,17
  9:18 10:12,13,17
  13:5 14:2 17:15
  17:19,22 18:10,13
  18:18 19:22 21:2
  21:6,21,24 23:3
  24:9,12,14 25:24
  25:25 26:5,9,14,16
  26:23 30:7 52:21
  58:14,17,19 62:1
  62:10,16,17,20
  63:6,12,17,21 64:6
  64:11 72:6,12,14
  72:20,21,24 73:1,3

73:5,5,9,12,19,19
73:20,21 74:2,15
74:18,22 75:5,10
75:12,14,16,23,25
76:1,5,7 77:1 79:3
80:10 81:24,25
82:4,17 83:2,3,5,8
83:14 84:7 85:20
85:25 86:2 88:12
88:15,19,20 89:24
90:6,11,15 91:4,12
91:16,17,21 92:3
92:16 93:1,1,5
95:19,22,25 96:1,6
96:6,8,9 100:1
105:21
**debtor** 5:3
**debts** 10:4 105:23
  116:13
**deceased** 46:4
**december** 6:11,19
  64:24 65:24,25
  89:11,20 93:13
  109:17 110:8
**decent** 57:24
**decide** 14:21
**decided** 82:5
**decision** 14:19,23
  63:12 82:9,11
  86:17
**decisions** 82:23
**declaration** 64:17
**deemed** 124:17
**defaulted** 89:10
**defend** 27:24 28:2
  38:1,3 53:5 91:6
**defendant** 2:8
  11:2 38:13 50:15
**defendants** 1:10
  97:23

**defended** 29:19
  48:10 83:6
**defending** 57:5,7
  76:6 79:20,25
  80:11
**defense** 39:23
**defensive** 87:25
**definitely** 51:23
  107:4
**definition** 88:19
**dekalb** 51:6
**delaware** 39:3
**demand** 49:8
**demonstrates**
  25:15 26:4,8,13
**denied** 30:3
**department**
  124:22
**depends** 15:13
  66:12,18 67:7
  68:5,8 88:18
  90:12,20,22
  116:13,14
**deposes** 84:5
**deposited** 61:18
**deposition** 1:5 6:7
  19:14 32:10 34:20
  34:21 61:17 71:23
  72:4 78:18 89:4
  99:7 106:23
  108:19,20 116:1
  120:3 121:10,14
  123:3 124:8,10
**depositions** 95:5
**deposits** 59:13
**depth** 116:3
**described** 59:25
**description** 89:19
  93:10 109:16
  110:5

**defended** continued...

**deserve** 12:4
**determination**
  95:24
**determine** 9:16
  10:3 72:6 73:8
  93:25 94:7 102:20
  105:24 108:12
  111:12
**determined** 77:12
**determining** 10:11
**development**
  11:17 40:7
**differences** 16:25
**different** 16:18
  41:21,23 60:20
  76:18,18
**difficult** 28:13
**direct** 3:2 4:6 35:8
**directly** 15:5
  18:11 55:1 113:25
  115:7,15 119:4
**disclosed** 108:9
  109:24
**discovery** 19:12
**discussed** 22:23
  36:9
**dismiss** 55:2
**dismissed** 55:4
**dispossessory**
  11:19 42:22
**dispute** 48:8
**district** 1:1,2
**divide** 81:10
**document** 27:2
  69:5 84:1
**documents** 3:9
  18:8 35:1 77:15
  78:14
**doing** 16:2 26:24
  27:7 30:11 42:4
  45:5 67:24 83:16

100:18 102:16
107:22
**dollar** 96:14,14
**dollars** 56:23
58:12,19 60:13
66:14 77:21,25
101:23 108:5
**doubt** 112:18
114:5
**draft** 114:7
**drawer** 27:4
**drive** 2:11 4:2
**dually** 84:3,5
**due** 14:2
**dui** 39:22
**duly** 4:3 122:6
**dustin** 43:22
**duties** 92:6

**e**

**e** 2:1,1 3:1,6 4:1
5:8 10:24 22:2
121:1,1,1 122:1,1
**earlier** 111:25
**early** 67:8
**earn** 103:13,17
**earned** 57:10
58:21 62:22 64:16
78:21 84:16 93:11
101:4 105:3,9
106:3 110:6
**eight** 29:2
**eighteen** 7:18
**either** 5:16 8:20
16:24 18:11 46:17
93:3 113:22
116:21
**electrician** 49:8
**email** 124:13
**employee** 122:16
122:19

**employees** 46:17
**employer** 50:21
**employment** 50:22
52:18
**encl** 124:24
**enclosed** 124:10
**encompass** 67:21
**engage** 63:7 64:13
88:23 105:25
**engaged** 78:2 89:9
**enjoin** 14:6,7
**entered** 5:6 62:12
**entire** 24:4,6,23
25:11 26:3,10,24
27:4,6 55:22 75:5
83:10
**entitled** 1:13
**entity** 41:21,24
**errata** 123:1
124:11,13
**erratas** 124:3
**esq** 1:6 2:8,12
124:5
**estimate** 50:3 70:3
80:14 116:20
**estimated** 79:7
**ethical** 92:6
**ethically** 92:11
**evicted** 12:4
**eviction** 11:21
40:12 41:12 42:2
42:4 43:2,12 44:2
47:7 93:19 94:14
115:2
**evictions** 12:16
44:10 45:21 99:12
109:22
**evidence** 25:23
26:1
**evident** 24:7

**exact** 7:16,19 45:7
63:3 74:1,8,12
75:4 83:19,22
97:13,15 110:12
116:18 117:9
118:5,6,9,13,14,20
118:21 119:24
**exactly** 33:20
52:11 59:15 78:13
78:14 100:12
115:25
**examination** 1:5
4:6 122:5
**example** 15:9
18:14
**excess** 115:4,5
**executives** 46:18
**exhibits** 34:23
**experience** 44:11
**expertise** 44:9
**expires** 123:25
**explain** 26:12 60:1
**explained** 95:21
98:12
**explains** 33:24
**extensive** 27:3
**extent** 33:21 64:12
89:17 105:25
109:14
**extra** 106:25 115:8

**f**

**f** 122:1
**fact** 33:1 79:17
80:4 118:25
119:15
**fair** 50:3 55:24
58:4 62:20 110:24
110:25
**fairly** 42:12 113:2
**false** 31:13,14,23

**familiar** 29:14
40:9 42:19 44:15
**family** 39:22 40:1
**far** 4:20 11:13
13:18 57:20 78:14
**fargo** 52:5 59:12
**fashion** 106:20
**fault** 8:2
**favor** 5:6
**fax** 124:2
**fci** 1:8 2:8 28:7
**fcpa** 72:20
**fdcpa** 26:23
**federal** 16:20,25
18:2 24:4,23 25:1
25:12 27:24 28:3
28:18 29:20,25
30:21 31:3,8 38:1
51:2 52:4
**fee** 39:18 42:6,14
42:16 56:25 66:7
67:14,19 68:24
69:4,9,13,18,23
70:1 86:25 100:19
118:12
**feel** 116:5,6,14
**fees** 4:21 6:4,16
45:3,4 49:24
52:21 53:14 55:23
56:1,17 57:3,10
61:19,23 66:4,21
74:22 76:18 78:21
84:16 85:24,25
94:10
**felt** 83:22 85:8
91:8,23 92:5,11
**fidelity** 39:2,9,11
**fifty** 50:1
**figure** 58:11 59:3
59:6 70:5 94:24
97:19 98:15 108:3

**file** 14:3 27:4 32:9 35:9 36:16 51:1 53:6 67:11 71:12 71:13,15,17,19,20 88:22 91:8,11 111:18,18 112:2,4 112:4,21,25 115:7

**filed** 4:25 5:1,15 5:25 10:10 17:25 25:18,19 28:19 34:4,5,5 46:1 53:8 54:20 55:1,5,12 77:15 91:23 92:15 92:18 98:8

**files** 102:20 108:15 111:17,23,23 112:6,13,14,16,18 112:20 113:21

**filing** 14:7 17:21 74:16 96:4

**filings** 35:2

**financial** 46:2

**financially** 122:20

**find** 47:12 58:12 58:17,25 71:20 107:10 116:6,11 124:10

**finding** 115:8

**fine** 116:8,10

**finish** 79:24

**finished** 43:7

**firm** 4:15,16 5:1 15:7 19:21 20:14 38:2 53:22 84:9 87:17

**first** 10:23 20:12 37:23 51:20 101:15

**five** 6:25 20:5 60:6 60:9 75:19 77:2,6 77:24 78:5 80:13

84:12,22 85:6 112:12 113:5,9,12

**flat** 42:6,14,16 66:25 67:4,14 69:4,9,13,18,23,25

**followed** 63:13 82:10

**follows** 4:4 84:6

**forced** 91:10

**foreclose** 13:7

**foreclosure** 12:6,8 12:13,14,15,17 13:10,17,21 14:1,3 14:5,6,7,13,16 15:4,11,15 16:2 18:1,17 20:23 22:3,4,22 23:1 29:24 30:4,6 40:11,24 41:11,17 41:19,21,25 42:1 43:1,10,15 44:1 45:25 47:7,8 62:19,23,25 63:7 63:17,21,24 64:13 66:5,9 67:1,6,19 76:10 83:3 87:5 93:18 94:14,16 96:25 97:10 98:16 99:16,23 100:8,22 101:9 102:6 104:7 104:10 105:10,20 106:1,4 107:23 108:8,13,22 109:6 109:11,21 110:10 112:4,14,16 114:23 115:1,3,18 117:15 118:2 119:7

**foreclosures** 13:14 23:3 43:13 44:10 45:20 64:5 82:3

82:17 87:13 98:22 99:11,25 102:13 103:3,6,11,15,18 103:25 106:23 111:13 116:16 119:8,15

**foregoing** 122:10

**forget** 28:17 31:25

**forgotten** 106:14 108:1

**form** 16:14

**forth** 122:13

**forty** 94:5 103:10

**forward** 6:11 23:1

**found** 15:24 104:6

**four** 49:18 58:9 81:17,19 113:3 114:16

**frame** 60:8 64:20

**free** 124:2

**friend** 39:21,25

**front** 7:17 16:5,9 28:21 29:7 35:13 65:16 68:13

**full** 67:13 101:3

**fully** 19:9 53:18

**fulton** 54:22

**further** 122:9,15

**future** 23:18 109:12

---

**g**

**g** 10:24,24,24 121:1

**geared** 74:18

**generally** 4:14 8:22 39:23 71:11 71:12 112:1 113:1 114:11 119:11

**generate** 31:25 59:16

**genuineness** 34:25

**georgia** 1:2 2:4,12 4:2 15:2 54:7 55:7 63:14 64:8 82:10 82:14,16 98:7 113:1 121:3

**getting** 42:15 50:25 66:9 106:8 109:6,10

**giggey** 10:20,24 11:6

**give** 62:4 95:3 100:25

**given** 62:4 121:15

**go** 18:16 56:9 59:9 61:15 71:13,19 89:16 95:9 97:19 106:24 111:18 115:8,9,11,16 116:3

**goes** 115:9

**going** 9:6 18:14,16 32:11 37:13 52:12 53:2 72:4 79:15 83:25 84:6 86:15 107:17 116:2

**good** 4:8,9 52:15 79:8

**gotten** 17:23 19:4 37:7 58:1,6 104:12

**gray** 2:6 47:2,2,4

**great** 41:22

**gross** 55:23 56:1

**grows** 55:23

**guess** 37:18 86:6 94:23 106:9 109:25 116:25

**guessing** 65:15 95:8

**guild** 44:18
**guy** 49:9
**guys** 53:9
**gwinnett** 10:21
  11:1

### h

**h** 3:6 4:1 15:21
**half** 77:2,13,18,18
  78:1,4 80:12
  81:14 83:13,18,24
  84:12,22 85:8,9
  118:12
**halt** 45:23
**hammond** 2:11
  4:2
**hand** 97:18
**handle** 8:23 12:16
  33:17 59:16,18
  115:8,15
**handled** 12:7,10
  12:11 44:16 45:8
  48:1 57:14 59:20
  60:5,9,19
**handling** 46:8
**happened** 13:7
  114:15,19
**happens** 115:14
**happy** 19:3 35:8
  63:9 102:23
  107:17 109:20
**hard** 67:12 82:22
  98:24 100:16
**harden** 49:17
**hate** 119:21
**head** 5:18 14:9
  48:2 49:20 60:19
  68:15 77:10 85:12
  85:16
**hearing** 5:5 22:24
  25:20

**help** 10:16 39:17
  59:7
**helped** 13:7
**henderson** 2:3
**henry** 48:1 49:1
**hereinbefore**
  122:13
**hide** 104:21
**high** 66:6
**hire** 33:19 54:24
**hired** 29:19 48:4
  62:9 74:15 86:1
  91:6,13
**home** 58:23 64:16
  65:22 66:22 67:25
  69:17,22 70:7,17
  70:20,23 71:2,10
  71:17 81:1 87:14
  98:23 104:13
  105:15 113:13,22
  115:19
**homeowners**
  14:15
**honest** 39:16
**hope** 15:20 40:7
**hopefully** 62:6
**hoping** 5:23 10:15
**hour** 68:18,20
  70:1,6,11,13
**hourly** 42:5 57:2
  66:21 68:22,24,25
  69:1,2
**hours** 68:21,21
  70:9,16,19,22
**house** 5:20 13:8
**housing** 11:17
  40:6
**hud** 40:15,16 41:7
  41:16,18,20,25
  42:16 43:20 44:12

**huh** 38:11 44:20
  60:14 75:8 89:5
**hundred** 7:18
  58:24
**hundreds** 18:7
  59:16,18 60:9
**husband** 39:8

### i

**idea** 67:22 70:12
  70:14 103:1
**identification** 89:6
  89:8
**identified** 10:8
  62:3 90:2 107:21
**identifying** 11:13
  11:13
**ignore** 82:22
**ignoring** 62:21
**implies** 117:23
**include** 23:18
  56:13,16,19 59:3
**included** 56:18
  99:10 106:12
  114:2,5 124:11
**includes** 6:16 32:1
  66:8 88:10,11
  89:23
**including** 62:23
  78:24 85:22 89:19
  100:2 109:16
**income** 62:22,24
  65:9 77:5 81:25
  83:13 87:12 96:19
  100:6 104:7 106:3
  107:21 108:8,14
  114:23 115:18
  117:16 118:2
**incorrect** 91:5
**indicate** 23:24
  24:2,19,21 27:12

**indicated** 20:2
  61:18
**indicating** 124:11
**indication** 23:22
  25:5,12 32:23
**indirectly** 18:12
**individual** 28:16
  78:10,20 80:22
  84:14 86:5,8
**information** 3:9
  4:21 15:3 65:3
**initial** 87:13 98:22
**initially** 4:24
  51:19 54:20 74:15
  86:1 91:6
**injunction** 14:6
  44:22
**injury** 49:11 50:9
  54:1 57:25 88:2
**insignificant** 65:10
  66:2,18
**instance** 57:17
  64:2 66:8 74:14
  76:3 115:4
**instances** 16:22
  42:15 62:14 67:13
**insurance** 46:7
**interested** 122:20
**investigating** 32:6
**investigation** 9:14
  9:20,24,25 10:1
  108:11,19
**investments** 20:16
  22:6 27:13,23
  28:2 29:5,10,17
  30:12,20 31:2,7
  32:18 33:3,7,12
**invoice** 68:7 69:10
  119:11
**invoiced** 71:2

**invoices** 68:6,11
  71:1,10
**involve** 20:23
  89:18 91:17
  109:15
**involved** 9:11 10:2
  13:13 17:24,24
  45:16 47:6 49:13
  49:19 50:19 53:5
  75:16 76:6 84:10
  87:4 91:16,21,22
  92:2,5 97:23
  98:11 99:2,12
  100:20
**involvement** 40:13
**involves** 74:13
**involving** 22:1
  26:15 33:4 57:16
  57:23 84:17
  104:14 106:4
**issue** 26:16
**issues** 6:7 71:21
  112:20,23 119:9

**j**

**j** 4:1
**jauregui** 12:11
  19:20 20:9 21:15
  23:16 28:11,12
  29:1 33:6,11
  35:24 36:4,11
  58:22 81:2 87:14
  98:23,25 104:15
  105:16 113:16,17
  113:23,24 114:3
  114:11,12 115:18
  118:23 119:5
**jeffrey** 1:4 84:17
  89:14
**jersey** 1:18,24
  124:2

**job** 1:24
**johnson** 1:6,7,9
  2:10,12,13,13 3:3
  4:8,11,20 5:7,7
  6:10 7:10 10:21
  11:2,8 19:22
  20:15 21:5 44:19
  62:6,13 79:12,13
  79:19 80:2 81:4,4
  84:2,4,9,10 85:23
  86:14,16 89:15
  93:12,12 96:18
  110:7,7 121:8,19
  123:4 124:5,6,8
**johnson's** 5:13
**jonson** 123:3
**judge** 30:3,3
**judgment** 5:6,10
  5:15 7:10,11,15
  34:6 43:4 44:2
  51:3 52:3 99:14
**judicial** 13:14,17
  22:3,22 23:1,2
  30:6 45:20 47:6,7
  62:19,22,24 63:7
  63:17,21,23,23
  64:5,12 66:4 67:6
  67:19 76:10 82:3
  82:16 83:2 87:5
  87:12 93:17 94:13
  94:16 96:24 97:10
  98:16 99:3,11,16
  99:23,25 100:7,22
  101:9 102:6,13
  103:3,5,11,14,18
  103:25 104:6,9
  105:10,20,25
  106:4,23 107:23
  108:7,8,13,22
  109:11,21 110:9
  111:13 112:4,14

  112:15 114:23
  115:17 116:16
  117:5,15 118:1
  119:8,14
**july** 20:10 28:25
  29:1,9 30:11,15
  31:13
**jurat** 124:16

**k**

**k** 22:2 121:1
**keep** 71:9 106:7
  110:1
**kg** 46:15,18,24
**kim** 46:15,16
**kind** 70:3 74:17
  76:23 93:9,21
  96:4,5 97:20
  100:18 110:4
  111:22
**kinds** 76:18
**know** 5:4 7:19,25
  8:9 10:5 14:25
  15:15,25 16:6,8
  17:12 18:23 26:2
  26:18 27:6,8
  28:13 29:18 31:9
  31:17,18,20 36:10
  36:13 39:15 41:15
  41:22 43:6 44:6
  44:14 46:12 47:16
  47:16,20,25 50:19
  52:10,14 55:8,18
  55:19 56:20 57:6
  57:13,14,18,20
  58:1,5,8,13,15
  59:1,17 60:6,17,18
  61:7,7,10,22 63:2
  63:3,8,19 64:7,20
  65:2,11,12 66:3,12
  66:17 67:2,9,16,25
  68:5,9,10 69:25

  70:18,21,24 71:7,9
  71:15 72:8,10
  73:18,24,25 74:1,2
  74:8 75:1,3,11,12
  76:5,11,12,13 77:6
  77:9,23,25 78:8,9
  78:12 81:4 83:18
  84:24,25 85:11,12
  85:15 86:13 88:18
  88:25 89:2 90:9
  90:12,17,23,25
  93:19 94:4,10,18
  94:20,22 95:1,23
  96:10,25 97:2,13
  97:16 98:6,24
  100:24,25 101:5,5
  101:19 103:23
  104:9 105:13
  106:22 108:5,25
  109:1 110:10,14
  111:14 113:1,10
  113:11 115:25
  116:11,22 117:9
  117:12 118:5,9,13
  118:25 119:13,22
  119:23
**knowing** 108:15
**knowledge** 41:5
  108:17 116:24
**korean** 46:25
**kristin** 39:20
  49:17

**l**

**l** 4:1 5:8 121:1
**larry** 1:6,9 2:12,13
  3:3 19:22 44:19
  84:2,4,8 93:12
  110:7 121:8,19
  123:4 124:5,8
**lasts** 42:9

**law** 2:3 4:3,15,16
4:25 15:2 16:19
16:25 18:2 20:14
38:2 53:22 84:9
87:17
**laws** 16:20
**lawsuit** 9:13 14:7
24:5 27:24 28:3
28:18 29:3,20
30:22 31:3,8 38:1
38:3 39:11 46:1
51:19 88:22
**lawsuits** 9:10
47:11
**lawyers** 26:21
**leads** 32:16
**learn** 110:25
**learned** 91:20 92:2
**leave** 37:21
**left** 103:4 106:2
**legal** 1:7 2:10,13
4:11 20:15 33:16
33:18 45:3,4,5,6
49:24 50:21 53:14
55:23 56:1 61:24
84:10 89:17,20
93:11,12 109:14
109:17 110:6,7
123:3 124:1,6
**lender** 1:8 2:8
14:18 15:8 26:20
26:21 28:7
**letter** 15:24 16:1,4
16:7,9,11,14,15,18
17:1,3 18:15 19:4
19:15,17,25 20:1,1
20:9,13,20 21:1,3
21:5,8,10,12,16,20
21:21,22,23 22:12
22:17,19 23:10,11
23:14,17 27:11,16

27:18,19 28:24,25
28:25 29:9,12,13
29:14 31:13,14
124:17
**letters** 15:10 16:13
16:17 17:5,8 19:1
19:14 23:19 31:18
31:24
**level** 54:21 98:7
**license** 1:15
122:24
**lien** 115:10
**lindsey** 12:11 20:9
23:16 28:12 35:24
104:15
**line** 123:5 124:11
**lines** 19:23
**list** 6:7 35:12
47:18 106:21
108:18
**listed** 32:7 39:9
53:23
**listen** 107:18
**litigation** 5:23
22:8,24 49:21
56:25 57:3,4
87:23,24,25 88:23
89:22,23,24 90:4
90:16 91:15 92:20
93:15 94:13
109:22
**little** 4:20 13:18
56:22 64:14,18,19
**livingston** 1:24
124:2
**llc** 1:8 2:6,10,13
4:12 20:15,16
22:6 27:13,23
28:2 29:5,11,17
30:12,20 31:2,7
32:19 33:7,12

84:10 93:13 110:8
**loan** 14:11,12
20:17 22:10,14,16
23:7,12,24,25
24:16 25:3,7,10,13
25:17 27:13,20
31:16 32:18,21,25
33:3,3,4,7,12
67:10,10 89:10
**loans** 20:22
**long** 42:8
**look** 8:14 9:9,9
17:2 19:3 24:10
32:8 35:2,8 36:25
47:21 55:13 57:19
65:13 71:6,8
74:25 76:16,19
79:14 81:21,23
86:15,16,24 89:1
90:24 99:6 102:8
111:15 116:1
**looked** 8:14 56:6,8
59:12 61:17 78:11
78:11,12,15 79:5,9
79:9,16,17 80:1,8
83:17,18 85:2
96:13 98:17 104:2
**looking** 10:1,6,10
20:8 29:8 59:9
68:16 79:20 81:22
89:3 103:20
**looks** 11:18 95:14
**lot** 17:6 29:13
52:12 60:20 61:5
63:2 65:10 66:6
**ltw** 1:2
**lunsford** 38:10

| m |
| --- |

**m** 121:1
**madam** 124:9

**magistrate** 4:25
5:5 6:3 11:19
54:21
**main** 99:1
**majority** 84:14
**making** 14:19,23
**march** 1:19
121:11
**marion** 41:7
**mark** 2:8 111:7
**marked** 3:12
**markings** 34:15
**math** 85:7
**matter** 1:13 5:23
6:10 12:6 25:21
26:14,25 40:2
48:24 62:3 74:14
74:17 75:7 79:25
86:3 112:2
**matters** 14:20
47:24,25 49:11
62:2 66:5 97:24
97:25 99:2
**maximum** 98:20
**mcmichael** 2:6
**mean** 11:12 14:25
29:24 32:13 35:11
44:15 45:13 47:3
53:1,18 75:3
76:17 80:14
**means** 90:14
**medical** 7:23 8:6
8:10 9:4,4
**meet** 94:5
**meggison** 5:20
**melissa** 5:19
**memorize** 16:10
**memorized** 16:5
**mention** 43:18
49:12 53:1,8 54:3

**mentioned** 17:10 53:24 57:6 58:8 60:23 94:11
**mexico** 46:23
**mhc** 1:2
**mill** 2:3
**million** 56:15,23 58:12,18 60:12,12 61:2 72:25 73:8 73:15,20 74:4 76:9 77:20,25 81:13 85:10,10 86:23 94:5 95:13 96:23,24 97:1 100:5,10 101:7,23 102:5 103:2,5 107:20,20 111:1 115:16 116:14,15 117:16
**mine** 82:19
**minute** 20:5 71:6 110:19
**mischaracterize** 101:20
**mischaracterized** 101:16
**mischaracterizing** 106:7
**misleading** 104:20 106:19 107:3
**missing** 47:13
**mixdeity** 98:1,4
**modification** 14:11
**mold** 38:15
**mom** 46:3,3
**money** 12:25 13:2 13:5 42:12 43:3,4 44:2 46:20 61:15 80:4 88:22,24 99:14 115:8

**monitoring** 111:10
**month** 56:11 100:17 113:7
**months** 29:2 32:3 56:8,10,23 57:11 57:15 58:10 59:2 60:11 61:2,14,15 62:25 68:7 87:6 93:25 94:2,5 96:20 99:20 100:6 100:11 101:4,7 102:15 103:14,18 104:1 105:2,12 106:3 107:22 111:2,14 115:21 118:2
**morning** 4:8
**mortgage** 44:18 45:22 58:23 64:16 65:22 66:22 67:25 69:17,22 70:7,17 70:20,23 71:2,10 71:17 81:2 87:14 98:23 104:14 105:15 113:13,22 115:19
**motion** 34:7 55:2
**move** 22:25
**mt** 1:23 124:1

| n |
| --- |

**n** 1:12 2:1 3:1 4:1 4:1 5:8 121:1,1
**name** 9:9 10:23 12:23 15:3 19:18 21:12,15,16 28:13 28:17 39:7 43:6 44:15,17 47:10 49:2 61:1 89:7,8 113:8 123:3,4 124:6

**named** 28:16
**names** 10:15 47:5 113:10
**nashville** 2:7
**nature** 93:10 110:5
**near** 101:18
**necessarily** 72:15
**need** 110:17
**needed** 92:12
**negative** 27:2
**negligent** 48:19
**negotiate** 36:7
**neither** 122:16,18
**never** 32:20 68:22 68:23 69:2 96:13 101:16
**new** 1:18,24 48:6 67:10 124:2
**nine** 29:2
**non** 13:14,17 22:3 22:22 23:1,2 30:6 45:20 47:6,7 62:19,22,24 63:7 63:17,21,23,23 64:5,12 66:4 67:6 67:19 76:10 81:25 82:3,16 83:2 85:25 87:5,13 93:17 94:13,16 96:24 97:10 98:16 99:3,11,16,23,25 100:7,22 101:9 102:6,13 103:3,5 103:11,14,18,25 104:6,9 105:10,20 105:25 106:4,23 107:23 108:8,13 108:22 109:11,21 110:9 111:13 112:4,14,15

114:23 115:17 116:16 117:5,15 118:1 119:8,14
**northern** 1:2
**notarized** 124:12
**notary** 1:17 121:24 123:21,24
**note** 92:19 124:11
**notice** 6:6 18:19 34:20,22 35:12 89:4 106:24 108:18
**notices** 15:15 16:21,23 17:16,19 17:23 18:1,10,21 18:22
**november** 6:20
**number** 6:13 7:1 7:20,21 42:7 57:11 59:9,13 60:21 61:12,18,20 62:7 63:3 65:9,11 66:7,12,14,16 74:1 74:4,8,13 75:4 78:25 79:4 80:9 81:21 83:22 85:4 85:20 86:22 95:3 95:4 101:19 104:3 104:4 110:13 112:10 116:18 118:5,9,14,20 119:24 124:7,11
**numbers** 74:25 75:1,2 79:11,14 83:17 85:2 86:16 98:20 99:16,19 102:9 103:12
**numerous** 18:22 19:15

**o**

**o** 4:1,1 15:21 22:2
  121:1
**o'hai** 15:19,22,23
  17:8,13 18:15
  19:15 20:10 24:6
  24:9,16 25:11
  26:4,7,12,14,17
  27:25 28:3 29:1
  30:21 31:2,7 32:9
  32:9 33:4 55:12
  55:15 57:17 58:3
  58:4,6 64:3
**o'hai's** 25:3,7,25
  26:5,9 27:13,20
  31:15 32:18
**oath** 78:17,19
  80:15 84:6 85:14
  99:3 102:17
  104:12 121:10
**oaths** 84:4
**obduskey** 22:1
  23:4 30:7 63:10
  64:7 82:4,15
  99:24
**objection** 100:14
**obtained** 4:22,22
**obviously** 57:2
**occasions** 19:16
**occurred** 20:6
  29:25 30:4 110:22
**odyssey** 47:22,23
**off's** 115:14
**offer** 14:14,15,24
  15:1
**office** 2:3 27:5
**officers** 46:18
**offices** 1:7 2:10,13
  4:11 20:15 54:13
  84:10 93:12 110:7
  123:3 124:6

**officially** 45:13
**oh** 52:20 100:9
  111:8,22
**okay** 4:16,19 6:4
  6:17,22 7:3,6,9,9
  7:14 8:7 9:6,21
  10:19 11:1,11,11
  12:2,7,18,24 13:3
  13:6,11,15,24
  14:10,14 15:9,19
  15:23 16:12 17:4
  19:11,19 20:3,8,18
  20:20,25 21:9,11
  21:14 22:9,12,20
  23:9,15,21 24:18
  25:14 26:11 27:19
  27:22 28:14,18,24
  29:8 30:9 34:19
  35:5,15,16,18,25
  36:3,10,13,17,19
  37:1,7,10,13,25
  38:8,16,20 39:13
  39:24 40:10,13,18
  40:23 41:1,7,10,13
  41:16 42:3,8,24
  43:5,8,20,24 44:6
  44:18 45:1,4,16
  46:13,15 47:1,11
  48:11 49:16,21
  50:8,17,17 51:8,11
  51:17,21,25 52:9
  52:13,20,23 53:3,3
  53:16,20 54:8,14
  54:19 55:10,21,21
  56:13,19 58:7
  60:22 61:22 63:4
  63:20 64:15 65:8
  66:1,21,24 67:5,23
  68:3,10 69:25
  71:24 72:2,16,21
  73:7,14,17 75:18

76:21,25 77:5
  79:12 80:25,25
  81:9 82:7 85:17
  86:18 87:11,16,20
  88:7,10,21 89:3,16
  90:14 91:1,7,19
  92:10 93:8,16
  95:7,10,12,15
  96:15,17 97:8,14
  98:5,14,19 99:18
  101:2,25 103:9
  105:17 107:25
  109:13,23 110:21
  111:8,8 112:3,13
  112:17 113:15
  117:11 118:18
  119:25
**old** 49:18
**once** 30:5 55:3
  91:20 114:15,19
**ones** 34:16,17
  47:17 61:3 75:22
  75:22 80:3 104:7
**onesie** 106:17
  114:24 119:17
**ongoing** 28:5
  38:24 46:4 48:24
  48:24,25 50:10
**open** 112:6 113:21
**opportunity**
  107:15
**opposition** 34:6
**option** 111:19
**oral** 1:5
**oranges** 100:18
**order** 68:17 92:6
  100:14
**outside** 106:11
**overall** 46:9
**owed** 9:2,3

**owned** 84:9
**owner** 40:16
**owns** 54:12

**p**

**p** 1:12 2:1,1
**p.m.** 1:20 120:4
**p1-5147340** 1:24
  123:2
**pacer** 15:24
**page** 18:6 84:1
  123:5 124:11
**pages** 18:8
**paid** 6:5,11,21,24
  7:4,6 37:25 38:7
  38:17,21 39:13,16
  39:18 40:3 41:2,4
  41:13 42:3 44:7
  46:10,13,14 48:21
  49:23 53:13 55:15
  57:18,21 58:10
  66:21 67:5 68:6
  68:18,23 70:6,10
  70:11 89:9 95:6
  114:3,7,9,11
  115:19 119:4
**pam** 39:7
**paper** 71:11
**paragraph** 84:7
**park** 20:16 22:5
  27:12,23 28:1
  29:5,10,16 30:12
  30:19 31:1,6
  32:18 33:2,6,12,18
**part** 9:19 10:11
  25:15 26:7 46:24
  48:6,7 54:16 59:1
  63:11 74:13
  105:21,22 108:23
  108:24 109:1
  116:15

particular   10:9
35:23 54:15 61:11
parties   122:17
party   5:24
pay   14:2 18:12,12
18:12,17 39:10,12
61:14 68:3,8,22
69:4,9,11,13,18,23
113:25 114:4,13
114:14 115:7
paying   38:3
payment   38:25
41:6 67:23
pays   67:10
pc   2:3
peach   47:24
penalty   124:13
pending   24:5 41:3
43:19 53:12
people   14:24 16:1
16:2,13 26:22
31:25
percent   59:4,4,5,6
63:5 72:12,25
77:2,13 78:4,20,22
78:23,24 80:13,21
81:14 83:13,19,24
84:12,13,22 85:8,9
86:4 87:1 94:17
94:19,21 95:1,12
95:14 96:17 97:4
97:5,9,12 99:4,15
99:21,22 100:7
101:10,13,18,23
103:3,4,10,10
104:23,25 119:21
119:22
percentage   72:6
78:1 81:24 84:11
94:20,22 95:17,17
97:13,15 98:15,18

99:8 101:22 102:4
116:23 117:2,5,6
118:4,6,14
percentages   80:8
80:8 106:22
118:21
perfect   11:13
period   56:12
65:23 77:24 79:6
81:17,19 100:13
perjury   124:13
permission   30:1
perryman   40:8
43:17
person   12:3 18:11
personal   49:11
50:8 53:25 57:25
83:20 88:2
personally   50:20
84:2
ph   40:8 41:8
piece   25:25
pieces   67:14
place   122:12
plain   83:3,5
plaintiff   1:5 2:5
30:2 38:14 50:16
plaintiff's   82:20
88:1
plaintiffs   26:21
pleading   25:18
pleadings   17:11
pleasant   1:23
124:1
please   20:5,13,19
101:20 124:10,10
plumbing   49:7
plus   7:4,5 49:4
81:2
point   5:19 25:22
26:11 29:4 48:3

49:3,4,22 110:17
portion   74:20
79:18 85:25 95:22
95:25 96:1
pose   43:1 44:1
position   30:5
74:23
possession   11:25
40:17,21 42:22
43:2 55:9 99:13
possible   101:13,17
101:17 102:12
106:2
post   12:6,15 40:11
41:11 44:10
pouring   8:3,3
practice   8:21
58:14,16 72:7
108:23,25 109:2
practitioner   88:8
97:17 109:1
pre   9:20
preceding   87:6
preparation   32:9
99:7
prepare   106:24
preparing   61:16
pretended   101:3
pretrial   9:19
pretty   24:7 93:21
93:22 112:12
previously   107:16
prior   9:13 17:21
19:5 29:22 32:2
38:14 39:7 50:20
74:16 96:4 108:20
122:5
priority   1:22
123:1
pro   54:20

probably   36:2
45:19 47:6 59:2
73:6 75:15 77:24
94:2 99:5 101:6
109:5 111:16
113:14 114:15
118:12,12,16,17
proceedings   20:24
proceeds   115:4,6
process   22:3,4
64:21 100:22
115:12
produce   18:20,25
36:14 37:17
produced   17:4,6,7
17:12,19 18:5,5,7
18:7 19:7 33:23
34:16,17 37:10,14
37:15
production   124:22
professional   1:17
122:4
pronounce   28:13
98:24
pronounced   15:22
pronounces   98:25
pronouncing
15:20 40:7
proper   9:14
property   12:1
20:23,24 40:17,22
55:9
protest   23:15
prove   27:1 82:21
provide   15:2
provided   16:15
33:14 34:1 36:1
65:5 104:8 118:23
providing   16:21
public   1:17 121:24
123:24

**pull** 85:13 111:16 111:19

**purchaser** 45:25

**put** 6:9 21:15,15 31:25 77:14 112:22

**q**

**qualification** 72:17

**queen** 49:6

**question** 4:13 15:17 21:4,5,20 23:6 24:14 26:19 27:8,11 30:10,10 30:24 31:12 33:14 33:21 41:23 58:13 66:20 72:23 73:11 81:1 107:14,15,17 107:19 113:19 116:11 117:7,21 117:25

**questions** 3:12 19:5,8 59:24 101:1 102:24 105:7 120:2

**quick** 113:2

**r**

**r** 1:12,12,14 2:1 4:1,1 122:1,2,23

**range** 50:7

**rate** 42:5 66:24,25 67:4

**rationale** 82:11

**rco** 50:21 56:15,15

**rd** 2:3

**reach** 15:5 61:1

**reached** 5:21

**read** 20:12 22:13 121:9

**reading** 63:10 124:17

**real** 58:13 83:23

**realize** 82:20 116:2

**really** 8:14 15:13 15:17 16:10 26:18 27:8 30:9 32:12 48:4 55:19 58:13 60:7 64:3 66:5,19 67:11,15,16 74:12 75:3 78:13 79:19 82:8 90:23 97:17 99:6 102:1 112:11

**reason** 8:11,17 30:18,25 31:11,21 75:3 106:20 123:5 124:12

**reasons** 31:5

**recall** 13:9 18:24 21:13 23:20 25:4 29:18 32:22 33:2 36:2 37:12 39:18 40:25 41:18 42:15 42:20 43:6,11,14 44:17 45:7 47:5 48:23 61:4 102:16 104:17 114:18 119:16

**receipt** 124:16

**received** 37:3 56:2 67:24 100:14 124:16

**recess** 20:6 110:22

**recognize** 10:25 11:9

**recollection** 8:5 32:12 46:9,19 47:9 65:19 108:17

**record** 20:7 24:6 24:23,25 25:11

**reading** 26:4,7,10,12,24 68:11 69:21 110:23 111:4 121:12,15

**records** 11:12

**recross** 3:2

**redirect** 3:2

**reference** 124:7

**referenced** 20:17 20:22 78:21 84:16

**referrals** 43:12 87:5 109:6,11,21 115:3

**referred** 22:22 91:18

**referring** 17:25 19:2 35:13

**refused** 39:10

**regard** 65:6

**regarded** 108:20

**regarding** 4:21 9:9

**regardless** 42:8

**registered** 1:16 122:3

**regularly** 10:4 72:13 73:3,11 105:22 116:12

**reinstates** 67:9

**rejected** 5:14,15

**related** 4:22 45:2,2 57:20 86:1 94:8 107:23

**relating** 17:8 48:9 49:22 61:19

**relationship** 58:22

**relative** 122:16,18

**relevant** 63:25 72:5 73:2,6,7,10 73:13,15,16 111:3

**relied** 89:19 109:16

**rely** 87:21 88:3,4,5 88:6,8 108:22 109:4,9

**relying** 90:3,4

**remained** 51:23

**remember** 5:17 12:12,19,21,23,24 13:1 17:14 18:3,6 29:6,23 30:13,17 31:4 32:12,14 34:14 35:7 39:15 42:7,18 44:24 45:8,10 47:3 52:10 53:20 64:22 67:3 68:14 78:13 86:19,21 106:18 114:17 118:24

**renovate** 48:4,6

**rent** 11:22,24 43:3 47:8

**rented** 54:15

**repeat** 6:13 7:1

**reporter** 1:16,17 20:4 111:6 122:3 122:4

**reporting** 1:22 123:1

**represent** 6:2 7:21 9:7 18:15 20:15 22:5 28:5,7,15 29:10 37:13 38:13 40:24 41:16 43:9 45:24 96:1 99:17

**representation** 118:10

**represented** 5:3 7:22,23 9:3 11:5,7 22:7 26:19 35:1 40:15 43:14

**representing** 26:20 29:5 30:14

30:19 31:1,6
41:18 46:5 83:1
**represents** 95:19
95:25 96:16
**request** 19:3
110:25
**requested** 3:9
**requesting** 18:3
**requests** 19:10
**required** 18:2
123:21
**resolve** 112:23
**resolved** 48:12
51:7 112:21
**response** 19:7
119:23
**responses** 19:12
**responsibilities**
92:7
**responsive** 19:10
**rest** 58:16 62:5
**restate** 107:17
**restating** 107:19
**result** 67:16
**results** 115:4
**retained** 6:2 8:23
20:21 22:9,13,15
23:7,12,23,25
24:15 25:2,7,9,13
25:16,24 26:5,8,13
26:15 27:12,20,22
28:1 31:15 32:17
32:24 33:2,6
48:13
**revenue** 76:22,24
79:5 81:25 86:21
86:25 93:11 110:6
**revenues** 77:8
84:11
**review** 34:20
124:11

**ricky** 42:18 43:21
**right** 4:17,18 8:5
9:21 13:12 17:5
19:16 20:11 28:20
33:5,8 41:6 42:23
49:3 50:24 51:4
53:10,17,19 61:4
68:19,23 69:4,19
71:13,25 73:17,22
75:14 77:12 78:1
78:17 80:16,24
83:4 85:7 87:7,13
88:12 89:24 90:8
91:4 92:13 94:6,9
95:16 102:19
103:7 104:8 106:5
110:11 112:7,8
113:8,11,20
114:20 116:24
119:19
**rings** 41:9 43:23
**rpr** 1:15 122:23
**rules** 91:25
**ruling** 6:3
**rulings** 3:12
**running** 66:8

**s**

**s** 1:12 2:1 3:6 4:1,1
5:8 22:2 123:5
**sale** 29:24 30:4,6
45:25 112:19
113:6 115:3
**saw** 51:15
**saying** 17:15 19:6
22:19 24:2,13,20
24:21 25:6,9
27:14,16 34:7
66:17 79:1,24
84:20,21,24 100:5
101:11,12,14
102:11,17 104:11

106:10 107:3
116:5
**sayings** 101:9
**says** 16:11 19:21
22:12 23:10 25:1
29:9 65:7,14
67:17 82:16 87:3
**scenario** 91:10
**scheduled** 112:19
113:6
**scratch** 60:24
**se** 54:20
**search** 66:9
**searching** 15:24
**seattle** 50:23
**second** 110:18
**secretary** 11:16
40:6
**secured** 20:22
**see** 5:22 11:16
24:11 35:5 37:4
49:14 51:12 53:25
56:20,21 58:17
65:14 74:25 87:1
**seeing** 90:18
**seek** 14:5 15:5
30:2 43:3 47:8
**seeking** 11:22,24
11:25 40:17,19,21
80:6,7 99:13
**seen** 31:24 32:4
**selwyn** 4:20 5:7
7:10 81:3,4 89:14
96:18
**send** 15:9,14 16:1
16:12,16,17 68:6,7
69:10 119:11,12
**sending** 119:14
**sense** 13:2
**sent** 5:8,12 17:16
17:16,17,20,22

18:19,22 19:14
**sentence** 20:12,18
**separate** 17:9
112:1,2,3
**serafina** 1:14
122:2,23
**services** 1:8,22 2:9
9:4 28:8 39:3
**set** 122:13
**seven** 37:5,5
**sheet** 123:1 124:11
124:12,13
**shimshon** 2:3
**shocked** 104:3,5
**short** 40:16
**show** 56:10 71:18
**showed** 64:17
**shown** 124:13
**shows** 26:24 27:7
85:18
**sic** 68:21 101:24
111:20
**side** 12:13 54:22
55:1 67:9 98:8
**signature** 36:11,24
122:22 124:12
**signed** 19:25 35:23
36:5
**significant** 79:18
**signing** 124:12,17
**similar** 16:23
19:15
**simply** 91:14
**sincerely** 124:20
**single** 82:15
**sir** 124:9
**sitting** 61:5 73:17
**six** 68:6
**slander** 51:6 53:8
**small** 84:11
108:24 112:10

118:4
smith  39:2,7
sole  39:10 88:8
  97:17 109:1
solely  4:17 79:20
  84:9
solutions  124:1
somebody  115:5
sorry  7:24 11:23
  19:13 40:20 49:7
  55:25 71:4 105:6
  111:9
sought  43:2 44:3
sound  28:20 44:14
sounds  28:22,22
  42:19
source  105:4
space  54:16,18
spalding  43:8
speak  4:14
speaking  4:10,11
  4:14 8:22
spec'd  82:1
specific  12:20
  16:13 17:3 19:2
  27:10 48:2 57:8,9
  57:21 61:11 89:1
  114:17 116:11
specifically  17:18
  18:9 24:15 47:9
  60:18
specifics  58:3
  90:13
spent  80:4
squeeze  55:7
ss  121:4
standing  80:20,21
  80:22 86:13
standpoint  8:15
  76:20 113:3

starts  78:18
state  1:18 5:16
  10:21 11:1 16:19
  16:24 18:2 39:20
  64:15 66:22 67:25
  69:17,22 70:7,16
  70:20,23 71:2,10
  71:17 81:1 87:14
  98:22 104:13
  105:15 113:13,22
  115:19 121:3
statement  23:22
states  1:1 84:5
stenographically
  1:14 122:11
stop  13:20,21 14:1
  14:3,5,13,16 15:11
  67:8
stopping  110:17
storage  111:17,21
  111:22
stores  111:20
strike  34:7
stuff  52:12 97:20
  104:22
subcontractors
  48:14,18 49:5
subordinate
  115:10
subscribed  121:21
  123:21
substantial  85:24
  100:21
sued  48:13,17 49:5
  49:9,10 51:5 53:4
sufficient  10:3,6
suing  5:9 9:17
  38:15 44:24,25
suite  1:23 2:4,7,11
  4:2 124:1

summary  34:6
super  82:9
superior  5:16
  54:22
supreme  22:1,2
  23:5 54:7 55:7
  63:10 82:5,22
  98:7
sure  4:24 6:15 7:2
  8:20 11:15 12:9
  13:13 16:11 17:3
  19:17 20:14 21:14
  21:18 24:4 30:25
  33:13,20 35:10
  37:9 39:21 59:8
  60:7 64:3 66:19
  71:19 74:12 80:24
  93:2,3,15 97:4,8,9
  99:8 100:11 102:1
  102:7,9,19,25
  103:6,19,20 105:8
  110:19 112:11,12
surprised  47:19
  49:14 51:12
sworn  4:3 84:5
  121:21 122:6
  123:21
system  47:21,22
  47:23 97:19

t

t  1:12,12 3:6 121:1
  122:1,1
take  5:22 20:5
  71:6 108:18
  110:17,18,19
taken  1:13,18 46:8
  121:10 122:11
takes  27:3
talk  22:18 57:9
  58:2 81:16 103:12

talked  29:13 54:9
  60:3 64:2 89:13
  98:2 109:24
talking  8:4 29:14
  38:4 60:11 64:4
  71:16 73:4 76:8
  82:12 104:10
  105:14
talks  36:3
tamika  45:23
tax  80:22
taxable  77:3,6
  78:5,8,9,20 80:13
  84:13,14,22 86:5,8
  96:17
taylor  2:6
technically  46:5
tell  4:19 13:17
  23:16,17 56:21
  59:14 76:14 93:6
  93:14 95:9 102:3
  105:5 108:4
  110:12
telling  15:10 63:22
  104:21 106:1
ten  59:4,22 80:5
  94:16 97:4,5
  110:19
tenant  13:20,20,23
  38:14 54:15
tendered  46:6
tennesse  2:7
teresa  45:23
terminated  45:14
terms  52:18
test  105:22
testifies  4:4
testify  104:18,24
  122:6
testifying  18:24

**testimony** 101:16
101:20 106:8
119:2 121:10
122:11
**theories** 48:18
**thing** 82:2 110:15
110:16
**things** 15:14 17:6
48:19 55:11 66:10
78:12 81:15
115:13
**think** 9:16,23,25
10:10 11:5 14:9
15:22 19:20 21:20
24:7,10 28:15
31:12,22 34:19
38:23 44:24 49:20
52:24 53:17,19
58:8 63:25 64:15
65:8,9 71:3,5 72:5
72:11 75:13,15
86:20,22 87:1
97:3,6,11 98:25
99:5 107:24 108:2
109:5 110:24
111:2 112:10
113:4,4 114:6
116:13,23 117:4
119:20
**thirty** 94:21,24
124:16
**thought** 6:1 59:19
79:15 85:24 86:22
92:25 111:5
**thousand** 6:25
50:1 58:24 108:5
**three** 14:8 17:20
30:16 47:13,19
51:9 58:9 60:4,5
64:21,23 65:23
70:22 79:6 81:10

81:17,19 87:4,5,10
89:11 95:1 98:21
100:10,12,17
114:16
**thursday** 1:19
37:18,19
**time** 42:13 55:8
60:8 64:20 76:5
79:6,16 85:22
92:22 115:6,6,14
115:14 122:12
**times** 63:9 80:5
83:10 85:6
**timing** 30:17
32:14
**title** 46:7 66:9
112:20,22,23
**today** 4:10 24:20
61:5 62:5 95:11
**told** 10:7 18:16
58:20,20 64:1,1
94:5
**toll** 124:2
**tomorrow** 37:22
62:5
**top** 5:17 14:9
19:21 48:2 49:20
60:19 68:14 77:9
83:25 85:11,15
89:6
**topic** 89:16 109:13
**topics** 32:6 34:21
56:7 102:22
**tort** 10:22
**total** 6:23 7:3 72:7
76:22,24 84:15
93:11 94:24 96:19
110:6 112:13
**tracy** 47:2
**transcript** 25:19
121:9,11 122:10

124:10,11
**transfer** 41:24
**translate** 77:19
**tree** 20:16 22:5
27:12,23 28:2
29:5,10,17 30:12
30:20 31:2,7
32:18 33:2,7,12,18
**trial** 5:5 54:25
**tried** 30:2 60:1
**tro** 30:1,2
**true** 24:19,20
27:14,15,16 34:10
34:10 42:10 77:4
84:25 121:12,15
122:10
**trust** 42:17 43:21
47:1 119:2
**truth** 104:21 122:7
122:7,8
**try** 16:19 55:7
69:20 82:21 99:14
116:3
**trying** 9:16 26:22
39:17 46:21 51:10
52:10 53:18 54:17
58:11,16,25 59:3,6
83:1 100:13
104:21 105:24
107:13 108:3
116:10
**turn** 7:25 89:1
90:5,7,11,15 91:1
91:19,20 92:1,1,21
**turned** 91:15 93:5
**turning** 48:3 49:3
49:4,22
**twenty** 94:19
**twice** 63:13 114:15
114:19

**two** 59:5 62:2,8,14
63:5 75:15,21
77:25 78:19,22,23
78:24 80:21 81:15
82:9 84:13 86:4
86:23 89:13,25
96:17 98:20 99:1
99:19 105:18
106:12 107:1,6
113:20 116:10
118:11
**twosie** 106:17
119:18
**twosie's** 114:24
**type** 9:8 45:6,17
87:16,20,24 88:2
93:9 110:4 119:9
**types** 18:25
**typical** 14:8 15:25
16:7
**typically** 13:22
14:17 38:24 41:24
42:10 45:21 115:9

**u**

**u** 22:2
**uh** 38:11 44:20
60:14 75:8 89:5
**ultimately** 53:6
**uncomfortable**
102:17 116:5
**underlying** 7:12
48:15 79:25
**undersigned** 84:3
**understand** 10:17
11:11 26:19 33:13
33:21 117:21,25
**understanding**
7:23 9:5
**united** 1:1
**unpaid** 8:6,10

**urban**  11:17 40:6
**usa**  46:15,18,24
  47:1
**use**  95:3
**usually**  15:7

**v**

**v**  123:3 124:6
**variety**  93:10
  110:5
**various**  37:2 78:12
**vehicle**  98:13
**velma**  44:12
**verify**  118:22
  119:3
**veritext**  123:1
  124:1,7
**veritext.com**
  124:3
**versus**  81:25
  100:17
**violating**  52:18
**virgilia**  40:8 43:17
**virtually**  1:18
**vs**  1:6 10:20 11:17
  38:10 39:2,20
  40:7 41:7 42:18
  43:21,21 44:12,19
  45:23 46:15 47:1
  98:4

**w**

**w**  1:9 2:12,13 5:8
  84:8 93:12 110:7
  121:1,8,19 124:1
**wait**  59:18 79:22
**waived**  124:17
**walls**  49:10
**want**  35:7 58:12
  65:13 81:15 82:21
  86:10 100:24
  101:22 103:12

106:18 107:2
  116:24
**wanted**  6:7 15:25
  32:7 56:7 69:1
  102:23 106:22
**wants**  15:4,14
**washington**  56:14
**way**  8:21 14:2,4
  15:12 56:9 59:25
  61:12 93:3 98:12
  113:18 114:6
  119:10
**ways**  13:25 99:1
**we've**  17:10 58:7
  69:6
**website**  9:8 10:6,7
  10:8,9
**week**  37:18,24
  53:21,21 54:1,10
  55:12 56:9 94:3
**weeks**  113:3
**wells**  52:4 59:11
**went**  9:6,7 53:24
  56:20 59:12,19
  61:3,13,13,17
  92:15 97:3,6
  111:24
**west**  1:23
**western**  56:14
**wexler**  2:3 3:3 4:6
  20:4,7 110:23
  120:1
**white**  44:12 47:4
**whittle**  66:11
**widow**  39:6,17
**wife**  46:17
**wilhoyt**  41:8
**william**  47:2
**willing**  99:21
  104:18,24 106:13

**wiped**  115:11
**wise**  96:14
**withdraw**  86:11
  92:10 93:7
**withdrawing**
  80:17 86:12
**witness**  3:2 122:6
  123:4 124:8,10
**witness'**  124:12
**won**  5:25 54:21,25
**work**  4:22 5:21
  13:17 33:16,18,20
  39:23 45:5,6,12,15
  45:17 54:1 61:24
  65:3,4 67:24 70:7
  70:20,23 72:12
  73:19,21,22 74:18
  87:20 89:17,20
  93:11,18,19,21
  96:3 105:20
  107:22 108:22
  109:4,14,17 110:6
  119:6,10
**worked**  53:21
  54:10 70:16
**working**  37:23
**workout**  14:12
**wound**  50:25
**wow**  52:20 54:19
**wreck**  49:19 50:9
**writ**  54:4,6 55:6
  98:9
**written**  69:14,16
  69:22
**wrong**  32:3
**wrongful**  52:17
**wrote**  97:21,22

**x**

**x**  3:1,6
**xi01637**  1:15
  122:24

**y**

**y**  4:1 5:8 10:24
  22:2
**yates**  38:10
**yeah**  11:4 33:1
  35:17 37:19 43:18
  44:23 48:25,25
  52:3,6,14,25 56:24
  64:23,25 73:6
  75:20 77:9,14,14
  77:23 85:15 86:9
  92:22 94:6 96:21
  97:6 98:17 112:9
  114:6 116:9 117:4
**year**  32:3 49:18
  51:20 55:22 56:2
  60:6 64:21 65:1
  65:23 70:15,19
  77:16,17,18,20,24
  78:9,11,16,16,20
  79:6 80:22 81:13
  81:17,18,19,22
  84:14 86:5,8
  87:15 96:17
  100:12,17
**years**  17:21 30:16
  32:13 47:13,19
  51:10 54:18 60:4
  60:5,9 64:23
  70:23 75:19 77:3
  77:6,17 78:5,9
  80:13 81:20 84:13
  84:23 89:11 98:21
  100:10 114:16

**z**

**zero**  75:14 116:4,5
**zinckgraf**  1:15
  122:2,23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.